**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

ARTHUR BARRY SOTLOFF Individually and
as the Administrator of the Estate of STEVEN
JOEL SOTLOFF; SHIRLEY GOLDIE
PULWER, and LAUREN SOTLOFF,

     *Plaintiffs*,

          v.

QATAR CHARITY and QATAR NATIONAL
BANK (Q.P.S.C.),

     *Defendants*.

Case No. 9:22-cv-80726

**QATAR NATIONAL BANK'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT
AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT**

## **TABLE OF CONTENTS**

MOTION TO DISMISS ................................................................................................. 1

MEMORANDUM OF LAW ......................................................................................... 1

    PRELIMINARY STATEMENT ............................................................................ 1

    ARGUMENT .......................................................................................................... 3

I.     Plaintiffs' Claims Against QNB Should Be Dismissed for Lack of Personal
      Jurisdiction. ................................................................................................................ 3

    A.     Plaintiffs Fail to Make a *Prima Facie* Showing of Proper Service on QNB. ......... 4

    B.     Plaintiffs Fail to Make a *Prima Facie* Showing That This Court Has
        Specific Personal Jurisdiction Over QNB Pursuant to the Federal Long-
        Arm Statute, Including That Exercising Jurisdiction Would Satisfy Due
        Process. ................................................................................................................. 6

II.    Plaintiffs Fail to State a Claim That QNB Is Secondarily Liable Under 18 U.S.C.
      § 2333(d) for Aiding and Abetting. ......................................................................... 9

    A.     Plaintiffs Fail to Allege Plausibly That QNB Was Generally Aware of
        Any Role It Allegedly Had in an Overall Illegal or Tortious Activity. ............... 10

    B.     Plaintiffs Fail to Allege Plausibly That QNB Knowingly and Substantially
        Assisted the Principal Violation That Caused Plaintiffs' Injuries. ...................... 17

III.   Plaintiffs Fail to State a Claim That QNB Is Secondarily Liable Under 18 U.S.C.
      § 2333(d) for Conspiracy. ...................................................................................... 21

IV.   Plaintiffs Fail to State a Claim That QNB Is Primarily Liable Under 18 U.S.C. §
      2333(a). ................................................................................................................... 22

    A.     Plaintiffs Fail to Allege Plausibly That QNB Committed an Act of
        International Terrorism. ........................................................................................ 22

    B.     Plaintiffs Fail to Allege Plausibly That QNB's Acts Were the Proximate
        Cause of Their Injuries. ........................................................................................ 23

    CONCLUSION ................................................................................................... 24

REQUEST FOR HEARING ....................................................................................... 26

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alexander Proudfoot Co. World Headquarters L.P. v. Thayer*,
  877 F.2d 912 (11th Cir. 1989) ..................................................................................................4

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...................................................................................................................9

*Atchley v. AstraZeneca UK Ltd.*,
  22 F.4th 204 (D.C. Cir. 2022)..................................................................................................20

*Att'y Gen. of Can. v. R.J. Reynolds Tobacco Holdings, Inc.*,
  268 F.3d 103 (2d Cir. 2001)......................................................................................................4

*Barber v. Nestlé USA, Inc.*,
  154 F. Supp. 3d 954 (C.D. Cal. 2015) .......................................................................................2

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...................................................................................................................9

*Bernhardt v. Islamic Republic of Iran*,
  47 F.4th 856 (D.C. Cir. 2022) ..........................................................................................passim

*Brill v. Chevron Corp.*,
  804 F. App'x 630 (9th Cir. 2020) ............................................................................................26

*Bristol-Myers Squibb Co. v. Superior Ct.*,
  137 S. Ct. 1773 (2017)...............................................................................................................8

*Caballero v. Ejercito De Liberacion Nacional*,
  No. 18-cv-25337 (KMM), 2019 WL 11505368 (S.D. Fla. Apr. 3, 2019) ................................5

*Cain v. Twitter*,
  No. 17-cv-2506, 2018 WL 4657275 (N.D. Cal. Sept. 24, 2018)............................................26

*Castillo v. Allegro Resort Mktg.*,
  603 F. App'x 913 (11th Cir. 2015) ............................................................................................3

*Clayborn v. Twitter*,
  No. 17-cv-6894, 2018 WL 6839754 (N.D. Cal. Dec. 31, 2018).............................................26

*Colon v. Twitter, Inc.*,
  14 F.4th 1213 (11th Cir. 2021) ................................................................................................26

*Consolidated Dev. Corp. v. Sherritt, Inc.*,
   216 F.3d 1286 (11th Cir. 2000) ...................................................................................7

*Copeland v. Twitter*,
   352 F. Supp. 3d 965 (N.D. Cal. 2018) .......................................................................26

*Crosby v. Twitter*,
   921 F.3d 617 (6th Cir. 2019) ....................................................................................26

*Daimler AG v. Bauman*,
   571 U.S. 117 (2014)..............................................................................................6, 7

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
   141 S. Ct. 1017 (2021)..............................................................................................8

*Freeman v. HSBC Holdings PLC*,
   413 F. Supp. 3d 67 (E.D.N.Y. 2019) ...................................................3, 21, 22, 26

*Gallop v. Cheney*,
   642 F.3d 364 (2d Cir. 2011).....................................................................................22

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
   564 U.S. 915 (2011).................................................................................................7

*Halberstam v. Welch*,
   705 F.2d 472 (D.C. Cir. 1983) ........................................................................ *passim*

*Honickman v. BLOM Bank SAL*,
   432 F. Supp. 3d 253 (E.D.N.Y. 2020), *aff'd*, 6 F.4th 487 .........................................20

*Honickman v. BLOM Bank SAL*,
   6 F.4th 487 (2d Cir. 2021) .............................................................................. *passim*

*Horne v. Potter*,
   392 F. App'x 800 (11th Cir. 2010) ..........................................................................21

*Int'l Designs Corp., LLC v. Qingdao SeaForest Hair Prod. Co.*,
   No. 17-60431-CIV, 2018 WL 2364297 (S.D. Fla. Jan. 4, 2018)................................5

*Int'l Shoe Co. v. Washington*,
   326 U.S. 310 (1945)..................................................................................................7

*Kaplan v. Lebanese Canadian Bank, SAL*,
   999 F.3d 842 (2d Cir. 2021).......................................................................... *passim*

*Kemper v. Deutsche Bank AG*,
   911 F.3d 383 (7th Cir. 2018) ...................................................................................23

*Linde v. Arab Bank, PLC*,
  882 F.3d 314 (2d Cir. 2018)..........................................................................................23, 24

*Louis Vuitton Malletier, S.A. v. Mosseri*,
  736 F.3d 1339 (11th Cir. 2013) ...........................................................................................3, 7

*Noble House, LLC v. Underwriters at Lloyd's, London*,
  No. 20-62080-CIV, 2021 WL 896219 (S.D. Fla. Mar. 3, 2021) .............................................6

*O'Sullivan v. Deutsche Bank*,
  No. 17-cv-8709, 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019)...........................................26

*Ofisi v. BNP Paribas*,
  No. 15-cv-2010, 2018 WL 396234 (D.D.C. Jan 11, 2018)...................................................26

*Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co.*,
  484 U.S. 97 (1987)..................................................................................................................4

*Oriental Imports & Exports, Inc. v. Maduro & Curiel's Bank, N.V.*,
  701 F.2d 889 (11th Cir. 1983) ...............................................................................................9

*Owens v. BNP Paribas*,
  897 F.3d 266 (D.C. Cir. 2018) .............................................................................................26

*Pennie v. Twitter*,
  281 F. Supp. 3d 874 (N.D. Cal. Dec. 4, 2017).....................................................................26

*Posner v. Essex Ins. Co., Ltd.*,
  178 F.3d 1209 (11th Cir. 1999) .............................................................................................4

*PowerTec Sols. Int'l, LLC v. Hardin*,
  Case No. 19-cv-61373, 2019 WL 6170040 (S.D. Fla. Nov. 20, 2019) ..................................3

*Prewitt Enters. v. OPEC*,
  353 F.3d 916 (11th Cir. 2003) ...............................................................................................5

*Remeus v. Waste Mgmt. Inc. of Fla.*,
  No. 14-80158-CIV, 2014 WL 1328392 (S.D. Fla. Mar. 31, 2014) ......................................21

*Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*,
  119 F.3d 935 (11th Cir. 1997) ...............................................................................................4

*Rothstein v. UBS AG*,
  708 F.3d 82 (2d Cir. 2013)....................................................................................................24

*Rushaid v. Pictet & Cie*,
  28 N.Y.3d 316 (N.Y. 2016) ....................................................................................................9

*Schrier v. Qatar Islamic Bank*,
   No. 20-60075-CIV, 2022 WL 4598630 (S.D. Fla. Sept. 30, 2022) ................................ *passim*

*Setai Hotel Acquisition, LLC v. Miami Beach Luxury Rentals, Inc.*,
   No. 16-21296-CIV, 2017 WL 3503371 (S.D. Fla. Aug. 15, 2017) ..................................... 2, 6

*Siegel v. HSBC N. Am. Holdings, Inc.*,
   933 F.3d 217 (2d Cir. 2019) ............................................................................ 14, 20, 21, 26

*Storm v. Carnival Corp.*,
   No. 20-22227, 2020 WL 7415835 (S.D. Fla. Dec. 18, 2020) .................................................. 7

*Strauss v. Credit Lyonnais, S.A.*,
   925 F. Supp. 2d 414 (E.D.N.Y. 2013) ................................................................................ 12

*In re Terrorist Attacks on Sept. 11, 2001*,
   714 F.3d 659 (2d Cir. 2013) ................................................................................................. 9

*Thompson v. Carnival Corp.*,
   174 F. Supp. 3d 1327 (S.D. Fla. 2016) ............................................................................. 6, 7

*Wultz v. Islamic Rep. of Iran*,
   755 F. Supp. 2d 1 (D.D.C. Oct. 20, 2010) ........................................................................... 9

**Statutes**

18 U.S.C. § 2331 ....................................................................................................................... 23

18 U.S.C. § 2333 ................................................................................................................ *passim*

**Rules**

Fed. R. Civ. P. 4 ................................................................................................................. *passim*

Fed. R. Civ. P. 12 .............................................................................................................. 1, 3, 6, 9

Pursuant to Fed. R. Civ. P. 12(b)(2), (5), and (6), Defendant Qatar National Bank Q.P.S.C. ("QNB") moves to dismiss all claims brought against QNB in Plaintiffs' complaint (the "Complaint") and respectfully submits the following memorandum in support of its motion to dismiss.

## MEMORANDUM OF LAW
## PRELIMINARY STATEMENT

While QNB condemns all acts of terrorism, this litigation is a misguided effort, which courts have repeatedly rejected, to assign liability to a respected bank doing business in the Middle East for nothing more than providing standard banking services to a respected customer in the region, Qatar Charity.

Founded in 1964, QNB is a commercial bank incorporated in Qatar and headquartered in Qatar's capital city, Doha.  QNB has subsidiaries and affiliates in Asia, Europe, and Africa, but none in the Americas (let alone in the United States).

As a preliminary matter, the Complaint has not been effectively served and thus should be dismissed under Fed. R. Civ. P. 12(b)(5).  Moreover, the Complaint fails to make even a *prima facie* showing of personal jurisdiction over QNB and should therefore be dismissed under Rule 12(b)(2).  The Complaint's sparse and conclusory allegations about supposed correspondent banking transactions outside of this District are insufficient to confer personal jurisdiction under the relevant case law.

The Complaint also fails to make any plausible allegation of liability against QNB. Plaintiffs advance primary and secondary liability claims against QNB under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a), *et seq.*, and the Justice Against Sponsors of Terrorism Act ("JASTA"), 18 U.S.C. § 2333(d)(2), *et seq.*  These claims are based on the killing of Steven Sotloff, perpetrated by ISIS, a heinous act that is far removed from any conduct by QNB.  The mere fact that the largest bank in Qatar provided standard banking services for the largest charity in Qatar, which charity was working collaboratively with both the United States Government and United Nations during the period in question, is hardly grounds for suspicion, much less a basis for liability.

The secondary liability claim for aiding and abetting falls short because Plaintiffs do not plausibly allege that QNB was "generally aware while it was providing banking services to [its customers] that it was playing a role in unlawful activities from which [ISIS's] attacks were

1

foreseeable." *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 499 (2d Cir. 2021) (quoting *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 860-61 (2d Cir. 2021)); *Halberstam v. Welch*, 705 F.2d 472, 488-89 (D.C. Cir. 1983)*.*  Plaintiffs cite no basis to believe that Qatar Charity was supporting terrorism, much less that QNB had any reason to believe so.  The Complaint acknowledges that Qatar Charity has consistently "touted its humanitarian work," Compl. ¶ 48, that Qatar Charity had "status as a charitable entity," *id.* ¶ 212, and that Qatar Charity's "funds [were] nominally intended to support humanitarian causes." *Id.* ¶ 242.  Moreover, this Court can take judicial notice that various sources have stated that Qatar Charity has actively partnered with the United States Government[1] and United Nations.[2]

Yet the Complaint's premise is that QNB should have ceased doing business with this U.S. and U.N. partner because, according to Plaintiffs (without citation), an *internal* list of a U.S. intelligence committee—unavailable to the public—identified Qatar Charity as potentially supporting terrorism. *See* Compl. ¶ 42.  An unsupported allegation concerning confidential U.S. government documents hardly gives rise to an inference that QNB was "generally aware" that its customer Qatar Charity allegedly had ties to ISIS.  Nor does the Complaint plausibly allege that the heinous killing of Steven Sotloff was somehow a foreseeable result of QNB's banking services for Qatar Charity, as the ATA and JASTA require for liability.  Plaintiffs fail to cite a single public

---

[1] *See, e.g.*, U.S. Agency for Int'l Dev. (USAID), *What We Do, Working in Crises and Conflict, Disaster Assistance, Malaysia* (2015), https://2012-2017.usaid.gov/crisis/malaysia (referencing partnership between USAID and Qatar Charity in regard to Malaysia); U.S. Agency for Int'l Dev. (USAID), *Monthly Progress Report, Pakistan* (June 2014)*,* https://pdf.usaid.gov/pdf_docs/ PA00KGN2.pdf (referencing partnership between USAID and Qatar Charity in regard to Pakistan). This Court can take "judicial notice of information publicly available from an official government website," such as the USAID website and document cited here. *Setai Hotel Acquisition, LLC v. Miami Beach Luxury Rentals, Inc.*, No. 16-21296-CIV, 2017 WL 3503371, at *7 (S.D. Fla. Aug. 15, 2017).

[2] *See, e.g.*, United Nations High Comm'r for Refugees (UNHCR), *Qatar Charity*, https://www.unhcr.org/en-us/qatar-charity.html ("Qatar Charity has been a strategic partner of UNCHR since 2012 with total contributions reaching some USD 48,957,525."); United Nations Children's Fund (UNICEF), *UNICEF and Qatar Charity Announce New Partnership on World Refugee Day* (June 20, 2020), https://www.unicef.org/turkiye/en/press-releases/unicef-and-qatar-charity-announce-new-partnership-world-refugee-day ("Thanks to Qatar Charity's timely financial contribution during the time of COVID-19, UNICEF will be able to expand essential services for refugee children in Turkey."); *Barber v. Nestlé USA, Inc.*, 154 F. Supp. 3d 954, 958 n.1 (C.D. Cal. 2015) (noting that publications of the United Nations "are published by a governmental entity and are not subject to reasonable dispute, and accordingly, they are appropriate for judicial notice").

source tying Qatar Charity to ISIS.  Their sole citation to a single line in an English language newspaper identifying Fadhel al Salim—a man alleged to have received a single transfer sent from a Qatar Charity account at QNB—as a "lawyer who is close to the Nusra Front," Compl. ¶ 103, is insufficient to plausibly allege general awareness on the part of QNB.

Plaintiffs further fail to allege plausibly that QNB "knowingly and substantially assisted the principal violation" of Sotloff's killing, as is also required for aiding and abetting liability. *Honickman*, 6 F.4th at 499 (quoting *Halberstam*, 705 F.2d at 477).  The six factors relevant in that analysis *all* favor QNB.  The secondary liability claim for conspiracy should also be dismissed because Plaintiffs fail to allege that QNB "directly conspired" or formed any kind of agreement "with the person or entity that committed the act of international terrorism that injured the plaintiff," namely ISIS.  *Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 97-98 & n.41 (E.D.N.Y. 2019); *see also Kaplan*, 999 F.3d at 855.

Finally, the assertion of primary liability against QNB is *a fortiori* inadequate.  The Complaint does not plausibly allege that QNB itself committed an "act of international terrorism." 18 U.S.C. § 2333(a).  The Complaint further fails to allege plausibly that Plaintiffs' injuries resulted "by reason of" any of QNB's actions (*i.e.*, proximate cause).  *Id.*  Due to these deficiencies, the Complaint should be dismissed under Fed. R. Civ. P. 12(b)(6) in its entirety as to QNB for failure to state a claim under the ATA and JASTA.

## ARGUMENT

### I.   PLAINTIFFS' CLAIMS AGAINST QNB SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION.

The Court should dismiss Plaintiffs' claims against QNB for failure to make a *prima facie* showing of personal jurisdiction over QNB.  To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff "bears the initial burden of alleging in the complaint sufficient facts to make out a *prima facie* case of jurisdiction."  *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013); *see also Castillo v. Allegro Resort Mktg.*, 603 F. App'x 913, 916 (11th Cir. 2015).  "[V]ague and conclusory allegations . . . do not suffice to establish a *prima facie* case of personal jurisdiction."  *PowerTec Sols. Int'l, LLC v. Hardin*, Case No. 19-cv-61373, 2019 WL 6170040, at *3 (S.D. Fla. Nov. 20, 2019).

To make a *prima facie* showing of personal jurisdiction over QNB, Plaintiffs must meet three requirements, none of which is met here.  *First*, "[b]efore a federal court may exercise

personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." *Schrier v. Qatar Islamic Bank*, No. 20-60075-CIV, 2022 WL 4598630, at *7 (S.D. Fla. Sept. 30, 2022) (quoting *Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987)). *Second*, "the court must satisfy itself that the exercise of personal jurisdiction comports with the [applicable] statute." *Id.* at *6 (citing *Alexander Proudfoot Co. World Headquarters L.P. v. Thayer*, 877 F.2d 912, 919 (11th Cir. 1989)); *see also Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997). *Third*, "the court must ensure that the exercise of jurisdiction is consistent with the requirements of the Fourteenth Amendment's Due Process Clause." *Id.* (citing *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1214 (11th Cir. 1999)). Plaintiffs have failed to make a *prima facie* showing of any of these requirements as to QNB.

### A.    Plaintiffs Fail to Make a *Prima Facie* Showing of Proper Service on QNB.

Service of a court summons, by which act the court obtains authority over the party summoned (at least to adjudicate questions of jurisdiction) is an exercise of governmental power; one state government is generally prohibited from exercising sovereign power in the territory of another without its consent. *See Att'y Gen. of Can. v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 111 n.6 (2d Cir. 2001). Sovereign states often agree to such reciprocal exercises of authority by treaty, but Plaintiffs point to no such treaty here.

Plaintiffs have attempted to serve QNB directly by electronic mail and courier mail, and they have also asked this Court to serve QNB by courier mail, all under Fed. R. Civ. P. 4(f)(3). *See* ECF No. 9. However, Qatari law clearly states that "*[e]very* summons or execution *shall* be served through the police or any other authority appointed by the President of the Supreme Judicial Council," with the only carveout being for a *Qatari* court to effect service by *registered* mail.[3] This language indicates that Plaintiffs' methods of service are *prohibited* by Qatari law. And as Plaintiffs themselves acknowledge, "As per [federal regulations], Letters Rogatory, through diplomatic channels, are mandated for formal service in all countries that are not parties to an international process treaty," and "[d]ocuments must be sent through diplomatic channels adhering to strict formal diplomatic protocol." ECF No. 9 at 3.

---

[3] *See* Articles 2 & 11, Qatar Civil & Commercial Procedure Law (Law No. 13 of 1990), https://www.almeezan.qa/LawArticles.aspx?LawTreeSectionID=8075&lawId=2492&language=en (emphases added).

4

While it is true that a "district court has the sound discretion to determine when the particularities and necessities of a given case require alternate service of process under Rule 4(f)(3)," *Int'l Designs Corp., LLC v. Qingdao SeaForest Hair Prod. Co.*, No. 17-60431-CIV, 2018 WL 2364297, at *3 (S.D. Fla. Jan. 4, 2018) (internal quotation marks omitted), Plaintiffs, in their earlier request for alternate service, ignore an important caveat in the case law:

> [B]efore permitting alternate service, a district court, in exercising the discretionary power permitted by Rule 4(f)(3), may require the plaintiff to show that they have reasonably attempted to effectuate service on defendant and that *the circumstances are such that the district court's intervention is necessary* to obviate the need to undertake methods of service that are unduly burdensome or that are untried but likely futile.

*Id.* (emphasis added) (internal quotation marks omitted). Plaintiffs' counsel has *already* successfully served QNB by letters rogatory in three separate litigations in the Eastern District of New York.[4] Notwithstanding this reality, Plaintiffs represent that "[s]ervice of process via Letters Rogatory would be unduly burdensome on the Plaintiffs." ECF No. 9 at 10. But "the fact that service of process . . . is expensive and time consuming is generally not sufficient to demonstrate that the facts and circumstances necessitate the district court's intervention." *Caballero v. Ejercito De Liberacion Nacional*, No. 18-cv-25337 (KMM), 2019 WL 11505368, at *2 (S.D. Fla. Apr. 3, 2019) (internal quotation marks omitted)). Plaintiffs are more than capable of achieving proper service without the Court's intervention, as they have done on three occasions already, and thus there is no need to give affront to Qatar's sovereign interests.

Indeed, one of the reasons for the necessity inquiry is, as the Committee Notes to Rule 4(f)(3) stress, that "an earnest effort should be made to devise a method of communication that is *consistent with due process and minimizes offense to foreign law*." Fed. R. Civ. P. 4(f)(3), Notes of Advisory Comm. on Rules – 1993 Amendment (emphasis added); *see also Prewitt Enters. v. OPEC*, 353 F.3d 916, 927 (11th Cir. 2003) (citing same committee notes). Here, where Plaintiffs' method of service is *prohibited* by Qatari law, service other than by letters rogatory or through the relevant Qatari authority risks considerable offense to a foreign sovereign. *See Prewitt Enters.*,

---

[4] *See* ECF No. 9 at 5; *Force, et al. v. Qatar Charity, et al.*, No. 1:20-cv-2578 (BMC) (E.D.N.Y. Sept. 2, 2022), ECF No. 81; *Przewozman, et al. v. Qatar Charity, et al.*, No. 1:20-cv-6088 (NGG) (RLM) (E.D.N.Y. Sept. 2, 2022), ECF No. 58; *Henkin, et al. v. Qatar Charity, et al.*, No.1:21-cv-5716 (AMD) (VMS) (E.D.N.Y. Sept. 2, 2022), ECF No. 73.

353 F.3d at 927 ("Rather than minimizing offense to Austrian law, the failure to obtain . . . consent would constitute a substantial affront to [the foreign] law" where the plaintiff attempted to serve the defendant "under Fed. R. Civ. P. 4(f)(3), even if the service is contrary to the laws of Austria"). Concerns of international comity are especially heightened where, as here, the Complaint makes baseless allegations of misconduct against the government of Qatar, notwithstanding the United States government's recent reaffirmation of Qatar as a "major non-NATO ally."[5]

The Complaint should therefore be dismissed under Fed. R. Civ. P. 12(b)(5) for insufficient service of process. Plaintiffs also have therefore failed to establish the first prong of a *prima facie* showing of personal jurisdiction as to QNB.

**B.    Plaintiffs Fail to Make a *Prima Facie* Showing That This Court Has Specific Personal Jurisdiction Over QNB Pursuant to the Federal Long-Arm Statute, Including That Exercising Jurisdiction Would Satisfy Due Process.**

Plaintiffs seek to establish specific personal jurisdiction over QNB by invoking the federal long-arm statute, Fed. R. Civ. P. 4(k)(2), which provides that effective service establishes personal jurisdiction if (1) the plaintiff's claim arises under federal law, (2) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction, and (3) the exercise of jurisdiction is consistent with the United States Constitution and laws. *Schrier*, 2022 WL 4598630, at *15. Courts "rarely invoke jurisdiction under Rule 4(k)(2)." *Noble House, LLC v. Underwriters at Lloyd's*, *London*, No. 20-62080-CIV, 2021 WL 896219, at *5 (S.D. Fla. Mar. 3, 2021). As shown below, Plaintiffs fail to make a *prima facie* showing that QNB has sufficient contacts with the United States for this Court to exercise specific personal jurisdiction consistent with due process.[6]

---

[5] C. Todd Lopez, *'Major Non-NATO Ally' Designation Will Enhance U.S., Qatar Relationship*, U.S. Dep't of Defense (Jan. 31, 2022), https://www.defense.gov/News/News-Stories/Article/Article/2917336/major-non-nato-ally-designation-will-enhance-us-qatar-relationship/ ("According to the U.S. State Department, a designation as major non-NATO ally, or MNNA, serves as 'a powerful symbol of the close relationship the United States shares with those countries and demonstrates our deep respect for the friendship for the countries to which it is extended.'"). Again, this Court can take "judicial notice of information publicly available from an official government website," such as the U.S. Department of Defense website cited here. *See Setai Hotel Acquisition,* 2017 WL 3503371, at *7.

[6] For the same reasons discussed below, Plaintiffs clearly cannot establish that this Court has general jurisdiction over QNB, because the alleged transactions do not present a "connection to the United States that is 'so substantial and of such a nature' as to make this one of those 'exceptional' cases in which a foreign corporation is 'at home' in a forum." *Thompson v. Carnival Corp.*, 174 F. Supp. 3d 1327, 1338 (S.D. Fla. 2016) (quoting *Daimler AG v. Bauman*, 571 U.S.

The exercise of personal jurisdiction is consistent with due process only when a defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945).  When, as here, a plaintiff seeks to demonstrate specific jurisdiction, the court must determine: "(1) whether the plaintiff's claims arise out of or relate to at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant purposefully availed himself of the privilege of conducting activities with the forum state, thus invoking the benefit of the forum state's law; and (3) whether the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice." *Louis Vuitton Malletetier, S.A. v. Mosseri,* 736 F.3d 1339, 1355 (11th Cir. 2013).  Under Rule 4(k)(2), "the applicable forum for the minimum contacts analysis is the United States." *Consolidated Dev. Corp. v. Sherritt, Inc.,* 216 F.3d 1286, 1291 (11th Cir. 2000).

Plaintiffs' theory of personal jurisdiction is premised on their assertion that the Defendants (collectively, not QNB individually) "[d]irected tortious conduct towards the United States in that they materially supported ISIS," "transacted business and committed tortious acts within the United States by transferring funds through the United States for the benefit of ISIS," and "purposefully availed themselves of the benefits and protections offered by the United States banking system and United States law in the course of committing the wrongful acts Plaintiffs allege." Compl. ¶ 27.  Conclusory allegations like these are plainly insufficient to make a *prima facie* showing of personal jurisdiction.  *See Storm v. Carnival Corp.,* No. 20-22227, 2020 WL 7415835, at *11 (S.D. Fla. Dec. 18, 2020) ("[E]ven if Rule 4(k)(2) could apply, conclusory statements do not constitute the *prima facie* showing necessary to carry the burden of establishing jurisdiction.").  Moreover, to the extent that Plaintiffs intend to rely on allegations of QNB's alleged participation in an overarching conspiracy involving the Qatari government, the Qatari

---

117, 139 n.19 (2014)).  Indeed, courts have acknowledged that "[i]n the wake of the Supreme Court's decision in *Daimler,* it appears unlikely that general jurisdiction over a foreign defendant could ever be available under 4(k)(2)." *Id.* at 1338 n.9.  In *Daimler,* the Supreme Court rejected as "unacceptably grasping" the plaintiffs' argument for the exercise of general jurisdiction in *any* state in which a corporation "engages in a substantial, continuous, and systematic course of business," rather than one in which the corporation's "affiliations with the State are so 'continuous and systematic' as to render [it] *essentially at home* in the forum State." *Daimler,* 571 U.S. at 137-38 (emphasis added) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 564 U.S. 915, 919 (2011)).

Royal Family, ISIS, and others, *see* Compl. ¶¶ 77-78, those allegations would fail as well because "Rule 4(k)(2) does not permit the exercise of conspiracy-based personal jurisdiction." *Schrier*, 2022 WL 4598630, at \*24 (collecting cases) (internal quotation marks omitted).

Beyond these conclusory allegations and impermissible group pleading, the Complaint alleges only that (i) QNB maintains standard bank accounts for Qatar Charity, (ii) QNB provided Qatar Charity with access to its correspondent accounts in the United States, and (iii) QNB processed two payments that Qatar Charity made to accounts at Ziraat Bank, a Turkish state-owned bank: an $800,000 payment to Fadhel al Salim ("al Salim"), an individual purportedly close to the "Nusra Front"; and a $2 million payment to a charity that Plaintiffs allege was fraudulently set up by Turkish intelligence to launder money. Compl. ¶¶ 3, 39, 92-112. None of these alleged transactions was sent from or ultimately received within the United States. Instead, the only connection to the United States is that, according to Plaintiffs, any "[p]ayments denominated in USD using electronic funds transfer, regardless of origin and ultimate destination, are virtually all processed through a U.S. bank in New York." *Id.* ¶ 122.

Plaintiffs fail to show that QNB's alleged contacts with the United States gave rise or relate to their injuries. Under the Due Process Clause, "what's needed 'is a connection between the forum and the specific claims at issue.'" *Schrier*, 2022 WL 4598630, at \*18 (quoting *Bristol-Myers Squibb Co. v. Superior Ct.*, 137 S. Ct. 1773, 1781 (2017)). Under this "fact-sensitive inquiry," courts require plaintiffs to show not only that their injury was the foreseeable result of the defendant's contacts with the forum, *id.* at \*19, but also that there is a "strong relationship among the defendant, the forum, and the litigation." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1028 (2021) (internal quotation marks omitted). For the reasons discussed in more detail below, Plaintiffs cannot show that QNB's provision of standard banking services to Qatar Charity foreseeably led to Mr. Sotloff's killing nearly a year later. *See infra* Sections II.A.2, IV.B. Accordingly, Plaintiffs cannot make a *prima facie* showing of personal jurisdiction because "the relationship between [the] transaction[] and [Plaintiffs'] claims is far too attenuated." *Schrier*, 2022 WL 4598630, at \*20 (finding three specific bank transactions too attenuated absent a detailed narrative as to how those funds were used to support the plaintiff's kidnapping).

Plaintiffs also fail to show that QNB purposefully availed itself of the United States. Courts have repeatedly held, including in the context of ATA claims, that foreign banks do not create sufficient contacts with the United States by "merely engag[ing] in a correspondent relationship

with banks in the forum." *Schrier*, 2022 WL 4598630, at *22 (citing *Wultz v. Islamic Rep. of Iran*, 755 F. Supp. 2d 1, 33–34 (D.D.C. Oct. 20, 2010)); *see also Oriental Imports & Exports, Inc. v. Maduro & Curiel's Bank, N.V.*, 701 F.2d 889, 892 (11th Cir. 1983)); *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 676 (2d Cir. 2013) (collecting cases). Instead, in order to exercise personal jurisdiction, "the quantity and quality of a foreign bank's contacts with the correspondent bank must demonstrate more than banking by happenstance." *Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 327 (N.Y. 2016); *see also Schrier*, 2022 WL 4598630, at *22 (noting that the plaintiff only identified three "routine" transactions "not [a] dozen or more acts of terrorism"). Plaintiffs' identification of two banking transactions that *may* have passed through some correspondent bank in the United States does not come close to showing that QNB has sufficient contacts here.

## II. PLAINTIFFS FAIL TO STATE A CLAIM THAT QNB IS SECONDARILY LIABLE UNDER 18 U.S.C. § 2333(D) FOR AIDING AND ABETTING.

Plaintiffs' secondary liability claim against QNB for aiding and abetting fails for a simple reason: Plaintiffs do not identity any public sources from which one could plausibly infer that QNB was generally aware of its customers' ties, if any, to ISIS. The limited, supposedly "public" sources Plaintiffs cite reveal the Complaint's deficiencies: Plaintiffs invoke only the thinnest sources, none of which QNB would have had any reason to be aware of. The Complaint also fails to allege plausibly that QNB's customers were closely intertwined with any terrorist activities of ISIS, or that the killing of Steven Sotloff was somehow a foreseeable result of QNB's banking services, or that QNB somehow knowingly and substantially assisted the principal violation. In light of these multiple failings, Plaintiffs' claims should be dismissed for failure to state a claim.

To survive a motion to dismiss for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face when the "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. However, "[t]hreadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Id*. What also "will not do" are pleadings that offer "labels and conclusions" or "naked assertion[s] devoid of further factual enhancement." *Id*. The Complaint fails this familiar standard; even with a generous reading of the Complaint, the allegations against QNB are

threadbare, wholly conclusory, and not plausibly supported by factual allegations.

JASTA amended the ATA to create a cause of action against "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed . . . an act of international terrorism." 18 U.S.C. § 2333(d)(2). Congress has "specifically endorsed the reasoning of the D.C. Circuit in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), in conducting the aiding-and-abetting analysis." *Honickman*, 6 F.4th at 494 (citing JASTA, Pub. L. No. 114-222, 130 Stat. 852 (2016)). The *Halberstam* court identified three elements of aiding-and-abetting liability: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be *generally aware* of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must *knowingly and substantially assist* the principal violation." 705 F.2d at 477 (emphases added). Recent D.C. Circuit and Second Circuit cases have refined and applied the *Halberstam* framework in the context of ATA/JASTA cases, including on motions to dismiss for failure to state a claim. *See Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856 (D.C. Cir. 2022); *Honickman*, 6 F.4th at 487. As in both *Bernhardt* and *Honickman*, Plaintiffs' Complaint fails to allege plausibly both general awareness as well as knowing and substantial assistance under the *Halberstam* framework.[7] Failure to plead adequately *either* of these elements requires dismissal of Plaintiffs' claim for secondary aiding and abetting liability under the ATA/JASTA; Plaintiffs fall far short on *both* elements.

## A. Plaintiffs Fail to Allege Plausibly That QNB Was Generally Aware of Any Role It Allegedly Had in an Overall Illegal or Tortious Activity.

In order to survive a motion to dismiss, Plaintiffs must plausibly allege the following to satisfy the "general awareness" prong: (1) as a threshold requirement, that QNB was aware of its customers' alleged connections with ISIS before the relevant attacks; and (2) that QNB's customers were "so closely intertwined with [ISIS's] violent terrorist activities that one can reasonably infer [QNB] was generally aware of its role in unlawful activities from which the attacks were foreseeable while it was providing financial services." *Honickman*, 6 F.4th at 501.

Like the complaint in *Honickman*, Plaintiffs here fail to meet even the threshold

---

[7] QNB accepts for purposes of this motion, in relation to the first element, that ISIS (as the alleged principal) performed the wrongful act that caused Plaintiffs' injuries, namely the killing of Steven Sotloff.

requirement for general awareness: Plaintiffs do not plausibly allege that QNB was aware of an alleged connection of its customer with ISIS during the relevant time period. The purportedly "public" sources that the Complaint cites are extremely limited, and the Complaint gives no basis from which to infer that QNB was aware from these sources of any alleged connection that its customer had with ISIS. Indeed, Plaintiffs fail even to allege that QNB's customer was involved with ISIS's violent terrorist activities, much less that it was *so closely* intertwined that one could reasonably infer QNB was generally aware that the killing of Steven Sotloff was a foreseeable consequence of QNB's banking services.

        1.      <u>Plaintiffs Fail to Meet the Threshold Requirement for General Awareness of Plausibly Alleging That QNB Was Aware of Alleged Connections Between Its Customer and ISIS.</u>

In regard to general awareness, Plaintiffs' claim for aiding and abetting states:

> At the time Defendants provided that substantial assistance to ISIS, its operatives, its predecessor organizations, and front organizations, Defendants knew that: (a) the ISIS was a designated FTO; (b) ISIS and its operatives engaged in terrorism, including the attacks alleged herein; (d) ISIS held Steven Sotloff hostage and was threatening his life; and (e) the financial assistance that Defendants were providing to those FTOs was essential to their ability to carry out terrorist attacks, including the attack that injured Plaintiffs.

Compl. ¶ 244. The last of these assertions is Plaintiffs' key claim with respect to QNB, but the Complaint is wholly deficient with regard to that contention.

As in *Honickman*, the "*limited public sources* Plaintiffs cite pale in comparison to the *detailed, numerous sources* that sufficed in *Kaplan*." 6 F.4th at 502 (emphases added). The *Kaplan* decision, another recent Second Circuit decision to address the sufficiency of an aiding and abetting claim under JASTA, involved rocket attacks by Hizbollah in 2006. There, the Second Circuit upheld the adequacy of the complaint, but did so stressing the complaint's many detailed public sources that connected the bank's customers with Hizbollah during the period leading up to the attacks. In particular, the Second Circuit highlighted that the complaint identified "press conferences and news media interviews" and "other specific media," including "Hizbollah's own 'official websites,' its 'official television station, Al-Manar,' and its 'official radio station, Al-Nour'" in which speakers identified as "senior Hizbollah officials" had "identified [three bank customers] as integral parts of Hizbollah" during a "particular time period (i.e., repeatedly in the

several years leading to July 12, 2006)." *Kaplan*, 999 F.3d at 864. The Complaint here pales in comparison. Plaintiffs' allegations are much weaker than those found adequate in *Kaplan*; indeed, they are even weaker than those held insufficient in *Honickman*. The "limited public sources" that were inadequate in *Honickman* included at least: (1) a news article about one of the bank's customers at issue, Sanabil, and its support for Palestinian families; (2) the "Lebanese press's coverage of Sanabil's center in Sidon closing due to 'its links to [Hamas]'"; and (3) the United States Treasury Department's official, public designation of Sanabil as a specially designated global terrorist ("SDGT"). *See* 6 F.4th at 501-02. Here, by contrast, there are *virtually no news sources* cited in the Complaint in regard to QNB's customer Qatar Charity, meaning there is even less than in *Honickman*. Further, like many of the sources in Honickman, the purportedly "public" sources relied on by Plaintiffs are inapposite for various reasons, including timing. *See id.*

QNB's only customer identified in the Complaint is Qatar Charity. The Complaint makes much ado about Qatar Charity's supposed inclusion as a "priority III terrorism support entity (TSE)" on an internal "list[]" of a U.S. intelligence committee, but the Complaint fails to explain how an *internal* intelligence document allegedly used to "advise and assist the Director of Central Intelligence" would constitute public knowledge attributable to QNB. *See* Compl. ¶¶ 42 & n.11, 60. Indeed, Plaintiffs admit that the information "was not published publicly," and yet they state in a conclusory fashion that "all of the Defendants were well aware of the reasons for that designation and, thus, Qatar Charity's status as a principal supporter of terrorist organizations." *Id.* ¶ 42. The Complaint's attempt to bolster the secret designation by citing to a purported "classified cable" that was allegedly "later published by Wikileaks" at some unspecified date is similarly unhelpful for demonstrating QNB's general awareness. *Id.* ¶ 60. Thus, Plaintiffs' headline allegation amounts to nothing and puts this case on a far different footing from other cases in which the United States Government affirmatively designated a known customer or transferee as a "foreign terrorist organization" or a "specially designated global terrorist," each of which is a public designation by the federal government specifically designed to dissuade legitimate enterprises from doing business with the designated entity. *Cf. Honickman*, 6 F.4th at 491-92 (involving an SDGT designation of the bank's direct customer that was ultimately untimely for purposes of alleging general awareness); *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 451 (E.D.N.Y. 2013) (noting that the ATA prevents "doing business with an FTO" and OFAC regulations provide "civil penalties for parties that do business with SDGTs").

The Complaint's allegations regarding the Israeli Defense Minister's 2008 order designating Qatar Charity as a member of the Union of Good also fail to pass muster. *See id*. ¶¶ 55, 87. Critically, that order appears to reference only *Hamas*, not *ISIS*, making it irrelevant for general awareness purposes. And while the Complaint misleadingly suggests (but does not actually allege) that Israel designated Qatar Charity as a terrorist organization, the cited designation does not necessarily appear to imply terrorist activities or support, but rather only support for Hamas's humanitarian activities.

And critically, many of the supposedly public sources cited in the Complaint actually *post-date* QNB's alleged provision of aid on October 16, 2013 (the alleged wire transfer to Fadhel al Salim). *See, e.g.*, Compl. ¶¶ 4 & n.1, 11-17, 54, 57-60. These sources must be ignored for the purposes of assessing QNB's general awareness. *See Honickman*, 6 F.4th at 501-02. In any event, Plaintiffs fail to cite a single article tying Qatar Charity to ISIS before or after the alleged provision of aid in October 2013. The cobbled-together testimony from older Congressional hearings from the early 2000s (referencing even older conduct from the 1990s) regarding the "Qatar Charitable Society" and alleged ties to Al-Qaeda in Afghanistan and Osama Bin Laden (deceased at the time of the alleged provision of aid in 2013) in regard to the September 11 attacks cannot amount to QNB's general awareness that Qatar Charity had ties to the growing terrorist group in Syria bearing the name ISIS, especially when the Complaint paints ISIS as a radical offshoot of Al-Qaeda with recent resurgence. *See* Compl. ¶¶ 62, 64 (alleging that the "predecessor organization" of ISIS "eventually lost the support of al-Qaeda . . . and became stigmatized within the Iraqi insurgency and the Sunni community."). Plaintiffs' expectation that QNB should have dug through old, buried House reports for a mention of Qatar Charity, which was operating under a different name at the time and was not alleged to have been a customer of QNB at that time, does not amount to a plausible inference of general awareness.

The absence from the Complaint of any *genuinely* public reports of any ties between Qatar Charity and ISIS is fatal to any attempt to establish general awareness. As the Second Circuit noted in *Honickman*, "'publicly *available*' evidence is not the same as public sources such as media articles." 6 F.4th at 502 n.18 (emphasis added). Notably, throughout the Complaint, Plaintiffs portray Qatar Charity as maintaining a charitable "cover" for allegedly nefarious activities. *See, e.g.*, *id*. ¶ 48 (noting that Qatar Charity "touted its humanitarian work"); *id*. ¶ 212 (noting Qatar Charity's "status as a charitable entity"); *id*. ¶ 242 (noting that Qatar Charity's "funds [were]

nominally intended to support humanitarian causes"). Indeed, many sources at the time recognized Qatar Charity as a leading international charity, a view the United Nations and United States Government have endorsed. *See supra* notes 1, 2. But even assuming, *arguendo*, that Qatar Charity's good works were maintained as a "cover" for more nefarious activities, as the Second Circuit held in *Honickman*, the fact "[t]hat organizations like the [bank's customer] maintained a 'cover' in public *undermines* the plausibility of Plaintiffs' theory that [the bank] understood these organizations' true nature and activities from the public record at the time." 6 F.4th at 502 (emphasis added). Therefore, Plaintiffs' own allegations actually undermine general awareness on the part of QNB.

Plaintiffs' lengthy recitation of AML, CTF, and KYC banking standards, *see* Compl. ¶¶ 128-217, does not salvage their Complaint. Plaintiffs cannot circumvent their requirement to plausibly allege general awareness by simply asserting that a bank has a duty to perform diligence on its customers and that therefore the Court should presume that the bank must have known what was allegedly transpiring. The Complaint does not explain how the application of AML, CTF, and KYC banking standards would have revealed any alleged connections between Qatar Charity and any terrorist groups, much less a connection to ISIS specifically. Nor do the Complaint's bald assertions that QNB failed to follow international banking standards somehow demonstrate general awareness, particularly when courts have rejected arguments that actual, proven violations of banking standards can establish general awareness. *See, e.g.*, *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 225-26 (2d Cir. 2019) (plaintiff failed to show defendant-bank had general awareness of client's activities despite defendant's violation of anti-money-laundering regulations and evasion of sanctions, leading to nearly $2 billion in fines and penalties).

QNB's only conduct alleged in the Complaint amounts to processing transactions whereby accounts held by Qatar Charity transferred funds to accounts at Ziraat Bank: an $800,000 payment to "Fadhel al Salim," a "lawyer" who one newspaper allegedly characterized as "close to the Nusra Front," Compl. ¶ 10, and a $2 million payment to a charity that Plaintiffs allege was fraudulently established by Turkish intelligence to launder money, Compl. ¶¶ 3, 39, 92-112. In other words, Plaintiffs' central theory is that QNB's customer allegedly made two transfers from QNB accounts to external accounts, one to an organization specifically established to look like a legitimate charity and the other to an individual about whom there was no alleged basis for QNB to be suspicious.

These transactions involving Ziraat Bank also fail to demonstrate general awareness. As

the court in *Honickman* explained, allegations "[t]hat organizations like the [bank's customer] maintained a 'cover' in public *undermines* the plausibility of Plaintiffs' theory that [the bank] understood these organizations' true nature and activities from the public record at the time." *Honickman*, 6 F.4th at 502 (emphasis added).  Moreover, the Complaint cites no public sources establishing that Ziraat Bank was known to have any connections to ISIS.  The same shortcomings regarding the payment to Fadhel al Salim to demonstrate general awareness also apply to transfers that the Complaint alleges ultimately went to conferences attended by individuals with alleged connections to ISIS (but apparently no actual ISIS members themselves, nor is it clear how QNB is alleged to have been connected to these payments), *see id.* ¶¶ 96, 98, or to purchasing weapons in Libya that allegedly made their way to "ISIS precursor groups," *see id.* ¶ 100.

As to Fadhel al Salim, the Complaint's sole allegation of a public source is a single quote buried in a newspaper article from the *Daily Star Lebanon* that apparently misspelled his name as "Fadel al-Salim" and identifies him as a "lawyer who is close to the Nusra Front."  Compl. ¶ 103. The Complaint does not say he is a *part* of the Nusra Front, only vaguely referencing that he might be "close."  Even if the Complaint alleged a basis to assume that QNB knew of this single article (which it fails to do), the only information QNB would have gleaned is that this individual may have provided legal counsel to the Nusra Front.  This modicum of information from a sole newspaper article cannot support an inference of QNB's general awareness regarding al Salim under the case law establishing that "limited public sources" are not enough to amount to general awareness.  *See, e.g.*, *Honickman*, 6 F.4th at 502.

Finally, to the extent the Complaint attempts to tie in the governments of Qatar and Turkey into a larger conspiracy involving QNB to fund terrorism, that too would fail to allege plausibly general awareness on the part of QNB; the D.C. Circuit in *Bernhardt* explained that because "sovereign nations invariably maintain legitimate government activities," even alleging that Iran supported terrorism would not be sufficient to demonstrate a bank's general awareness of ties to terrorism when providing banking services to Iranian entities.  That is even more so when the allegations relate to designated U.S. allies like Qatar and Turkey, *see* Compl. ¶ 4 n.1, rather than a designated state sponsor of terrorism like Iran.  The bald allegations of Qatar's and Turkey's support for terrorism do not plausibly allege QNB's general awareness that the entities that Qatar and Turkey were allegedly tied to—Qatar Charity and state-owned Ziraat Bank, respectively— were somehow closely tied to ISIS.  Beyond conclusory allegations of "close relationships," *id.* ¶

15

256, the Complaint fails to allege plausibly how those governments interacted with QNB's customer Qatar Charity, let alone QNB itself, or to allege any further details that might give rise to general awareness.  In sum, Plaintiffs' allegations do not even amount to a plausible threshold inference that QNB knew of Qatar Charity's (or the other entities') alleged connections to ISIS.

> ### 2.     Plaintiffs Further Fail to Allege Plausibly That QNB's Customers Were So Closely Intertwined with ISIS's Violent Terrorist Activities.

The second part of the general awareness analysis asks whether Plaintiffs plausibly allege that QNB's customers were "*so closely intertwined* with [ISIS's] violent terrorist activities that one can reasonably infer [QNB] was generally aware of its role in unlawful activities from which the attacks were *foreseeable* while it was providing financial services." *Honickman*, 6 F.4th at 501 (emphases added).  For the same reasons as above, Plaintiffs fail to meet the threshold of plausibility at the motion to dismiss stage.  Plaintiffs fail to allege plausibly that Qatar Charity was even connected, let alone *so closely intertwined*, with ISIS's violent terrorist activities.  Moreover, it is an even higher hurdle to allege plausibly that Qatar Charity and ISIS were so intertwined that the heinous attack on Mr. Sotloff was somehow *foreseeable* from QNB's provision of banking services to Qatar Charity.

"Foreseeability is . . . central to the *Halberstam* framework, and as a result to JASTA aiding-and-abetting liability." *Honickman*, 6 F.4th at 496-97.  With respect to the Complaint's central allegation (Qatar Charity's alleged wire transfer to Fadhel al Salim at Ziraat Bank), Plaintiffs allege nothing about QNB or its representatives beyond standard banking services.  Unlike in cases such as *Bernhardt* and *Kaplan*, QNB is not alleged to have aided in sanctions avoidance or to have granted any special exceptions to Qatar Charity as a bank customer (nor to Fadhel al Salim or Ziraat Bank as transferees).  Al Salim was allegedly escorted to Ziraat Bank by Turkish intelligence officers and by Muslim Brotherhood members, *see* Compl. ¶ 108, not any QNB representatives.  The only alleged involvement of QNB in the transaction is that the transfer originated from an account at QNB.  Plaintiffs attempt to build a narrative connecting that alleged transfer to Mr. Sotloff's killing, but that narrative contains numerous intervening steps (and gaps between those steps), such that Plaintiffs do not plausibly allege that the funds at issue had anything to do with Mr. Sotloff's killing, much less that the provision of standard banking services could have foreseeably led to the killing.  The Complaint in one breath asserts that "Al Salim crossed the Turkish-Syrian border . . . where he proceeded to found and organize a brigade of Islamic State

fighters . . . and to become a Sharia Judge under the Islamic State in the Islamic Court in Ash Shaddadi," *id.* ¶ 112, from which nearly a year later Fadhel al Salim would "sign[] the Legal Retribution Verdict for Steven Joel Sotloff." *Id.* ¶ 228.  There are no allegations as to how the funds may have been used in connection with Sotloff; Sotloff's killing, while despicable, would not have required funding to accomplish the heinous act.  The Complaint's own allegations are to the effect that al Salim did not take on the roles from which he could have had any power to commit terrorist acts until *after* he relocated to Syria.  Neither QNB nor any bank can be charged with clairvoyance about how a transferee will radically change in the future.

Given Plaintiffs' failure to allege any public sources that would tie Qatar Charity to ISIS, Plaintiffs necessarily also fail to allege plausibly that Qatar Charity was so closely intertwined with ISIS's violent terrorist activities that one can reasonably infer that QNB was generally aware of its role in unlawful activities from which the attacks were foreseeable while QNB was providing financial services to Qatar Charity.[8]   Failure on either the first or second parts of the general awareness analysis dooms Plaintiffs' JASTA claim against QNB; here, the Complaint fails on both parts and therefore must be dismissed.

**B.    Plaintiffs Fail to Allege Plausibly That QNB Knowingly and Substantially Assisted the Principal Violation That Caused Plaintiffs' Injuries.**

The Complaint also fails to allege plausibly that QNB "knowingly and substantially assist[ed] the principal violation."  *Honickman*, 6 F.4th at 499 (quoting *Halberstam*, 705 F.2d at 477).  This element from *Halberstam* involves both a "knowledge" component and a "substantial

---

[8] In *Halberstam* (the reasoning of which Congress explicitly endorsed in its enactment of JASTA), Linda Hamilton served Bernard Welch's burglary enterprise as a "banker, bookkeeper, recordkeeper, and secretary," and she performed these services "in an unusual way under unusual circumstances for a long period of time."  705 F.2d at 487.  The D.C. Circuit explained that it "defie[d] credulity that Hamilton did not know that something illegal was afoot," namely due to "Welch's pattern of unaccompanied evening jaunts over five years, his boxes of booty, the smelting of gold and silver, the sudden influx of great wealth, the filtering of all transactions through Hamilton except payouts for goods, [and] Hamilton's collusive and unsubstantiated treatment of income and deductions on her tax forms."  *Id.* at 486.  When Welch's dangerous activities resulted in the killing of Michael Halberstam, Hamilton was found to be liable as well for aiding and abetting.  *See id.* at 474.  QNB is not alleged to have performed services for Qatar Charity "in an unusual way under unusual circumstances," and is not alleged to have had anywhere near the level of involvement that Hamilton had, nor the level of knowledge that Hamilton had, nor the level of indications of unlawful activity that Hamilton had, such that the killing of Steven Sotloff was somehow foreseeable from QNB's banking services.

assistance" component. *See id.*[9] For "substantial assistance," courts employ the six-factor analysis from *Halberstam* to determine whether a defendant substantially assisted the principal violation, considering:

> (1) "[T]he nature of the act encouraged"; (2) "the amount and kind of assistance given"; (3) "the defendant's absence or presence at the time of the tort"; (4) the defendant's "relationship to the tortious actor"; (5) "the defendant's state of mind"; and (6) the "length of time an alleged aider-abettor has been involved."

*Halberstam*, 705 F.2d at 483-84 (cleaned up).  No one factor in the analysis is dispositive, and the weight given to each factor is determined on a case-by-case basis.  *See Honickman*, 6 F.4th at 500 (citing *Halberstam*, 705 F.2d at 483).  Here, all of the factors weigh in QNB's favor and support dismissal of the claims against QNB.

The first factor—the nature of the act encouraged—requires "assessing whether the alleged aid . . . would be important to the nature of the injury-causing act."  *Honickman*, 6 F.4th at 500. The injury-causing act was the killing of Steven Sotloff.  Plaintiffs do not allege that this violent act, while heinous, required banking services.  Separately, the narratives regarding earlier conferences in 2011 and 2012, as well as weapons purchases, are far too attenuated from Sotloff's killing to support this factor; those narratives mention that funds from QNB accounts were sent to Ziraat Bank accounts (some of which were set up as a "fraudulent charity" by "Turkish intelligence," Compl. ¶ 100) and were then sent on to conferences allegedly attended by individuals with some alleged connections to ISIS, but apparently no actual ISIS members themselves, *see id.* ¶¶ 96, 98, or for purchasing weapons in Libya that allegedly made their way to "ISIS precursor groups," *see id.* ¶ 100.  None of these narratives are even remotely tied to Sotloff's killing.

The second factor—the amount and kind of assistance given—also weighs in QNB's favor.

---

[9] The "knowledge" component generally does not require knowledge greater than that required for the general awareness element.  *See Honickman*, 6 F.4th at 500.  However, as discussed above, Plaintiffs fail to plausibly allege general awareness, and a "defendant who lacks general awareness cannot be said to have knowingly assisted a foreign terrorist organization."  *Bernhardt*, 47 F.4th at 870.  Moreover, any assistance that QNB may have allegedly provided was done so inadvertently through QNB's provision of standard banking services, which is exactly the situation the knowledge component was designed to avoid, as laid out in *Halberstam*.  705 F.2d at 485 n.14 (noting that the knowledge component "is designed to avoid subjecting innocent, incidental participants to harsh penalties or damages").  Therefore, Plaintiffs fail to allege plausibly that QNB knowingly assisted the principal violation under this element.

Again, at the core of the Complaint is a single transfer from a QNB account allegedly initiated by one of QNB's customers (not QNB itself) to another account.  This is unlike cases where sanctions avoidance, special exceptions, or repeated targeted transactions are alleged to demonstrate greater access to capital for a terrorist organization.  *See, e.g.*, *Bernhardt*, 47 F.4th at 870-71; *Kaplan*, 999 F.3d at 862.  The Complaint does not allege that QNB treated Qatar Charity any differently than any of its countless customers, nor does the Complaint allege that the amounts transferred would have been anything out of the ordinary for QNB.  Courts have explained that what might suffice for the second factor are "[f]actual allegations that permit a reasonable inference that the defendant recognized the money it transferred to its customers would be received by the [foreign terrorist organization]."  *Id.* at 871 (quoting *Honickman*, 6 F.4th at 500).  Here, QNB's customer, a charity, allegedly transferred money to an account at Ziraat Bank, the same bank at which the Complaint explains that "Turkey intelligence set up a fraudulent charity . . . . [and] required that a certain amount of the funds be used to purchase actual medical supplies as a cover," Compl.  ¶ 100; these allegations do not permit a reasonable inference that QNB recognized the money would somehow be received by ISIS.  The overwhelming inference is that they would be used for charitable purposes, especially considering Qatar Charity's charitable works in Turkey in collaboration with the United Nations.  *See supra* note 2.  The court in *Honickman* has already explained that allegations "[t]hat organizations like the [bank's customer] maintained a 'cover' in public *undermines* the plausibility of Plaintiffs' theory that [the bank] understood these organizations' true nature and activities from the public record at the time."  *Honickman*, 6 F.4th at 502 (emphasis added).  The limited amount of assistance, taken together with QNB's perspective, weighs in QNB's favor for this second factor.

The third factor—the defendant's absence or presence at the time of the tort—plainly weighs in QNB's favor.  The district court in *Honickman* reached the conclusion (which the Second Circuit left undisturbed) that a bank's provision of banking services during the relevant period would not amount to "presence" at the time of the tort.  *See Honickman v. BLOM Bank SAL*, 432 F. Supp. 3d 253, 269 (E.D.N.Y. 2020), *aff'd*, 6 F.4th 487 ("BLOM was not 'present' during the time of the attacks, other than providing banking services to Sanabil and Subul Al-Khair during the relevant period."); *see also Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 223 (D.C. Cir. 2022).  Plaintiffs fail to allege any kind of presence on the part of QNB, much less physical presence, at the killing of Steven Sotloff.

The fourth factor—the defendant's relationship to the tortious actor—also weighs in QNB's favor. While a direct relationship between QNB and ISIS is not required to be alleged, the Complaint fails to "allege a connection between the foreign bank[] and [the terrorist organization] sufficient to infer any relationship, much less a close one, between [the bank] and [the terrorist organization]." *Bernhardt*, 47 F.4th at 872. The Complaint only alleges a relationship between QNB and Qatar Charity; Qatar Charity in turn is alleged to have had a relationship to Ziraat Bank or Fadhel al Salim, who in turn is alleged to have been "close to the Nusra Front" and allegedly became an ISIS judge some time afterward. QNB's alleged relationship to ISIS is thus several steps removed and is therefore impermissibly "attenuated." *See Honickman*, 6 F.4th at 500-01 (citing *Siegel*, 933 F.3d at 220-21).

For the fifth factor—the defendant's state of mind—Plaintiffs fail to allege plausibly that QNB had even general awareness, as noted above. *See supra* Section II.A; *Atchley.*, 22 F.4th at 223 (noting that "[k]nowledge of one's own actions and general awareness of their foreseeable results" is required for this factor to weigh in a plaintiff's favor). Without plausible allegations supporting even this level of awareness, this factor as well cuts against Plaintiffs and in QNB's favor.

Lastly, the sixth factor—the length of time an alleged aider-abettor has been involved—also weighs in QNB's favor. The Complaint alleges that QNB has maintained "at least six accounts" for Qatar Charity, Compl. ¶ 39, but conveniently omits that most or all of these accounts were opened in 2012 (just a year before the alleged wire transfer to Fadhel al Salim), as Plaintiffs' counsel has pleaded in court filings in the three E.D.N.Y. litigations, of which this Court can take judicial notice.[10] Yet even if the period of involvement were lengthier, the Second Circuit has explained in *Siegel*, a case in which "HSBC provided banking services to ARB for *twenty-five years*," that the duration "certainly bespeaks a lengthy relationship *but not necessarily of assistance in terrorism*." *Siegel*, 933 F.3d at 225 (emphases added) (citing *Halberstam*, 705 F.2d

---

[10] *See, e.g.*, Complaint, *Henkin, et al. v. Qatar Charity, et al.*, No.1:21-cv-5716 (AMD) (VMS) (E.D.N.Y. Sept. 2, 2022), ECF No. 1 ¶¶ 169-70 (pleading that "QNB maintained at least seven accounts for Qatar Charity" and that "[s]ix of these accounts were opened on March 18, 2012"). Here, Plaintiffs appear to only reference those six accounts. *See* Compl. ¶ 39. "Courts may take judicial notice of pleadings from another lawsuit without converting a motion to dismiss into a motion for summary judgment." *Remeus v. Waste Mgmt. Inc. of Fla.*, No. 14-80158-CIV, 2014 WL 1328392, at *2 (S.D. Fla. Mar. 31, 2014) (citing *Horne v. Potter*, 392 F. App'x 800, 802 (11th Cir. 2010)).

at 484). Again, the Complaint acknowledges Qatar Charity's well-known charitable mission, *see* Compl. ¶ 48 (noting that Qatar Charity "touted its humanitarian work"); *id.* ¶ 212 (noting Qatar Charity's "status as a charitable entity"); *id.* ¶ 242 (noting that Qatar Charity's "funds [were] nominally intended to support humanitarian causes"), and fails to allege plausibly that QNB's relationship with Qatar Charity was "necessarily . . . assistance in terrorism." *Siegel*, 933 F.3d at 225. There are no allegations, for example, of earlier assistance QNB may have provided Qatar Charity in supporting terrorism outside of the timeframe identified in the Complaint of "[b]etween 2011 and 2013." *Id.* ¶ 92.

All six factors thus fall on QNB's side. Therefore, the "substantial assistance" prong is not plausibly met by Plaintiffs' skeletal allegations, and the secondary liability aiding and abetting claim should be dismissed for failure to state a claim.

## III.   PLAINTIFFS FAIL TO STATE A CLAIM THAT QNB IS SECONDARILY LIABLE UNDER 18 U.S.C. § 2333(D) FOR CONSPIRACY.

The secondary liability claim for conspiracy should also be dismissed as to QNB, because the Complaint is devoid of any non-conclusory allegations that QNB conspired *directly* with the person or entity that committed the acts of international terrorism injuring Plaintiffs. *See Freeman*, 413 F. Supp. 3d at 97-98 & n.41; *see also Kaplan*, 999 F.3d at 855. Plaintiffs advance broad allegations that "Defendants conspired with each other, the government of Qatar, the Muslim Brotherhood, ISIS, and others to bring about acts of international terrorism." Compl. ¶ 253. But beyond this conclusory group pleading, Plaintiffs' specific allegations regarding QNB fail to reference any interactions, let alone an agreement of any kind, between QNB and ISIS.

By JASTA's terms, QNB can be liable for conspiracy only if it "conspire[d] with the person who committed such an act of international terrorism." 18 U.S.C. § 2333(d)(2). Secondary liability under this provision requires that defendants "*directly* conspired" with the FTO that allegedly committed the terrorist attacks at issue. *Freeman*, 413 F. Supp. 3d at 97-98 & n.41 (emphasis added). As in *Bernhardt*, Plaintiffs' "conspiracy claim fails because [they have] not adequately alleged an *agreement* between [the bank] and [the terrorist organization]," as required to plead a civil conspiracy. 47 F.4th at 872-73 (emphasis added). The Second Circuit made clear in *Kaplan* that "JASTA states that to be liable for conspiracy a defendant would have to be shown to have 'conspire[d] with' the principal." 999 F.3d at 855. Mere "conclusory, vague, or general allegations of conspiracy," like Plaintiffs' group pleading, will not suffice. *Gallop v. Cheney*, 642

F.3d 364, 369 (2d Cir. 2011).

Here, the Complaint's conclusory allegations fall far short of plausibly pleading conspiracy liability against QNB. The Complaint merely attempts to connect QNB to a conspiracy by alleging:

> Defendant Qatar National Bank joined the conspiracy by agreeing, among other things, expressly or tacitly: (a) to allow Qatar Charity to use accounts at QNB to funnel money to ISIS, its operatives, its predecessor organizations, and front organizations; (b) to give Qatar Charity, and ISIS, its operatives, its predecessor organizations, and front organizations access to U.S. dollars through QNB's correspondent banking relationships in the U.S.; and (c) to provide banking services to its co-conspirator, Qatar Charity.

Compl. ¶ 255. The Complaint does not even plausibly allege that QNB had any unlawful agreement with Qatar Charity, much less one with ISIS sharing a common objective. As such, Plaintiffs' conspiracy liability claim also fails and should be dismissed.

## IV.   PLAINTIFFS FAIL TO STATE A CLAIM THAT QNB IS PRIMARILY LIABLE UNDER 18 U.S.C. § 2333(A).

As Plaintiffs' allegations do not even support a plausible inference of secondary liability, their claims that QNB is *primarily* liable for an act of international terrorism (Counts III and IV) are even more deficient. To prove primary liability under the ATA, a plaintiff must credibly establish, *inter alia*, that the defendant committed an "act of international terrorism" and that the U.S. national's injury occurred "by reason of" said act of international terrorism. 18 U.S.C. § 2333(a). As a threshold matter, Plaintiffs fail to allege plausibly that QNB committed an act of international terrorism. And even assuming, *arguendo*, that they plausibly allege an act of international terrorism, Plaintiffs further fail to allege plausibly that their injuries occurred by reason of said act (*i.e.*, proximate cause). Because the Complaint plainly fails on either ground, the Complaint should be dismissed for failing to state a claim for primary liability under the ATA.

### A.   Plaintiffs Fail to Allege Plausibly That QNB Committed an Act of International Terrorism.

To meet the definition of an act of "international terrorism" under the ATA, a plaintiff must establish certain statutory requirements, among them that the allegations must "involve violent acts or acts dangerous to human life," 18 U.S.C. § 2331(1)(A), and that the act must "appear to

be intended (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping," 18 U.S.C. § 2331(1)(B). More specifically, "to qualify as international terrorism, a *defendant's* act must also involve violence or endanger human life . . . [or] appear to be intended to intimidate or coerce a civilian population or to influence or affect a government." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 327 (2d Cir. 2018) (emphasis added) (citing 18 U.S.C. § 2331(1)).

In other words, the ATA's primary liability provision provides "civil relief only against the principals perpetrating acts of international terrorism . . . [and] provide[s] no civil action against secondary actors who, while not committing international terrorist acts themselves, facilitated such acts by others." *Id.* at 319-20. Any other reading would render "superfluous" the ATA's secondary liability provision under 18 U.S.C. § 2333(d)(2). *See Kemper v. Deutsche Bank AG*, 911 F.3d 383, 396 (7th Cir. 2018).

QNB's own actions as alleged in the Complaint, even if they could be connected to Plaintiffs' injuries at all, amount to passively facilitating transfers on behalf of its customer (a charity with numerous charitable operations) and simply do not rise to the level of international terrorism. QNB's alleged banking services do not involve violence, nor are they dangerous to human life, as required by the statute. Even assuming, *arguendo*, that QNB's customer Qatar Charity was actively associated with ISIS during the relevant time period (which the Complaint fails to allege plausibly), the Second Circuit has already concluded that "providing routine financial services to members and associates of terrorist organizations is not so akin to providing a loaded gun to a child as to . . . compel a finding that as a matter of law, the services were violent or life-endangering acts that appeared intended to intimidate or coerce civilians or to influence or affect governments." *Linde*, 882 F.3d at 327.

**B.     Plaintiffs Fail to Allege Plausibly That QNB's Acts Were the Proximate Cause of Their Injuries.**

The requirement under 18 U.S.C. § 2333(a) that the injury must occur "by reason of" an act of international terrorism requires Plaintiffs to allege that QNB's conduct was the proximate cause of their injuries, and the Complaint falls well short of this standard. More specifically, the Second Circuit has explained that while proximate cause does not necessarily require but-for causation, Plaintiffs must nonetheless allege that QNB's conduct was a "*substantial factor* in the

sequence of responsible causation and whose injury was *reasonably foreseeable or anticipated as a natural consequence*." *Rothstein v. UBS AG*, 708 F.3d 82, 91-92 (2d Cir. 2013) (emphases added) (internal quotation marks omitted).

Plaintiffs' allegations fall well short here because the causal link between QNB's alleged banking services and Plaintiffs' injuries is far too attenuated to support a finding of proximate cause.  As described earlier, *see supra* Section II.A.2, it is simply implausible for Plaintiffs to assert, based on QNB's provision of standard banking services to Qatar Charity, including the $800k transfer to al Salim in October 2013, that it was somehow reasonably foreseeable that nearly a year later, al Salim would—after moving to Syria, establishing an ISIS brigade, and becoming an ISIS judge—sentence Steven Sotloff to death.  There are no allegations that Sotloff's killing, while despicable, would have been the foreseeable result of such a transfer to al Salim, given that his move into Syria and transformation into an ISIS brigade founder and later ISIS judge occurred only *after* this transfer.

Therefore, in regard to QNB's banking services, the Complaint fails to allege plausibly this activity was a "substantial factor in the sequence of responsible causation," nor does it allege that Plaintiffs' injuries, while deeply unfortunate, were "reasonably foreseeable or anticipated as a natural consequence" of QNB's banking services.  For these reasons, Plaintiffs fail to plausibly allege proximate cause and therefore fail to state a claim for primary liability under the ATA.

## CONCLUSION

For the foregoing reasons, Qatar National Bank respectfully submits that the Court should grant in full its Motion to Dismiss Plaintiffs' Complaint with prejudice.

Dated: October 27, 2022

Respectfully submitted,

*/s/ Edward M. Mullins*
Edward M. Mullins
**REED SMITH LLP**
200 South Biscayne Boulevard, 26th Floor
Miami, Florida 33131
Telephone: (786) 747-0200
Facsimile: (786) 747-0299
emullins@reedsmith.com

Michael G. McGovern (*pro hac vice*)
**ROPES & GRAY LLP**
1211 Avenue of the Americas
New York, New York 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
michael.mcgovern@ropesgray.com

Douglas Hallward-Driemeier (*pro hac vice*)
**ROPES & GRAY LLP**
2099 Pennsylvania Avenue, NW
Washington, DC 20006-6807
Telephone: (202) 508-4600
Facsimile: (202) 508-4650
douglas.hallward-driemeier@ropesgray.com

*Counsel for Defendant Qatar National Bank*
*(Q.P.S.C.)*

25

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b)(2), QNB respectfully requests a hearing on this motion, as it implicates complex and evolving areas of law. A recent opinion in this district involved similar allegations of correspondent banking in regard to the same charity. After analyzing those issues at length, the court concluded that it lacked personal jurisdiction over the defendant-bank. *See Schrier v. Qatar Islamic Bank*, No. 20-60075-CIV, 2022 WL 4598630 (S.D. Fla. Sept. 30, 2022). There have been an increasing number of cases involving aiding and abetting claims brought under the ATA/JASTA in various federal courts. These claims have typically rested on broad theories of liability such as the one asserted in this case; the overwhelming majority of these suits have been dismissed, however, for failing to satisfy the statute's standards.[11] A hearing on this motion would aid the Court in its resolution of the motion. QNB estimates that the time required for argument is 20 minutes for QNB (and the same for each other party to this suit).

---

[11] *See, e.g.*, *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856 (D.C. Cir. 2022); *Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021); *Colon v. Twitter, Inc.*, 14 F.4th 1213, 1219 (11th Cir. 2021); *Brill v. Chevron Corp.*, 804 F. App'x 630 (9th Cir. 2020); *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019); *Crosby v. Twitter*, 921 F.3d 617 (6th Cir. 2019); *Owens v. BNP Paribas*, 897 F.3d 266 (D.C. Cir. 2018); *Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67 (E.D.N.Y. 2019); *O'Sullivan v. Deutsche Bank*, No. 17-cv-8709, 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019); *Clayborn v. Twitter*, No. 17-cv-6894, 2018 WL 6839754 (N.D. Cal. Dec. 31, 2018); *Copeland v. Twitter*, 352 F. Supp. 3d 965 (N.D. Cal. 2018); *Cain v. Twitter*, No. 17-cv-2506, 2018 WL 4657275 (N.D. Cal. Sept. 24, 2018); *Ofisi v. BNP Paribas*, No. 15-cv-2010, 2018 WL 396234 (D.D.C. Jan. 11, 2018); *Pennie v. Twitter*, 281 F. Supp. 3d 874 (N.D. Cal. Dec. 4, 2017).

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on October 27, 2022, a true and correct copy of the foregoing was served via transmission of Notices of Electronic Filing generated by CM/ECF on all counsel or parties of record.

*<u>/s/ Edward M. Mullins</u>*
Edward M. Mullins

27