**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

ARTHUR BARRY SOTLOFF Individually and as
Administrator of the Estate of STEVEN JOEL
SOTLOFF; SHIRLEY GOLDIE PULWER, and
LAUREN SOTLOFF,

Plaintiffs,

v.

QATAR CHARITY, a Foreign Non-Profit
Organization and QATAR NATIONAL BANK
(Q.P.S.C.), a Foreign Multinational Commercial Bank,

Defendants.

Case No. 9:22-cv-80726 (DMM)

**DEFENDANT QATAR CHARITY'S MOTION TO DISMISS THE**
**COMPLAINT AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT**

Harout J. Samra
**DLA PIPER LLP (US)**
200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131
Tel:  305.423.8534
Email:  harout.samra@dlapiper.com

John M. Hillebrecht*
Kevin Walsh*
Jessica A. Masella*
Lane Earnest McKee*
Michael G. Lewis*
    *Pro Hac Vice*
**DLA PIPER LLP (US)**
1251 Avenue of the Americas, 27th Floor
New York, NY 10020
Tel:  212.335.4500
Email:  john.hillebrecht@us.dlapiper.com
        kevin.walsh@us.dlapiper.com
        jessica.masella@us.dlapiper.com
        lane.mckee@us.dlapiper.com
        michael.lewis@us.dlapiper.com

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ................................................................................................... 2

    A.  Defendant Qatar Charity ....................................................................................... 2

    B.  Plaintiffs' Allegations ........................................................................................... 5

ARGUMENT .......................................................................................................................... 6

    I.    QATAR CHARITY IS NOT SUBJECT TO PERSONAL JURISDICTION IN FLORIDA ...................................................................................................................... 6

    A.  Personal Jurisdiction Under Rule 4(k)(1)(a)—Plaintiffs Fail to Allege a Basis for Exercising Personal Jurisdiction Over Qatar Charity Under the Florida Long-Arm Statute ................................................................................................................. 7

        1.  Plaintiffs Fail to Allege a Basis for The Exercise of Personal Jurisdiction Over Qatar Charity Under Florida's Long Arm Statute ................................... 7

        2.  Plaintiffs Fail to Satisfy Due Process Requirements ........................................... 10

    B.  Personal Jurisdiction Under Rule 4(k)(2)—Plaintiffs Fail to Allege a Basis for Exercising Personal Jurisdiction Over Qatar Charity Under the Federal Long-Arm Statute ................................................................................................................. 11

        1.  Plaintiffs Fail to Allege Contacts Between Qatar Charity and the United States . 11

        2.  Plaintiffs Fail to Satisfy Due Process Requirements ........................................... 12

    II.  PLAINTIFFS FAIL TO STATE ANY CLAIM FOR RELIEF ........................................ 16

    A.  Counts III and IV Must Be Dismissed for Failure to Plausibly Plead a Primary Liability Claim Under Section 2333(a) ................................................................. 16

        1.  Plaintiffs Fail to Plausibly Allege That Qatar Charity Committed an Act of International Terrorism ...................................................................................... 17

        2.  Plaintiffs Fail to Plausibly Allege That Qatar Charity Proximately Caused the Attack ................................................................................................................ 17

    B.  Counts I and II Must Be Dismissed for Failure to Plausibly Plead a Secondary Liability Claim Under Section 2333(d) ................................................................. 21

        1.  The Complaint Does Not State a JASTA Conspiracy Claim ............................... 21

        2.  The Complaint Does Not State a JASTA Aiding and Abetting Claim ................. 22

    III.  PLAINTIFFS FAILED TO PROPERLY EFFECT SERVICE OF PROCESS ON QATAR CHARITY ....................................................................................................... 25

CONCLUSION ....................................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases** **Pages**

*Anza v. Ideal Steel Supply Corp.*,
    547 U.S. 451 (2006).................................................................................................20

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).............................................................................................15, 16

*Averbach v. Cairo Amman Bank*,
    2020 WL 486860 (S.D.N.Y. 2020).....................................................................23, 25

*Banco Contl., S.A. v. Transcom Bank (Barbados), Ltd.*,
    992 So. 2d 395 (Fla. 3d Dist. App. 2006) ..............................................................10

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007).............................................................................................15, 21

*Berdeaux v. OneCoin Ltd.*,
    2021 WL 4267693 (S.D.N.Y. 2021)..............................................................1, 14, 15

*Carey v. Kirk*,
    2022 WL 4594124 (S.D. Fla. 2022) ........................................................................8

*Carmouch v. Tamborlee Mgmt., Inc.*,
    789 F.3d 1201 (11th Cir. 2015) ...............................................................................6

*In re Chiquita Brands Intl.*,
    284 F. Supp. 3d 1284 (S.D. Fla. 2018) ...................................................16, 18, 20

*Consol. Dev. Corp. v. Sherritt, Inc.*,
    216 F.3d 1286 (11th Cir. 2000) .............................................................................12

*Copeland v. Twitter, Inc.*,
    352 F. Supp. 3d 965 (N.D. Cal. 2018) ..................................................................25

*DirectTV Latin Am. v. Park 610, LLC*,
    691 F. Supp. 2d 405 (S.D.N.Y. 2012)....................................................................15

*Fields v. Twitter, Inc.*,
    881 F.3d 739 (9th Cir. 2018) .................................................................................18

*First Title of America v. Trust Bank*,
    2020 WL 13042833 (S.D. Fla. 2020) ....................................................................15

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
    141 S. Ct. 1017 (2021).............................................................................................12

*Fraser v. Smith*,
   594 F.3d 842 (11th Cir. 2010) ...................................................................................7, 12

*Future Tech. Today, Inc. v. OSF Healthcare Sys.*,
   218 F.3d 1247 (11th Cir. 2000) ................................................................................8, 10

*Gonzalez v. Google, Inc.*,
   335 F. Supp. 3d 1156 (N.D. Cal. 2018) .......................................................................18

*Halberstam v. Welch*,
   705 F.2d 472 (D.C. Cir. 1983) .............................................................21, 22, 23, 25

*Honickman for Est. of Goldstein v. BLOM Bank SAL*,
   432 F. Supp. 3d 253 (E.D.N.Y. 2020) .........................................................................24

*Honickman v. BLOM Bank SAL*,
   6 F.4th 487 (2d Cir. 2021) .................................................................................23, 24, 25

*Justiniano v. Chap. 4 Corp.*,
   2021 WL 6338791 (M.D. Fla. 2021) .............................................................................9

*Kaplan v. Lebanese Canadian Bank, SAL*,
   999 F.3d 842 (2d Cir. 2021)................................................................................22, 23, 24

*Kernel Records Oy v. Mosley*,
   2010 WL 2812565 (S.D. Fla. 2010) ...............................................................................9

*Licci v. Lebanese Canadian Bank, SAL*,
   20 N.Y.3d 327 (2012) .....................................................................................................13

*Licciardello v. Lovelady*,
   544 F.3d 1280 (11th Cir. 2008) ......................................................................................9

*Linde v. Arab Bank, PLC*,
   882 F.3d 314 (2d Cir. 2018).....................................................................................22, 23

*Louis Vuitton Malletetier, S.A. v. Mosseri*,
   736 F.3d 1339 (11th Cir. 2013) ....................................................................................12

*Nat'l Numismatic Cert. LLC v. eBay Inc.*,
   2008 WL 2704404 (M.D. Fla. 2008) .........................................................................9, 10

*O'Sullivan v. Deutsche Bank AG*,
   2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019) ........................................................21, 22

*O'Sullivan v. Deutsche Bank AG*,
   2020 WL 906153 (S.D.N.Y. 2020)................................................................................23

*Oriental Imports & Exports v. Maduro & Curiel's Bank*,
   701 F.2d 889 (11th Cir. 1983) ......................................................................10

*Oueiss v. Saud*,
   2022 WL 1311114 (S.D. Fla. 2022) ...............................................................11

*Owens v. BNP Paribas, S.A.*,
   897 F.3d 266 (7th Cir. 1990) .........................................................................20

*Perkins v. Nat'l LGBTQ Task Force*,
   580 F. Supp. 3d 1236 (S.D. Fla. 2021) .........................................................16

*Posner v. Essex Ins. Co. Ltd.*,
   178 F.3d 1209 (11th Cir. 1999) ..............................................................6, 7, 10

*Rothstein v. UBS AG*,
   708 F.3d 82 (2d Cir. 2013)........................................................................17, 18

*Schrier v. Qatar Islamic Bank*,
   2022 WL 4598630 (S.D. Fla. Sept. 30, 2022) (Altman, J.) ........................... *passim*

*Siegel v. HSBC North Am. Holdings, Inc.*,
   933 F.3d 217 (2d Cir. 2019).............................................................................25

*South Spanish Trail v. Globenet Cabos Submarinos America, Inc.*,
   2019 WL 3285533 (S.D. Fla. 2019) ...............................................................16

*Spetner v. Palestine Inv. Bank*,
   495 F. Supp. 3d 96 (E.D.N.Y. 2020) ...............................................................15

*Stansell v. BGP, Inc.*,
   2011 WL 1296881 (M.D. Fla. 2011) ...............................................................17

*In re Takata Airbag Prods. Liability Litig.*,
   396 F. Supp. 3d 1101 (S.D. Fla. 2019) ...........................................................11

*Tamam v. Fransabank SAL*,
   677 F. Supp. 2d 720 (S.D.N.Y. 2010)..............................................................13

*In re Terrorist Attacks*,
   714 F.3d 118 (2d Cir. 2013).............................................................................18

*United Tech. Corp. v. Mazer*,
   556 F.3d 1260 (11th Cir. 2009) .........................................................................7

*Universal Trading & Inv. v. Tymoshenko*,
   2012 WL 6186471 (S.D.N.Y. 2012).................................................................15

*Vasquez v. HSBC.*,
   477 F. Supp. 3d 241 (S.D.N.Y. 2020)......................................................................15

*Venetian Salami Co. v. Parthenais*,
   554 So. 2d 499 (Fla. 1989)...........................................................................7, 10

*Walden v. Fiore*,
   571 U.S. 277 (2014)......................................................................................13

*Weinstock v. Abu Marzook*,
   2019 WL 1470245 (S.D. Fla. 2019) ...........................................................11

*Weiss v. Nat'l Westminster Bank PLC*,
   278 F. Supp. 3d 636 (E.D.N.Y. 2017) ........................................................22

*Weiss v. Nat'l Westminster Bank PLC*,
   381 F. Supp. 3d 223 (E.D.N.Y. 2019) ........................................................23

*World-Wide Volkswagen Corp. v. Woodson*,
   444 U.S. 286 (1980)......................................................................................13

**Statutes**

18 U.S.C. § 2331 ..........................................................................................16

18 U.S.C. § 2333............................................................................16, 17, 21, 22

18 U.S.C. § 2334(a) ........................................................................................6

22 U.S.C. § 2321K ..........................................................................................4

Fla. Stat. § 48.193 .......................................................................................7, 8

**Other Authorities**

Fed. R. Civ. P. 4(k) .............................................................................. *passim*

Fed. R. Civ. P. 12(b) ................................................................................1, 15

Pursuant to Fed. R. Civ. P. 12(b)(2), (5), and (6), Defendant Qatar Charity moves to dismiss all claims brought against Qatar Charity in Plaintiffs' Complaint and respectfully submits the following memorandum of law in support of its motion.[1]

## PRELIMINARY STATEMENT

This case arises from a heinous act of terrorism alleged to have been committed by the Islamic State of Iraq and Syria ("ISIS"), resulting in the death of Steven Sotloff.  Plaintiffs are relatives of the victim and assert causes of action pursuant to the Anti-Terrorism Act (the "ATA") against Defendant Qatar Charity and a bank purportedly used by Qatar Charity—Qatar National Bank (Q.P.S.C.) ("QNB").  The Complaint must be dismissed.  Qatar Charity is not subject to the personal jurisdiction of this Court.  Furthermore, Plaintiffs' allegations fail to state a claim for which relief may be granted.

Plaintiffs do not allege facts sufficient to plausibly suggest that Qatar Charity—one of the world's leading humanitarian organizations, that regularly partners with the U.S. and other Western governments and has been effusively praised by U.S. government officials—is in any way responsible for the terrorist act at issue, or that Qatar Charity directed any action in Florida that would suffice to subject it to the jurisdiction of this Court.

Plaintiffs no doubt intend to rely on caselaw holding that, in some limited circumstances, the use of a correspondent banking account in the United States for purposes of transferring dollars suffices to establish jurisdiction.  But those cases involve ***bank*** defendants—not "an individual [customer's] wiring of funds that incidentally pass through a New York-based correspondent account."  *Berdeaux v. OneCoin Ltd.*, 2021 WL 4267693, at *12 (S.D.N.Y. 2021). There is no authority standing for the illogical principle that a non-domiciliary bank ***customer*** may be subject to jurisdiction in Florida, or any other U.S. state, simply "because the non-

---

[1] Pursuant to Local Rule 7.1(b)(2), Qatar Charity respectfully requests a hearing on this motion

domiciliary moved money between foreign bank accounts, with the transfer passing through [that state] via a correspondent account." *Berdeaux*, 2021 WL 4267693, at *12 (collecting cases). For this reason alone, the Complaint must be dismissed as to Qatar Charity.

While the terrorist acts detailed in the Complaint are horrific, exercising jurisdiction here would plainly violate due process. *See Schrier v. Qatar Islamic Bank*, 2022 WL 4598630, at *26 (S.D. Fla. Sept. 30, 2022) (Altman, J.) (alleged tortious actions by bank were "harrowing," but its motion to dismiss was granted because "a democracy is served best when its judges apply the law, however unpleasant the outcome").

As set forth below, the Complaint's many deficiencies are fatal to Plaintiffs' claims.

## FACTUAL BACKGROUND

### A.  Defendant Qatar Charity

Qatar Charity is a charitable organization that operates in over 70 countries, where it provides charitable relief to millions of desperate recipients, including through implementing partners that include agencies of the United Nations and international non-governmental organizations like the Bill and Melinda Gates Foundation.  As detailed below, Qatar Charity regularly partners with various arms of the United Nations such as the U.N. Refugee Agency, the United Nations Children's Fund, the U.N. World Food Program, and the U.N. Relief and Works Agency, as well as other prominent international aid organizations.  Qatar Charity also partners with governments—including, crucially, that of the United States—to provide aid to nations in crisis.[2]

---

for the reasons set forth in Qatar National Bank's Amended Motion to Dismiss (Docket No. 53).

[2]  *See* U.S. Agency for International Development, *What We Do, Working in Crises and Conflict, Disaster Assistance, Malaysia* (referencing partnership between U.S. Agency for International Development ("USAID") and Qatar Charity) and USAID-PAKISTAN, *Monthly Progress Report No. 46* (June 2014) (same), annexed hereto as Exhibits 1 and 2, respectively, to the Declaration of Harout J. Samra in Support of Qatar Charity's Motion to Dismiss ("Samra Declaration"). Hereafter, references to exhibits to the Samra Declaration are denoted simply as "Ex. __."

In recent years, Qatar Charity has welcomed at its headquarters in Doha four U.S. Chargés d'Affaires (the most senior diplomatic representatives of the United States in Qatar) to discuss a variety of humanitarian issues and the best means of addressing these issues together. In fact, Qatar Charity officials met this very week with representatives of the U.S. Embassy in Qatar to discuss current humanitarian challenges and the ways in which non-governmental organizations and governments might collaborate to address these challenges; the Embassy "retweeted" Qatar Charity's tweet announcing the "great discussion" at the meeting.[3]  Qatar Charity officials also regularly meet with representatives of the U.S. Treasury Department in Doha to discuss the provision of humanitarian aid in jurisdictions subject to sanctions and to ensure coordination with the U.S.

In 2021, because of Qatar Charity's recognized expertise in providing aid to refugee communities, the U.S. government selected Qatar Charity as the sole organization responsible for the care of unaccompanied children evacuated from Afghanistan pending their relocation to the U.S.  During this mission, Qatar Charity has met regularly with U.S. representatives.[4]

As detailed below, contrary to Plaintiffs' unsupported allegation that Qatar Charity was designated as a supporter of terrorism by the United States, the U.S. government not only partners with the Charity, but senior U.S. diplomats have also regularly praised Qatar Charity for its positive impact in providing vital assistance to millions around the world, characterizing Qatar Charity as "one of the best organizations in the world."  (*See* Ex. 6 (January 24, 2022, Tweet of Ambassador Natalie Baker)).  That the U.S. government would offer this unqualified

---

[3]  Ex. 3 (December 7, 2022, Retweet by U.S. Embassy Qatar of Tweet by Qatar Charity) (noting meeting with U.S. Embassy in Doha regarding "current humanitarian challenges and dynamics of government-NGO collaboration")).

[4]  *See* Ex. 4 (AFP, *Unaccompanied Afghan Evacuee Children in Qatar Limbo*, New Straits Times (Sept. 11, 2021) (discussing Qatar Charity's pivotal role in the refugee crisis)); *see also* Ex. 5 (Aya Batrawy, *Qatar Emerges as Key Player in Afghanistan After US Pullout*, AP News (Aug. 30, 2021)).

praise at the very same time that Plaintiffs would have the Court believe that Qatar Charity is identified by the U.S. as a supporter of terrorism represents a preposterous contradiction and underscores the implausibility of Plaintiffs' claims.

Equally implausible is the conclusory allegation against the (non-party) Qatari government, which Plaintiffs invite the Court to believe is a terrorist mastermind.  (*See, e.g.*, Complaint ¶ 77).  To the contrary, Qatar is a key ally of the United States—"a good friend, and a reliable and capable partner."  Indeed, in the words of President Biden, the U.S.'s "partnership with Qatar . . . has been central to many of our most vital interests:  relocating tens of thousands of Afghans," among other things.[5]  In recognition of that fact, President Biden designated Qatar as a "major non-NATO ally" in recognition of our "strong partnership" over 50 years.[6]

Plaintiffs baldly claim that Qatar Charity was listed as a "priority III terrorism support entity" in 2008 by the U.S. Interagency Intelligence Committee on Terrorism (the "IICT"). (Complaint ¶¶ 42, 60).  As "support" for that assertion, Plaintiffs cite to a hyperlink to a document, apparently discussing the IICT, that makes no mention whatsoever of the Charity. (*See* Ex. 11).  This obviously provides no support for the claim that Qatar Charity is a "priority III terrorism support entity," nor is any explanation provided as to what such a designation even means.  The only putative source for the claim is a webpage found at wikileaks.org.  (*See* Ex. 12).  But the WikiLeaks document identifies as its sender only "Doha Qatar," and WikiLeaks, hardly an unimpeachable resource, identifies neither its source nor its context.  There is no reason to conclude that this information has any credible basis.

What is credible, however, is that the public record of which this Court may take judicial notice reflects that Qatar Charity has ***never*** been designated as a Foreign Terrorist Organization

---

[5]  Ex. 7; *cf.* Ex. 8 (quoting Secretary of State Antony Blinken as stating: "Qatar is a crucial partner in promoting regional stability [and] providing significant economic and humanitarian assistance to people in dire situations.").

("FTO") or Specially Designated Global Terrorist ("SDGT") by the United States.  To the contrary, as discussed below, Qatar Charity has been widely recognized by U.S. authorities for its humanitarian works.  Plaintiffs' flimsily-sourced claim is inconsistent with the Charity's ongoing close working relationship with the U.S. government, as evidenced by the high praise publicly lavished on Qatar Charity by U.S. government officials.  (*See, e.g.*, Ex. 13).[7]

## B.  Plaintiffs' Allegations

The injuries at issue in the Complaint arise from one incident—the 2014 murder of Steven Sotloff.  Aside from wholly conclusory allegations devoid of factual support, nothing in the Complaint suggests that Qatar Charity was involved in any way with this murder.

Furthermore, the Complaint's only allegations of connections between Qatar Charity and the United States is the vague claim that certain dollar-denominated transactions, including purported wire transfers to a purported "fraudulent charity" that Plaintiffs do not even bother to identify, "necessarily" passed through Qatar National Bank correspondent bank accounts in the United States.  (Complaint ¶¶ 100, 102).  The conclusory allegations by Plaintiffs that U.S. dollar transfers "are ***virtually all*** processed through" New York (Complaint ¶ 122) (emphasis added)) is (as discussed below) counter-factual and insufficient for jurisdictional purposes.

---

[6]  Ex. 9; Ex. 10; *cf.* 22 U.S.C. § 2321K.

[7]  Plaintiffs also point to the fact that in June 2017 various regional neighbors of Qatar labeled Qatar Charity as a "financial supporter of terrorism."  (Complaint ¶ 59).  Here too, Plaintiffs fail to complete the story.  As is well known, those designations were part of a wider geopolitical struggle between Qatar and its regional adversaries and were viewed by many informed observers as pretextual.  Among others who refused to recognize their accuracy were the United Nations and the United States.  (*See, e.g.*, Ex. 14).  Similarly, the U.S. government continued after the fact to work regularly with the Charity and obviously never designated it as an FTO. The Court should therefore give no weight to these "designations."  The King Salman Humanitarian Aid and Relief Center of Saudi Arabia, one of the states that spuriously claimed during this regional conflict that Qatar Charity was a supporter of terrorism, recently invited the Charity to participate in the Global Humanitarian Overview 2023 in Riyadh, an event co-sponsored by the United Nations Office for the Coordination of Humanitarian Affairs, which coordinates the global emergency response to save lives and protect people in humanitarian crises.  (*See* Ex. 15 (December 1, 2022, Tweet of Qatar Charity)).

As to the murder, the Complaint includes only threadbare and insufficient allegations suggesting, but not specifically alleging, a transfer purportedly originating from a "representative" of Qatar Charity that occurred nearly a year earlier and in an entirely different country (Complaint ¶¶ 106–09) and wholly conclusory allegations that Qatar Charity engaged in a conspiracy to lend material support to ISIS's terrorist activities (Complaint ¶¶ 1–2).  While these activities are undoubtedly abhorrent, these allegations are sufficient neither to establish this Court's jurisdiction over Qatar Charity nor to state a plausible claim for relief.

## ARGUMENT

## I.   QATAR CHARITY IS NOT SUBJECT TO PERSONAL JURISDICTION IN FLORIDA

The Complaint must be dismissed for lack of specific personal jurisdiction.[8]

A federal court's "determination of personal jurisdiction over a nonresident defendant requires a two-part analysis." *Schrier*, 2022 WL 4598630, at *6.  Plaintiff must first establish a statutory basis for jurisdiction over Qatar Charity. *Schrier*, 2022 WL 4598630, at *6.  The Complaint here purports to do so by claiming that Qatar Charity is "subject to personal jurisdiction in the United States pursuant to 18 U.S.C. § 2334(a), and Fed. R. Civ. P. 4(k)(1)-(2) . . . pursuant to a conspiracy."  (Complaint ¶ 27).  For the reasons set forth below, Qatar Charity is not subject to any of these statutory bases for personal jurisdiction in Florida.

Plaintiffs must also satisfy constitutional due process requirements. *Schrier*, 2022 WL 4598630, at *6.  "Subjecting [a defendant] to jurisdiction in Florida comports with due process so long as 'minimum contacts' exist between [the defendant] and Florida and exercising jurisdiction does not offend traditional notions of fair play and substantial justice." *Posner v. Essex Ins. Co. Ltd.*, 178 F.3d 1209, 1220 (11th Cir. 1999).

First, the defendant must have contacts related to or giving rise to the plaintiff's cause of action.   Second, the defendant must, through those contacts, have purposefully availed itself of forum benefits.   Third, the defendant's contacts with the forum must be such that it could reasonably anticipate being haled into court there.

*Fraser v. Smith*, 594 F.3d 842, 850 (11th Cir. 2010) (citation omitted).   Plaintiffs' allegations as to Qatar Charity fail to satisfy any of these three prongs.

## A. Personal Jurisdiction Under Rule 4(k)(1)(a)—Plaintiffs Fail to Allege a Basis for Exercising Personal Jurisdiction Over Qatar Charity Under the Florida Long-Arm Statute

Under Rule 4(k)(1)(a), in order to establish jurisdiction over Qatar Charity, a non-resident defendant, Plaintiffs must "allege sufficient facts to make out a prima facie case" that ***both***:  (1) the Florida long-arm statute provides a basis for personal jurisdiction; ***and*** (2) sufficient minimum contacts exist between Qatar Charity and Florida to satisfy constitutional due process requirements.   *Posner*, 178 F.3d at 1214; *see also Venetian Salami Co. v. Parthenais*, 554 So. 2d 499, 502 (Fla. 1989) (citations omitted).   Plaintiffs fail in both respects.

### 1. *Plaintiffs Fail to Allege a Basis for The Exercise of Personal Jurisdiction Over Qatar Charity Under Florida's Long Arm Statute*

Rule 4(k)(1)(a) provides that a federal court may exercise personal jurisdiction over a defendant to the extent allowed by the state in which that court sits.   Plaintiffs do not make any allegations connecting Qatar Charity to the state of Florida in any way.   Only two subsections of Florida's long-arm statute have even theoretical application here.   These provide for jurisdiction over "cause[s] of action arising from any of the following acts":

1. Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state.
2. Committing a tortious act within this state.

Fla. Stat. § 48.193(1)(a).   Plaintiffs' allegations are wholly insufficient.

---

[8]   Florida is neither Qatar Charity's principal place of business nor its place of incorporation. Thus, the Court cannot exercise *general* personal jurisdiction over Qatar Charity.   *See Carmouch*

Plaintiffs assert jurisdiction based entirely on a theory of conspiracy.  (Complaint ¶ 27). "[Florida's] long-arm statute can support personal jurisdiction over any alleged conspirator where any other conspirator commits an act in Florida in furtherance of the conspiracy."  *United Tech. Corp. v. Mazer*, 556 F.3d 1260, 1281–82 (11th Cir. 2009) (citations omitted).  But Plaintiffs' conclusory allegations are insufficient to establish personal jurisdiction based on a conspiracy under this subsection "because they have alleged nothing that clearly connects [Qatar Charity] to a conspiracy ***made or carried out in Florida***."  *Carey v. Kirk*, 2022 WL 4594124, at *4 (S.D. Fla. 2022) (emphasis added).  In support of their conclusion, Plaintiffs allege that "the Qatari Government and Royal Family conspired with Defendants, Turkish intelligence services, and the Muslim Brotherhood to move money from Qatar in the form of U.S. dollars to" ISIS. (Complaint ¶ 77).  Nowhere in the Complaint, however, do Plaintiffs allege that this purported conspiracy was "made or carried out in Florida," *Carey*, 2022 WL 4594124, at *4, and it quite obviously was not.  Instead, they make allegations of meetings held and actions taken in Qatar and Turkey.  (*See, e.g.*, Complaint ¶¶ 77–102).  These out-of-state acts obviously cannot be the basis for an exercise of jurisdiction over Qatar Charity under the Florida long-arm statute.  This alone is fatal to Plaintiffs' argument.  *See, e.g. Schrier*, 2022 WL 4598630, at *11–15.

### a.  *Subsection (1)(a)(1) Does Not Apply*

Qatar Charity is not subject to personal jurisdiction under subsection (1)(a)(1) of the Florida statute.  To satisfy this section, "the activities of the defendant must . . . show a general course of business activity in the state for pecuniary benefit."  *Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir. 2000).  Qatar Charity conducted no business in Florida and it is not alleged to have done so.

---

*v. Tamborlee Mgmt., Inc.*, 789 F.3d 1201, 1204 (11th Cir. 2015).

     *b.   Subsection (1)(a)(2) Does Not Apply*

Subsection (1)(a)(2) of Florida's long-arm statute requires that a "cause of action aris[e] from . . . [a defendant's] committing a tortious act within th[e] state." Fla. Stat. § 48.193(1)(a)(2).  That provision also does not apply.  Plaintiffs do not allege ***any*** conduct by Qatar Charity (tortious or not) in Florida.  Furthermore, "[a] tort claim is deemed to have accrued where the last event necessary to make the defendant liable for the tort took place." *Schrier*, 2022 WL 4598630, at *13 (quoting *Merkin v. PCA Health Plans of Fla., Inc.*, 855 So. 2d 137, 140 (Fla. 3d DCA 2003)).  On the Plaintiffs' alleged facts, the last event would be the execution of Steven Sotloff, which took place in Syria, not Florida.

Although it is not free from all doubt, it is true that the Florida long-arm statute arguably provides for jurisdiction over a defendant who commits a tort outside of the state that causes injury in the state.  *Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008).[9]  However, the courts have never "interpreted the long-arm statute to ***automatically*** provide personal jurisdiction over a defendant who is alleged to tortiously cause an injury in Florida" but have done so only "in certain contexts [where defendants] took tortious actions ***directed toward the state,***" such as knowingly making phone calls to a victim in the state.  *Nat'l Numismatic Cert. LLC v. eBay Inc.*, 2008 WL 2704404, *11 (M.D. Fla. 2008) (second emphasis added).  Federal courts in the Circuit considering the issue under Florida law look to whether the defendant ***directed*** its conduct at Florida.  *See Kernel Records Oy v. Mosley*, 2010 WL 2812565, at *5 (S.D. Fla. 2010) ("[i]n cases where the Eleventh Circuit applied section (1)(b) to foreign torts causing injury within Florida, that conduct was directed at Florida residents, corporations, or

---

[9]   Significantly, the "Florida Supreme Court has yet to address whether injury alone satisfies Section (1)(a)(2)." *Justiniano v. Chap. 4 Corp.*, 2021 WL 6338791, at *5 n.8 (M.D. Fla. 2021). Thus, Florida "law is not entirely settled as to the scope of this portion of the long-arm statute" as its courts are "divided on the issue of whether a tortious act committed outside the state

property, and the harm was felt exclusively or primarily in Florida").  The idea that an abduction and execution in Syria was "directed towards" Florida or "felt exclusively" there beggars credulity.  Furthermore, even those courts that have relied on injury in the state have only applied that theory to find jurisdiction over the ***actor***, not an alleged co-conspirator, as Qatar Charity is alleged to be here.  *See Posner*, 178 F.3d at 1216.

### 2.  *Plaintiffs Fail to Satisfy Due Process Requirements*

This Court's exercise of specific personal jurisdiction over Qatar Charity under Rule 4(k)(1)(a) must also satisfy the requirements of due process.  *Venetian Salami*, 554 So. 2d at 502.  Three requirements are relevant to this analysis: "(1) purposeful availment of the forum state; (2) the cause of action arises out of the activities of which [a defendant] purposefully avail[s itself;] and (3) reasonable foreseeability that '[a defendant] should reasonably anticipate being haled into court there.'"  *Future Tech.*, 218 F.3d at 1250-51 (citations omitted).  Stated differently, the requirement that a defendant "purposefully direct itself toward Florida in a manner that implicates the relevant minimum contacts which give rise to specific personal jurisdiction" is intended to "assure[ ] that a defendant will not be haled into a jurisdiction as a result of random, fortuitous, or attenuated contacts."  *Nat'l Numismatic*, 2008 WL 2704404, at *13 (citations omitted).  Even accepting, *arguendo*, that injuries felt by Plaintiffs in Florida are sufficient to satisfy the long-arm statute, and that that "rule" applies also to co-conspirators, it cannot be credibly suggested that Qatar Charity "had any level of knowledge that its conduct would cause injuries to [the Plaintiffs] in Florida."  *Nat'l Numismatic*, 2008 WL 2704404, at *14.

Instructively, the Eleventh Circuit has long held that a defendant's maintenance of a correspondent account even with a ***Florida*** bank is an insufficient contact with the forum to confer jurisdiction under the Florida long-arm statute.  *Oriental Imports & Exports v. Maduro &*

---

resulting in injury inside the state subjects the actor to jurisdiction."  *Justiniano*, 2021 WL

*Curiel's Bank*, 701 F.2d 889, 892 (11th Cir. 1983); *see also Banco Contl., S.A. v. Transcom Bank (Barbados), Ltd.*, 992 So. 2d 395, 399 (Fla. 3d Dist. App. 2006) (Honduran bank's maintenance of a correspondent relationship with a Florida bank did "not provide the requisite minimum contacts for personal jurisdiction"). Here, of course, there is no allegation that either defendant maintained any accounts in Florida. The only allegation is that QNB—***not*** Qatar Charity— maintained a correspondent banking relationship—***not*** in Florida—in New York. Under settled Eleventh Circuit precedent, that even-more-attenuated "contact" cannot suffice; it certainly cannot suffice ***as to Qatar Charity***, a banking customer.

For these reasons, along with those detailed in Section I(B)(2) below, Plaintiffs' allegations fail to satisfy the requirements of due process.

## B.   Personal Jurisdiction Under Rule 4(k)(2)—Plaintiffs Fail to Allege a Basis for Exercising Personal Jurisdiction Over Qatar Charity Under the Federal Long-Arm Statute

Qatar Charity is similarly not subject to this Court's jurisdiction under the federal long-arm statute. Rule 4(k)(2) "'permits a court to aggregate a foreign defendant's nationwide contacts' for jurisdictional purposes." *Weinstock v. Abu Marzook*, 2019 WL 1470245, at *2 (S.D. Fla. 2019) (citing *Fraser*, 594 F.3d at 848–49). That rule was adopted to address the issue of non-resident defendants that lack sufficient contacts with any one state to support the exercise of jurisdiction but do have sufficient contacts with the United States as a whole. *See In re Takata Airbag Prods. Liability Litig.*, 396 F. Supp. 3d 1101, 1152 (S.D. Fla. 2019).

### 1.   *Plaintiffs Fail to Allege Contacts Between Qatar Charity and the United States*

Plaintiffs do not make any allegations of direct contacts between Qatar Charity and the United States. Instead, the only claim is that Qatar Charity is "subject to personal jurisdiction in the United States . . . ***pursuant to a conspiracy theory***." (Complaint ¶ 27 (emphasis added)).

---

6338791, at *5 n.8.

That claim fails as a matter of law.  As Judge Moore recently observed, "Rule 4(k)(2) does not permit the exercise of conspiracy-based personal jurisdiction."  *Oueiss v. Saud*, 2022 WL 1311114, at *19 (S.D. Fla. 2022); *see also Schrier*, 2022 WL 4598630, at *24 (view that Rule 4(k)(2) does not permit conspiracy jurisdiction is the "general [one] among the federal courts") (collecting cases).  In fact, "[n]o federal court in the country . . . has ***ever*** applied a conspiracy-based theory of jurisdiction under Rule 4(k)(2)."  *Schrier*, 2022 WL 4598630, at *24 (emphasis added).  This Court therefore cannot, as a matter of law, exercise personal jurisdiction over Qatar Charity on a theory of conspiracy.  Plaintiffs therefore must rely on ***direct*** contacts between Qatar Charity and the United States to establish a *prima facie* basis for the exercise of personal jurisdiction under Rule 4(k)(2)—something that they do not even try to do (because they cannot).

### 2.  *Plaintiffs Fail to Satisfy Due Process Requirements*

The due process prong of Rule 4(k)(2) requires that a defendant have minimum contacts with the United States sufficient to satisfy the requirements of due process.  *See Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000).  In cases where specific personal jurisdiction is alleged, the Eleventh Circuit applies a:

> three-part due process test, which examines:  (1) whether the plaintiff's claims 'arise out of or relate to' at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant 'purposefully availed' himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's law; and (3) whether the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice.

*Louis Vuitton Malletetier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013) (citations omitted).  Even were this Court to find that Qatar Charity had sufficient contacts with the United States to satisfy Rule 4(k)(2), Plaintiffs' allegations cannot be read to satisfy any of these three Due Process Clause elements.

a. *Plaintiffs' Claims Do Not Arise Out of Or Relate to Contacts Between Qatar Charity and The United States*

As to the first prong of the due process analysis, the requirement that a "plaintiff's claim must arise out of or relate to at least one of the defendant's contacts with the forum" is "fundamental." *Fraser*, 594 F.3d at 850.  This requires a "relationship among the defendant, the forum, and the litigation" which must be "strong." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1028 (2021).  Fundamental fairness requires foreseeability.  More specifically, "the defendant's conduct and connection with the forum [must be] such that [it] should reasonably anticipate being haled into court" in the United States.  *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

Plaintiffs do not, and cannot, meet this burden.  The Complaint is devoid of a single allegation of direct contact between Qatar Charity and the United States.  Plaintiffs allege that, in 2013, QNB (*not* Qatar Charity) wired funds to an individual named Fadhel al Salim ("al Salim") via a correspondent bank account in the United States.  (Complaint ¶¶ 106–09).  These funds were allegedly received by al Salim's Turkish bank and he allegedly withdrew them at a branch in Istanbul.  (Complaint ¶¶ 106, 108).  It defies reason to suggest that an alleged transfer of funds from a Qatari bank in Qatar to a Turkish bank in Turkey supposedly for the benefit of a Qatari entity is sufficient to find that the Qatari entity "could reasonably anticipate being haled into court" in the United States nearly eight years later.

The focus of the "purposeful availment" inquiry is on the "contacts that the 'defendant *himself*' creates with the forum State," as opposed to contacts of third parties or co-defendants. *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)) (emphasis in original).  The Complaint does not allege that Qatar Charity had *any* contacts in New York, much less Florida.  To the contrary, it alleges only that *QNB* used a

13

correspondent bank located in New York (not Florida), without any alleged knowledge by Qatar Charity.  (Complaint ¶ 122).

Courts have routinely recognized the plain reality that dollar transfers between a foreign source and a foreign destination need not transit through the United States.  *See Licci v. Lebanese Canadian Bank, SAL* ("*Licci III*"), 20 N.Y.3d 327, 340 (2012) (bank could have routed U.S. dollar transaction anywhere in the world); *Tamam v. Fransabank SAL*, 677 F. Supp. 2d 720, 729 (S.D.N.Y. 2010) (same).  Even more significantly, Qatar Charity is not a bank; it is alleged to be a bank ***customer***—in this case, a customer allegedly seeking to send funds from one foreign location (Qatar) to another (Turkey), without any concern for the institutional routing by which that transfer was accomplished.  The "nature of correspondent banking renders largely nonsensical any attempt to base jurisdiction against . . . individual Defendants on wire transfers of funds moving through a New York correspondent account" because "[a]bsent unusual circumstances, an individual bank customer would have no reason to direct its foreign bank to use a New York-based correspondent account for a transaction that, such as those at issue here, has no other connection to New York."  *Berdeaux*, 2021 WL 4267693, at *12 n.25.

Indeed, the conclusory allegations here are especially implausible given the nature of the putative end game.  Accepting for the sake of argument Plaintiffs' allegations—that Qatar Charity's aim was to fund terrorist attacks committed by a U.S.-designated FTO—why on earth would it invite U.S. scrutiny of these transactions by purposefully using the U.S. banking system, especially when other alternatives, as courts have regularly noted, were available to it?

But without even reaching that question, the conclusory allegations on this score are insufficient as a matter of law as to Qatar Charity.  The *Berdeaux* case also involved a bank ***customer***, not a bank.  The allegations included assertions regarding "hundreds of transactions," including one $30 million transaction as to which the defendant e-mailed himself a copy of the

wire instructions—thus making explicit his knowledge that the funds would be processed through New York. *Berdeaux*, 2021 WL 4267693, at *3–4. That knowledge was deemed insufficient. *Berdeaux*, 2021 WL 4267693, at *11; *cf. id.* at *12 (these allegations are "insufficient as a matter of law").

> As that court observed in words that resonate loudly here:
>
> Plaintiffs have not alleged that [the defendant] *directed* the use of a New York correspondent account, nor that the transfer of funds . . . was otherwise *purposeful*. Instead, Plaintiffs allege only that [the defendant] was *aware* that a New York account would be used. . . . Absent allegations that [the defendant] *directed* the funds to be deposited or *controlled* the route of the plaintiffs' funds through the correspondent account, the mere use of a correspondent account does not subject [the defendant] to jurisdiction under Section 302 (a)(1).

*Berdeaux*, 2021 WL 4267693, at *12 (emphases added) (citation and internal quotations omitted); *accord Vasquez v. HSBC.*, 477 F. Supp. 3d 241, 253, 259 (S.D.N.Y. 2020); *Universal Trading & Inv. v. Tymoshenko*, 2012 WL 6186471, at *3 (S.D.N.Y. 2012) ("the Court's research [has not] revealed any cases" that support the argument that passage of money through New York correspondent accounts can create jurisdiction over a foreign customer); *cf. DirectV Latin Am. v. Park 610, LLC*, 691 F. Supp. 2d 405, 423–24 (S.D.N.Y. 2012).

Here, there is no plausible factual allegation that Qatar Charity *even knew* that the Bank maintained a correspondent relationship with a New York bank (if in fact it did) or *directed* the Bank to use a New York correspondent account (why would it?). And even if Qatar Charity knew that a New York correspondent banking relationship would be used (assuming it was), this would not confer jurisdiction. *Berdeaux*, 2021 WL 4267693, at *12 & n.25; *see also Spetner v. Palestine Inv. Bank*, 495 F. Supp. 3d 96, 112 (E.D.N.Y. 2020) (defendant "may have expected, or even known for a fact, that [the bank] would need to settle the wire transfers in New York; but knowing and expecting are not the same as directing and controlling").

## II.   PLAINTIFFS FAIL TO STATE ANY CLAIM FOR RELIEF

In the alternative, the Complaint should be dismissed for failure to state a claim pursuant to Rule 12(b)(6).  A complaint must include "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court may consider only well-pled factual allegations, *First Title of America v. Trust Bank*, 2020 WL 13042833, at *2 (S.D. Fla. 2020), and must ignore "legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," *Iqbal*, 556 U.S. at 678; *see also South Spanish Trail v. Globenet Cabos Submarinos America, Inc.*, 2019 WL 3285533, at *1 (S.D. Fla. 2019).  "'[N]aked assertion[s]' devoid of 'further factual enhancement'" will not do.  *Perkins v. Nat'l LGBTQ Task Force*, 580 F. Supp. 3d 1236, 1238 (S.D. Fla. 2021) (quoting *Iqbal*, 556 U.S. at 678).

### A.   Counts III and IV Must Be Dismissed for Failure to Plausibly Plead a Primary Liability Claim Under Section 2333(a)

The ATA's primary liability provision provides a cause of action for any U.S. national (or any estate, survivor, or heir of a U.S. national) "injured . . . by reason of an act of international terrorism."  18 U.S.C. § 2333(a).  The statute defines an "act of international terrorism" as requiring, among other things, that a given defendant's activities "involve[d] violent acts or acts dangerous to human life" that "appear[ed] to be intended" to "coerce a civilian population" or to "influence the policy of a government by intimidation." 18 U.S.C. § 2331(1).  "Because § 2333(a) supports only primary liability, a successful ATA plaintiff must allege and prove that the defendant directly committed an 'act of international terrorism' which caused the plaintiff's injuries."  *In re Chiquita Brands Intl.*, 284 F. Supp. 3d 1284, 1307 (S.D. Fla. 2018).

1.  ***Plaintiffs Fail to Plausibly Allege That Qatar Charity Committed an Act of International Terrorism***

The primary liability claims must be dismissed because Plaintiffs have failed to plausibly allege, and obviously cannot allege, that Qatar Charity itself committed an act of "international terrorism"—in this case, the murder of Steven Sotloff.  Plainly, there has been no allegation that Qatar Charity itself or any of its employees were involved in the murder.  Any such allegations involving an internationally respected humanitarian agency that regularly partners with the U.N. and the U.S. government to alleviate human suffering would, of course, be preposterous.  (*See, e.g.*, Ex. 16; Ex. 17).

The core of the Complaint—the allegation that Qatar Charity is a supporter of terrorism and has been designated as such by the United States (Complaint ¶¶ 40–42)—is demonstrably false and flatly belied by the public record available to the Court.  The U.S. government frequently works with the Charity and its diplomats praise it as "one of the best organizations in the world."  (Ex. 6 (January 24, 2022, Tweet of Ambassador Natalie Baker)).  The conclusory allegations of the Complaint are thus wholly implausible and cannot stand.

And in any event, even if one were to accept those baseless allegations as true, such conduct would not change the analysis as to primary liability.  The Complaint does not, and obviously cannot, allege that Qatar Charity ***itself*** committed an act of "international terrorism." *See, e.g.*, *Stansell v. BGP, Inc.*, 2011 WL 1296881 (M.D. Fla. 2011) (corporate defendant's payment of funds directly to a U.S.-designated FTO "would not lead an objective observer to conclude Defendants intended to achieve any one of the results listed in § 2331(1)(B)").

2.  ***Plaintiffs Fail to Plausibly Allege That Qatar Charity Proximately Caused the Attack***

The primary liability claims also fail because Plaintiffs have not plausibly alleged that Qatar Charity proximately caused their injuries.  The ATA confines liability to injuries sustained

"*by reason of* an act of international terrorism." 18 U.S.C. § 2333(a) (emphasis added). As set forth above, the Complaint fails to adequately allege that Qatar Charity itself committed an "act of international terrorism," and hence this claim must be dismissed on that ground alone.

But it also must be dismissed because recovery under § 2333 is not permitted "on a showing of less than proximate cause." *Rothstein v. UBS AG*, 708 F.3d 82, 95 (2d Cir. 2013). "[T]he fact that there is an intervening cause of the plaintiff's injury may foreclose a finding of proximate cause." 708 F.3d at 92. The burden is on Plaintiffs to establish that Qatar Charity's conduct "was a material and 'substantial factor' in bringing about their injuries" and that those injuries "were a reasonably foreseeable consequence of that conduct." *In re Chiquita Brands Int'l*, 284 F. Supp. 3d at 1317.

Where, as here, alleged "terror funding" is the predicate, Plaintiffs must "meet *Twombly's* plausibility standard with respect to the need for a proximate causal relationship between the cash transferred by" the defendant and "the terrorist attacks . . . that injured plaintiffs." *In re Terrorist Attacks*, 714 F.3d 118, 124–25 (2d Cir. 2013); *accord Gonzalez v. Google, Inc.*, 335 F. Supp. 3d 1156, 1178–79 (N.D. Cal. 2018). "[C]onsiderations of temporal proximity and the magnitude of support are assessed on a fact-specific and ad hoc basis. This avoids the potentially boundless window of liability, in time or person, which might otherwise attend the excision of this element from fundamental causation analysis in material support cases." *In re Chiquita Brands Int'l*, 284 F. Supp. 3d at 1313. Thus, for example, "the greater the time between the payments and the attack, the more attenuated the foreseeability of the attack, and the weaker the likelihood that the support played a significant role in facilitating the attacks." 284 F. Supp. 3d at 1313. Alleging, as Plaintiffs do, that a defendant enhanced an FTO's abilities is insufficient to state a claim without a "direct relationship with the injuries" to Plaintiffs. *Fields v. Twitter, Inc.*, 881 F.3d 739, 749–50 (9th Cir. 2018).

Here, Plaintiffs plead threadbare and conclusory allegations relating to a single transfer, supposedly by Qatar Charity but not alleged to have been directed by it, that occurred nearly a year earlier in Turkey, an entirely different country from where Steven Sotloff was executed. There are no allegations linking the fund transfer alleged to the murder of Mr. Sotloff.  The only claimed connection is that the person who supposedly received these funds (al Salim) later became a "Judge" and thereafter (ten months after the alleged transfer) authorized the execution.

Specifically, the Complaint alleges that on October 16, 2013, QNB wired $800,000 to al Salim.  (Complaint ¶ 106).  Plaintiffs allege that al Salim withdrew the money in cash from Ziraat Bank in Istanbul, purportedly signing "the wire transfer printout with a handwritten statement acknowledging receipt of USD 800,000 from 'Mr. Jassem Abdullah', representative of Qatar Charity."  (Complaint ¶¶ 108–09).  Plaintiffs allege that ten months later, al Salim would authorize the execution of Steven Sotloff.  (Complaint ¶ 107).  Significantly, the Complaint does not allege that anybody at Qatar Charity had any knowledge of al Salim whatsoever, to say nothing of facts linking him to violence, terrorism, or the Nusra Front.  Nor does it allege that al Salim had been designated by the U.S. (or any other) government as a terrorist or terrorist supporter.  All the Complaint does on this score, in a single conclusory sentence out of its 61-page bulk, is allege that al Salim was "a known terrorist" who declared an "affiliation" with the Nusra Front, which was purportedly "published online and in print"—without identifying *when* that occurred or how it was "published."  (Complaint ¶ 212).

These allegations as to conduct by Qatar Charity are plainly insufficient.  There is no allegation whatsoever that Qatar Charity had reason to know that al Salim had any links to violent terrorism—if, in fact, he did.  There is no allegation that Qatar Charity directed the payment of $800,000 to al Salim knowing or intending that he would use these funds for terrorist purposes.  Indeed, remarkably, there is no specific allegation that Qatar Charity directed the

payment at all, only the allegation that "QNB wired USD 800,000 . . . via its correspondent account in the U.S." (Complaint ¶ 106) and a conclusory phrase at the end of the Complaint asserting, with no detail whatsoever, and no reference to any conduct of Qatar Charity itself or reference to any of *its* bank accounts, that the wire was "from Qatar Charity and QNB" (Complaint ¶ 226).  The reference to al Salim's alleged acknowledgment that the transfer was received from a "representative" of Qatar Charity, with no specification of what that means or what his relationship, if any, to Qatar Charity was, falls far short of alleging actual conduct by the Charity connected to Steven Sotloff's murder.[10]

Although ISIS's terrorist activities are abhorrent, Plaintiffs' allegations do not state a plausible claim for relief.  Plaintiffs' conclusory allegations that their injuries were a "foreseeable result" of Qatar Charity's conduct are insufficient to state a claim.  *See, e.g.*, *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 276 (7th Cir. 1990) (allegations that funds were transmitted "directly to al Qaeda [and used] to carry out the embassy bombings" were "conclusory allegations that do not meet *Twombly's* plausibility standard").  Furthermore, the alleged payment by a "representative" of Qatar Charity to al Salim did not "lead directly" to the Plaintiffs' injuries here.  *See Anza v.  Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006).  The alleged payment occurred almost a year before the incident at issue, which "weake[ns] the likelihood that the [alleged] support played a significant role in facilitating the attacks."  *In re Chiquita Brands Int'l*, 284 F. Supp. 3d at 1313.

For all these reasons, the primary liability claims in Counts III and IV must be dismissed.

---

[10] As to the individual named in that paragraph, as a matter of fact management of Qatar Charity has no idea who that is.

**B.  Counts I and II Must Be Dismissed for Failure to Plausibly Plead a Secondary Liability Claim Under Section 2333(d)**

This Court must also dismiss Counts I and II for failure to state an aiding-and-abetting or conspiracy claim under Section 2333(d).  That provision provides that:

> In an action . . . for an injury arising from an act of international terrorism committed, planned, or authorized by [a designated FTO] . . . liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism.

For liability to attach, the defendant must assist the principal violation and must be "integral" to, or play a "major part in prompting," the act of international terrorism that caused Plaintiffs' injuries ("the injury at issue").  *Halberstam v. Welch*, 705 F.2d 472, 484 (D.C. Cir. 1983).  Here, the "act of international terrorism" at issue is the murder of Steven Sotloff.  Qatar Charity was neither integral to his tragic murder nor did it play any role in prompting it, and the conclusory assertions to the contrary are irrational.

**1.  *The Complaint Does Not State a JASTA Conspiracy Claim***

Under JASTA, a defendant is liable if it "conspire[d] with the person who committed such an act of international terrorism."  18 U.S.C. § 2333(d)(2).  That text imposes four requirements on any conspiracy claim: "(1) an agreement between two or more persons; (2) to participate in an [act of international terrorism]; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme."  *Halberstam*, 705 F.2d at 477.

The Complaint does not clear any of these hurdles and, indeed, stumbles at the very first step by not plausibly alleging the most basic requirement of a conspiracy:  an agreement.  *Twombly*, 550 U.S. at 557 ("naked assertion of conspiracy . . . stops short of the line between possibility and plausibility of entitle[ment] to relief"); *cf. O'Sullivan v. Deutsche Bank AG*, 2019 WL 1409446, at *9 (S.D.N.Y. 2019).

Plaintiffs' factual allegations are fatally attenuated.  The Complaint alleges that QNB wired $800,000 to al Salim in Istanbul on October 16, 2013, which was almost an entire year before the murder in Syria on August 31, 2013, and apparently before al Salim was a member of ISIS or an ISIS "Judge."  (Complaint ¶¶ 2, 106–07).  Also, the alleged funds were received in one country and the execution occurred in another.  Moreover, Plaintiffs obviously do not claim that Qatar Charity or QNB committed the murder themselves; nor did al Salim.  By "the plain language of the statute, § 2333(d) does not create liability against a person who aids and abets or conspires with the person who merely authorized (rather than committed) the terrorist act." *Weiss v. Nat'l Westminster Bank PLC*, 278 F. Supp. 3d 636, 650 (E.D.N.Y. 2017); *accord O'Sullivan*, 2019 WL 1409446 at *9.  The allegation here is that al Salim, acting as a "Judge," authorized the execution of Mr. Sotloff, which was carried out by others.  (Complaint ¶ 226).

### 2. The Complaint Does Not State a JASTA Aiding and Abetting Claim

Civil aiding and abetting under Section 2333(d) is comprised of three elements:  (1) "the party whom the defendant aids must perform a wrongful act that causes an injury"; (2) "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance"; and (3) "the defendant must knowingly and substantially assist the principal violation."  *Halberstam*, 705 F.2d at 487.  In the ATA context:

> Aiding and abetting an *act* of international terrorism requires more than the provision of material support to a designated terrorist *organization*.  Aiding and abetting requires the secondary actor to be 'aware' that, by assisting the principal, it is itself assuming a 'role' in terrorist activities.

*Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018) (citing *Halberstam*, 705 F.2d at 477) (emphasis in original).

The "general awareness" prong requires Plaintiffs to plead that a defendant was generally aware of its role in an act of international terrorism.  The "substantial assistance" prong requires Plaintiffs to plead specific facts giving rise to an inference that the defendant had "***actual***

***knowledge***" that it was providing ***substantial*** assistance to an act of international terrorism.

*Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 863–64 (2d Cir. 2021) (emphasis

added).  The Complaint falls short as to both prongs.

    a.  *Plaintiffs Fail to Allege Facts Permitting a Plausible Inference That Qatar Charity Knowingly Played a Role in Terrorist Activities*

        To survive dismissal, the Complaint must contain plausible allegations that Qatar Charity

was generally aware that it was playing a role in an FTO's "violent or life-endangering

activities"—which requires more than the provision of "material support" to an FTO, but less

than specific intent or knowledge of the particular attacks at issue.  *Linde I*, 882 F.3d at 329.

Plaintiffs must show that the defendant not only ***knew*** of the principal's involvement in

committing acts of "international terrorism," but also that the defendant and the principal were

"one in spirit."  *Halberstam*, 705 F.2d at 484; *Linde I*, 882 F.3d at 329, n.10.

        Here, the Complaint does not plausibly allege that Qatar Charity was generally aware that

it played a role in the "violent or life-endangering" activities of ISIS.  It also does not provide

***anything*** to support the inference that anybody at Qatar Charity had any reason to believe that al

Salim was a terrorist or supporter of terrorism, and there is no allegation that he was ever

designated as such.  The Complaint, instead, repeatedly makes conclusory statements about

knowledge and intent.  (*See, e.g.*, Complaint ¶¶ 18, 126, 241–42).  Plaintiffs "are required to

include allegations of the facts or events they claim give rise to an inference of knowledge" in

order to plead knowing substantial assistance.  *Kaplan*, 999 F.3d at 864.  Allegations like those

here are insufficient to establish general awareness.  *See, e.g.*, *Honickman v. BLOM Bank SAL*, 6

F.4th 487, 496–503 (2d Cir. 2021); *Averbach v. Cairo Amman Bank*, 2020 WL 486860, at *13–

15 (S.D.N.Y. 2020); *O'Sullivan v. Deutsche Bank AG*, 2020 WL 906153, at *6 (S.D.N.Y. 2020);

*Weiss v. Nat'l Westminster Bank PLC*, 381 F. Supp. 3d 223, 232–33, 239 (E.D.N.Y. 2019).

        The *Honickman* court had this to say on the subject:

> Plaintiffs quote a passage from *Halberstam* stating that the district court's conclusions that Hamilton "*knew about* and acted to support *Welch's illicit enterprise,*" if not the murder, establish that she "had a general awareness of her *role in a continuing criminal enterprise.*" . . . Plaintiffs argue that this standard simply requires Plaintiffs to show that BLOM knew that it was playing a role, in a sense, in Hamas' terrorist *enterprise,* by providing funds to organizations which supported Hamas. Again, the standard Plaintiffs seek to impose is simply that of knowingly providing material support to a terrorist organization, which differs from the scienter required to support aiding-and-abetting liability for supporting terrorist acts.

*Honickman for Est. of Goldstein v. BLOM Bank SAL*, 432 F. Supp. 3d 253, 264 n.8 (E.D.N.Y. 2020) (emphasis in original), *aff'd sub nom. Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021). As the Second Circuit clarified in affirming *Honickman*, "the relevant inquiry for the general awareness element" is whether the intermediate or affiliated entity which received funds from the defendant (here, presumably, al Salim) was "***so closely intertwined*** with [the FTO's] violent terrorist activities that one can reasonably infer that [the defendant] was generally aware . . . that it was playing a role in unlawful activities from which [the FTO's] attacks were foreseeable." *Honickman*, 6 F.4th at 499 (emphasis added). The Plaintiffs' Complaint, devoid of non-conclusory allegations of knowledge of any kind, plainly does not support such inference.

*Honickman* makes another point of relevance here. There, the Court held that the Complaint did not plausibly allege that the defendant was generally aware of any connection between its customers and Hamas, as it relied only on "press articles, government actions, and allegedly 'public knowledge.'" 432 F. Supp. 3d at 265. The Second Circuit found that "[t]he limited public sources Plaintiffs cite pale in comparison to the detailed, numerous sources that sufficed in *Kaplan*," in which the Complaint quoted Hezbollah statements "which were 'specific as to the status of the speaker,' 'the circumstances in which the statements were made,' and 'the other specific media in which they were made.'" *Honickman*, 6 F.4th at 502. All of that is completely lacking here.

> b. *Plaintiffs Fail to Plausibly Allege That Qatar Charity's Alleged Assistance Was "Substantial" For Purposes of Secondary Liability Under § 2333(d)*

Only conduct that "play[ed] a 'major part in prompting the tort' or [was] 'integral' to the tort [should] be considered substantial assistance." *Copeland v. Twitter, Inc.*, 352 F. Supp. 3d 965, 976 (N.D. Cal. 2018) (quoting *Halberstam*, 705 F.2d at 484).  Failure to adequately plead the "substantial assistance" element is grounds for dismissal.  *Siegel v. HSBC North Am. Holdings, Inc.*, 933 F.3d 217, 225 (2d Cir. 2019); *Honickman*, 432 F. Supp. 3d at 267–70; *Averbach*, 2020 WL 486860, at \*16–17.  The *Halberstam* framework provides six factors for determining "how much encouragement or assistance is substantial enough."  These include (1) "the nature of the act encouraged;" (2) "the amount . . . of assistance given" by defendant; (3) "defendant's absence or presence at the time of the tort;" (4) defendant's "relation to" the principal; (5) "defendant's state of mind;" and (6) the period of defendant's assistance." *Halberstam*, 705 F.2d at 483–84.  Here, for the reasons discussed above, the *Halberstam* factors weigh heavily in favor of dismissal.

## III. PLAINTIFFS FAILED TO PROPERLY EFFECT SERVICE OF PROCESS ON QATAR CHARITY

By Order dated December 1, 2022, this Court authorized alternative service.  Plaintiffs filed a Proof of Service via Email to counsel as to Qatar Charity and QNB with this Court on December 9, 2022 (Docket No. 52).  To preserve the record, Qatar Charity repeats its objections as set forth in its brief in opposition (Docket No. 45), incorporated here.

## <u>CONCLUSION</u>

For each of the foregoing reasons, this Court should dismiss the Complaint in its entirety.

Respectfully submitted,

Dated: December 9, 2022
   Miami, Florida

**DLA PIPER LLP (US)**

By:  */s/ Harout J. Samra*
   Harout J. Samra
   Florida Bar No. 70523

200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131
Tel:  305.423.8534
Email:  harout.samra@dlapiper.com

John M. Hillebrecht*
Kevin Walsh*
Jessica A. Masella*
Lane Earnest McKee*
Michael G. Lewis*
  *Pro Hac Vice*

1251 Avenue of the Americas, 27th Floor
New York, NY 10020
Tel:  212.335.4500
Email:  john.hillebrecht@us.dlapiper.com
   kevin.walsh@us.dlapiper.com
   jessica.masella@us.dlapiper.com
   lane.mckee@us.dlapiper.com
   michael.lewis@us.dlapiper.com

*Counsel for Qatar Charity*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 9, 2022, a true and correct copy of the foregoing

was served via transmission of Notices of Electronic Filing generated by CM/ECF on all counsel

or parties of record.

By: _/s/ Harout J. Samra_
Harout J. Samra
Florida Bar No. 70523