**IN THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN
DISTRICT OF FLORIDA WEST PALM
BEACH DIVISION**

ARTHUR BARRY SOTLOFF Individually and
as the Administrator of the Estate of STEVEN
JOEL SOTLOFF; SHIRLEY GOLDIE
PULWER, and LAUREN SOTLOFF,

     *Plaintiffs*,

          v.

QATAR CHARITY and QATAR NATIONAL
BANK (Q.P.S.C.),

     *Defendants*.

Case No. 9:22-cv-80726

**PLAINTIFFS' OPPOSITION TO DEFENDANT QATAR NATIONAL BANK'S
AMENDED MOTION TO DISMISS [DE 53] AND DEFENDANT QATAR CHARITY'S
MOTION TO DISMISS [DE 54] AND MEMORANDUM IN SUPPORT THEREOF**

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ......................................................................................................................... 2

I.   This Court May Exercise Personal Jurisdiction over Both Defendants ................................2

    A.   Defendants' Use of the U.S. Banking System to Transfer Dollars for Known
        Terrorist Client and Payee Satisfy Statutory and Due Process Requirements ...........2

    B.   Defendants' Knowing Support of a Terrorist Organization with a History of
        Targeting and Brutally Murdering Americans Also Satisfies Due Process
        Requirements Via the "Effects Doctrine" ...................................................................10

    C.   Defendants Do Not Allege That This Court's Exercise of Personal Jurisdiction
        "Would Violate Traditional Notions of Fair Play and Substantial Justice," Nor Can
        They......................................................................................................................13

    D.   Florida's Long-Arm Statute Provides an Alternative Basis for Personal Jurisdiction
        Over all Defendants...................................................................................................15

    E.   If the Court Finds Plaintiffs' Jurisdictional Allegations Inconclusive, Plaintiffs
        Request the Opportunity to Conduct Jurisdictional Discovery ...................................17

II.  Plaintiffs State a Claim that Defendants are Secondarily Liable under 18 U.S.C. § 2333(d)
    for Aiding and Abetting...........................................................................................................18

    A.   Defendants Aided ISIS and Fadhel Al Salim, who Carried out the Execution of
        Steven Sotloff, the "the Wrongful Act That Cause[d] Injury"...................................18

    B.   Plaintiffs Plausibly Allege that Defendants Were Generally Aware of Their Role in
        Unlawful Activities .................................................................................................19

    C.    Plaintiffs Plausibly Allege the "Substantial Assistance" Factors ............................23

III. Plaintiffs State a Valid Claim that Defendants are Secondarily Liable under 18 U.S.C. §
    2333(d) for Conspiracy..........................................................................................................27

IV.  Plaintiffs Plausibly Allege Primary Liability Under 18 U.S.C. § 2333(a)............................29

CONCLUSION....................................................................................................................... 33

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*APWU v. Potter*,
343 F.3d 619 (2d Cir. 2003) .......................................................................................... 17

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................................................................................................... 24

*Atchley v. Astrazeneca UK Ltd.*,
22 F.4th 204 (D.C. Cir. 2022) ........................................................................... 19, 25, 26

*Berdeaux v. OneCoin Ltd.*,
2021 WL 4267693 (S.D.N.Y. 2021) ................................................................................ 6

*Bernhardt v. Islamic Republic of Iran*,
47 F.4th 856 (D.C. Cir. 2022) ....................................................................................... 26

*Blanco v. Carigulf Lines*,
632 F.2d 656 (5th Cir. 1980) ......................................................................................... 17

*Boim v. Holy Land Foundation for Relief and Development*,
549 F.3d 685 (7th Cir. 2008) .................................................................................... 30, 31

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985) ......................................................................................................... 2

*Calder v. Jones*,
 465 U.S. 783 (1984) ...................................................................................................... 13

*Catalyst Pharms., Inc. v. Fullerton*,
2017 WL 6558397 (S.D. Fla. 2017) .............................................................................. 15

*Del Valle v. Trivago GMBH*,
2022 WL 17101160 (11th Cir 2022)…………………………………………………..13

*Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*,
593 F.3d 1249 (11th Cir. 2010) ..................................................................................... 14

*Eaton v. Dorchester Dev., Inc.*,
692 F.2d 727 (11th Cir. 1982) ....................................................................................... 17

*Freeman v. HSBC Holdings PLC*,
413 F. Supp. 3d 220 (E.D. NY 2020) ...................................................................... 28

*GTE New Media Servs. Inc. v. BellSouth Corp.*,
199 F.3d 1343 (D.C. Cir. 2000) ............................................................................... 10

*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983) ...................................................................... 18, 23, 25, 27

*Honickman v. BLOM Bank SAL*,
6 F.4th 487 (2d Cir. 2021) .............................................................................. passim

*In re Chiquita Brands Int'l, Inc.*,
284 F. Supp. 3d 1284 (S.D. Fla. 2018) .................................................................... 33

*In re Terrorist Attacks on Sept. 11, 2001*,
392 F. Supp. 2d 539 (S.D.N.Y. 2005) ..................................................................... 10

*Internet Sols. Corp. v. Marshall*,
557 F.3d 1293 (11th Cir. 2009) ........................................................................... 8, 15

*ISI Int'l, Inc. v. Borden Ladner Gervais*, LLP,
256 F.3d 548 (7th Cir. 2001) ..................................................................................... 3

*Jackson v. Wal-Mart Stores, Inc.*,
753 F. App'x 866 (11th Cir. 2018) .......................................................................... 24

*Kaplan v. Lebanese Canadian Bank, SAL*,
999 F.3d 842 (2d Cir. 2021) ............................................................................ passim

*Kemper v. Deutsche Bank AG*,
911 F.3d 383 (7th Cir. 2018) .................................................................................. 31

*Kordash v. United States*,
2021 WL 8894304 (S.D. Fla. Apr. 29, 2021) .......................................................... 16

*Lanfear v. Home Depot, Inc.*,
679 F.3d 1267 (11th Cir. 2012) .............................................................................. 25

*Licci ex rel. Licci v. Lebanese Canadian Bank*, SAL,
732 F.3d 161 (2d Cir. 2013) ..................................................................................... 6

*Licciardello v. Lovelady*,
544 F.3d 1280 (11th Cir. 2008) ........................................................................ 13

*Linde v. Arab Bank, PLC*,
882 F.3d 314 (2d Cir. 2018) ........................................................................ 19, 30

*Louis Vuitton Malletetier, S.A. v. Mosseri*,
736 F.3d 1339 (11th Cir. 2013) .................................................................... 3, 13

*Miller v. Arab Bank, PLC*,
372 F. Supp. 3d 33 (E.D.N.Y. 2019) .................................................................. 30

*Miller v. Gizmodo Media Grp., LLC*,
383 F. Supp. 3d 1365 (S.D. Fla. 2019) ............................................................... 15

*Morris v. Khadr*,
415 F. Supp. 2d 1323 (D. Utah 2006) ..................................................... 10, 11, 14

*Oppenheimer Fund, Inc. v. Sanders*,
437 U.S. 340 (1978) .................................................................................... 17

*Phoenix Consulting, Inc. v. Republic of Angola*,
216 F.3d 36 (D.C. Cir. 2000) ........................................................................ 17

*PowerTec Sols. Int'l, LLC v. Hardin*,
2019 WL 6170040 ...................................................................................... 3

*Quail Cruises Ship Mgmt., Ltd. v. Agencia de Viagens CVC Tur Limitada*,
2011 WL 5057203 (S.D. Fla. 2011) ................................................................. 16

*Rothstein v. UBS AG*,
708 F.3d 82 (2d Cir. 2013) ........................................................................... 32

*Rushaid v. Pictet & Cie*,
28 N.Y.3d 316 (N.Y. 2016) ............................................................................ 6

*Schansman v. Sberbank of Russia PJSC*,
565 F. Supp. 3d 405 (S.D.N.Y. 2021) ............................................................... 30

*Schrier* v. Qatar Islamic Bank,
2022 WL 4598630 (S.D. Fla. 2022) ............................................................ passim

*Siegel v. HSBC N. Am. Holdings, Inc* ............................................................................ 22, 26

*Weiss v. Nat'l Westminster Bank PLC*,
278 F. Supp. 3d 636 (E.D.N.Y. 2017) ....................................................................... 28, 32

*Wolf v. Celebrity Cruises, Inc.*,
683 F. App'x 786 (11th Cir. 2017) .................................................................................. 17

*World–Wide Volkswagen Corp. v. Woodson*,
444 U.S. 286 (1980) ........................................................................................................ 14

*Wultz v. Islamic Republic of Iran*,
755 F. Supp. 2d 1 (D.D.C. 2010) ........................................................................... 2, 9, 14

**Statutes**

§ 48.193(1)(a)(2) .......................................................................................................... 15, 17
18 U.S.C. § 2331(1)(A) ...................................................................................................... 30
18 U.S.C. § 2331(1)(B) ...................................................................................................... 30
18 U.S.C. § 2333(a) ..................................................................................................... 29, 32
18 U.S.C. § 2333(d) ..................................................................................................... 27, 33
Fla. Stat. § 48.193(1)(a)(2) ............................................................................................... 15

**Rules**

Rule 4(k)(1)(a) .................................................................................................................... 15

## PRELIMINARY STATEMENT

Plaintiffs are the estate and immediate family of Steven Sotloff, who was brutally beheaded by the Islamic State after it kidnapped and tortured him for more than a year. Plaintiffs allege that Defendants, a bank and a "charity," are controlled by the Qatari Royal Family and chose to participate in a conspiracy to destabilize Qatar's regional rival, the government of the Syrian Arab Republic ("Assad Regime"), through the funding of terrorism and the creation of an extremist Islamic state in Syria. Defendant Qatar National Bank ("QNB") transferred funds from Qatar Charity ("QC"), a member of the Union of Good, a Specially Designated National ("SDN") under the U.S.' Specially Designated Global Terrorists ("SDGT") program, to Fadhel al Salim, a member of al Nusra, Al Qaeda in Iraq's ("AQI") successor and a U.S. designated Foreign Terrorist Organization ("FTO") already notorious for abducting, torturing, and killing Americans in precisely the manner Steven was killed. Defendants moved this money into the account of al Salim—a man who had publicly and expressly threatened to create an Islamic state in Syria on behalf of al Nusra—at a bank in a country bordering Syria, at a time in which multiple American hostages including Steven Sotloff were being held in Syria. Unsurprisingly, Fadhel al Salim would go on to become a member of the Islamic State and from that position order the execution of Steven Sotloff. In its designation of Defendant QC as a member of the Union of Good, this Israeli government explicitly warned banks like Defendant QNB that doing business with QC might result in their being haled into U.S. courts to answer for injuries to U.S. nationals.

In response to these allegations Defendants feign ignorance and express surprise that they might be held accountable in this Court for their role in Steven's death. Regardless, as discussed in detail below, this Court is statutorily and constitutionally authorized to exercise personal jurisdiction as to both Defendants and Plaintiffs have more than adequately pled their primary and secondary liability claims under the Anti-Terrorism Act.

1

## ARGUMENT

### I.   This Court May Exercise Personal Jurisdiction over Both Defendants

"A court has specific personal jurisdiction when a defendant's contacts with the forum derive from the defendant having purposefully directed its activities toward the forum and when the litigation arises out of or relates to those activities." *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 32 (D.D.C. 2010) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)). This court may exercise personal jurisdiction over both Defendants for two independently sufficient reasons: (1) they both purposefully (and necessarily) availed themselves of the U.S. financial system to transfer U.S. dollars from a designated terror financier to a designated Foreign Terrorist Organization ("FTO") or alternatively, because (2) Defendants directed their conduct at the United States by sending money to an FTO with a history of brutally executing Americans at the time American hostages including Steven Sotloff were already being held captive, and to the specific terrorist who played a key role in the execution of Steven Sotloff.

### A.   Defendants' Use of the U.S. Banking System to Transfer Dollars for Known Terrorist Client and Payee Satisfy Statutory and Due Process Requirements

Defendants' personal jurisdiction defense focuses exclusively on their banking contacts with the United States, heavily relying on *Schrier v. Qatar Islamic Bank* for the proposition that this Court may not exert personal jurisdiction over them. QC MTD at 2, 6, 8, 9, 12, QNB MTD at 4-6, 24. Even through the *Schrier* lens, Plaintiffs' allegations satisfy the requirements of Fed. R. Civ. P. 4(k)(2) as well as constitutional due process requirements.

A federal court's determination of personal jurisdiction over a nonresident defendant requires a finding that: (1) there exists a statutory basis for jurisdiction over the defendant, and (2) application of this statutory basis comports with constitutional due process requirements. QC MTD

at 6 (citing *Schrier*, 2022 WL 4598630, at *6); QNB MTD (citing *PowerTec Sols. Int'l, LLC v. Hardin*, 2019 WL 6170040, at *6 (S.D. Fla. Nov. 20, 2019)). However, Defendants ignore the *Schrier* ruling that a statutory basis for personal jurisdiction exists under Rule 4(k)(2) over defendant Qatar Islamic Bank because, as here, (1) plaintiffs "asserted 'a claim that arises under federal law,'" (2) plaintiffs "serve[d] a summons," and (3) defendant failed to meet its burden of identifying another state where it is subject to personal jurisdiction." *Schrier*, 2022 WL 4598630, at *16 ("A defendant who wants to preclude use of Rule 4(k)(2) has only to name some other state in which the suit could proceed.") (quoting *ISI Int'l, Inc. v. Borden Ladner Gervais*, LLP, 256 F.3d 548, 552 (7th Cir. 2001) (Easterbrook, J.)) (noting that "federal courts around the country have adopted Judge Easterbrook's reasoning.").

While the *Schrier* court found that its exercise of personal jurisdiction would not comport with constitutional due process requirements under the facts of that case, its analysis—studiously truncated by Defendants in their briefs—strongly militates towards the opposite finding under the facts of this case. In specific jurisdiction cases, the court may apply the following three-part "minimum contacts" test:

> (1) whether the plaintiff's claims arise out of or relate to at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant purposefully availed himself of the privilege of conducting activities with the forum state, thus invoking the benefit of the forum state's law; and (3) whether the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice.

2022 WL 4598630, at *18 (quoting *Louis Vuitton Malletetier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013)).

Specifically, the *Schrier* court found the relationship between the financial transactions alleged in Schrier's complaint and the harm suffered too "attenuated" to satisfy the "relatedness" prong. 2022 WL 4598630, at *19. The court carried out the "fact-sensitive inquiry . . . hewing

closely to the foreseeability and fundamental fairness principles" required by the Eleventh Circuit,

and focused on the following facts:

1) "Schrier advances only the general allegation that some 'funds'—not *these specific funds*—flowed through the QIB accounts and went to support the Qatar Charity."
2) While "Schrier (it's true) does aver that Qatar Charity had some documented connections to Islamist terror groups . . . he never alleges (or shows) that *the three pre-escape transactions* he's identified here supported *either* the Qatar Charity *or* the two groups that held him (Nusra Front and Ahrar al-Sham)."
3) "And there's no evidence that, through the three fund transfers Schrier relies on here, QIB was knowingly funding the groups that held him hostage. For another, there's no evidence—as there was in the Sept. 11 case—that QIB directly (or even indirectly) funded two (or, frankly, any) of the men who held Schrier captive."
4) "QIB appended [an affidavit (and some accompanying exhibits)] to its MTD, which unambiguously suggest that these transfers went to legitimate organizations."

2022 WL 4598630, at **19-20, 23 (emphasis in original).

In contrast to the facts in *Schrier*, Plaintiffs allege Defendant QNB transferred funds

through a correspondent bank in New York, Compl. ¶¶ 102, 122-25, directly from its customer

QC—a charity identified by Israel as a member of the U.S.-designated SDN the Union of Good,

Compl. ¶¶40-55—to a lawyer named Fadhel Al Salim who months before the transfer publicly

declared on behalf of the Nusra Front, a U.S.-designated FTO[1]:

> We are working to re-establish the Islamic caliphate in Syria, and we have informed [Syrian National Council head] Moaz al-Khatib that we will not accept the building of a civil state in Syria. We control the ground and will rule by Islamic law.

Compl. ¶¶ 103-104.  Defendant QC argues that "the Complaint does not allege that anybody at

Qatar Charity had any knowledge of al Salim whatsoever, to say nothing of facts linking him to

violence, terrorism, or the Nusra Front." This is false; Plaintiffs allege that in March 2013 Salim

publicly declared his support for al Nusra, a U.S. designated FTO, and that acting as al Nusra's

---

[1] At the time of the transfer, the "United States Department of State had already designated Al Nusra as an FTO ["Foreign Terrorist Organization"] in recognition of the fact that it was an "alias" of AQI, led by the same terrorists, that had claimed nearly 600 attacks, seeking to "hijack the struggles of the Syrian people for its own malign purposes. Complaint ¶105.

mouthpiece, he declared their intention to create an Islamic state in Syria. Compl. ¶¶ 103, 212(c). Defendant QC argues that Plaintiffs failed to identify when this statement occurred or how it was published. This is false; Plaintiffs allege that this statement was reported in the Daily Star Lebanon on March, 19, 2013, and provide an archived link to that publication from that same day. Complaint at n. 23.

This payment to Al Salim took place on October 16, 2013, more than two months after ISIS took Steven Sotloff hostage.[2] Compl. ¶¶ 2, 106. Additionally, Al Salim immediately used the funds to "found and organize a brigade of Islamic State fighters under the nom de guerre Abu al Mughira al-Hashemi, and to become a Sharia Judge under the Islamic State," a position from which he ordered the execution of Steven Sotloff, by televised beheading within a year of the payment from Defendants. Compl. ¶¶ 3, 39, 106-07, 112, 226. Defendants knew what would happen to Steven Sotloff based upon more than a decade of infamous and widely-televised and reported prior examples of kidnapped and beheaded American hostages in Iraq and Syria. Compl. ¶ 28 ("Based upon the infamous and widely-publicized activities of Zarqawi and his successors which began in 2002, Defendants knew or recklessly ignored the fact that ISIS would target Westerners and Americans for spectacular acts of terrorism and murder."). As the U.S. District Court for the District of Columbia found in the Sotloff family's case against Syria for its material support of ISIS:

> The Zarqawi organization routinely kidnapped, tortured, and beheaded Americans and journalists in strikingly similar fashion. ISIS in Iraq had even "captured Americans; put them in orange jumpsuits of a kind that Mr. Sotloff and Mr. Foley

---

[2] At the time of the transfer, other U.S. nationals James Foley, Kayla Mueller, and Peter Kassig had been held for nearly a year, more than two months, and more than two weeks, respectively. At that time, the Islamic State also held many other Western hostages from different countries. *The Fate of 23 Hostages in Syria*, NY Times, Feb. 10, 2015, https://www.nytimes.com/interactive/2014/10/24/world/middleeast/the-fate-of-23-hostages-in-syria.html.

were forced to wear; [ ] tortured them; and then [ ] beheaded them on camera."
Thus, 'it was very foreseeable that it might happen again.'"

Compl. ¶80 (quoting *Sotloff v. Syrian Arab Republic*, 525 F. Supp. 3d 121, 139-40 (D.D.C. 2021)
(internal citations omitted)).

Indeed, where use of the "correspondent account at issue is alleged to have been used as
an instrument to achieve the very wrong alleged . . . [i]t should hardly be unforeseeable to a bank
that selects and makes use of a particular forum's banking system that it might be subject to the
burden of a lawsuit in that forum for wrongs related to, and arising from, that use." *Licci ex rel.
Licci v. Lebanese Canadian Bank*, SAL, 732 F.3d 161, 171 (2d Cir. 2013) (finding due process
requirements satisfied where payments to Hamas were transferred through U.S.). Because
Plaintiffs have plausibly alleged that Defendants' contacts with the United States foreseeably
resulted in the wrongful acts complained of, the "relatedness" prong of the Eleventh Circuit's
minimum contacts test is satisfied. *See Schrier*, 2022 WL 4598630, at *19.

Defendants purposefully chose to avail themselves of the benefits of U.S. correspondent
accounts; their choice was not mere "happenstance" or "incidental." *See* QNB MTD at 6 (quoting
*Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 327 (N.Y. 2016) and citing *Schrier*, 2022 WL 4598630,
at *22); QC MTD at 1 (quoting *Berdeaux v. OneCoin Ltd.*, 2021 WL 4267693, at *12 (S.D.N.Y.
2021)). Defendant QC asks an excellent question: "why on earth would [QC] invite U.S. scrutiny
of these transactions by purposefully using the U.S. banking system . . .?" QC MTD at 14. Plaintiffs'
Complaint answers this question: U.S. dollars were "a coveted currency in the world of terror
finance during the time period relevant to this action" and "U.S. dollars are the currency of choice
and lifeblood of terrorist organizations as they are necessary to purchase material and illicit
services upon which terrorist organizations such as ISIS rely." Compl. ¶¶82, 120. Plaintiffs further
allege that because QNB "cannot directly participate in either CHIPS [a private payment system]

or Fedwire [a real-time gross payment system administered by the U.S. Federal Reserve], QNB could only transfer the U.S. dollars in the amount required by deliberately availing itself of its correspondent accounts[3] at U.S. banks. Compl. ¶¶ 122-25.

For this very reason, foreign banks have continually run afoul of U.S. regulators by laundering dollars through the U.S. on behalf of terrorist organizations and state sponsors of terrorism.[4] In other words, Defendants deliberately chose dollars because their terrorist payees wanted them, and Defendants therefore intentionally availed themselves of the U.S. financial system. Neither Defendant meaningfully contests these allegations. *See* QNB MTD at 5-6; QC MTD at 14 (merely referring to them incorrectly as "conclusory"). These uncontested allegations satisfy the second prong of the Eleventh Circuit's three-part specific "minimum contacts" due process test by showing that defendants "purposefully availed [themselves] of the privilege of conducting activities with the forum state" *See Schrier*, 2022 WL 4598630, at *18.

Additionally, it should be noted that unlike Qatar Islamic Bank in *Schrier*, Defendants here have offered no evidence by affidavit, exhibit, or even unevidenced assertion demonstrating that the transfers complained of "went to legitimate organizations", which leaves Plaintiffs' allegations uncontroverted. *See id.* at *20 ("QIB has done precisely that: It's submitted documents that suggest the three pre-escape transactions have nothing to do with Schrier's claims."). Defendants are permitted to "rebut a plaintiff's allegations supporting personal jurisdiction through the submission

---

[3] Bank of New York Mellon, JP Morgan Chase Bank NA, Wells Fargo Bank NA, Standard Charted Bank (New York), and Citibank NA, among others. Compl. at ¶125.
[4] *See e.g. BNP Paribas Sentenced for Conspiring to Violate the International Emergency Economic Powers Act and the Trading with the Enemy Act*, U.S. Department of Justice, May 1, 2015, https://www.justice.gov/opa/pr/bnp-paribas-sentenced-conspiring-violate-international-emergency-economic-powers-act-and; *Manhattan U.S. Attorney Announces Criminal Charges Against Industrial Bank Of Korea For Violations Of The Bank Secrecy Act*, U.S. Department of Justice, April 20, 2020, https://www.justice.gov/usao-sdny/pr/manhattan-us-attorney-announces-criminal-charges-against-industrial-bank-korea.

of affidavits or other competent proof" but neither Defendant has chosen to do so. *See id.* (citing *Internet Sols. Corp. v. Marshall*, 557 F.3d 1293, 1295 (11th Cir. 2009) ("The plaintiff bears the burden of making out a prima facie case for personal jurisdiction by presenting sufficient evidence to withstand a directed verdict motion. The defendant then must raise, through affidavits, documents or testimony, a meritorious challenge to personal jurisdiction.").

Defendant QC submitted 17 exhibits documenting the charitable works of that organization, but none asserting that the specific payments enumerated in the Complaint were anything other than what Plaintiffs alleged: illegal payments from an SDN to an FTO. Neither Plaintiffs, nor the U.S. Department of Justice[5], nor the Israeli Ministry of Defense[6], nor the Interagency Intelligence Committee on Terrorism[7], nor the 9/11 Commission[8], nor the UK Charity Commission[9], nor Saudi Arabia, Bahrain, Egypt, and the UAE[10] allege that *none* of Defendant QC's funding goes towards legitimate charitable projects. Such projects are not a shield to legal liability and the notion that entities conducting charitable work are incapable of terror finance is ridiculous. *Risk of Terrorist Abuse in Non-Profit Organizations* at 1, Financial Action Task Force ("FATF"), June 2014, https://www.fatf-gafi.org/documents/documents/risk-terrorist-abuse-non-profits.html.  Donations to so-called charitable wings of terrorist organizations "can further terrorism by foreign groups in multiple ways . . . Such support frees up other resources within the organization that may be put to violent ends. It also importantly helps lend legitimacy to foreign terrorist groups--legitimacy

---

[5] Asserted in 2003 that Bin Laden specifically discussed Defendant QC as one of the charities used to fund Al Qaeda. Compl. ¶45; *United States of America v. Enaam M. Arnaout*, Case No. 02 CR 892, ECF No. 78-2 (N.D. Ill. Jan. 6, 2003).

[6]  Designated QC as a terrorist organization in 2008. Compl. ¶55.

[7] Listed QC as a "priority III terrorism support entity (TSE)" in 2008. Compl. ¶42.

[8] Found QC to be one of Bin Laden's funders. Compl. ¶44.

[9] Linking QC to terror finance in 2015 report. Compl. ¶57.

[10] Designated QC as a terror financier in 2017. Compl, ¶59.

that makes it easier for those groups to persist, to recruit members, and to raise funds--all of which facilitate more terrorist attacks." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 30 (2010).

A court cannot exercise specific personal jurisdiction based on "the mere provision of routine banking services that benefitted a terrorist organization 'in some general, nondescript manner,'" "'[i]n the absence of any allegations that a bank has ties to a terrorist organization, or that it knew or had reason to believe that the monies it was processing through the bank would be used to carry out terrorist attacks on civilian targets.'" *Wultz*, 755 F. Supp. 2d at 34 (citing *In re Terrorist Attacks on Sept. 11, 2001*, 718 F. Supp. 2d 456, 488–90 (S.D.N.Y.2010)). However, as discussed earlier in this section, Plaintiffs allege precisely the opposite: Defendant QNB transferred funds through a correspondent bank in New York, Compl. ¶¶ 102, 122-25, directly from its customer QC—a charity identified by Israel as a member of the U.S.-designated SDN Union of Good, Compl. ¶¶40-55—to a lawyer named Fadhel Al Salim who months before the transfer publicly declared on behalf of the Nusra Front, a U.S.-designated FTO, their intention to "re-establish the Islamic caliphate in Syria." Compl. ¶¶ 103-105.

Where, as here, "a bank has knowledge that it is funding terrorists, however, contacts created by such funding can support such a finding [of specific personal jurisdiction]." *See Wultz*, 755 F. Supp. 2d at 34. This focus "on the importance of *knowledge* . . . 'that [Defendants] knew or had reason to believe that the monies it was processing through the bank would be used to carry out terrorist attacks on civilian targets,'" strongly supports a finding that Plaintiffs' allegations satisfy the "minimum contacts" requirements of the Fourteenth Amendment Due Process clause. *See Schrier*, 2022 WL 4598630, at *23 (quoting *Wultz*, 755 F. Supp. 2d at 34) (emphasis in original).

**B. Defendants' Knowing Support of a Terrorist Organization with a History of Targeting and Brutally Murdering Americans Also Satisfies Due Process Requirements Via the "Effects Doctrine"**

In *Morris v. Khadr,* 415 F. Supp. 2d 1323, 1327 (D. Utah 2006), a federal court found personal jurisdiction under the "effects doctrine" over a Canadian national who, while not directly involved in the attack at issue, "provided substantial financial support and personnel assistance to help [al Qaeda] achieve its international terrorism objectives)." "In terrorism cases, courts have employed the 'effects doctrine' to establish the requisite minimum contacts for personal jurisdiction." *Id.* at 1327. Under the effects doctrine, "jurisdiction may attach if the defendant's conduct is aimed at or has an effect in the forum." *Id.* at 1335–36 (quoting *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1349 (D.C. Cir. 2000). As the *Morris* court elaborated:

> The effects doctrine, moreover, creates personal jurisdiction even when a defendant did not personally participate in the attack itself. To establish jurisdiction over a terrorist, " 'Plaintiffs must make a prima facie showing of each Defendant's personal or direct participation in the *conduct giving rise* to Plaintiffs' injuries.' " **Terrorist attacks require more than a triggerman—they also require financing**, planning, and coordinating before a bomb detonates or a plane flies into a building. **As such, a defendant's "conduct giving rise" to a terrorism victim's injuries includes any personal "participation in al Qaeda's terrorist agenda," not just an attack**.

415 F. Supp. 2d at 1327 (citing *In re Terrorist Attacks on Sept. 11, 2001*, 392 F. Supp. 2d 539, 558 (S.D.N.Y. 2005) (emphasis added).

As in the case of the Islamic State's abduction, torture, and execution of Steven Sotloff, Compl. ¶¶227-34, "Al Qaeda's attack on Mr. Morris and Mr. Speer was an 'unabashedly malignant action[ ] directed at [and] felt in' the United States. " *Morris*, 415 F. Supp. 2d at 1336. (citation omitted). Indeed, before his execution, Steven Sotloff was forced to recite on camera anti-American screen intended to affect U.S. foreign policy and terrify the public. Compl. ¶230 ("Obama, your foreign policy of intervention in Iraq was supposed to be for the preservation of American lives and interests, so why is it that I am paying the price of your interference with my

life?"). Before murdering Sotloff, his executioner made similar remarks. Compl. ¶243 ("You, Obama, have [nothing] to gain from your actions but another American citizen. So just as your missiles continue to strike our people, our knife will continue to strike the necks of your people..."). The act of filming Sotloff's beheading live and distributing it online was also itself facially intended to terrorize Americans and influence U.S. policy. *See* Compl. ¶235.

Also, as in *Morris*, the defendant provided financial support directly to Al Qaeda, the terrorist group that physically carried out the attack, 415 F. Supp. 2d at 1327; here Plaintiffs allege Defendant QNB transferred funds directly from its customer and notorious Israel-designated terror financier Defendant QC, Compl. ¶¶40-55, to Fadhel Al Salim, a lawyer who, months before the transfer publicly spoke on behalf of the Nusra Front, a U.S.-designated FTO, with a history of killing Americans in the same manner as Steven Sotloff was killed. Compl. ¶¶ 4-7, 103-04, 105, 107, 112.

Finally, in *Morris*, the defendant encouraged his son to join Al Qaeda, where he played a central role in the attack. 415 F. Supp. 2d at 1323. Similarly, Defendants provided funding to Fadhel al Salim, "so that he could found a militant brigade [and] join ISIS," which he proceeded to do within 24 hours of receiving payment. Compl. ¶¶3, 103-05, 112, 212(c). As discussed throughout this section, as an ISIS judge, Salim would go on to order the execution of Steven Sotloff. Compl. ¶107.

The abduction, torture, and murder of an American victim like Steven Sotloff was a "foreseeable consequence" of both Defendants' individual roles in the payment of funds from one known terror financier to a known member of an FTO. *See Schrier*, 2022 WL 4598630, at *19-20, *22 ("injury in the United States undeniably is a foreseeable effect of a terrorist attack purposefully directed at this country's citizens") (quoting *Morris*, 415 F. Supp. 2d at 1335-36).

While Plaintiffs' conspiracy allegations are surplus to the due process requirements of personal jurisdiction, Defendants—as part of a conspiracy to "to establish an Islamic state in Syria and to destabilize . . . [Qatar's] regional rival, [Syria's] Assad Regime"—subordinated themselves to the interests of the Qatari Royal Family. Compl. ¶¶1, 36-37, 61, 78, 212, 258. "Defendants, whose boards and management are controlled by Qatari Royal Family members and government officials, and who are regulated by the Qatari government,[11] shared Qatar's objectives. *Id*. So, not only was the harm to Steven Sotloff and his family a foreseeable result of Defendant's misconduct, *see supra* Section IA-B, but Plaintiffs allege it was the *intended* result of Defendants' conspiracy:

> The members of the conspiracy paid this sum to al Salim so that he could found a militant brigade, join ISIS, and destabilize Syria by committing acts of terror, such as the murder of American hostages like Steven. Predecessor terrorist groups in Iraq and Syria which later morphed into ISIS had been practicing this tactic for many years, dating at least to the U.S. invasion of Iraq in 2003.

Compl. ¶3.

---

[11] Specifically, Plaintiffs alleged that "QNB was controlled by the Qatari government and members of the Qatari Royal Family through their substantial stock ownership in the bank and membership on the bank's board of directors." And that "[s]everal members of the Qatari Royal Family are or have been members QNB's board, including the bank's current vice-chair, Sheikh Fahad Bin Faisal Al-Thani (also the vice Governor of Qatar Central Bank), chairman Ali Ahmed Al Kuwari, Qatar's Minister of Finance, Sheikh Abdulrahman Bin Saud Bin Fahad Al-Thani, and Sheikh Hamad Bin Jaber Bin Jassim Al-Thani") Compl. ¶36. Plaintiffs further allege that "QNB's regulator in Qatar, Qatar Central Bank, was at the time of the misconduct described in this Complaint, governed by senior members of the Qatari ruling family: Sheikh Abdullah Bin Saoud Al-Thani as Governor; and Sheikh Fahad Faisal Al-Thani as Deputy Governor." Compl. ¶37. As to Defendant QC, Plaintiffs allege "[a]t all times relevant to this Complaint, the chairman of the Qatar Charity board has been Hamad bin Nasser al-Thani, a member of the Qatari Royal Family, former Minister of State, Minister of Interior Affairs, and General Secretary of the Ruling Family Affairs Council. The vice chairman is Ahmad Abdulla S G Al-Marri, former Minister of Endowments and Islamic Affairs, Adviser to the Emir of Qatar. Other board members include Mohamed Abdelwahed Al Hammadi, Minister of Education and Higher Education and Secretary-General of the Supreme Education Council, Yousef bin Ahmed Al Kuwari, member of the Shura Council (one of two main branches of Qatar's legislative body), and Mohamed Nasser M A. Al Hajri, Director of Economic and Political Affairs for the Emir of Qatar's Diwan (administrative office of the Emir)."

The Eleventh Circuit agrees that "[u]nder the effects test, a nonresident defendant's single tortious act can establish purposeful availment without regard to whether the defendant had any other contacts with the forum state." *Del Valle v. Trivago GMBH*, 2022 WL 17101160, at *5 (11th Cir. Nov. 22, 2022) (citing *Calder v. Jones*, 465 U.S. 783, 790 (1984)); *Licciardello v. Lovelady*, 544 F.3d 1280, 1287–88 (11th Cir. 2008) (same).

It should be noted that Defendant QC's contention that it is not subject to personal jurisdiction under Rule 4(k)(2) because that provision "does not permit conspiracy jurisdiction" QC MTD at 12,[12] is irrelevant in the context of the effects doctrine. Specifically, Plaintiffs allege that—in addition to QC's and QNB's conspiracy to process USD payments to FTOs—the payment from QC to FTO member Fadhel al Salim was "aimed at or has an effect in the forum." *See Morris*, 415 F. Supp. 2d at 1335-36. Thus as in *Morris*, QC's own conduct provided financial aid to an FTO and encouraged the participation of one of the key actors in the murder of Steven Sotloff, *see id.*, which does not require demonstration of a conspiracy.

### C. Defendants Do Not Allege That This Court's Exercise of Personal Jurisdiction "Would Violate Traditional Notions of Fair Play and Substantial Justice," Nor Can They

While Defendants note that the third and final prong of the due process analysis for specific personal jurisdiction is "whether the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice," neither asserts that this Court's exercise of personal jurisdiction would violate those norms. QNB MTD at 4-5 (quoting *Louis Vuitton Malletetier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013)); QC MTD at 6, 12 (same). The "plaintiff bears

---

[12] Regardless, Plaintiffs' allegation that QC directed QNB to generate the U.S. dollars coveted by QC's terrorist payees subjects it to personal jurisdiction under Rule 4(k)(2) not because Defendant QNB was its co-conspirator, but because it was also Defendants QC's *agent. See supra* Section I.A (noting that QC's choice of dollars was not "happenstance" or "incidental").

the burden of establishing the first two prongs [relatedness and purposeful availment], and if the plaintiff does so, 'a defendant must make a 'compelling case' that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice.'" *Mosseri*, 736 F.3d at 1355 (quoting *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.,* 593 F.3d 1249, 1267 (11th Cir. 2010)). Plaintiffs have met their burden as to prongs one and two, Defendants have not attempted to meet their burden as to prong three.

Moreover, even if Defendants had attempted to meet their burden, their arguments would be necessarily unpersuasive. Defendant QNB was expressly warned in 2008 by the Israeli government that it might be subject to "civil lawsuits by victims of terrorism" in the United States if it continued to provide financial services to Qatar Charity after its designation by Israel as a member of the Union of Good, a U.S.-designated Specially Designated National ("SDN") under the Specially Designated Global Terrorists ("SDGT") program. Compl. at ¶¶55-56[13]. Additionally, Defendants are "fully aware of U.S. law concerning financial institutions, including provisions of the ATA criminalizing material support to terrorist organizations" and "should be aware that *any* party subject to a civil claim under § 2333 may be hauled into *any* U.S. District Court, per the provision of nationwide service of process." *See Wultz*, 755 F. Supp. 2d at 34–35 (emphasis in original). Moreover, "since the attack complained of here occurred several years after the September 11 attacks and the lawsuits stemming from them," [Defendants] should have foreseen that "attacking Americans was the sort of 'conduct and connection with the' United States that might reasonably lead [them] to be 'haled into court' here." *Morris*, 415 F. Supp. at 1336 (quoting *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980)).

---

[13] Treasury Designates the Union of Good, U.S. Department of the Treasury, Nov. 12, 2008, https://home.treasury.gov/news/press-releases/hp1267

For all the above reasons, Plaintiffs' complaint satisfies the statutory and due process requirements necessary for this Court to exercise personal jurisdiction over Defendant QNB and Defendant QC.

### D. Florida's Long-Arm Statute Provides an Alternative Basis for Personal Jurisdiction Over all Defendants

Rule 4(k)(1)(a) provides that a federal court may exercise personal jurisdiction over a defendant to the extent allowed by the state in which that court sits. QC MTD at 7. Florida's long-arm statute provides for personal jurisdiction over causes of action arising from, among other acts, "committing a tortious act within the state." Fla. Stat. § 48.193(1)(a)(2). For the purposes of § 48.193(1)(a)(2), a nonresident defendant commits a tortious act in Florida where the tortious act involves publication of materials on a website accessible in Florida and accessed in Florida. *See Miller v. Gizmodo Media Grp., LLC*, 383 F. Supp. 3d 1365, 1371 (S.D. Fla. 2019) (citing *Internet Sols. Corp. v. Marshall*, 39 So. 3d 1201, 1216 (Fla. 2010); *Internet Sols. Corp. v. Marshall*, 611 F.3d 1368, 1370 (11th Cir. 2010) (finding that the tort of defamation occurred in Florida when defamatory materials were published to a website accessible in Florida)). Indeed, when online materials are accessed in Florida, they are "thereby published, in Florida." *Id*. (citing *Catalyst Pharms., Inc. v. Fullerton*, No. 16-25365, 2017 WL 6558397, at *6 (S.D. Fla. Aug. 8, 2017)). By publishing the Foley execution video (in which Sotloff appears), and the Sotloff execution video online, Compl. ¶¶ 89(d), 230-235, where they could be accessed by Plaintiffs in Florida, ISIS both published materials in Florida and committed the tort of intentional infliction of emotional distress as to Plaintiffs. Under Florida law, the elements of a claim for IIED are: "(1) [t]he wrongdoer's conduct was intentional or reckless, that is, he intended his behavior when he knew or should have known that emotional distress would likely result; (2) [t]he conduct was outrageous, that is, as to go beyond all bounds of decency, and to be regarded as odious and utterly intolerable in a civilized

community; (3) [t]he conduct caused emotional distress; and (4) [t]he emotional distress was severe." *Kordash v. United States*, No. 1:20-CV-24257-KMM, 2021 WL 8894304, at *12 (S.D. Fla. Apr. 29, 2021). ISIS' recorded beheading of Sotloff, as observed by Plaintiffs, unquestionably meets this definition.

"Under Florida law, then, "personal jurisdiction can be exercised over a non-resident defendant under the 'co-conspirator theory' if: (1) jurisdiction can, under the traditional tests discussed below [such as the "effects doctrine"], be asserted over a 'resident' defendant (*i.e.* one with sufficient ties to the state); (2) the plaintiff can demonstrate the existence of a conspiracy in which the non-resident defendant and the resident defendant participated; and (3) an overt act in furtherance of the conspiracy took place within the state." *Schrier*, 2022 WL 4598630, at *12 (citing *Quail Cruises Ship Mgmt., Ltd. v. Agencia de Viagens CVC Tur Limitada*, 2011 WL 5057203, at *4 (S.D. Fla. Oct. 24, 2011)). Defendants qualify under this test because they conspired with Al Salim and ISIS, among others, to destabilize Qatar's regional rival, Syria, by supporting and committing acts of terror, "such as the murder of American hostages like Steven," *See supra* Section I.B; Compl. ¶¶ 3, 19, 20, 77, 253.

First, for the same reasons discussed above in Section I.B, there is no constitutional bar to this Court asserting jurisdiction over the "resident" conspirators, ISIS and al Salim. Second, Plaintiffs have amply demonstrated the existence of the conspiracy. *See supra* Section III. Third, Plaintiffs allege that the overt act of intentional infliction of emotional distress furthered the conspiracy because "Steven Sotloff's televised beheading by ISIS . . . furthered the objectives of the conspiracy in that it strengthened ISIS, helped ISIS gather recruits, terrorized the population of Syria and the United States, and offered ISIS the opportunity to spread extremist Sunni propaganda favored by Defendants and their co-conspirators." Compl. ¶ 19. Accordingly, there is

no statutory or constitutional bar to this Court exerting personal jurisdiction over Defendants under Fla. Stat. § 48.193(1)(a)(2).

### E. If the Court Finds Plaintiffs' Jurisdictional Allegations Inconclusive, Plaintiffs Request the Opportunity to Conduct Jurisdictional Discovery

If the Court concludes that Plaintiffs must offer more detailed proof concerning Defendants' secret financial transactions, the Court should permit Plaintiffs to conduct the discovery necessary to uncover those hidden jurisdictional facts. Federal courts have the power to order, at their discretion, the discovery of facts necessary to ascertain their competency to entertain the merits. *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n.13 (1978).

"The right to jurisdictional discovery is a qualified one, available when a court's jurisdiction is genuinely in dispute." *Wolf v. Celebrity Cruises, Inc.*, 683 F. App'x 786, 792 (11th Cir. 2017) (internal citation omitted); *Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 730 (11th Cir. 1982)) (citing *Blanco v. Carigulf Lines*, 632 F.2d 656, 658 (5th Cir. 1980)) ("Plaintiff must be given an opportunity to develop facts sufficient to support a determination on the issue of jurisdiction. As we said in *Blanco*, 'the rules entitle a plaintiff to elicit material through discovery before a claim may be dismissed for lack of jurisdiction.'"); *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003) ("a court should take care to give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction") (quoting *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)).

Plaintiffs have made a prima facie showing that this Court may exercise personal jurisdiction over both Defendants. However, if the Court determines that more is required than what Plaintiffs have alleged, Plaintiffs request the Court allow limited jurisdictional discovery.

## II.     Plaintiffs State a Claim that Defendants are Secondarily Liable under 18 U.S.C. § 2333(d) for Aiding and Abetting

The standard for JASTA aiding and abetting liability includes three elements: (1) "the party whom the defendant aids must perform a wrongful act that causes an injury, (2) "the defendant [must] be "generally aware" of its role in 'an overall illegal or tortious activity at the time that [it] provides the assistance,'" and (3) the defendant must have "knowingly and substantially assist[ed] the principal violation." *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 495-499 (2d Cir. 2021) (citing *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)).

### A. Defendants Aided ISIS and Fadhel Al Salim, who Carried out the Execution of Steven Sotloff, the "the Wrongful Act That Cause[d] Injury"

As in *Honickman*, "the first element, that 'the party whom the defendant aids must perform a wrongful act that causes an injury,' is straightforward. It is satisfied when the party whom the defendant directly or indirectly aided performed the injury-causing act." 6 F.4th at 495 (quoting *Halberstam*, 705 F.2d at 477) (internal citation omitted). The first element does not require that plaintiffs prove "a defendant actually 'aided and abetted ... the person who committed' the relevant 'act of international terrorism,'" but rather merely show that the "'defendant's acts aided and abetted the principal' who committed the wrongful act 'even where [the defendant's] relevant substantial assistance was given to an intermediary' of the principal." 6 F.4th at 495 (quoting *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 856 (2d Cir. 2021)). Plaintiffs exceed the requirements of this element by alleging that Defendants aided and abetted "the principal" himself, Fadhel al Salim, the ISIS judge who ordered Steven Sotloff's execution, in that they wired him $800,000 which he immediately used to found an ISIS brigade. Compl. ¶¶3, 39, 106-07, 112, 226. Neither Defendant contests that Fadhel al Salim and ISIS performed the wrongful act that caused Plaintiffs' injuries. *See* QNB MTD at n. 5; *see generally* QC MTD.

18

### B. Plaintiffs Plausibly Allege that Defendants Were Generally Aware of Their Role in Unlawful Activities

Plaintiffs plausibly allege that all Defendants in this conspiracy were generally aware of their roles as part of overall illegal or tortious activity when they provided material assistance to the FTO. As the Second Circuit makes clear in *Honickman*, "[t]he defendant need not be generally aware of its role in the specific act that caused the plaintiff's injury," nor does it require "proof of the specific intent demanded for criminal aiding and abetting culpability," rather, "a defendant may be liable for aiding and abetting an act of terrorism if it was generally aware of its role in an 'overall illegal activity' from which an 'act of international terrorism' was a foreseeable risk.' 6 F.4th at 496-98 (citing *Linde v. Arab Bank, PLC*, 882 F.3d 314, 319 (2d Cir. 2018); *Kaplan*, 999 F.3d at 860)); *see also Atchley v. Astrazeneca UK Ltd.*, 22 F.4th 204, 220 (D.C. Cir. 2022) ("[t]here is no specific intent requirement" to commit an act of terrorism to demonstrate "general awareness.") (citing *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 863 (2d Cir. 2021)). Additionally, *Kaplan* emphasized that plaintiffs can rely on circumstantial evidence, including public information, at the pleading stage to allege general awareness. *Kaplan*, 999 F.3d at 864; *see also Atchley*, 22 F.4th at 220 (finding that media reports may establish "general awareness"). Moreover, "[a] complaint is allowed to contain general allegations as to a defendant's knowledge, see Fed. R. Civ. P. 9(b), because a plaintiff realistically cannot be expected to plead a defendant's actual state of mind." *Kaplan*, 999 F.3d at 864.

Plaintiffs allege that Defendant QNB's customer, Defendant QC, was at the time of the payment from QC to Fadhel al Salim, designated by the government of Israel as a member of the Union of Good, a U.S.-designated SDN. Compl. ¶¶55-56.[14] Defendant QC does not contest its

---

[14] Treasury Designates the Union of Good, U.S. Department of the Treasury, Nov. 12, 2008, https://home.treasury.gov/news/press-releases/hp1267

Union of Good membership.[15] *See generally* QC MTD. Not only was QNB's customer, QC, a member of a U.S.-designated SDN,[16] but its payee, Fadhel al Salim, had—months before the wire transfer—acted as a spokesperson for a U.S. designated FTO (using the pronoun "we" to refer to himself and al Nusra), declaring their intention to create an Islamic state in Syria. Compl. ¶103. Plaintiffs further allege that "the United States Department of State had already designated Al Nusra as an FTO in recognition of the fact that it was an 'alias' of AQI," an organization that since 2004 has distinguished itself under the leadership of Zarqawi through "notorious and spectacular acts of terrorism against Westerners and U.S. citizens," and "routinely kidnapped, tortured, and beheaded Americans and journalists in strikingly similar fashion" to that inflicted on Steven Sotloff. Compl. ¶¶63, 80, 105.

Additionally, Defendants "were aware that the money [transferred to al Salim] was originally and ultimately intended for ISIS," that ISIS was "the most recent iteration of the Zarqawi terrorist network, and "that ISIS had at the time [of the payment to al Salim] taken a number of American hostages, including Steven Sotloff, and that ISIS was threatening to kill Mr. Sotloff in order to extract political concessions from Syria and the United States . . . ." Compl. ¶¶28, 81, 111. This information would have been available to QNB through its "anti-money laundering ("AML"), counter-terrorism financing ("CTF"), know-your-customer ("KYC"), and other due diligence requirements designed to prevent precisely the type of illicit activity that caused the abduction, torture, and death of Steven Sotloff," Compl. ¶¶128-217.

---

[15] Defendant QNB dismisses this allegation as "irrelevant for general awareness purposes" because this designation arises out the Union of Good's activities as the fundraising wing of the FTO Hamas, a different terrorist organization than the Islamic State. QNB MTD at 10. Not only should QC's membership in any SDN have made QNB generally aware that QC might sponsor terrorism generally, but there was at the time of the transfer an abundance of publicly available materials indicating that QC supported a variety of FTOs including the al Nusra and ISIS predecessor organization, al Qaeda. Compl. ¶ 44-50, 62, 212.

Even before factoring in the conspiracy allegations, there is no question that Defendants were "generally aware of [their] role in an 'overall illegal activity' from which an 'act of international terrorism' was a foreseeable risk." *Honickman*, 6 F.4th at 496-98.

In other words, the idea that a bank with a functioning AML system would not know that in transferring money from a member of an SDN to a member of an FTO that it was participating in "illegal activity from which an act of international terrorism was a foreseeable risk" is facially absurd. The fact that QNB had these due diligence requirements in place and still allowed itself to be used to transfer monies to a member of an FTO evidences QNB was a willing participant. Likewise, Defendant QC had access to al Salim's public statements regarding his support for al Nusra and the foundation of an Islamic state in Syria. It also knew that Israel had publicly identified it as a member of the SDN the Union of Good.

Going a step further, as part of a conspiracy to "to establish an Islamic state in Syria and to destabilize [Qatar's regional rival,] Syria's Assad Regime," Defendants subordinated themselves to the interests of the Qatari Royal Family because "Defendants, whose boards and management are controlled by Qatari Royal Family members and government officials, and who are regulated by the Qatari government, shared Qatar's objectives." Compl. ¶¶1, 36-37, 61, 78, 212, 258. So, not only were Defendants "generally aware" of their role in an illegal activity from which an act of international terrorism was a foreseeable risk, but Plaintiffs allege that acts of international terrorism were the *intended* result of their conspiracy to carry out illegal terror finance:

> The members of the conspiracy paid this sum to al Salim so that he could found a militant brigade, join ISIS, and destabilize Syria by committing acts of terror, such as the murder of American hostages like Steven. Predecessor terrorist groups in Iraq and Syria which later morphed into ISIS had been practicing this tactic for many years, dating at least to the U.S. invasion of Iraq in 2003.

Compl. ¶3. This is an unusual case where the defendants did not stumble into their support of terrorism, rather they intentionally designed it.

Defendants' cited authority is inapposite. In *Honickman*, the defendant bank allegedly carried out three transactions, none of which involved the terrorists that actually harmed those plaintiffs, but rather transfers from U.S. and German charities to three Hamas intermediaries. 6 F.4th at 493. In the absence of allegations regarding a connection between the defendant and the terrorists who carried out the attacks, the court needed to know whether those three *intermediaries* (not the Defendant) "were so closely intertwined with [Hamas's] violent terrorist activities that one can reasonably infer [the Bank] was generally aware while it was providing banking services to those entities that it was playing a role in unlawful activities from which [Hamas's] attacks were foreseeable." *See id.* at 499. In contrast, this case involves a transfer from the Defendants directly to the individual who ordered Steven Sotloff's execution. Compl. ¶¶63,80, 103, 105.

The allegations Plaintiffs have presented in this case are not found in the *Kaplan* case cited by Defendants; there, the bank's customers were a putative charity (the "Martyrs Foundation" or "Shahid"), two corporations, and two of their officers. *Kaplan*, 999 F.3d at 849-50. As in *Honickman*, none of the customers in *Kaplan* had a direct role in any attack and the connection between the defendant and the attackers had to be *inferred* through the court's "closely intertwined" analysis of the defendant's customers. *Id.* Again, both Defendants in this case were in direct privity with the actual perpetrator of Sotloff's execution, Fadhel al Salim, in that QC paid him USD 800,000 directly and that QNB issued the wire to an account held in his name. Compl. ¶¶106, 109, 217.  Likewise, the plaintiffs in *Siegel v. HSBC N. Am. Holdings, Inc.*, did not allege that the defendants provided any funds to AQI, but rather alleged that the defendant "provided hundreds of millions of dollars to [Saudi Arabia's largest bank]"; the plaintiffs did not allege that "AQI received any of those funds or that [the defendant] knew or intended that AQI would receive the funds." 933 F.3d 217, 225 (2d Cir. 2019).

Moreover, in *Honickman*, the bank's customer, also the Union of Good, was not designated as an SDN until 2008, *after* the transfers at issue in that case, 2001-2003. *See* 6 F.4th at 492-93. Here, Israel publicly designated Qatar Charity as a terrorist financer and member of the SDN the Union of Good, well *before* the alleged transfer. Compl. ¶¶ 54-55, 322. The plaintiffs in *Honickman* also alleged that Israel designated a customer as a terrorist organization in 1998 "without specifying whether and where this was made public." 6 F.4th at 502 n.20.  In contrast, here, Plaintiffs allege that Israel's 2008 ban of QC was publicly broadcast to "all world banking and financial institutions," who were "expressly warned" by the Israeli government not to provide financial services to QC lest they be haled into U.S. court. Compl. ¶¶87-88.

Defendants' assertion that they were not "generally aware" of their role in unlawful activities are unsupported and for the reasons explained above, implausible. *See generally* QNB MTD Section A (citing *Honickman* 6 F.4th at 501; *Halberstam*, 705 F.2d at 488-89); QC MTD at 23. Plaintiffs have adequately alleged the general awareness element of their aiding-and-abetting claim.

### C. Plaintiffs Plausibly Allege the "Substantial Assistance" Factors

Six *Halberstam* factors determine whether Plaintiffs have adequately alleged the substantial assistance element of an aiding-and-abetting claim: "(1) the nature of the act encouraged or assisted, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance." *Kaplan*, 999 F.3d at 852 (quoting *Linde*, 882 F.3d at 329 (citing *Halberstam*, 705 F.2d at 483-84)).  As the Second Circuit has emphasized, "[n]o factor is dispositive; the weight accorded to each is determined on a case-by-case basis." *Honickman*, 6 F.4th at 500. Here, the *Halberstam* analysis yields the unmistakable conclusion that Plaintiffs have adequately alleged the substantial assistance element of their claim.

The first factor requires assessing "whether the alleged aid . . . would be important to the nature of the injury-causing act ([the] terrorist attacks). *Honickman*, 6 F.4th at 500. Plaintiffs allege that the $800,000 provided by Defendants to al Salim allowed him to "found and organize a brigade of Islamic State fighters under the nom de guerre Abu al Mughira al-Hashemi, and to become a Sharia Judge under the Islamic State at the Islamic Court in Ash Shaddadi," from which position he was able to order the execution of Steven Sotloff. Compl. ¶¶108-12. Accordingly, the financial support provided to al Salim was crucial to the "nature of the injury causing act." *See Honickman*, 6 F.4th at 500.

Contrary to Plaintiffs' allegations regarding its knowledge, Defendant QNB alleges without evidence that "any assistance that QNB may have allegedly provided was done so inadvertently through QNB's provision of standard banking services." QNB MTD at n.7. "[W]hether a defendant bank's 'financial services to [an FTO or its affiliates should or] should not be viewed as routine' is a 'question[ ] of fact for a jury to decide.'" *Kaplan*, 999 F.3d at 858 (quoting *Linde*, 882 F.3d at 327). This supposed defense cannot justify the dismissal of Plaintiffs' claims at the pleading stage. Moreover, when evaluating a motion to dismiss for failure to state a claim, a court must "assume the truth of well-pleaded factual allegations, construe them in the light most favorable to the plaintiff, and only then analyze whether they plausibly support an entitlement to relief." *Jackson v. Wal-Mart Stores, Inc.*, 753 F. App'x 866, 868 (11th Cir. 2018) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1271 n.4 (11th Cir. 2012)). In any event, whether the aid was inadvertent is not an issue under the first factor, only whether it was "important." *Honickman*, 6 F.4th at 500

Furthermore, "[t]he extraordinary blameworthiness" of ISIS' execution of Steven Sotloff "increases the responsibility of [Defendants]." *See Atchley v. AstraZeneca UK Ltd*., 22 F.4th 204,

24

222 (D.C. Cir. 2022). Because "[i]n relation to such vicious acts, even 'relatively trivial' aid could count as substantial . . . [t]his factor supports substantiality." *See id.*

In regards to the second factor, the amount and kind of assistance, Plaintiffs do not have to prove that the assistance was "indispensable to the injurious acts for this factor to weigh in support of liability." *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 222 (D.C. Cir. 2022) ("As alleged, defendants' actions were a considerable source of funding that helped the organization commit multiple terrorist acts. Because defendants' alleged assistance was at least significant, this factor supports substantiality.") (emphasis added). Plaintiffs allege that since 2011 "Defendant Qatar Charity paid millions of U.S. Dollars ("USD") to ISIS, its operatives, its predecessor organizations, and front organizations while knowing and intending that these terrorists would spend these funds in furtherance of the brutal violence for which they were already notorious. Defendant Qatar National Bank carried out these payments on behalf of Qatar Charity with the same knowledge and intention." Compl. ¶18. Among those transfers, Defendants directly sent $800,000 to al Salim, an amount sufficient for him to found an ISIS brigade, months before he ordered Steven's brutal execution. Compl. ¶112.

Plaintiffs do not allege either Defendant was present at the beheading of Steven Sotloff. Neither was the defendant in *Halberstam* who was still held civilly liable for aiding and abetting the murder at issue in that case, despite the fact that she was not aware her companion was planning even to burglarize the victim, let alone kill him. *Kaplan*, 999 F.3d at 856 (citing *Halberstam* 705 F.2d at 474, 487) (noting that "a court might well reason that culpability for the same amount of assistance would increase with an increase in either the blameworthiness of the tortious act aided or the seriousness of the foreseeable consequences.").

25

"[T]he fourth factor, the "defendant's relation to the principal," is useful for determining the defendant's capacity to assist." *Honickman*, 6 F.4th at 500-501 (citing *Siegel*, 933 F.3d 217) Here, Defendants both had a direct relationship with al Salim: Defendant QC sent him $800,000, and Defendant QNB provided him with a financial service by transferring those funds to an account in his name. Compl. ¶¶106, 109.

In regards to the fifth factor, the defendant's state of mind, "this factor favors aiding-and-abetting liability [where] defendants' assistance was knowingly provided with a general awareness that it supported the terrorist acts of a notoriously violent terrorist organization . . . ." *Atchley*, 22 F.4th at 223. Plaintiffs allege a detailed factual basis for inferring that not only were Defendants aware of the brutality of the terrorist organization to which al Salim belonged, but also that all Defendants acted with intent to further the Qatar-led terror financing conspiracy. *See supra* Section II.B. Defendant QNB mistakenly identifies a "one in spirit" requirement in *Halberstam*. QNB MTD at 23. There is no such requirement. *See Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 872 (D.C. Cir. 2022) ("The district court thus erred in requiring Bernhardt to show that HSBC and al-Qaeda were 'one in spirit.'"); *Atchley*, 22 F.4th at 224 ("A specific intent, or 'one in spirit,' requirement is contrary to *Halberstam* as incorporated into the JASTA.").

The sixth factor, the duration of defendant's assistance, is relevant insofar as "[t]he length of time an alleged aider-abettor has been involved with a tortfeasor almost certainly affects the quality and extent of their relationship." *Siegel*, 933 F.3d at 225. Plaintiffs allege that Defendants began their support of ISIS and its predecessor organizations in 2011. Compl. ¶18. In *Siegel*, the Second Circuit was unmoved by a 25-year relationship where plaintiffs "fail[ed] to adequately allege that [bank] funds ever reached AQI," and where all "the other factors relevant to aiding and abetting, compel the conclusion that the plaintiffs fail plausibly to plead a claim." 933 F.3d at 225.

The duration of the relationship between Defendants and al Salim was long enough to have a profound effect on the fate of Steven. *See* Compl. ¶3.

Qatar Charity erroneously claims that Plaintiffs must also show that its actions were "integral" to or played a "major part in prompting" the terrorist acts at issue. QC MTD at 21 (citing *Halberstam*, 705 F.2d at 484). The Second Circuit's recent decisions in *Kaplan* and *Honickman* contain no such requirement, nor does the D.C. Circuit's opinion in *Atchley.* In any event, providing the seed funding to the ISIS judge that ordered Steven Sotloff's execution was "integral" to the terrorist attack at issue.

For the foregoing reasons, Plaintiffs have plausible alleged that both Defendants aided and abetted the terrorists that carried out the abduction, torture, and execution of Steven Sotloff and are therefore liable to Plaintiffs for aiding and abetting under 18 U.S.C. § 2333(d).

### III.    Plaintiffs State a Valid Claim that Defendants are Secondarily Liable under 18 U.S.C. § 2333(d) for Conspiracy

Plaintiffs have adequately alleged a conspiracy claim by showing "[1] an agreement to do an unlawful act or a lawful act in an unlawful manner; [2] an overt act in furtherance of the agreement by someone participating in it; [3] an injury caused by the act." *Halberstam*, 705 F.2d at 487. First, Plaintiffs allege an agreement to do an unlawful act; the same facts that support Plaintiffs' aiding-and-abetting claim likewise evidence the existence of Defendants' conspiracy. *See Supra Section* II. Qatar and its royal family exerted control over each Defendant, thus facilitating their ability to coordinate Defendants' support for the Islamic State; accordingly, Defendants agreed to pursue Qatar's objectives," to "destabilize Qatar's regional rival, Syria, through the creation of an Islamic state in Syrian territory . . . ." and to "to destabilize Syria through acts of terrorism," Compl. ¶¶1, 19, 20, 36-37, 61, 78, 212, 258, an illegal act.

Second, Plaintiffs allege an overt act, namely, that "[t]he members of the conspiracy paid [$800,000] to al Salim so that he could found a militant brigade, join ISIS, and destabilize Syria by committing acts of terror, such as the murder of American hostages like Steven" Compl. ¶3. Third, Plaintiffs allege that Plaintiffs' injuries were caused by this act of terror finance. *See infra* Section IV. (discussing proximate causation).

Defendants "may be liable under § 2333(d) even if [they] did not directly conspire with 'the specific individual representative of the [FTO] who, for instance, actually planted the [bomb] that injured or killed a plaintiff.'" *Freeman*, 413 F. Supp. 3d 220 at n.38 (E.D. NY 2020). Moreover, Defendants have grossly misstated the universality of the "directness" requirement in *Freeman*. *Id.* at n.40 (agreeing with the magistrate that Defendants can be held liable for conspiring with "fronts or alter egos of FTOs" but finding that the facts before it did not support such a conclusion). Regardless, Plaintiffs exceed even Defendants' distorted *Freeman* standard by showing a direct conspiracy between Defendants and the "specific individual representative" who proverbially "planted the bomb."[17]

Plaintiffs allege Defendant Qatar Charity wired $800,000 to al Salim (who signed a handwritten note on the wire confirmation printout acknowledging receipt and recognizing the sender), the individual who ordered Steven's execution. Compl. ¶109. Defendant QC cannot and does not allege that this was an arm's-length transaction. Plaintiffs allege Defendant QNB carried

---

[17] Defendant QC argues that ¶2333(d) does not give rise to liability against a defendant who conspires with a person "who merely authorized (rather than committed) the terrorist act." QC MTD at 22 (quoting *Weiss v. Nat'l Westminster Bank PLC*, 278 F. Supp. 3d 636, 650 (E.D.N.Y. 2017)). QC fails to quote the preceding paragraph which makes clear that the court merely intended to prevent plaintiffs from bypassing a factual finding that the FTO at issue did not *commit* the terrorist attack by alleging that it planned or authorized it. *Weiss*, 278 F. Supp. at 650 ("Plaintiffs are collaterally estopped from arguing that Hamas committed the Bus No. 19 Attack."). As Defendant QNB concedes, the FTO at issue here, ISIS, "performed the wrongful act that caused Plaintiffs' injuries." QNB MTD at n. 5.

out that transfer not to an intermediary or alias of al Salim, but directly to an account in his name

in a jurisdiction bordering Syria, the country al Salim had publicly pledged to found an Islamic

state in for al Nusra. Compl. ¶¶103, 106.

Plaintiffs further allege that Defendant QNB's AML system would have flagged the

transfer, but that "QNB subordinated its AML and CTF obligations to the desire of their largest

shareholders, the members of the Qatari Royal Family and the entities they control, to fund ISIS."

Compl. ¶212. Plaintiffs clearly allege a common goal among the conspirators: "members of the

conspiracy paid this sum to al Salim so that he could found a militant brigade, join ISIS, and

destabilize Syria by committing acts of terror, such as the murder of American hostages like Steven"

and that members of the conspiracy stated "that all parties to the conspiracy were aware that the

money was originally and ultimately intended for ISIS." Compl. ¶¶3, 111.

## IV.     Plaintiffs Plausibly Allege Primary Liability Under 18 U.S.C. § 2333(a)

Defendants mistakenly argue that 18 U.S.C. § 2333(a) only provides relief against the

direct perpetrators of terrorist attacks. QNB MTD at 21, QC MTD at 17. Both rely on a tautological

misreading of *Linde*, quoting in part "the ATA's primary liability provision offers 'civil relief only

against the principals perpetrating acts of international terrorism . . . [and] provide[s] no civil action

against secondary actors who, while not committing international terrorist acts themselves,

facilitated such acts by others.'" QNB MTD at 21 (quoting 882 F.3d at 327).  This language,

removed from the contextualizing definition of "international terrorism" at § 2331(1) amounts to

no more than the circular statement that § 2333(a) only provides liability against Defendants who

commit "acts of terrorism" and not against Defendants who do not commit "acts of terrorism."

*Linde* does not say that the ATA provides primary liability only against defendants who act as

triggermen, or defendants who are designated terrorists, or defendants who are not banks or

charities. Indeed, the *Linde* court remanded to a jury the question of whether the Arab Bank's misconduct met "all of § 2331(1)'s definitional requirements for an act of international terrorism, including those pertaining to violence or danger and the apparent intent to intimidate or influence." *Linde*, 882 F.3d at 326.

Specifically, § 2331 defines "international terrorism" as activities that "involve violent acts or acts dangerous to human life," 18 U.S.C. § 2331(1)(A), that "appear to be intended (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping," 18 U.S.C. § 2331(1)(B). Giving money to an FTO is "like giving a loaded gun to a child," not a violent act, but an "'act dangerous to human life' under the ATA." *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 45 (E.D.N.Y. 2019) (quoting Judge Posner's opinion in *Boim v. Holy Land Foundation for Relief and Development*, 549 F.3d 685, 690 (7th Cir. 2008)); *see also Schansman v. Sberbank of Russia PJSC*, 565 F. Supp. 3d 405, 416 (S.D.N.Y. 2021) ("Courts have made such a finding before, reasoning that when banks such as Sberbank and VTB Bank route payments and maintain accounts for terrorist organizations to enhance their ability to commit terrorist attacks, they are committing "acts dangerous to human life.") (citing *Miller*, 372 F. Supp. 3d at 45). Defendant QNB wired funds from the account of a member of a U.S.-designated SDN, defendant QC, to the account of a member of a U.S.-designated FTO with a history of killing Americans in precisely the same manner Steven Sotloff was killed, and which FTO member went on to order the execution of Steven Sotloff after using the transferred funds to found an ISIS brigade. *See supra* Section I.B. In other words, Defendants handed al Salim the proverbial loaded gun (which al Salim promptly converted to literal loaded guns). *See* Compl. ¶112.

Defendant QNB cites *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 390 (7th Cir. 2018), presumably as a counterpoint to the Seventh Circuit's *Boim* opinion. QNB MTD at 21. But in *Kemper*, the Seventh Circuit distinguished *Boim* in a way inapplicable to this case:

> The facts in our case are different from those in *Boim III*, which dealt with direct donations to a known terrorist organization. While giving fungible dollars to a terrorist organization may be "dangerous to human life," doing business with companies and countries that have significant legitimate operations is not necessarily so.

911 F.3d at 390. If Defendants had merely processed donations to Defendant QC, which has *some* legitimate business, perhaps *Kemper* might apply, but Defendants made direct payment to a publicly avowed member of al Nusra, an infamous, U.S.-designated FTO and so *Boim* and its progeny *Miller* and *Schansman* are substantially more applicable.

As in *Miller*, the "intended to intimidate and coerce" prong of ATA liability is satisfied where, as here, a defendant knowingly provides support to a violent terrorist organization, or even to an organization substantially likely to engage in terrorism. 372 F. Supp. 3d at 45 (quoting *Boim*, 549 F.3d at 694) ("Even if one does not know the organization engages in terrorism, liability is appropriate when one "is deliberately indifferent to whether it does or not, meaning that one knows there is a substantial probability that the organization engages in terrorism but one does not care."). Defendants do not contest Plaintiffs' allegations at Compl. ¶¶ 240, 269, that their material assistance was intended to "intimidate or coerce the civilian populations of Syria and the United States," "influence the policies of Syria and the United States by means of intimidation and coercion," and "to affect the conduct of the governments of Syria and the United States by mass destruction, assassination, or kidnapping." *See* QNB MTD at 21; QC MTD at 16. Plaintiffs' conspiracy allegations also satisfy this element. *See supra* Section III. For the above reasons Defendants' misconduct satisfies § 2331's definition of "international terrorism."

Finally, Defendants correctly note that the requirement "under 18 U.S.C. § 2333(a) that the injury must occur "by reason of" an act of international terrorism requires Plaintiffs to allege that QNB's conduct was the proximate cause of their injuries . . . . [and] as the Second Circuit has explained, proximate cause requires Plaintiffs to allege that QNB's conduct was a 'substantial factor in the sequence of responsible causation and whose injury was reasonably foreseeable or anticipated as a natural consequence.'" QNB MTD at 22 (quoting *Rothstein v. UBS AG*, 708 F.3d 82, 91-92 (2d Cir. 2013)); QC MTD at 18 (same). Understandably, Defendants struggle to argue that their alleged payment of USD 800,000 to al Salim, which he used as seed money to found an ISIS brigade before ordering the execution of Steven, was not a "substantial factor" in Steven's murder.

Similarly, Defendants are hard-pressed to argue that Steven's murder was not a foreseeable result of their substantial payment to a known member of al Nusra, a U.S.-designated FTO operating in Syria with a reputation for abducting and executing Americans, at a time Steven Sotloff was already being held hostage in Syria, or that it was not foreseeable that transferring those funds to a lawyer for al Nusra, who had publicly expressed support for an Islamic state in Syria, at his account in neighboring country could foreseeably result in his traveling to Syria and using his law degree in service of the Islamic State. *See* Compl. n.23.

Defendants argue that because al Salim ordered Sotloff executed "nearly a year" after their payment to him, that this payment was not a "substantial" factor in that murder. QNB MTD at 22, QC MTD at 20. But al Salim crossed the border into Syria within 24 hours of the payment and proceeding to found and organize a brigade of Islamic State fighters, from which position he became an Islamic State judge. Compl. ¶112. Courts have declined to conclude as a matter of law at the motion to dismiss stage that a specific payment's temporal proximity to an attack could not

satisfy the causation requirement. *Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 632 (E.D.N.Y. 2006) (finding plaintiffs sufficiently alleged proximate cause of terrorist attacks despite a two-year gap between funding and the attack).

Defendants' reliance on *In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284, 1313 (S.D. Fla. Jan. 3, 2018) for the proposition that "[t]he greater the time between the payments and the attack, the more attenuated the foreseeability of the attack, and the weaker the likelihood that the support played a significant role in facilitating the attacks" is misplaced. *See* QC MTD at 18. The *Chiquita* court was explaining why it *denied* the defendant's motion for summary judgment, although that case involved a more attenuated causal chain than this one.  284 F. Supp. 3d at 1317-18 (jury question existed concerning whether the defendant's payments of $32,000 annually in protection money over a 9-year period to the FARC terrorist organization, which generated annual revenues of up to $100 million, in the banana-growing zones of Colombia proximately caused the plaintiffs' injuries in terrorist attacks perpetrated by FARC in distant areas of Colombia).

Accordingly, Plaintiffs have plausibly pled secondary liability for aiding and abetting, and conspiracy under 18 U.S.C. § 2333(d), and primary liability under § 2333(a).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that Defendants' motions to dismiss be denied in their entirety. In the alternative, Plaintiffs request that the Court reserve its decision on Defendants' Rule 12(b)(2) motions pending discovery and an evidentiary hearing regarding personal jurisdiction.[18]

---

[18] Plaintiffs wish the Court to note that in lieu of filing one response to QNB's Motion [DE 53] and one response to QC's Motion [DE54], each response consisting of up to 25 pages, Plaintiffs are submitting this one response consisting of 34 pages. In an abundance of caution Plaintiffs had caused to be filed a joined in a motion which, inter alia, sought permission to enlarge the page limit up to 35 pages in one comprehensive response to both motions.

Respectfully submitted

By: /s/*George A. Minski, Esq.*
George A. Minski, Esq.
FBN. 724726
**LAW OFFICES OF GEORGE A. MINSKI, P.A**.
*Co-Counsel for Plaintiffs*
2500 Hollywood Boulevard
Hollywood, FL 33020
Dade: 305-792-2200
Broward: 954-362-4214
Email: gminski@minskilaw.com
Primary email: dgomez@minskilaw.com
**and**
**PERLES LAW FIRM PC**
Steven R. Perles
sperles@perleslaw.com
Joshua K. Perles
jperles@perleslaw.com
816 Connecticut Ave. NW,
12th Floor
Washington  D.C.  20006
Telephone:  202-955-9055

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been electronically filed with the Clerk of Court and served via transmission of Notice of Electronic Filing generated by CM/ECF on all counsel or parties of record, on this 23[th] day of December 2022.

By: /s/*George A. Minski, Esq.*
George A. Minski, Esq.
FBN. 724726