**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

| | |
|---|---|
| ARTHUR BARRY SOTLOFF Individually and as the Administrator of the Estate of STEVEN JOEL SOTLOFF; SHIRLEY GOLDIE PULWER, and LAUREN SOTLOFF, <br><br> *Plaintiffs*, <br><br> v. <br><br> QATAR CHARITY and QATAR NATIONAL BANK (Q.P.S.C.), <br><br> *Defendants*. | Case No. 9:22-cv-80726 (DMM) (WDM) |

**QATAR NATIONAL BANK'S REPLY MEMORANDUM OF LAW IN SUPPORT OF
ITS MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................................... 1

ARGUMENT .................................................................................................................................... 2

I. PLAINTIFFS' CLAIMS AGAINST QNB SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION. ........................................................................ 2

    A. Plaintiffs Fail to Demonstrate Any Basis for Personal Jurisdiction Over QNB. ............................................................................................................ 2

        1. QNB Is Not Subject to Personal Jurisdiction Under Fed. R. Civ. P. 4(k)(2) ..................................................................................................... 2

        2. Plaintiffs' Invocation of Florida's Long-Arm Statute Likewise Fails ........ 4

    B. Plaintiffs Are Not Entitled to Jurisdictional Discovery. ........................................ 6

II. PLAINTIFFS FAIL TO STATE A CLAIM THAT QNB IS SECONDARILY LIABLE UNDER 18 U.S.C. § 2333(D) FOR AIDING AND ABETTING. ...................... 6

    A. Plaintiffs Fail to Plausibly Allege General Awareness. ........................................ 7

    B. Plaintiffs Fail to Plausibly Allege Knowing and Substantial Assistance. .............. 9

III. PLAINTIFFS FAIL TO STATE A CLAIM THAT QNB IS SECONDARILY LIABLE UNDER 18 U.S.C. § 2333(D) FOR CONSPIRACY. ........................................ 12

IV. PLAINTIFFS FAIL TO STATE A CLAIM THAT QNB IS PRIMARILY LIABLE UNDER 18 U.S.C. § 2333(A). ............................................................................. 13

CONCLUSION ............................................................................................................................... 13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atchley v. Astrazeneca UK Ltd.*,
   22 F.4th 204 (D.C. Cir. 2022) .................................................................................... 2, 9, 10

*Aviation One of Fla., Inc. v. Airborne Ins. Consultants (PTY), Ltd*,
   722 F. App'x 870 (11th Cir. 2018) ...................................................................................... 6

*Bernhardt v. Islamic Republic of Iran*,
   47 F.4th 856 (D.C. Cir. 2022) .................................................................................... passim

*Bristol-Myers Squibb Co. v. Superior Ct.*,
   137 S. Ct. 1773 (2017) ........................................................................................................ 3

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985) ............................................................................................................ 4

*Condor, S.A. v. Bolivia*,
   No. 3D22-169, 2022 WL 17479905 (Fla. Dist. App. Ct. 2022) .......................................... 5

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
   141 S. Ct. 1017 (2021) ........................................................................................................ 5

*Fullman v. Graddick*,
   739 F.2d 553 (11th Cir. 1984) .......................................................................................... 12

*Goldberg v. UBS AG*,
   660 F. Supp. 2d 410 (E.D.N.Y. 2009) ................................................................................ 8

*Halberstam v. Welch*,
   705 F.2d 472 (D.C. 1983) ................................................................................................. 11

*Hinkle v. Cirrus Design Corp.*,
   775 F. App'x 545 (11th Cir. 2019) ...................................................................................... 6

*Honickman v. BLOM Bank SAL*,
   6 F.4th 487 (2d. Cir. 2021) ......................................................................................... passim

*Internet Sols. Corp. v. Marshall*,
   39 So. 3d 1201 (Fla. 2010) .................................................................................................. 5

*Kaplan v. Lebanese Canadian Bank, SAL*,
   999 F.3d 842 (2d Cir. 2021) ........................................................................................ passim

*Kemper v. Deutsche Bank AG*,
 911 F.3d 383 (7th Cir. 2018) ..................................................................................................13

*Linde v. Arab Bank, PLC*,
 882 F.3d 314 (2d Cir. 2018)....................................................................................................13

*Louis Vuitton Malletier, S.A. v. Mosseri*,
 736 F.3d 1339 (11th Cir. 2013) ................................................................................................2

*Miller v. Arab Bank, PLC*,
 372 F. Supp. 3d 33 (E.D.N.Y. 2019) ......................................................................................13

*Morris v. Khadr*,
 415 F. Supp. 2d 1323 (D. Utah 2006).......................................................................................4

*Noble House, LLC v. Underwriters at Lloyd's, London*,
 No. 20-62080-CIV, 2021 WL 896219 (S.D. Fla. Mar. 3, 2021) ...............................................3

*Oueiss v. Saud*,
 No. 1:20-cv-25022, 2022 WL 1311114 (S.D. Fla. Mar. 29, 2022) ..................................3, 4, 5

*PowerTec Sols. Int'l, LLC v. Hardin*,
 No. 19-61373-CIV, 2019 WL 6170040 (S.D. Fla. Nov. 20, 2019) ...........................................2

*Rothstein v. UBS AG*,
 708 F.3d 82 (2d Cir. 2013)......................................................................................................13

*Schrier v. Qatar Islamic Bank*,
 No. 20-60075-CIV, 2022 WL 4598630 (S.D. Fla. Sept. 30, 2022).......................................3, 4

*Setai Hotel Acquis., LLC v. Miami Beach Luxury Rentals, Inc.*,
 No. 16-21296-CIV, 2017 WL 3503371 (S.D. Fla. Aug. 15, 2017) ..........................................2

*Siegel v. HSBC N. Am. Holdings, Inc.*,
 933 F.3d 217 (2d Cir. 2019)....................................................................................................12

*Sovereign Offshore Servs., LLC v. Shames*,
 No. 17-cv-80172, 2017 WL 7798664 (S.D. Fla. Aug. 3, 2017) ...............................................5

*Thompson v. Carnival Corp.*,
 174 F. Supp. 3d 1327 (S.D. Fla. 2016) .....................................................................................5

*Walden v. Fiore*,
 571 U.S. 277 (2014).................................................................................................................3

*Weiss v. Nat'l Westminster Bank*,
 993 F.3d 144 (2d Cir. 2021)................................................................................................6, 11

*Wendt v. Horowitz*,
  822 So. 2d 1252 (Fla. 2002) ..................................................................................................5

*Wolf v. Celebrity Cruises, Inc.*,
  683 F. App'x 786 (11th Cir. 2017) ........................................................................................6

**Statutes**

18 U.S.C. § 2333 ................................................................................................................6, 12, 13

18 U.S.C. § 2334(a) ........................................................................................................................2

**Other Authorities**

Fed. R. Civ. P. 4(k)(2) ............................................................................................................ *passim*

**PRELIMINARY STATEMENT**

Plaintiffs' opposition brief ("Opposition") advances a flawed interpretation of the relevant law that would, if adopted, expose almost any multinational bank to civil liability claims by victims of terrorism, as it would hold banks liable for the unforeseeable acts of any person or entity that received funds, either directly or indirectly, by way of a bank transfer. Plaintiffs lack any plausible allegation that demonstrates some meaningfully relevant contact with this forum or that would tie Defendant Qatar National Bank (Q.P.S.C.) ("QNB") or its provision of standard banking services to any *foreseeable* act of terrorism that injured Plaintiffs. Plaintiffs thus have not established a basis for this Court's exercise of personal jurisdiction over QNB, much less any claim for relief.

Plaintiffs' Opposition adds nothing to the insufficient allegations of their Complaint with respect to personal jurisdiction under Fed. R. Civ. P. 4(k)(2), and their invocation of Florida's long-arm statute fares no better. The Opposition simply repeats the Complaint's sparse and conclusory allegations about QNB's *potential* use of a correspondent bank in New York to facilitate one or more bank transfers on behalf of Qatar Charity, a respected charity that has collaborated with both the United States Government and the United Nations.[1] But none of these allegations creates any genuine issue of fact to support jurisdiction because, even if true, they would still be insufficient to establish personal jurisdiction in this forum. Nor are Plaintiffs entitled to jurisdictional discovery; as the Eleventh Circuit has instructed, plaintiffs should not be permitted to engage in a fishing expedition in search of facts that they hope may cure their pleading defects.

Plaintiffs' efforts to defend their claims fail. Plaintiffs focus almost *exclusively* on an alleged transfer of $800,000 from a Qatar Charity account at QNB to a "Fadhel al Salim" ("al Salim") in Turkey. Regarding QNB's supposed "general awareness" of Qatar Charity's alleged ties to terrorism, Plaintiffs change course, switching from their headline allegation from an *unpublished* designation by the U.S. IICT, which QNB never could have seen, to Israel's 2008 "designation" of Qatar Charity as a potential supporter *of Hamas*, which has nothing to do with *ISIS,* the focus of Plaintiffs' Complaint.[2] In regard to al Salim, all that Plaintiffs allege was in the

---

[1] *See* QNB Br. at 2 n.2; *id.* at 2 n.3; Qatar Charity Br., Fact. Back. (judicially noticeable materials).
[2] *See* Israel Ministry of Foreign Affairs, *Defense Minister Signs Order Banning Hamas-Affiliated Charitable Organizations*, Wayback Machine (July 7, 2008), https://web.archive.org/web/20130614210048/https://www.mfa.gov.il/mfa/pressroom/2008/pages/defense%20minister%20signs%20order%20banning%20hamas-affiliated%20charitable%20organizations%207-jul-2008.aspx (referencing only *Hamas*). Plaintiffs directly quote this source, *see* Compl. ¶¶ 56, 88 and Opp. at 14, 23, and it is also the kind of governmental source of which the court can take

1

public record at the time of the alleged transfer is an article in a Lebanese newspaper containing a quote from a differently spelled "Fadel al-Salim," identified only as "a lawyer . . . close to the Nusra Front." Compl. ¶ 103. That source not only said very little about al Salim but also stands alone in the Complaint. And in regard to knowing and substantial assistance, Plaintiffs misapply many of the six factors and misinterpret *Atchley* and *Kaplan*, which involved extreme allegations.

The Opposition makes little effort to defend Plaintiffs' conspiracy liability and primary liability claims, which are plainly deficient. Rather than restating arguments in QNB's opening brief, this Reply focuses on the legal errors and misleading arguments undergirding the Opposition.

## ARGUMENT

**I.   PLAINTIFFS' CLAIMS AGAINST QNB SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION.**

**A.   Plaintiffs Fail to Demonstrate Any Basis for Personal Jurisdiction Over QNB.**

Plaintiffs' failure to make a *prima facie* showing of personal jurisdiction in both their Complaint and Opposition is grounds for dismissal. Plaintiffs' Opposition asserts that this Court's exercise of personal jurisdiction is permissible under Fed. R. Civ. P. 4(k)(2) and, alternatively, under Florida's long-arm statute. An exercise of personal jurisdiction, however, is proper only when a court is satisfied that the exercise (1) is authorized by an applicable statute, and (2) is consistent with due process. *PowerTec Sols. Int'l, LLC v. Hardin*, No. 19-61373-CIV, 2019 WL 6170040, at *6 (S.D. Fla. Nov. 20, 2019). Plaintiffs have not met their burden on either. *See Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013) (plaintiff "bears the initial burden of alleging in the complaint sufficient facts to make out a *prima facie* case of jurisdiction").[3]

   1.   QNB Is Not Subject to Personal Jurisdiction Under Fed. R. Civ. P. 4(k)(2)

Under Fed. R. Civ. P. 4(k)(2), effective service establishes personal jurisdiction if (1) the plaintiff's claim arises under federal law; (2) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (3) the exercise of jurisdiction is consistent with the

---

judicial notice, *see Setai Hotel Acquisition, LLC v. Miami Beach Luxury Rentals, Inc.*, No. 16-21296-CIV, 2017 WL 3503371, at *7 (S.D. Fla. Aug. 15, 2017).

[3] Plaintiffs do not assert in their Opposition that QNB is subject to personal jurisdiction pursuant to the ATA's nationwide service of process provision, 18 U.S.C. § 2334(a). QNB adopts Qatar Charity's arguments that this provision is inapplicable. *See* Qatar Charity Reply at 1. Exercising jurisdiction under that provision would not comport with due process principles.

United States Constitution and laws. *See Schrier v. Qatar Islamic Bank*, No. 20-60075-CIV, 2022 WL 4598630, at *15 (S.D. Fla. Sept. 30, 2022). Plaintiffs' Opposition fails to make a *prima facie* showing that QNB has sufficient contacts with the United States that would allow for the "rare[] invo[cation of] jurisdiction under Rule 4(k)(2)." *Noble House, LLC v. Underwriters at Lloyd's, London*, No. 20-62080-CIV, 2021 WL 896219, at *5 (S.D. Fla. Mar. 3, 2021).

To comport with due process, Plaintiffs must show that QNB has "certain minimum contacts [with the United States] . . . such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (citation omitted). This inquiry involves a three-pronged test, "which examines: (1) whether the plaintiff's claims arise out of or relate to at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant purposefully availed himself of the privilege of conducting activities with the forum state, thus invoking the benefit of the forum state's law; and (3) whether the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice." *Schrier*, 2022 WL 4598630, at *18. As explained in QNB's opening brief, Plaintiffs' allegations, most of which are conclusory, fall far short. *See* QNB Br. at 5.

*First*, Plaintiffs have failed to show a "strong" connection between the forum (the United States) and the underlying controversy (Plaintiffs' ATA/JASTA claims against QNB). *Schrier*, 2022 WL 4598630, at *18; *see also Bristol-Myers Squibb Co. v. Superior Ct.*, 137 S. Ct. 1773, 1781 (2017). Plaintiffs rest their jurisdictional allegations as to QNB solely on an alleged $800,000 bank transfer to al Salim, "a lawyer . . . close to the Nusra Front." *See* Opp. at 4-6; Compl. ¶¶ 3, 39, 92-112. Plaintiffs do not even specifically allege that these funds *did* pass through the United States, but instead merely speculate that they "necessarily" did so because "virtually all" such transactions do. *See* Compl. ¶¶ 102, 122. "The Court need not credit this speculative assertion for purposes of determining whether it has personal jurisdiction over [QNB]." *Oueiss v. Saud*, No. 1:20-cv-25022, 2022 WL 1311114, at *23 (S.D. Fla. Mar. 29, 2022). Nor do Plaintiffs specify how the alleged transfer facilitated or otherwise supported the "kidnap[ping], torture, and execut[ion]" of Steven Sotloff. Compl. ¶ 23; *see Schrier*, 2022 WL 4598630, at *19 (criticizing plaintiffs' failure to connect "*these specific funds*" to the alleged terrorist acts underlying the claims). Rather, Plaintiffs offer only the conclusory allegation that *some* of these funds made their way into Syria nearly two months *after* Sotloff's kidnapping and supported some ISIS fighters in some unknown way. *See* Compl. ¶ 111 (alleging "money was originally and ultimately intended for ISIS," without alleging how it specifically facilitated the Sotloff kidnapping, torture, or

3

execution). As in *Schrier*, Plaintiffs' reliance on the $800,000 transaction fails because the relationship between the alleged bank transaction and Plaintiffs' claims is too attenuated.

*Second*, Plaintiffs fail to show that QNB purposefully availed itself of the United States. QNB's alleged engagement in a single correspondent banking transaction that *may* have passed through the United States does not create minimum contacts. *See* QNB Br. at 6. Plaintiffs' reliance on the "effects" test is of no avail. Plaintiffs assert that because QNB allegedly facilitated a wire transfer of $800,000 to al Salim, QNB knowingly supported anti-American terrorist groups that targeted U.S. nationals. *See* Opp. at 11. Plaintiffs' reliance on *Morris v. Khadr*, 415 F. Supp. 2d 1323 (D. Utah 2006), is misplaced. As *Schrier* observed, *Morris* involved claims against terrorists and not third-party institutions allegedly providing standard banking services. 2022 WL 4598630 at *21. In *Morris*, the court exercised jurisdiction based on the defendant's extensive ties to al-Qaeda, including personal participation in the group's terrorist agenda by encouraging the defendant's son to join al-Qaeda, who participated in the attack causing plaintiff's injuries. *See* 415 F. Supp. 2d at 1326-27. *Morris* is inapposite. Plaintiffs here have filed their claims against QNB, not the terrorists who allegedly injured them, and have not alleged that QNB had any direct involvement in the kidnapping, torture, and execution of Steven Sotloff.[4]

2. <u>Plaintiffs' Invocation of Florida's Long-Arm Statute Likewise Fails</u>

By invoking Rule 4(k)(2), Plaintiffs implicitly concede that QNB is not subject to personal jurisdiction in the courts of any state, including Florida. Fed. R. Civ. P. 4(k)(2) ("the defendant is not subject to jurisdiction in any state's courts of general jurisdiction"). Nonetheless, Plaintiffs argue that QNB is subject to jurisdiction pursuant to Florida's long-arm statute. *See* Opp. at 15. Plaintiffs claim Defendants' alleged co-conspirators, ISIS and al Salim, are "resident" in Florida. *See id.* at 15-16. As Plaintiffs' theory goes, by publishing execution videos that "could be accessed by Plaintiffs" in Florida, ISIS and al Salim are subject to personal jurisdiction in Florida and, as their alleged co-conspirators, so are Defendants. *Id.* Plaintiffs are mistaken. To establish

---

[4] Plaintiffs fault QNB for not addressing the third prong of the due process analysis. *See* Opp. at 14. That prong is reached only if a plaintiff makes a *prima facie* showing on the first two prongs. *See Oueiss*, 2022 WL 1311114, at *12. As noted in QNB's briefing, Plaintiffs fail to do so. Even so, that prong also compels dismissal, particularly given that the burden on QNB to litigate this action here would be immense. QNB does not have an office in the United States and is not otherwise physically present here; none of QNB's books, records, files, or potential witnesses are located in Florida. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-77 (1985).

4

jurisdiction over ISIS and al Salim (and, by extension, their alleged co-conspirators), Plaintiffs would first have to establish both that (1) Florida's long-arm statute provides a basis for personal jurisdiction; and (2) sufficient minimum contacts exist between ISIS and al Salim on one hand and Florida on the other. *See* Qatar Charity Br. at 7 (citing cases); *Internet Sols. Corp. v. Marshall*, 39 So. 3d 1201, 1207 (Fla. 2010); *see also Oueiss*, 2022 WL 1311114, at *1 (Florida's long-arm statute is strictly construed in favor of non-resident defendants). Plaintiffs fail to meet either.[5]

Exercising personal jurisdiction under Florida's long-arm statute would not comport with due process, for the same reasons as under Fed. R. Civ. P. 4(k)(2). *See supra* Section I.A.1. There is not a single allegation that QNB had any connection to the videos; rather, Plaintiffs attribute that conduct solely to ISIS. But because those conspiracy allegations are wholly conclusory, *see infra* Section III, they cannot serve as the basis for an exercise of personal jurisdiction over QNB. *See, e.g., Condor, S.A. v. Bolivia*, No. 3D22-169, 2022 WL 17479905, at *3 (Fla. Dist. Ct. App. 2022) (reversing exercise of personal jurisdiction when complaint "failed to make the requisite clear, positive, and specific allegations of [defendant's] participation in the conspiracy" but alleged only "a common, rather routine, business practice"). Plaintiffs also do not allege that ISIS specifically targeted Florida or its residents. *See Sovereign Offshore Servs., LLC v. Shames*, No. 17-cv-80172, 2017 WL 7798664 (S.D. Fla. Aug. 3, 2017) (Middlebrooks, J.) (no personal jurisdiction when plaintiffs failed to establish that the alleged tortious blog posts were directed at Florida consumers, regardless of the posts being accessible in Florida). As Plaintiffs allege, the videos were directed at then-President Barack Obama. *See* Opp. at 10-11. Plaintiffs fail to show that exercising personal jurisdiction over QNB pursuant to the long-arm statute would comport with due process.[6]

---

[5] Plaintiffs do not appear to assert general personal jurisdiction under Florida's long-arm statute, nor could they. QNB is decidedly not "at home" in Florida—it is incorporated in Qatar and has its principal place of business there. QNB does not maintain even one branch in the United States, much less Florida. *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021); *Thompson v. Carnival Corp.*, 174 F. Supp. 3d 1327, 1338 (S.D. Fla. 2016).

[6] Plaintiffs' cause of action must "*arise from*" the alleged tortious act committed *within* the state of Florida. *See Internet Sols.*, 39 So. 3d at 1208; *Oueiss,* 2022 WL 1311114, at *11 (there must "be some direct affiliation, nexus, or substantial connection between the cause of action and the activities within the state." (cleaned up)). Plaintiffs' claims must *arise from* the posting of the videos, but Plaintiffs allege that their claims arise from the execution of Sotloff, not the posting. *See* Opp. at 18. Plaintiffs' claim that the tort of IIED was committed in Florida, *see id.* at 15, is deficient. To claim that as a basis, a valid claim must be sued upon. *See Wendt v. Horowitz*, 822 So. 2d 1252, 1260 (Fla. 2002) (citation omitted). *Nowhere* in the Complaint do Plaintiffs advance an IIED claim under Florida law. *See* Compl. ¶ 1.

### B. Plaintiffs Are Not Entitled to Jurisdictional Discovery.

The Court should not grant Plaintiffs' request for jurisdictional discovery, which they now make over seven months after filing their Complaint and as a fallback proposition buried in their Opposition. Jurisdictional discovery should be ordered only "when a court's jurisdiction is genuinely in dispute." *Wolf v. Celebrity Cruises, Inc.*, 683 F. App'x 786, 792 (11th Cir. 2017). "[A] district court does not abuse its discretion in dismissing the plaintiff's action for lack of personal jurisdiction, even before jurisdictional discovery occurs, when the plaintiff has not diligently pursued such discovery despite the opportunity to do so." *Aviation One of Fla., Inc. v. Airborne Ins. Consultants (PTY), Ltd*, 722 F. App'x 870, 878 (11th Cir. 2018). Here, Plaintiffs "did not move for jurisdictional discovery," but instead responded to QNB's motion, nor did Plaintiffs "explain . . . what type of facts they wish to discover if given the opportunity," but merely buried the request as "an alternative to the granting of the Defendants' motion to dismiss." *Hinkle v. Cirrus Design Corp.*, 775 F. App'x 545, 550 (11th Cir. 2019) (affirming denial of discovery).

Plaintiffs have not made a *prima facie* showing of personal jurisdiction over QNB *even accepting all of their jurisdictional allegations as true*. Plaintiffs are not entitled to go on a "fishing expedition," *Wolf*, 683 F. App'x at 792, "to uncover those hidden jurisdictional facts." Opp. at 17.

## II. PLAINTIFFS FAIL TO STATE A CLAIM THAT QNB IS SECONDARILY LIABLE UNDER 18 U.S.C. § 2333(D) FOR AIDING AND ABETTING.

While QNB accepted for purposes of this motion that, in relation to the first element of aiding and abetting, ISIS (the alleged principal) performed the wrongful act that caused Plaintiffs' injuries (the killing of Steven Sotloff), *see* QNB Br. at 8 n.5, Plaintiffs misleadingly suggest that QNB also accepted that transferee al Salim is the principal. *See* Opp. at 18. QNB never did so, nor does that proposition find any support. "For an ATA aiding-and-abetting claim, JASTA identifies the principal as 'an organization that had been designated as a foreign terrorist organization.'" *Weiss v. Nat'l Westminster Bank*, 993 F.3d 144, 164 (2d Cir. 2021) (quoting 18 U.S.C. § 2333(d)(2)). *ISIS*, not al Salim, is the principal. Plaintiffs allege that al Salim was "a lawyer . . . close to the Nusra Front" who then received money, crossed the Turkish-Syrian border, and *only thereafter* is alleged to have founded an ISIS brigade, and later still became a judge under ISIS's rule. *See* Compl. ¶¶ 103-112. The allegations therefore at most paint al Salim as an *intermediary* to the Nusra Front, and through it, to ISIS, at the time of the transfer. Plaintiffs further fail to allege any plausible means by which QNB could have been aware of al Salim's ties

6

to ISIS at the time of the alleged bank transfer; they identify a single news source that stated that he was merely a lawyer "close" to the Nusra Front.

As detailed in QNB's opening brief, "QNB's only customer identified in the Complaint is Qatar Charity." QNB Br. at 10. Plaintiffs' allegations relate solely to the relationship between QNB and Qatar Charity, for which QNB is alleged only to have provided standard banking services. The Complaint's general awareness allegations as to it are equally as deficient.

### A. Plaintiffs Fail to Plausibly Allege General Awareness.

Plaintiffs focus almost *exclusively* on the alleged $800,000 transfer to al Salim from an account of Qatar Charity, a respected charity that has collaborated with the United States Government and the United Nations. *See supra* note 1.[7] In addressing aiding and abetting, Plaintiffs ignore that the general awareness standard "requires the defendant to be generally aware of its role in an overall illegal or tortious activity *at the time that it provides the assistance*." *Honickman v. BLOM Bank SAL,* 6 F.4th 487, 496 (2d. Cir. 2021) (cleaned up) (emphasis added).

In regard to alleged transferee al Salim, all that Plaintiffs allege, at the time of the alleged transfer, is a single news article from the *Daily Star Lebanon* containing a single quote from a differently spelled "Fadel al-Salim," who is identified as "a lawyer who is close to the Nusra Front." Compl. ¶ 103. Plaintiffs reference this article repeatedly. *See* Opp. at 1, 4, 9, 11, 20-21, 29, 31-32. It says little about al Salim, and the Complaint does not supplement it. Plaintiffs do not allege that he was a Specially Designated National ("SDN") or had any other terrorism-related designation. No public sources other than the article are provided; the "limited public source[] Plaintiffs cite [therefore] pale[s] in comparison to the detailed, numerous sources that sufficed" in other ATA/JASTA cases at the motion to dismiss stage, such as *Kaplan*, which Plaintiffs repeatedly cite. *Honickman*, 6 F.4th at 502. Plaintiffs attempt to charge QNB with clairvoyance about how al Salim subsequently took intervening steps, culminating in his signing Sotloff's "Legal Retribution Verdict," but that runs afoul of *Halberstam*'s foreseeability requirement, which undergirds the aiding and abetting analysis. *See Honickman*, 6 F.4th at 496-97 & n.10.

In regard to general awareness concerning Qatar Charity, Plaintiffs change course, switching their headline allegation from an alleged unpublished designation by the U.S. IICT to

---

[7] As QNB's opening brief noted, "the narratives regarding earlier conferences in 2011 and 2012, as well as weapons purchases, are far too attenuated from Sotloff's killing" to support liability. QNB Br. at 16. Plaintiffs' Opposition focuses solely on the $800,000 payment.

7

instead rely on Israel's 2008 purported "designation" of Qatar Charity, which is just as deficient. Plaintiffs ignore that this statement regarding "The Charitable Qatar Society" in 2008 was made with respect to Union of Good's support for *Hamas*, not *ISIS*. *See supra* note 2. Such statements about a *different* entity "are not sufficient to show [the bank's] awareness because they express only the possibility of a terrorist connection, say nothing about [the FTO at issue] specifically, and focus on conduct occurring years before the [incident]." *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 869 (D.C. Cir. 2022). In any event, the Israeli statement only notes that the organizations are "trying to raise funds not only for Hamas charitable associations . . . but for the activities of the Hamas government as well," *see supra* note 2; the Israeli statement says nothing about the Charitable Qatar Society supporting Hamas's third wing, its "military operational wing," as Plaintiffs' counsel has previously characterized it.[8]

Whatever significance a designation by a foreign government might theoretically have, it cannot be treated as a basis for "general awareness" when the responsible U.S. authorities chose *not* to designate the entity. While the U.S. Treasury Department designated the Union of Good as a Specially Designated Global Terrorist ("SDGT"), it did not so designate Qatar Charity. To the contrary, the Treasury press release Plaintiffs cite explains Hamas "continue[s] to *exploit* charities."[9] The Treasury Department *did* designate certain charities as SDGTs under the executive order, *see supra* note 9, but *not* Qatar Charity. The Treasury Department has *never* designated Qatar Charity a SDGT, unlike other organizations that have been alleged to be members of the Union of Good. *See, e.g.*, *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 416 (E.D.N.Y. 2009) (two organizations were "member[s] of the Union of Good . . . [and have] similarly been designated as . . . SDGT[s] by the U.S. Government"). Plaintiffs' assertion that U.S. law obligated QNB to treat Qatar Charity as a pariah due to the Israeli statement is implausible, especially in light of the U.S. government's own collaboration with and praise for Qatar Charity. *See supra* note 1. In any event, the allegations in the Complaint are about ISIS rather than Hamas, and there is no allegation that the two groups are somehow related.[10]

---

[8] *See, e.g.*, Complaint, *Henkin v. Qatar Charity, et al.*, No. 1:21-cv-05716 (E.D.N.Y. Oct. 13, 2021), ECF No. 1 ¶ 91.

[9] *See* Opp. at 14 n.13 (citing *Treasury Designates the Union of Good*, U.S. Dep't of the Treasury (Nov. 12, 2008), https://home.treasury.gov/news/press-releases/hp1267).

[10] Plaintiffs also point to what they call "an abundance of publicly available materials indicating that [Qatar Charity] supported a variety of FTOs including al Nusra and ISIS predecessor organization, al Qaeda." Opp. at 20 n.15 (citing Compl. ¶¶ 44-50, 62, 212). But these materials

8

Plaintiffs misleadingly label the alleged transfer as "illegal payments from an SDN to an FTO," Opp. at 8, but Qatar Charity is not an SDN, nor is al Salim an FTO. Plaintiffs proclaim that "the idea that a bank with a functioning AML system would not know that in transferring money from a member of an SDN to a member of an FTO that it was participating in illegal activity from which an act of international terrorism was a foreseeable risk is facially absurd." *Id.* at 21. But Plaintiffs' allegations are insufficient to draw a plausible inference that either alleged status is even accurate, much less that QNB was generally aware of such "designations." QNB already has explained that Plaintiffs cannot circumvent their requirement to plausibly allege general awareness by asserting that a bank has a duty to perform diligence on its customers and thus the Court should presume the bank must have known what was allegedly transpiring. *See* Br. at 12. In *Bernhardt*, the bank's direct customers, unlike Qatar Charity (or transferee al Salim), were on OFAC's list of sanctioned terrorism-related entities. 47 F.4th at 861-62, 868. Even then, the D.C. Circuit noted that "aiding and abetting an act of international terrorism requires more than the provision of material support to a designated terrorist organization," 47 F.4th at 868 (quoting *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018)), and held that *more* was required to support an inference that the bank had general awareness it was playing a role in terrorist activities.

Plaintiffs' allegations therefore "fall far short of what [courts] have previously found adequate in the ATA context." *Id. Bernhardt* in particular noted that its *Atchley* case involved "notorious[] corrupt[ion]" and "ubiquitous media reports," *see id.*, while the Second Circuit *Kaplan* case involved substantial reports in various media that repeatedly "identified [three bank customers] as integral parts of Hizbollah," *see* QNB Br. at 9 (quoting *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021)). Here, Plaintiffs' allegations do not rise to the level of those found inadequate in *Bernhardt*, which included *actual* terrorism-related designations of the bank's customers themselves. *Honickman* held that a "single . . . transfer, standing alone" effected even "*post-designation*" was "insufficient to suggest [the bank] was aware of [its customer's] links to the [FTO]." 6 F.4th at 502 & n.20 (distinguishing customers and non-customers for bank's general awareness). Plaintiffs thus fail to plausibly allege general awareness.

### B.     Plaintiffs Fail to Plausibly Allege Knowing and Substantial Assistance.

Plaintiffs misapply many of the six factors that comprise the knowing and substantial

---

are insufficient for establishing general awareness, because they are too old (dating to early 2000s), do not deal with al-Qaeda in Iraq (AQI), and do not even mention al Nusra. *See* QNB Br. at 11.

9

assistance analysis. In so doing, Plaintiffs rely heavily on *Atchley*, which involved allegations that were far more extreme than those contained in the Complaint.

The first factor—the nature of the act encouraged—requires "assessing whether the alleged aid . . . would be important to the nature of the injury-causing act." *Honickman*, 6 F.4th at 500. Plaintiffs fail to explain how Sotloff's killing required banking services. Plaintiffs rely heavily on *Atchley* throughout its substantial assistance argument, *see* Opp. at 24-27, but that case involved "corrupt payments and valuable gifts" to a terrorist group that "openly controlled Iraq's Ministry of Health . . . and used it as a vehicle for terrorist activity." *Atchley v. Astrazeneca UK Ltd.*, 22 F.4th 204, 209 (D.C. Cir. 2022). The *Atchley* plaintiffs detailed a complex system in which the defendants' infusions of cash and gifts was funneled toward "injur[ing] or kill[ing] hundreds of United States service members and civilians . . . [and] massacr[ing] thousands of people, including Plaintiffs and their family members." *Id.* The court explained that the "defendants' actions were a considerable source of funding that helped the organization commit multiple terrorist acts," and that the defendants directly gave the group "at least several million dollars per year. *Id.* at 222. In contrast, the Complaint here details a single, standard bank transfer on behalf of its customer and a single, subsequent terrorist act by the recipient that bears only an attenuated link.[11]

For the second factor—the amount and kind of assistance—Plaintiffs aim for a lower hurdle of QNB's alleged assistance being "at least significant." Opp. at 25. Plaintiffs point to allegations that "Defendant Qatar Charity paid millions of U.S. Dollars to ISIS . . . while knowing and intending that these terrorists would spend these funds in furtherance of the brutal violence for which they were already notorious" and that "Defendant Qatar National Bank carried out these payments on behalf of Qatar Charity with the same knowledge and intention." *Id.* These conclusory allegations—bereft of any details—are not sufficient to meet *Twombly*'s plausibility standard. Turning to their marginally more detailed allegations of the $800,000 transfer, they

---

[11] Nor is QNB raising a *factual* dispute that its banking services were "standard"; QNB uses that adjective as a shorthand to emphasize that the Complaint itself, when boiled down, alleges only passive facilitation of a wire transfer on behalf of a customer (a charity), with no unusual services provided by QNB. QNB is not creating a factual dispute and is crediting the only non-conclusory factual allegations the Complaint does make. Those allegations fall far short in comparison to those in *Atchley* and *Kaplan*, upon which Plaintiffs rely. *See* Br. at 24. Similar to *Atchley*, the *Kaplan* plaintiffs alleged that the bank "granted special exceptions to its Hizbollah-related Customers, allowing them to deposit" large amounts of cash per day/week "all without disclosing the sources of the funds," which allowed them to "circumvent existing sanctions on Hizbollah as a designated FTO." Kaplan, 999 F.3d at 862. Nothing like that is alleged here.

10

again state in conclusory fashion that "Defendants directly sent $800,000 to al Salim, an amount sufficient for him to found an ISIS brigade, months before he ordered Steven's brutal execution." *Id.* Again, this is unlike cases in which sanctions avoidance, special exceptions, or repeated targeted transactions are alleged to demonstrate greater access to capital for a terrorist organization. *See, e.g.*, *Bernhardt*, 47 F.4th at 870-71; *Kaplan*, 999 F.3d at 862. The Complaint does not allege that QNB treated Qatar Charity any differently than any of its customers, nor does the Complaint allege that the transfers facilitated were out of the ordinary for QNB.

Plaintiffs concede the third factor—the defendant's absence or presence at the time of the tort—acknowledging that "Plaintiffs do not allege either Defendant was present at the beheading of Steven Sotloff." Opp. at 25.[12]

For the fourth factor—the defendant's relationship to the principal—Plaintiffs' arguments also fail. "For an ATA aiding-and-abetting claim, JASTA identifies the principal as 'an organization that had been designated as a foreign terrorist organization.'" *Weiss*, 993 F.3d at 164 (quoting 18 U.S.C. § 2333(d)(2)). The appropriate principal under JASTA is *ISIS*, not the individual to whom funds allegedly were transferred—al Salim. The Complaint alleges only a relationship between QNB and Qatar Charity; Qatar Charity in turn is alleged to have initiated a single transfer to al Salim, who following that transfer took intervening steps allegedly leading to founding an ISIS brigade, becoming a judge under ISIS, and signing Sotloff's "Legal Retribution Verdict." QNB's alleged relationship with the principal—ISIS—is thus several steps removed and impermissibly "attenuated" from both a legal and commonsense perspective. *See Honickman*, 6 F.4th at 500-01. The Complaint therefore fails to "allege a connection between the foreign bank[] and [the FTO] sufficient to infer any relationship, much less a close one, between [the bank] and [the FTO]." *Bernhardt*, 47 F.4th at 872.

For the fifth factor—the defendant's state of mind—Plaintiffs claim that "Defendant QNB mistakenly identifies a 'one in spirit' requirement in *Halberstam*." Opp. at 26. Not so; QNB never

---

[12] Plaintiffs nonetheless argue that the D.C. Circuit looked past that factor for the defendant in *Halberstam*, Linda Hamilton. *See* Opp. at 25. But the court explained that "the success of the tortious enterprise clearly required expeditious and unsuspicious disposal of the goods, and Hamilton's role in that side of the business was *substantial*." *Halberstam v. Welch*, 705 F.2d 472, 488 (D.C. Cir. 1983). Here, QNB's minimal role in providing a single, standard bank transfer means that QNB has far less metaphorical "presence" than Hamilton, who was engaged in an ongoing "tortious enterprise" with Bernard Welch, described as a "pattern . . . over five years." *Id.* at 486, 488.

11

cited any such requirement, but instead explained that, because there are no allegations plausibly supporting even general awareness (the news article Plaintiffs cite is insufficient, *see supra* Section II.A), this factor weighs in QNB's favor.  QNB is not properly alleged to have had the requisite state of mind, beyond conclusory assertions that it did.  *See* QNB Br. at 18 (citing cases).

The sixth factor—the length of time an alleged aider-abettor has been involved—supports QNB, as any relationship with al Salim was fleeting.  Plaintiffs wrongly suggest this factor asks whether, regardless of duration, the relationship "*ha[d] a profound effect*," Opp. at 27 (emphasis added).  The factor asks about the temporal length of assistance in terrorism, not its effects.  *See* QNB Br. at 18-19 (citing *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 225 (2d Cir. 2019)).  If Plaintiffs want to focus on QNB's alleged relationship with al Salim (rather than Qatar Charity), none truly exists: it is the infinitesimal time it would have taken for the passive facilitation of a transfer from one of QNB's customers to al Salim.  QNB is alleged to have been involved with Qatar Charity for a short period of time before the alleged transfer.  But even if lengthier, that "relationship" would "not necessarily [bespeak] of *assistance in terrorism*," *id.*, given Qatar Charity's acknowledged charitable mission.  *See id.* at 19 (citing Complaint).

### III.   PLAINTIFFS FAIL TO STATE A CLAIM THAT QNB IS SECONDARILY LIABLE UNDER 18 U.S.C. § 2333(D) FOR CONSPIRACY.

Plaintiffs fall short at the first step of alleging a conspiracy under JASTA: they fail to plausibly allege an "agreement" between QNB and ISIS.   Plaintiffs attack a strawman in arguing that QNB need not have conspired with "the specific individual representative of the FTO who, for instance, actually planted the bomb that injured or killed a plaintiff."  Opp. at 28 (cleaned up).  That argument leads nowhere; QNB focuses on an alleged conspiracy with *ISIS* as the FTO at issue.  Plaintiffs fail to plausibly allege an agreement between QNB and ISIS or QNB and al Salim.

"Proving a conspiracy requires evidence 'each conspirator had the *specific intent* to further the *common unlawful objective*.'"  *Bernhart*, 47 F.4th at 873 (emphases added) (citation omitted).  "[C]onclusory, vague and general" allegations, *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984), like pleading that "Defendants conspired with each other, the government of Qatar, the Muslim Brotherhood, ISIS, and others to bring about acts of international terrorism," Compl. ¶ 253, are insufficient.  Plaintiffs' allegations that the governments of Qatar and Turkey are part of a larger conspiracy involving QNB to fund terrorism, destabilize Syria, or even to kill American journalists are devoid of details explaining how QNB had *specific intent* to further those *common*

12

*objectives*. Plaintiffs' "conspiracy claim fails because [they have] not adequately alleged an *agreement* between [the bank] and [the FTO]." *Bernhardt*, 47 F.4th at 872-73 (emphasis added).

## IV. PLAINTIFFS FAIL TO STATE A CLAIM THAT QNB IS PRIMARILY LIABLE UNDER 18 U.S.C. § 2333(A).

Plaintiffs continue to press their primary liability claims despite the clear inappropriateness of doing so. The ATA's primary liability provision provides "civil relief only against the principals perpetrating acts of international terrorism . . . [and] provide[s] no civil action against secondary actors." *Linde*, 882 F.3d at 319-20. Any other reading renders "superfluous" JASTA's secondary liability provision. *See Kemper v. Deutsche Bank AG*, 911 F.3d 383, 396 (7th Cir. 2018).

Plaintiffs rely on a minority view in *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33 (E.D.N.Y. 2019), and the Seventh Circuit *Boim* case on which *Miller* relied. The Second Circuit has held that as a pre-JASTA case, *Boim* is "insufficient to overcome the binding effects of *Linde*." *Honickman*, 6 F.4th at 499 n.14.[13] *Linde* makes clear that even "providing routine financial services to members and associates of terrorist organizations is not so akin to providing a loaded gun to a child" as compel a finding of an act of international terrorism. 882 F.3d at 327. Plaintiffs fail to distinguish *Linde*, which forecloses their "loaded gun argument" from *Miller*. QNB's own actions as alleged in the Complaint amount to passively facilitating a single transfer.

In attempting to rebut QNB's argument on proximate cause, Plaintiffs again rely only on the Lebanese news article to argue that all of al Salim's intervening acts were foreseeable. Plaintiffs' injuries must be "reasonably foreseeable or anticipated as a natural consequence." *Rothstein v. UBS AG*, 708 F.3d 82, 91-92 (2d Cir. 2013). The Complaint does not raise a plausible inference of foreseeability here, for reasons already discussed. *See supra* Section II.A.

## CONCLUSION

For the foregoing reasons, Qatar National Bank respectfully submits that the Court should grant in full its Motion to Dismiss Plaintiffs' Complaint with prejudice.

---

[13] Plaintiffs ignore that the facts in *Miller* are far more extreme. In *Miller*, Arab Bank was alleged to have "processed over $30,000,000 for Hamas entities from various sources, as well as processing millions of dollars through New York for Hamas leaders." 372 F. Supp. 3d at 39. Arab Bank also was alleged to have "administered a terrorist insurance scheme . . . in which the Saudi Committee provided over $35 million to martyrs and their families, including individuals responsible for attacks that have injured plaintiffs in the instant cases." *Id.* The allegations were replete with specific facts regarding how this dangerous terrorist operation was meticulously run. This is a far cry from anything alleged against QNB.

Dated: January 9, 2023                                Respectfully submitted,

*/s/ Edward M. Mullins*
Edward M. Mullins
**REED SMITH LLP**
200 South Biscayne Boulevard, 26th Floor
Miami, Florida 33131
Telephone: (786) 747-0200
Facsimile: (786) 747-0299
emullins@reedsmith.com

Michael G. McGovern (*pro hac vice*)
**ROPES & GRAY LLP**
1211 Avenue of the Americas
New York, New York 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
michael.mcgovern@ropesgray.com

Douglas Hallward-Driemeier (*pro hac vice*)
**ROPES & GRAY LLP**
2099 Pennsylvania Avenue, NW
Washington, DC 20006-6807
Telephone: (202) 508-4600
Facsimile: (202) 508-4650
douglas.hallward-driemeier@ropesgray.com

*Counsel for Defendant Qatar National Bank (Q.P.S.C.)*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 9, 2023, a true and correct copy of the foregoing was served via transmission of Notices of Electronic Filing generated by CM/ECF on all counsel or parties of record.

/s/ Edward M. Mullins
Edward M. Mullins