**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 22-CV-80726-MIDDLEBROOKS/Matthewman

ARTHUR BARRY SOTLOFF, individually
and as the Administrator of the Estate of
STEVEN JOEL SOTLOFF; SHIRLEY
GOLDIE PULWER; and LAUREN SOTLOFF;

      Plaintiffs,

v.

QATAR CHARITY, a Foreign Non-Profit
Organization; and QATAR NATIONAL
BANK (Q.P.S.C); a Foreign Multinational
Commercial Bank;

      Defendants.

_____/

## <u>ORDER DENYING MOTIONS TO DISMISS</u>

### TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................................ 3

II.  BACKGROUND ................................................................................................................ 3

  A. STEVEN SOTLOFF'S KIDNAPPING, TORTURE, AND EXECUTION ........................... 4

  B. THE CO-CONSPIRATORS ....................................................................................... 6

    1.  QATAR, ITS ROYAL FAMILY, AND THE MUSLIM BROTHERHOOD ................. 6

    2.  DEFENDANT QATAR NATIONAL BANK ..................................................... 9

    3.  DEFENDANT QATAR CHARITY ............................................................... 10

  C. THE CONSPIRACY IN ACTION ................................................................................ 12

  D. PLAINTIFFS' CLAIMS ............................................................................................ 16

III. DISCUSSION ................................................................................................................. 16

  A.  PERSONAL JURISDICTION ..................................................................................... 16

    1.  STATUTORY HOOK ............................................................................................. 18

      a.  ATA ................................................................................................................. 18

      b.  FLORIDA'S LONG-ARM STATUTE ........................................................... 19

      c.  FED. R. CIV. P. 4(k)(2) .................................................................................. 20

    2.  DUE PROCESS ..................................................................................................... 21

      a.  QATAR NATIONAL BANK ......................................................................... 36

      b.  QATAR CHARITY ......................................................................................... 49

  B.  THE MERITS ............................................................................................................. 54

    1.  COUNTS III AND IV – PRIMARY LIABILITY ................................................. 54

    2.  COUNT II – CONSPIRACY LIABILITY .................................................... 58

    3.  COUNT I – AIDING AND ABETTING ...................................................... 60

  IV. CONCLUSION ............................................................................................................... 63

## I.      INTRODUCTION

In an effort to change U.S. foreign policy by terrorizing the American public, ISIS beheaded an American journalist, Steven Sotloff, in Syria on August 31, 2014, and released a video of the same.  An ISIS judge, Fadhel al Salim ("al Salim"), ordered the execution.  Plaintiffs are Sotloff's estate and family members.  They allege that Defendants—Qatar National Bank and Qatar Charity acting at the behest of and in concert with the government and Royal Family of Qatar—wired al Salim "$800,000 ten months earlier . . . . so that he could found a militant brigade, join ISIS, and destabilize Syria by committing acts of terror, such as the murder of American hostages like [Sotloff]."  Plaintiffs filed suit on May 13, 2022, under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a), *et seq.*, as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), 18 U.S.C. § 2333(d)(2), *et seq.*

After opposing a motion authorizing alternative service of process, Defendants now move to dismiss this action for lack of personal jurisdiction and failure to state a claim.  (DE 53; DE 54). The Motions are fully briefed.  (DE 56; DE 58; DE 59).  For the following reasons, the Motions are denied.[1]

## II.     BACKGROUND

The issues raised in Defendants' Motions to Dismiss require a highly fact intensive analysis.  To that end, I will spend a great deal of time setting up Plaintiffs' allegations.  I start at the end of the story—Sotloff's harrowing experience—and then work my way through how Defendants (in Plaintiffs' telling) contributed to, and indeed intended, Sotloff's execution.[2]

---

[1] QNB's request for a hearing on the motions is denied.  (DE 53 at 30).  The Parties fully addressed the issues on the papers.

[2] Mr. Sotloff was brutally murdered by terrorists claiming to be acting in furtherance of religion.  Thus, the Complaint and this Order contain graphic and disturbing descriptions of

## A. STEVEN SOTLOFF'S KIDNAPPING, TORTURE, AND EXECUTION

On August 4, 2013, Sotloff was kidnapped by the Islamic State of Iraq and Syria ("ISIS") shortly after crossing into Syria from Turkey.  (Compl. ¶ 219).[3]  He was covering the civil war in Syria.  Less than a year prior, in November 2012, James Foley, another American journalist covering the war, and his British colleague, John Cantlie, were also kidnapped by ISIS in Syria.  (¶ 218).  Sotloff and Foley were held hostage for months in the same ISIS prison in Syria.  (¶ 219).  Both men did not see daylight for months at a time, were forced to use "bottles and buckets to relieve themselves," starved, and were chained together.  (¶ 221).  The ISIS militants would beat them just before "proof of life contact so that the hostages would recount their horror and put more pressure on their home countries."  (*Id*.).  There was also psychological torture.  ISIS would threaten Sotloff and Foley with execution and force them to watch execution videos of other hostages.  (¶ 222).  Sometime in late 2013 or early 2014, ISIS transferred Sotloff and Foley to a prison in Raqqa, Syria.  (¶ 223).

On August 14, 2014, al Salim—the terrorist funded by Defendants 10 months earlier—headed a convoy of "four closed Hyundai military vehicles belonging to [ISIS]" from Raqqa to Ash Shaddadi, Syria.  (¶ 224).  That convoy likely carried Sotloff and Foley.  (¶ 225).  That day, al Salim adjudged Foley (not clear of what) and ordered his beheading, by way of a "Legal

---

violence, alongside repeated references to various concepts ostensibly associated with the religion of Islam.  I am mindful of the power of rhetoric in shaping how societies come to think about groups of people, and I do not wish to reinforce stereotypes or misconceptions.  Therefore, I feel compelled to note that the Muslim mainstream denounces ISIS and terror.  And nothing about the tone or content of this Order should be construed as defining (even implicitly) any person's faith by reference to extremists.  My task is straightforward, even if exceedingly difficult, and it is this: to determine whether entities in Qatar can be made to answer in a U.S. court for funding a terrorist that murdered an American journalist in Syria.  In setting out to answer this complex legal question, my focus is on the well-pled allegations of the Complaint.

[3] Hereinafter, references to the Complaint (DE 1) will be as follows:  (¶ __ ).

Retribution Verdict," to take place on August 16, 2014.  (¶ 226).  Al Salim signed the Verdict as

"Sharia Judge 'Abu Al-Mughirah Al-Hashemi' for the Islamic Court in Ash Shaddadi . . . . " (*Id.*).

Prior to his execution, "Foley was forced to kneel in front of a camera and recite a statement

denouncing the United States . . . . " (¶ 230).  Foley was forced to say things like, "I call on my

friends, family, and loved [sic] to rise up against my real killers, the U.S. government, for what

will happen to me is only a result of their complacency and criminality."  (*Id.*).  His executioner,

another ISIS militant later identified as Mohammad Emwazi, followed up by saying:

> This is James Wright Foley, an American citizen of your country.
> As a government, you have been at the forefront of aggression
> towards the Islamic State. You have plotted against us and gone far
> out of your way to find reasons to interfere in our affairs. Today,
> your military airforce is attacking us daily in Iraq. Your strikes have
> caused casualties amongst Muslims. You're no longer fighting an
> insurgency, we are an Islamic army and a State that has been
> accepted by a large number of Muslims worldwide, so effectively,
> any aggression towards the Islamic State is an aggression towards
> Muslims from all walks of life who have accepted the Islamic
> Caliphate as their leadership. So any attempt by you, Obama, to
> deny the Muslims their rights of living in safety under the Islamic
> Caliphate will result in the bloodshed of your people.

(¶ 231).  Emwazi then beheaded Foley on camera.  (¶ 232).  Afterwards, but still on camera,

"Emwazi reappears holding Sotloff, in the same position and orange jumpsuit as Foley, then states

'[t]he life of this American citizen, Obama, depends on your next decision.'" (*Id.*).

About a week later, on August 24, 2014, al Salim signed a similar "Verdict" for Sotloff.

Al Salim ordered Sotloff's beheading to take place on August 31, 2014, at the hands of Emwazi.

(¶ 229).  Right before his execution, Sotloff was forced to recite a statement on camera.  It was as

follows:

> I am Steven Joel Sotloff. I'm sure you know exactly who I am by
> now and why I am appearing before you. And now this time for my
> message: Obama, your foreign policy of intervention in Iraq was
> supposed to be for the preservation of American lives and interests,

> so why is it that I am paying the price of your interference with my life? Am I not an American citizen? You've spent billions of U.S. taxpayers' dollars and we've lost thousands of our troops in our previous fighting against the Islamic State, so where is the people's interest in reigniting this war? From what little I know about foreign policy, I remember a time you could not win an election without promising to bring our troops back home from Iraq and Afghanistan and to close down Guantánamo. Here you are now, Obama, nearing the end of your term, and having achiev[ed] none of the above, and deceivingly marching us the American people in the blazing fire.

(¶ 233).  Emwazi then made the following statement:

> I'm back, Obama, and I'm back because of your arrogant foreign policy towards the Islamic State, because of your insistence on continuing your bombings and [unclear] on Mosul Dam, despite our serious warnings. You, Obama, have but to gain from your actions but another American citizen. So just as your missiles continue to strike our people, our knife will continue to strike the necks of your people . . . We take this opportunity to warn those governments that enter this evil alliance of America against the Islamic State to back off and leave our people alone.

(¶ 234).  Emwazi then beheaded Sotloff.  ISIS published the Foley and Sotloff execution video.

(*Id.*).

## B.  THE CO-CONSPIRATORS

### 1.  QATAR, ITS ROYAL FAMILY, AND THE MUSLIM BROTHERHOOD

Plaintiffs allege that there was a conspiracy headed by the government and Royal Family of Qatar whose objective was to destabilize the Syrian government, their regional rival, by creating an Islamic state in Syria.[4]  (¶ 1).  To do so, they conspired to finance "terrorist groups operating in Syria" all while knowing that such groups held American hostages, like Sotloff.  (*See* ¶ 3). Sotloff's execution furthered the conspiracy by putting "pressure on the United States government,

---

[4] The State Department describes Qatar as a "constitutional monarchy" with "hereditary rule by men in the Emir's branch of the Al Thani family."  U.S. State Department, 2022 Country Reports on Human Rights Practices: Qatar, https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/qatar/.

rais[ing] ISIS' profile among potential terrorist recruits, and attract[ing] funding from other terror funding networks . . . to destabilize Syria." (¶ 21).

Plaintiffs cite to contemporaneous reports that Qatar was knowingly funding terrorist organizations like the Islamic State in Iraq, al Nusra Front ("Nusra Front" or "al Nusra" or variation thereof), and al Qaeda in Iraq ("AQI"); predecessors to ISIS.[5] (¶ 4). The U.S. State Department's 2013 Country Reports on Terrorism stated that "Qatari-based terrorist fundraisers, whether acting as individuals or as representatives of other groups, were a significant terrorist financing risk and may have supported terrorist groups in countries such as Syria." (¶ 13) (citation omitted). And in March 2014, the Treasury Under Secretary for Terrorism and Financial Intelligence indicated that "the Qatari government is also supporting extremist groups operating in Syria" and "fundraisers operating in more permissive jurisdictions – particularly in Kuwait and Qatar – are soliciting donations to fund extremist insurgents . . . . including al-Qa'ida's Syrian affiliate, al-Nusrah Front, and the Islamic State of Iraq and the Levant (ISIL) . . . . " (¶¶ 14-15) (citation omitted).

This followed a long history, Plaintiffs allege, of the Royal Family's support for terrorist organizations. As early as 2003 a member of the Royal Family, Abdul Karim al-Thani, operated a safe house in Qatar for a notorious terrorist, Abu Mussam al-Zarqawi. (¶ 5). Zarqawi led AQI,

---

[5] One such report reads as follows:

> U.S. ties with Qatar have been strained for months, due to Doha's backing of Sunni rebels in Syria, including the Islamic Front and possibly even Jabhat al-Nusra. The U.S. Treasury has also raised concerns about Doha serving as a "permissive jurisdiction" for private terrorism finance to al-Nusra and the group now known as the Islamic State. This was cause for bipartisan concern at confirmation hearings for the next U.S. ambassador to Doha.

(¶ 4 n.1) (citing *US-Qatar Alliance: Under Strain?*, Foundation for Defense of Democracies, Aug. 4, 2014, https://www.fdd.org/analysis/2014/08/04/us-qatar-alliance-under-strain/).

a leading insurgency in Iraq following the U.S. invasion in 2003. (¶ 63). Zarqawi also orchestrated the murder of a USAID worker, Lawrence Foley, Jr., in Jordan in 2002 and appeared in a series of propaganda videos in which he personally beheaded American hostages.[6] (¶¶ 6-7). The United States offered a $10 million reward for his capture and eventually killed him in June 2006. (¶¶ 6, 65). In October 2006, a subsequent iteration of the Zarqawi network founded the Islamic State of Iraq ("ISI"). (¶ 66). By April 2013, ISI merged with the Nusra Front, expanded into Syria, and adopted the name the Islamic State of Iraq and the Levant ("ISIL" or "ISIS"). (*Id.*).

The Muslim Brotherhood was allegedly another key member of the conspiracy. (¶ 253). Plaintiffs describe the Muslim Brotherhood as a transnational "Islamist organization founded in Egypt in 1928" whose goal it is to create a "global Islamic state under its control." (¶ 67). Accordingly, the Muslim Brotherhood supported the destabilization of Syria to create an Islamic state. (¶ 68). The Muslim Brotherhood, through its "undisputed spiritual leader," Yusuf al Qaradawi, has maintained close ties with the Royal Family ("the Al Thanis"). (¶¶ 70-71). In 2005, then-U.S. Ambassador to Qatar detailed just how close by noting that the Heir Apparent of the Royal Family personally granted Qaradawi citizenship. (¶ 71). The Royal Family has also given

---

[6] In a lawsuit filed by these same Plaintiffs against the Syrian Arab Republic, the U.S. District Court for the District of Columbia found, in an order entering default judgment after holding a two-day evidentiary hearing, the following:

> [T]he Zarqawi organization routinely kidnapped, tortured, and beheaded Americans and journalists in strikingly similar fashion. ISIS in Iraq had even "captured Americans; put them in orange jumpsuits of a kind that Mr. Sotloff and Mr. Foley were forced to wear; [ ] tortured them; and then [ ] beheaded them on camera." Thus, it was very foreseeable that it might happen again.

(¶ 80) (citing *Sotloff v. Syrian Arab Republic*, 525 F. Supp. 3d 121, 140 (D.D.C. 2021).

Qaradawi "substantial properties including villas, which he rents, and the building which houses the Ruling Family Council, an organization of the Al Thani family." (*Id*.)

### 2. DEFENDANT QATAR NATIONAL BANK

Plaintiffs allege that at all times relevant, "QNB was controlled by the Qatari government and . . . Royal Family through their substantial stock ownership in the bank and membership on the bank's board of directors."   (¶ 36) (listing members).  Qatar National Bank ("QNB") was founded in 1964 as Qatar's first domestically owned commercial bank.  (¶ 32).  Qatar Investment Authority, Qatar's state-owned sovereign wealth fund, owned a 50% interest in QNB at all times relevant.  (¶ 33).  The Qatar Investment Authority was founded in 2005 by Qatar's then-Emir (of the Al Thani family).  Hammad bin Jassim bin Jaber bin Mohammad Al Thani ("Hammad bin Jassim"), the former Prime Minister and Foreign Minister of Qatar, ran the fund until 2013.[7]  (¶ 34).   Moreover, at the time of the alleged misconduct, QNB's regulator, Qatar Central Bank, was "governed by senior members" of the Royal Family.  (¶ 37).

QNB markets its ability to provide "Sharia compliant current accounts in numerous currencies," as approved by their "Sharia Supervisor Board." (¶ 38).  Qaradawi, the spiritual leader for the Muslim Brotherhood, sits on that board.  (¶ 76).  He also performed the ribbon-cutting at the opening of QNB's Islamic banking division.  (*Id*.).

QNB, lacking a U.S. branch, arranged with banking institutions that maintained offices in the United States to conduct "correspondent banking."  (¶ 114).  Correspondent banking allows foreign banks, like QNB, to conduct transactions in U.S. dollars by accessing the U.S. financial system. (*See* ¶¶ 115-18).  QNB advertises that it holds U.S. correspondent bank accounts at:  Bank

---

[7] Take note of Hammad bin Jassim as he will become even more relevant to the conspiracy later.

of New York Mellon, JP Morgan Chase Bank NA, Wells Fargo Bank NA, Standard Charted Bank (New York), and Citibank NA. (¶ 125). Plaintiffs allege that wire transfers in USD are "virtually all processed through a U.S. bank in New York." (¶ 122).

Like any other international bank, QNB maintains a compliance department meant to ensure that the bank complies with its Anti-Money Laundering, Counter-Terrorism Financing, Know-Your-Customer, and other due diligence obligations. (¶ 128). Plaintiffs describe in great detail how that due diligence should have operated to stop the wire transfer at issue. (*See* ¶¶ 128-217).

### 3. DEFENDANT QATAR CHARITY

Plaintiffs accuse Qatar Charity ("QC") of being a key funding source for international terrorism. (¶ 40). QC was founded in 1991 under the name Qatar Charitable Society.[8] At all times relevant, the following members of the Royal Family and/or government served on QC's board:

- Hamad bin Nasser al-Thani: Chairman of QC board, member of Royal Family, former Minister of State, Minister of Interior Affairs, and General Secretary of the Ruling Family Affairs Council.

- Ahmad Abdulla S G Al-Marri: Vice Chairman of QC board, former Minister of Endowments and Islamic Affairs, and Adviser to the Emir of Qatar.

---

[8] Plaintiffs appear to have mistakenly alleged that QC was founded in 2002 even though they allege misconduct dating back to the 1990's. (¶ 40). Another federal district court that adjudicated a similar motion to dismiss by QC (but with different plaintiffs) identified the same issue and explained: "The court takes judicial notice of the fact that public sources, including Qatar Charity's website, state the organization was founded in 1992, and assume the Complaint's discrepancy is attributable to a typo. *See, e.g., What We Do*, Qatar Charity, https://www.qcharity.org/en/qa/home/whatwedo (last visited Mar. 6, 2023)." *Przewozman v. Charity*, 20-6088-CIV, 2023 WL 2562537, at *2 n.2 (E.D.N.Y. Mar. 17, 2023). In addition, QC has not disputed that it operated under the name Qatar Charitable Society pre-2002.

- Mohamed Abdelwahed Al Hammadi:  QC board member, Minister of Education and Higher Education and Secretary-General of the Supreme Education Council.

- Yousef bin Ahmed Al Kuwari:  QC board member, member of the Shura Council (one of two main branches of Qatar's legislative body).

- Mohamed Nasser M A. Al Hajri:  QC board member, Director of Economic and Political Affairs for the Emir of Qatar's Diwan (administrative office of the Emir).

(¶ 61).

Plaintiffs allege numerous instances in which Qatar Charity has been labeled as a key funding source for international terrorism.  While not published publicly, in 2008 the U.S. Interagency Intelligence Committee on Terrorism listed Qatar Charitable Society as a "'terrorism support entity' . . . because of its 'intent and willingness' to support terrorist organizations that attack the U.S. and its interests."  (¶ 42).  In testimony to the 9/11 Commission and Congress, a former business aide to Osama bin Laden said that bin Laden told him in 1993 that the Qatar Charitable Society was one of bin Laden's major sources of funding.  (¶ 44).  In a 2002 terrorism-related criminal case in the U.S. District Court for the Northern District of Illinois, the government confirmed (via an evidentiary proffer) that the Qatar Charitable Society financed bin Laden, who used the money to carry out the 1998 East Africa embassy bombings.  (¶ 45) (citing *United States of America v. Enaam M. Arnaout*, Case No. 2-CR-892 (N.D. Ill. Jan 6, 2003) (DE 78-2).  That was repeated in testimony before the U.S. House Committee on Financial Services Subcommittee on Oversight and Investigations.  (*See* ¶¶ 46-48).  Plaintiffs also allege that Qatar Charity funded a slew of other terrorist organizations:  National Islamic Front in Sudan; Eritrean Islamic Jihad Movement; Ahfad al-Rasul Brigade; and others in Chechnya, Mali, the Balkans, and the republics of the Caucasus.  (*See* ¶¶ 49-53).

In 2008, Israel's Defense Minister designated Qatar Charitable Society as a member of the Union of Good, a "notorious funder of Hamas terrorism," and banned it from operating in territories administered by the Palestinian Authority.  (¶ 55).  At the same time, Israel also warned financial institutions to "prepare accordingly and act with caution in order to avoid criminal actions and civil lawsuits by victims of terrorism . . . . "  (¶ 56) (citation omitted).  Then in 2017, Saudi Arabia, Bahrain, Egypt, and the United Arab Emirates cut ties with Qatar due to its support of terrorist organizations.  (¶ 58).  The same countries designated Qatar Charity a financial supporter of terrorism in 2017.  (¶ 59).  Finally, also in 2017, QC renamed its UK branch "Nectar Trust" to "avoid suspicion from international banks after a damning report by the UK Charity Commission noting its questionable 'independence,' and its connections to the Muslim Brotherhood."  (¶ 57).  Given this history, Plaintiffs allege that QC could not have obtained U.S. dollars without QNB's help.  (¶ 121).

### C.  THE CONSPIRACY IN ACTION

Plaintiffs allege that the conspiracy to fund (with USD) ISIS predecessors, then later ISIS itself, as well as ISIS's front organizations, began in 2011.  (¶ 77).  U.S. dollars were chosen because it was "the currency of choice and lifeblood of terrorist organizations . . . . "  (¶ 82).  As previously mentioned, the purpose of the conspiracy was to "establish an Islamic state in Syria and to destabilize Syria's Assad Regime."  (¶ 78).  The co-conspirators knew that the taking of American hostages increased "notoriety, power, wealth, and recruiting power of ISIS and its predecessor[s]," thus furthering the conspiracy.  (¶ 79); *see also supra*, note 6.  Plaintiffs allege that Defendants, "whose boards and management are controlled by Qatari Royal Family members and government officials, and who are regulated by the Qatari government, shared Qatar's objectives."  (*Id*.).

During one or more visits to Turkey between 2011-2013, then Qatar Prime Minister and Foreign Minister Hamad bin Jassim (mentioned earlier as also running the Qatar Investment Authority which owned 50% of QNB), "declared his intention to finance the Muslim Brotherhood's strategy of destabilizing Syria through the funding of radical militant groups such as ISIS and its predecessors." (¶ 91).  To do so, funds were wired from QNB accounts to accounts at Ziraat Bank, "a state-owned Turkish bank, then withdrawn to fund numerous conferences held in Turkey at which funds were distributed to ISIS predecessor organizations and then later to ISIS itself, its operatives, and front organizations." (¶ 92).

Plaintiffs describe one such meeting as taking place in September 2011 at a hotel in Ankara, Turkey.  (¶ 96).  The attendees included:

- Hamad bin Jassim:  mentioned above.

- Saad Hariri:  Former Lebanese Prime Minister.

- Oqab Saqer:  Lebanese politician.

- Several military leaders of the Muslim Brotherhood who swore allegiance to the Islamic State and to al Qaeda.

- Mamoun Kanaan:  al Qaeda leader from Iraq.

- Hassan Abboud:  one of the founders of Ahrar al-Sham, who worked with the Islamic State.

- Abd al-Rahman bin 'Umayr al-Nu'aymi ("Sheik Nu'aymi"):  Qatari terror financier, who was designated as a terrorist by the U.S. Treasury in 2013 for his support of ISIS precursor AQI.

- Maher al-Nu'aymi:  a relative of Sheik Nu'aymi and terrorist brigade commander in Homs, Syria.

(*Id.*).  At the meeting, Hammad bin Jassim is said to have shaken hands with the attendees and met with Shiek Nu'aymi privately.  (¶ 97).  The following day, "Hammad bin Jassim returned and told the representatives of the terrorist organizations that all funding requests had been approved."

(*Id.*).  Suitcases of cash were then distributed to the terror group leaders.  (*Id.*).  In another conference held in July 2012 at a hotel in Istanbul, Turkey, Abdul Hadi Manna al Hajri, the brother-in-law of the Emir of Qatar, distributed about $25 million in cash to 11 leaders of Syrian terrorist groups swearing allegiance to ISIS and/or its precursors.  (¶ 98).

Over time, Plaintiffs allege that this turned into a well-run terrorist financing operation that funneled millions of U.S. dollars to ISIS and its affiliates.  (¶¶ 18, 99).  The first step was for terrorists to approach the Muslim Brotherhood with proposals to carry out acts of violence in Syria. The Muslim Brotherhood would "vet" the terrorists and Qatar would then fund them.  (¶ 99). Qatar, Turkish intelligence, the Muslim Brotherhood, and Defendants conspired to set up a reliable means of laundering the millions of U.S. dollars in cash.  (¶ 100).  To do so, Turkish intelligence set up a fraudulent charity at Ziraat Bank and provided the account details to Qatar.  (*Id.*).  "The Qatari government, in turn, provided the account details to Qatar Charity, which initially wired 2 million USD into the account."  (*Id.*).  Plaintiffs allege that most, if not all, of the USD that ISIS and its affiliates received from Defendants' conspiracy went from QNB to Ziraat Bank, following the steps outlined above.  (¶ 101).  And that QNB was an essential player in the conspiracy because no "reputable international banking institutions" would have passed "USD through the American banking system on behalf of . . . Qatar Charity, which was a known supporter of terrorism."  (¶ 121).

***The Wire Transfer to al Salim.***  On March 19, 2013, the Daily Star Lebanon published a quote by a "Fadel al Salim, a lawyer who is close to the Nusra Front[:]"  "**We** are working to re-establish the Islamic caliphate in Syria, and **we** have informed [Syrian National Council head] Moaz al-Khatib that **we** will not accept the building of a civil state in Syria. **We** control the ground and will rule by Islamic law."  (¶ 103) (emphasis added).  The article further notes that Turkey and

Qatar "share[] an ideological grounding with the Muslim Brotherhood's militias [such as the Nusra Front] . . . and its vision of a future Syria." (¶ 104).  By December 2012, the U.S. State Department had designated the Nusra Front as a Foreign Terrorist Organization recognizing that it was an alias for AQI, "led by the same terrorists, that had claimed nearly 600 attacks, seeking to 'hijack the struggles of the Syrian people for its own malign purposes.'" (¶ 105).  And remember that by August 2013, ISIS had already kidnapped Sotloff and Foley and were threatening to kill them in order to extract political concessions from Syria and the United States.  (¶¶ 81, 218-19).

"On October 16, 2013, at 11:25 AM, QNB wired USD 800,000 to [al Salim] at his account at Ziraat Bank (account no. ending in XXXX013) via its correspondent account in the U.S." (¶ 106).  Upon confirmation of the wire transfer, al Salim was escorted to the Fatih Branch of Ziraat Bank in Istanbul by Muslim Brotherhood members and Turkish intelligence officers, whereupon he withdrew the $800,000 in cash.  (¶ 108).  Al Salim signed and marked with his thumbprint a copy of the wire confirmation with a handwritten statement acknowledging receipt from "Mr. Jassem Abdullah, **representative of Qatar Charity**." (¶ 109) (emphasis added).  Al Salim then gave the Muslim Brotherhood a $50,000 cut and packed the rest ($750,000) into boxes and bags.  (¶ 110).

"Members of the Muslim Brotherhood stated contemporaneously that **all parties** to the conspiracy were aware that the money was originally and ultimately intended for ISIS." (¶ 111) (emphasis added).  By the next day, al Salim crossed into Syria with the USD and "arrived in al Hasakah . . . where he proceeded to found and organize a brigade of Islamic State fighters . . . and to become a Sharia Judge under the Islamic State in at the Islamic Court in Ash Shaddadi, a town in southern al Hasakah." (¶ 112).  About 10 months later, in that very town, al Salim would order the beheading of Sotloff and Foley.  (¶ 228).

### D.  PLAINTIFFS' CLAIMS

Plaintiffs bring four counts, each one against both Defendants.  In summary, Count I alleges that Defendants aided and abetted a Foreign Terrorist Organization ("FTO"), ISIS, in violation of the ATA/JASTA by (a) transferring ISIS significant sums of money, (b) providing ISIS with access to USD and the U.S. banking system and (c) enabling ISIS to convert funds nominally intended to support humanitarian causes into resources necessary to commit terrorist attacks, which were the direct and proximate cause of Sotloff's execution.  (¶¶ 242, 247).  Count II alleges that Defendants conspired with the government of Qatar, the Muslim Brotherhood, ISIS, and others to bring about acts of international terrorism, including the execution of Sotloff, in violation of the ATA/JASTA. (¶ 253).  Count III and IV allege that Defendants are primarily liable for Sotloff's execution because they provided material support to an FTO, in violation of 18 U.S.C. §§ 2333(a), 2333A, and 2339B(a)(1).  (¶¶ 263, 280).  Plaintiffs allege to have suffered significant physical, psychological, and emotional injuries due to Defendants' actions.  (¶ 289).

Defendants move under Fed. R. Civ. P. 12(b)(2) to dismiss for lack of personal jurisdiction, or in the alternative, under Rule 12(b)(6) for failure to state a claim as to all Counts.

### III.    DISCUSSION

I first address Defendants' personal jurisdiction challenge.  The statutory jurisdiction analysis is virtually the same for both Defendants.  Once I reach the due process analysis, however, I discuss each Defendant individually.  I find that the exercise of personal jurisdiction is appropriate under Fed. R. Civ. P. 4(k)(2) and the Due Process Clause of the Fifth Amendment.  As for the merits, Plaintiffs plausibly allege a claim as to all Counts.

### A.  PERSONAL JURISDICTION

As an initial matter, "[b]efore a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." *Omni Capital Intern., Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 104 (1987). Here, on December 1, 2022, pursuant to Fed. R. Civ. P. 4(f)(3), I entered an Order authorizing alternative service of process on Defendants via FedEx to their offices in Qatar and via email to their lawyers in New York. (DE 47). Plaintiffs filed proof of service on December 9, 2022. (DE 52).

Given that Plaintiffs properly effectuated service of process, I proceed to the personal jurisdiction analysis. Rule 12(b)(2) allows for dismissal of a claim when the court lacks personal jurisdiction over a defendant. *See* Fed. R. Civ. P. 12(b)(2). "A plaintiff seeking to establish personal jurisdiction over a nonresident defendant 'bears the initial burden of alleging in the complaint sufficient facts to make out a *prima facie* case of jurisdiction.'" *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013) (quoting *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009)). "Where . . . the defendant submits affidavits contrary to the allegations in the complaint, the burden shifts back to the plaintiff to produce evidence supporting personal jurisdiction, unless the defendant's affidavits contain only conclusory assertions that the defendant is not subject to jurisdiction." *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 (11th Cir. 2006) (quoting *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002)). "Where [the plaintiff's] complaint and supporting affidavits and documents conflict with the [d]efendant['s] affidavits, we must construe all reasonable inferences in favor of the plaintiff . . . . " *Id.* (quoting *Meier*, 288 F.3d at 1269).[9]

---

[9] QNB did not file *any* evidence in support of its personal jurisdiction challenge. QC filed twenty-four exhibits, but only one—a 2009 letter from QC to the Union of Good cancelling its membership—even comes to close to challenging Plaintiffs' *prima facie* case. (*See* DE 59-7). As I will explain later, the rest of the exhibits are essentially print outs touting Qatar's recent goodwill on the global stage and QC's charitable works. Given the lack of evidence challenging Plaintiffs'

"In analyzing a motion to dismiss for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2), we first determine whether the applicable statute potentially confers jurisdiction over the defendant, and then determine whether the exercise of jurisdiction comports with due process." *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997). "Only if both prongs of the analysis are satisfied may a federal or state court exercise personal jurisdiction over a nonresident defendant." *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990).

### 1. STATUTORY HOOK

Starting with the first prong, the statutory hook, Plaintiffs allege three potential bases for personal jurisdiction:  18 U.S.C. § 2334(a) ("ATA"); Florida's Long-Arm Statute, Fla. Stat. § 48.193; or Fed. R. Civ. P. 4(k)(2).[10]   I will take each in turn.

### a. ATA

While Plaintiffs allege personal jurisdiction under the ATA's nationwide service of process provision (¶ 27), they abandoned it in their response to Defendants' Motions to Dismiss by failing to raise it as a basis for jurisdiction.  (*See generally* 56).   § 2334(a) provides as follows:

> Any civil action under section 2333 of this title against any person may be instituted in the district court of the United States for any district where any plaintiff resides or where any defendant resides or is served, or has an agent. Process in such a civil action **may be served in any district where the defendant resides, is found, or has an agent**.

18 U.S.C. § 2334(a) (emphasis added).  "When a federal statute provides for nationwide service of process, it becomes the statutory basis for personal jurisdiction." *Rep. of Panama*, 119 F.3d at 942.  Here, Defendants were served via FedEx in Doha, Qatar, not in a district within the United

---

allegations and my finding that Plaintiffs have alleged a *prima facie* case for personal jurisdiction, there is no need for jurisdictional discovery.

[10] Plaintiffs neither allege nor argue that Defendants are subject to general jurisdiction.

States.  And while technically their lawyers served in New York may be "agents," that would be an inappropriate expansion of the statute given that such service was authorized by the Court and not by actions taken by Defendants.  In any event, Plaintiffs abandoned this line of argument.

### b.   FLORIDA'S LONG-ARM STATUTE

Plaintiffs allege that Defendants are subject to personal jurisdiction under Fla. Stat. § 48.193(1)(a)(2), which provides that a non-resident defendant becomes subject to the personal jurisdiction of Florida's courts by "personally or through an agent . . . [c]ommitting a tortious act within this state."[11]  Fla. Stat. § 48.193(1)(a)(2).

To reach that conclusion, Plaintiffs argue that ISIS's distribution of the execution video, which could be accessed by Plaintiffs in Florida, constituted a tort committed *in* Florida upon which this case arises.[12]  (DE 56 at 21).  And while Defendants may not have been intimately involved in the distribution of the video, personal jurisdiction is nonetheless appropriate under a co-conspirator theory.[13]  (*Id*. at 22).

---

[11] To the extent Plaintiffs allege personal jurisdiction under Fla. Stat. § 48.193(1)(a)(1) (transacting business in Florida), that argument has also been abandoned in their response.  (*See* ¶ 27(b); DE 56).  Moreover, even if properly raised, the facts in the Complaint would not warrant the exercise of jurisdiction under that prong of the long-arm statute.

[12] *See Wendt v. Horowitz*, 822 So.2d 1252, 1260 (Fla. 2002) ("'committing a tortious act' in Florida under section 48.193[(1)(a)(2)] can occur through the nonresident defendant's telephonic, electronic, or written communications into Florida."); *see also Internet Sols. Corp. v. Marshall*, 39 So. 3d 1201, 1215 (Fla. 2010) ("When the posting is then accessed by a third party in Florida, the material has been 'published' in Florida and the poster has communicated the material 'into' Florida, thereby committing the tortious act of defamation within Florida.").

[13] *See Wilcox v. Stout*, 637 So. 2d 335, 337 (Fla. 2d DCA 1994) ("[I]f appellant has successfully alleged a cause of action for conspiracy among appellees . . . to commit tortious acts toward appellant, and . . . any member of that conspiracy committed tortious acts in Florida in furtherance of that conspiracy, then all of the conspirators are subject to the jurisdiction of the state of Florida through its long-arm statute [§ 48.193[(1)(a)(2)] . . . . ").

Assuming that is all correct, which I believe it is, it still fails for two reasons.  First, Plaintiffs have not pled that any of them accessed/viewed the video in Florida.  However, that error is likely curable.  The real issue is the second:  the Fourteenth Amendment's Due Process Clause.  The exercise of personal jurisdiction under Florida's long-arm statute would not comport with the Due Process Clause of the Fourteenth Amendment because, unlike under Rule 4(k)(2), the relevant forum at which Defendants' actions must be directed to is Florida, not the United Sates more broadly.  When ISIS distributed the video, it cannot reasonably be said to have "expressly aimed" it at Florida or made Florida the "focal point."  *See Calder v. Jones*, 465 U.S. 783, 789 (1984) (finding personal jurisdiction, in part, because "California is the focal point both of the story and of the harm suffered.").  Rather, the video was clearly intended to terrorize the American public more broadly and influence the U.S. government.  Plaintiffs actually do not argue otherwise (*see* DE 56 at 22), but nonetheless fail to acknowledge the significance of that distinction.

### c.  FED. R. CIV. P. 4(k)(2)

Lastly, Plaintiffs allege personal jurisdiction under Rule 4(k)(2), which operates as a federal long-arm statute.  *See Fraser v. Smith*, 594 F.3d 842, 848 (11th Cir. 2010).  Rule 4(k)(2) reads as follows:

> (2) *Federal Claim Outside State-Court Jurisdiction.* For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if:
>
> (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and
>
> (B) exercising jurisdiction is consistent with the United States Constitution and laws.

Fed. R. Civ. P. 4(k)(2).

Defendants' arguments against personal jurisdiction under Rule 4(k)(2) are limited to its final requirement—jurisdiction that is consistent with the United States Constitution and laws (*i.e.*, due process). (*See* DE 53 at 10-11; DE 54 at 17-21). I will turn to that issue in the next Section, but, for the sake of thoroughness, I will briefly address the other requirements under Rule 4(k)(2). The first two requirements—raising a federal claim and effectuating service of process—are clearly met in this case. (*See* Parts II.D, III.A).

The third requirement—not being subject to personal jurisdiction in any state—is also met. In the Eleventh Circuit, "[a] district court is not required to analyze the laws of all fifty states to ascertain whether any state court of general jurisdiction has jurisdiction over the defendant; rather, 'if . . . the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2).'" *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1218 n.22 (11th Cir. 2009) (citing same approach by Fifth, Seventh, Ninth, and D.C. Circuits). Such is the case here: Defendants argue that they are not subject to personal jurisdiction in Florida and do not identify any other state in which they may be subject to personal jurisdiction.

## 2. DUE PROCESS

Under Rule 4(k)(2), the requirement that the exercise of "jurisdiction [be] consistent with the United States Constitution and laws," means that which comports with the Fifth Amendment's Due Process Clause. *Herederos De Roberto Gomez Cabrera, LLC v. Teck Res. Ltd.*, 43 F.4th 1303, 1307 (11th Cir. 2022), *cert. denied*, 143 S.Ct. 736 (Jan. 17, 2023). In *Herederos*, the Eleventh Circuit held, though it had long assumed, that "courts should analyze personal jurisdiction under the Fifth Amendment using the same basic standards and tests that apply under the Fourteenth Amendment." *Id*. at 1307; *see also Oldfield*, 558 F.3d at 1219 n.25 (11th Cir. 2009)

(stating, but not holding, same).  Thus, under Rule 4(k)(2), courts must apply the minimum-contacts test with the applicable forum being the United States as a whole.  *See Herederos*, 43 F.4th 1310.

Courts apply a three-part due process test in evaluating whether there is specific personal jurisdiction over a defendant: "(1) whether the plaintiff's claims 'arise out of or relate to' at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant purposefully availed himself of the privilege of conducting activities with the forum state, thus invoking the benefit of the forum state's law; and (3) whether the exercise of personal jurisdiction comports with 'traditional notions of fair play and substantial justice.'"  *Louis Vuitton*, 736 F.3d at 1355 (citation format).  The plaintiff bears the burden of establishing the first two elements before the defendant is required to make a "compelling case" regarding the third element.  *Id.*

Plaintiffs raise two arguments for satisfying due process under Rule 4(k)(2).  First, Defendants purposefully availed themselves of the forum by using the U.S. banking system to fund a known terrorist with a history of "targeting and brutally murdering Americans."  (DE 56 at 8).  Second, by funding the same known terrorist organization, Defendants satisfy the "Effects Doctrine" (or "Effects Test").  (*Id*. at 16).  Plaintiffs' framing of the Effects Test implicates conspiracy jurisdiction, much like their Florida long-arm statute argument.[14]  (*See id*. at 18; *see also* ¶¶ 24, 27-28).  That in turn prompts a discussion below about conspiracy jurisdiction under Rule 4(k)(2).  In the context of terrorism-related cases, the Effects Test also merits further discussion.  What follows is a long, but ultimately necessary, detour on our road to reaching the due process analysis.

---

[14] Both the Effects Test and conspiracy jurisdiction are different ways of satisfying due process, but neither can supplant the traditional minimum contacts test.  *See Louis Vuitton*, 736 F.3d at 1357.

*Effects Test*.   "Under the effects test, a nonresident defendant's single tortious act can establish purposeful availment without regard to whether the defendant had any other contacts with the forum state." *Del Valle v. Trivago GMBH*, 56 F.4th 1265, 1276 (11th Cir. 2022).   To satisfy the Effects Test, a plaintiff must allege that " [1] the tort was intentional, [2] aimed at the forum state, [3] and caused harm that the defendant should have anticipated would be suffered in the forum state." *Id*.   While the Effects Test is typically analyzed under the "purposeful availment" prong of the three-part *Louis Vuitton* framework, *see, e.g.*, *Del Valle*, 56 F.4th at 1275-76, an intentional tort targeted at a forum can also be enough to satisfy the minimum contacts requirement.   *See Licciardello v. Lovelady*, 544 F.3d 1280, 1287-88 (11th Cir. 2008) (finding minimum contacts where only contact was defendant's unauthorized use of trademark on website accessible in and aimed at Florida); *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 173 (2d Cir. 2013) ("The effects test is a theory of personal jurisdiction typically invoked where . . . the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff.").

Courts frequently cite *Mwani v. bin Laden*, 417 F.3d 1 (D.C. Cir. 2005) (Garland, J.) for the underlying logic behind finding that a defendant's *financing* of terrorism can satisfy the Effects Test.   As one district court put it, "[t]errorist attacks require more than a triggerman—they also require financing, planning, and coordinating before a bomb detonates or a plane flies into a building." *Morris v. Khadr*, 415 F. Supp. 2d 1323, 1336 (D. Utah 2006).   In *Mwani*, the D.C. Circuit reversed a district court's dismissal for lack of personal jurisdiction under Rule 4(k)(2) over Osama bin Laden (and al Qaeda) in a suit against him for orchestrating the 1998 bombing of

the American embassy in Nairobi, Kenya, which killed more than 200 people and wounded more than 4000. *Mwani*, 417 F.3d at 4. In doing so, the court explained that:

> Although "the constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum," *Burger King,* 471 at 474 (quoting *International Shoe,* 326 U.S. at 316), the "foreseeability" of causing injury in the forum can establish such contacts where "the defendant's conduct and connection with the forum . . . are such that he should reasonably anticipate being haled into court there." *Id.* (quoting *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. at 286, 295). "Jurisdiction in these circumstances may not be avoided merely because the defendant did not *physically* enter the forum." *Id.* at 477. Rather, "[s]o long as [an] actor's efforts are 'purposefully directed' toward residents of another [forum]," the Supreme Court has "consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there."

*Id*. at 12-13 (citations omitted).

As applied to bin Laden's planning of the 1998 bombing, the court found that "**there is no doubt that the defendants** '**engaged in unabashedly malignant actions directed at [and] felt in this forum**.'" *Id*. at 13 (citation omitted and emphasis added). To do so, the court relied on the plaintiffs' allegations and evidence that bin Laden planned the bombing to not only kill the American and Kenyan employees, "**but to cause pain and sow terror in the embassy's home country, the United States**." *Id*. (emphasis added). In addition, the court looked to the defendants' ongoing conspiracy to attack the United States as evidenced by the 1993 World Trade Center bombing and similar plots. *Id*.

Two Second Circuit cases[15] arising out of the September 11 terrorist attacks illustrate that, in the terrorism financing context, the degree of separation between the financier and terrorist

---

[15] There is little-to-no Eleventh Circuit case law dealing with the sort of facts raised in this case. Most relevant cases have come out of the Second and D.C. Circuits.

organization is a key factor in satisfying the Effects Test.[16]  In the first case, *In re Terrorist Attacks on September 11, 2001*, 538 F.3d 71 (2d Cir. 2008) ("*In re Terrorist I*"), *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305 (2010), families of 9/11 victims sued five Saudi princes for their connection to al Qaeda leading up to the attacks.  The first four princes ("the financiers") funded charities that in turn funded al Qaeda.  The financiers were put on notice by foreign governments that the charities were fronts for al Qaeda.  *Id*. at 77-78.  One financier also had direct contact with bin Laden between 1980-1990 and in 1998 he agreed with al Qaeda and the Taliban not to extradite bin Laden in exchange for sparing Saudi Arabia from terrorist attacks. *Id*. at 78.  The fifth prince ("the CEO") was the CEO of a bank that invested in another bank at which bin Laden and other terrorists held bank accounts.  *Id*. at 95.  The plaintiffs alleged that the CEO was an active participant in bin Laden's plan because Sharia banking requires that the bank and depositors manage the money together.  *Id*.  The Second Circuit held that there was no personal jurisdiction over the five princes.  As to the financiers, the court distinguished *Mwani* by holding that "[p]roviding *indirect* funding to an organization that was openly hostile to the United States does not constitute [expressly aiming tortious acts at the United States]."  *Id*. (emphasis added). Similarly, the CEO's relationship to the terrorists was found to be too attenuated because (a) he was never a "director, officer, shareholder or employee" of the banks that held the deposits and (b) his only relation to the "bad" banks was managing a bank that invested in them.  *Id*. at 96.

In a follow-on case, *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 659 (2d Cir. 2013) ("*In re Terrorist II*"), the Second Circuit distinguished *In re Terrorist I*.  The court held that

---

[16] This principle is rooted, in part, in the Supreme Court's holding in *Calder v. Jones* that defendants who are "*primary* participants in an alleged wrongdoing intentionally directed at a [forum] resident . . . " can subject themselves to personal jurisdiction in that forum.  465 U.S. 783, 790 (1984) (emphasis added).

certain foreign charity officials might be subject to personal jurisdiction in the United States because:

> [I]nstead of knowingly sending money to purported charitable organizations that allegedly supported al Qaeda—like the defendants in [*In re Terrorist I*]—the Charity Official defendants and Al Kadi allegedly controlled and managed some of those "charitable organizations" and, through their positions of control, they allegedly sent financial and other material support *directly* to al Qaeda when al Qaeda allegedly was known to be targeting the United States.

*Id*. at 678 (emphasis in original).  Notwithstanding, the court explained that factual issues remained as to whether the Charity Officials' support of al Qaeda was "expressly aimed" at the United States. To that end, the court listed four non-exhaustive areas for jurisdictional discovery:

> (1) when the alleged support was given to al Qaeda, (2) what support was given, (3) whether the support was "earmarked" for use in specific schemes or attacks not directed at the United States, **or** (4) specifically how these defendants were involved in the process of providing support to al Qaeda.

*Id*. at 678-79 (emphasis added).  Notably, none appeared to be dispositive.

The court similarly held that the plaintiffs were entitled to jurisdictional discovery on a foreign bank official who:

> (1) provided financial services for several known al-Qaeda front charities, including SDGT ["Specially Designated Global Terrorist"] al Haramain; (2) provided financial services to the Spanish and Hamburg al-Qaeda cells; (3) allowed the "SAAR network" of terrorist support entities to use its correspondent account with a U.S. bank to launder money for terrorist activities; (4) provided banking and financial services for Youssef Nada (another SDGT); and (5) acted as a correspondent bank for Bank al Taqwa, an SDGT.

*Id*. at 668, 679 (cleaned up).  Crucially, however, the court explained that allegations 1-5 were insufficient under *In re Terrorist I*.  *See id*. at 679.  What got the banking official "over the line" (*i.e.*, triggering jurisdictional discovery) was his travel to the United States shortly before the

26

September 11 attacks during which he switched his initial hotel reservation to the *same hotel* as some of the American Airlines Flight 77 hijackers. *Id*.  The court reasoned that the latter allegations "not only suggest the possibility that he may have provided direct aid to members of al Qaeda, but they also raise a plausible inference that he may have *intended* his alleged indirect support of al Qaeda to cause injury in the United States." *Id*. (emphasis added).  In other words, contrary to the sweeping language in *In re Terrorist I*, the fact that funding is *indirect* is not dispositive—what matters is the defendant's *intention* in making the transaction.  Again, notwithstanding, the court remanded for jurisdictional discovery on the banking official's activities in the United States shortly before the September 11 attacks. *Id*. at 679.

Cases applying *Mwani* also emphasize that the victim's American citizenship cannot, standing alone, be the basis for establishing personal jurisdiction. *See, e.g.*, *Est. of Klieman by and through Kesner v. Palestinian Auth.*, 923 F.3d 1115, 1125 (D.C. Cir. 2019)[17] ("[T]he emotional suffering felt by forum residents and (perhaps) foreseen by the attackers cannot without more qualify as the relevant 'effect.'").  Those courts rely on *Walden v. Fiore*, in which the Supreme Court held that a "plaintiff's contacts with the defendant and forum" cannot "drive the jurisdictional analysis." *See id*. (citing 571 U.S. 277, 289 (2014)).

As another example, in *Lewis v. Mutond*, the question presented was whether "Foreign Officials purposefully availed themselves of the United States by torturing Lewis to extract a false confession that he was an American mercenary."  62 F.4th 587, 591 (D.C. Cir. 2023).  The D.C. Circuit explained that "torture alone of an American abroad, *unless directed at the United States*, is 'insufficient to satisfy the usual 'minimum contacts' requirement.'" *Id*. (citation omitted and

---

[17] *cert. granted, judgment vacated*, 206 L. Ed. 2d 851 (Apr. 27, 2020), and *opinion reinstated on, inter alia, personal jurisdiction,* 15-7034, 2020 WL 5361653 (D.C. Cir. Aug. 18, 2020).

emphasis added).  In Lewis's case, the court reasoned that his torture was not directed at the United States because "the fact Lewis is an American was incidental to the Foreign Officials' chief concern: that mercenaries—whether American or South African—were attempting to influence the DRC's presidential elections."  *Id.* at 594.  That was because the whole point of extracting the confession was to tar the Foreign Officials' political rivals, for whom Lewis worked.  *Id.* at 590. Moreover, the court emphasized that, under *Mwani*:

> The reason those contacts aimed at the United States were evident of "unabashedly malignant actions" was because the Nairobi attack  (i) was orchestrated to "kill both American and Kenyan employees . . . "; (ii) it was designed to "cause pain and sow terror in the embassy's home country, the United States"; and (iii) in light of the two prior attacks, the Nairobi attack was part of "an ongoing conspiracy to attack the United States."

*Id.* at 593.

As may now be evident, cases applying *Mwani* tend to grapple with the same issue:  a lack of direct evidence regarding the defendant's intentions.  The following hypothetical demonstrates why:  A plaintiff sues a foreign defendant for funding a terrorist organization that committed an act of terrorism on [date x] at [foreign location y].  Aside from committing acts of terror, the terrorist organization also has a robust public service arm in its home country (building schools, providing food, etc.).  In the complaint, the plaintiff cites to a check from the defendant to the terrorist organization, which has written on it "for the terrorist attack on Americans on [date x] at [foreign location y]."  In that case, there would be no question that the defendant is subject to personal jurisdiction.  Now imagine the same core set of facts except no check.  Then the case for personal jurisdiction begins to look less obvious.  Questions like "did the defendant really intend to fund that particular terrorist attack?" or "are the defendant's actions too attenuated?" carry significantly more weight in the second hypothetical.  In sum, the less convincing it is that a

defendant's payment was actually intended for terrorism directed at the United States, the less likely that a court finds a defendant "expressly aimed" his actions at the United States.

To deal with the reality that most terrorist financiers do not memorialize their intent in writing, five factors relevant to the Effects Test can be distilled from these cases.

1. Was the terrorist attack intended to "cause pain and sow terror" in the United States?

2. Did the terrorist organization perform similar attacks before the defendant paid them?

3. Did the defendant directly give the money to the terrorist organization?

4. How much time passed between the defendant's payment and the terrorist attack?

5. Was the defendant's payment "earmarked" for terrorism aimed at the United States?

The answer to the first must be yes. The rest of the factors are not determinative, but if all cut against the plaintiff (assuming there is no direct evidence), then the Effects Test fails.

*Conspiracy Jurisdiction.* Put simply, conspiracy jurisdiction refers to the exercise of personal jurisdiction over a defendant for his participation in a conspiracy aimed at and touching the forum. Applied in that manner, which I believe to be the most faithful to due process, creates significant overlap with the Effects Test. While it has its detractors, several federal courts of appeals—including the Eleventh Circuit—have applied conspiracy jurisdiction with approval.[18]

---

[18] *See J & M Associates, Inc. v. Romero*, 488 Fed. Appx. 373, 376 (11th Cir. 2012) (exercising conspiracy jurisdiction under Alabama's long-arm statute); *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Group PLC*, 22 F.4th 103, 125 (2d Cir. 2021), *cert. denied*, 142 S.Ct. 2852 (June 21, 2022) (same under California's long-arm statute in MDL case); *Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013) (applying but not exercising conspiracy jurisdiction under Virginia's long-arm statute); *Textor v. Bd. of Regents of N. Illinois U.*, 711 F.2d 1387, 1392 (7th Cir. 1983) (same under Illinois's long-arm statute); *Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1070 (10th Cir. 2007) (same under Colorado's long-arm statute); *Jungquist v. Sheikh*

There appears to be no controlling precedent or other circuit court decisions that determine whether conspiracy jurisdiction is appropriate under Rule 4(k)(2).

And at the district court level, most judges to consider the issue have held that there is no conspiracy jurisdiction under Rule 4(k)(2), and Defendants rely heavily on those cases. In particular, Defendants cite *Schrier v. Qatar Islamic Bank,* 20-60075-CIV, 2022 WL 4598630 (S.D. Fla. Sept. 30, 2022) (Altman, J.), as highly persuasive. Respectfully, I disagree with *Schrier*. To explain why, it helps to first outline its reasoning.[19]

The plaintiff in *Schrier* (Matthew Schrier) was an American journalist kidnapped in Syria by ISIS but who managed to escape to safety. *Id*. at *1. Schrier sued Qatar Islamic Bank ("QIB") for providing financial services to Qatar Charity (same charity as in this case) which in turn, allegedly, funded the terrorists holding Schrier hostage. *Id*. at *5. Judge Altman dismissed the case for lack of personal jurisdiction.[20] One of the reasons for doing so was a rejection of conspiracy jurisdiction under Rule 4(k)(2). *Id*. at *24. The case is on appeal to the Eleventh Circuit.

The *Schrier* court provided three reasons for not applying conspiracy jurisdiction under Rule 4(k)(2). First, at least at that time, no federal court had "applied a conspiracy-based theory of jurisdiction under Rule 4(k)(2)." *Id*. Second, the Supreme Court's recent admonition in *Walden*

---

*Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1031 (D.C. Cir. 1997) (same under D.C.'s long-arm statute).

[19] I rely on *Schrier* to frame this issue because it provides the most complete and reasoned arguments for prohibiting conspiracy jurisdiction under Rule 4(k)(2). It also has the added benefit of coming out of the Eleventh Circuit.

[20] *Schrier* contains many similarities to this case—an American journalist, ISIS, a Qatar bank using New York correspondent banking, and Qatar Charity—that make it an attractive analog for Defendants. However, as I will explain later, the reasoning behind *Schrier*'s finding of no personal jurisdiction, when applied to the factual distinctions in this case, cut markedly in favor of Plaintiffs.

*v. Fiore* that "to comport with due process, a defendant's relationship with the forum 'must arise out of contacts that the defendant *himself* creates with the forum." *Id*. at *25 (citing *Walden v. Fiore*, 571 U.S. 277, 284 (2014)).  Third, the text of Rule 4(k)(2) "unambiguously directs its focus towards *the defendant*—without any regard for the contacts of others."  *Id*.  I will address each in reverse order.

As is relevant to the *Schrier* court's textual analysis, Rule 4(k)(2) reads as follows: "For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a **defendant** if: (A) the **defendant** is not subject to jurisdiction in any state's courts of general jurisdiction . . . . "  Fed. R. Civ. P. 4(k)(2) (emphasis added).  The *Schrier* court reasoned that Rule 4(k)(2)'s use of the word "defendant," without any mention of co-conspirators or others, means that Rule 4(k)(2) is narrower than state long-arm statutes, which tend to include language like "personally or through an agent."  *Schrier*, 2022 WL 4598630 at *25 (citing Fla. Stat. § 48.193(1)(a)).

One issue with that is that "agent" is not always synonymous with "co-conspirator," so its absence in Rule 4(k)(2) says little, if anything, about whether co-conspirator jurisdiction is applicable.  *See In re Platinum and Palladium Antitrust Litig.*, 61 F.4th 242, 272 (2d Cir. 2023) (citation omitted) ("We have observed that 'some control is necessary to establish agency for jurisdictional purposes,' . . . but we have squarely rejected that limitation on conspiracy jurisdiction.").  In *In re Platinum*, the Second Circuit affirmed a district court's exercise of conspiracy jurisdiction under two federal statutes that provide for nationwide service of process— 15 U.S.C. § 22 (Sherman Act) and 7 U.S.C. § 25(c) (Commodities Exchange Act)[21]—both of

---

[21] Section 22 of the Sherman Act reads as follows:

which, in *Schrier*'s words, "focus" on the defendant without mention of language like "personally or through an agent." *See id.*; *In re Platinum and Palladium Antitrust Litig.*, 449 F. Supp. 3d 290, 319 (S.D.N.Y. 2020) (explaining relevant statutes). Furthermore, under California's long-arm statute, which simply states that "[a] court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States," conspiracy jurisdiction is also acceptable. *See Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82 n.4, 87 (2d Cir. 2018) (relying on Cal. Civ. Proc. Code § 410.10) (finding conspiracy jurisdiction acceptable under California's long-arm statute in MDL case).[22]

The *Schrier* court's reading would also seem to forbid theories of agency and/or alter ego to establish personal jurisdiction under Rule 4(k)(2), both of which are regularly applied under the Rule. To be sure, these theories of personal jurisdiction are difficult to establish. Most cases that analyze agency and/or alter ego under Rule 4(k)(2) rarely find personal jurisdiction, but I could

---

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22. And Section 25(c) of the Commodities Exchange Act reads in part:

> Any action brought under subsection (a) of this section may be brought in any judicial district wherein the defendant is found, resides, or transacts business, or in the judicial district wherein any act or transaction constituting the violation occurs. Process in such action may be served in any judicial district of which the defendant is an inhabitant or wherever the defendant may be found.

7 U.S.C. § 25(c).

[22] The *Schrier* court distinguished *Schwab* by noting that "*Schwab* was a case about the California long-arm statute—not Rule 4(k)(2)." *Schrier*, 2022 WL 4598630, at *24. However, given the text of California's long-arm statute, I believe that *Schwab* undermines *Schrier*'s textual analysis.

not find one that held either theory is foreclosed as a matter of law.  *See, e.g., Jekyll Island-State Park Auth. v. Polygroup Macau Ltd.*, 2:21-CV-8, 2023 WL 2632813, at *16 (S.D. Ga. Mar. 24, 2023) (analyzing alter ego under Rule 4(k)(2)); *Miami Products & Chem. Co. v. Olin Corp.*, 449 F. Supp. 3d 136, 183-86 (W.D.N.Y. 2020) (analyzing alter ego *and* agency under Rule 4(k)(2)).  For those reasons, I do not read Rule 4(k)(2)'s use of the word "defendant" as prohibiting conspiracy jurisdiction.  Instead, I read the initial part of Rule 4(k)(2) as simply providing a statutory hook for plaintiffs suing defendants (1) under federal law (2) that are not subject to personal jurisdiction in any state.

Having found that the text of Rule 4(k)(2) does not prohibit conspiracy jurisdiction, the only question left is whether the Fifth Amendment's Due Process Clause does.  The *Schrier* court appears to have answered that question in the affirmative by relying on *Walden*'s admonition that a defendant's relationship with the forum must arise out of contacts that *he himself* creates.  *Schrier*, 2022 WL 4598630 at *25.  While a correct statement of *Walden*'s holding, *Walden* did not address conspiracy jurisdiction or otherwise hold that it violates the Fourteenth Amendment's Due Process Clause.  Nor is there any reason to believe that the Supreme Court intended such a sweeping result.  That is because in *Daimler*, decided about a month before *Walden*, the Supreme Court reiterated the long-standing principle that "the commission of some single or occasional acts of the corporate agent in a state may sometimes be enough to subject the corporation to jurisdiction in that State's tribunals" and that "[a]gency relationships . . . may be relevant to the existence of specific jurisdiction."  *Daimler AG v. Bauman*, 571 U.S. 117, 127, 135 n.13 (2014).

The Parties have not cited to, and the Court is unaware of, any higher court precedent holding that conspiracy jurisdiction is barred under the Fifth Amendment.  Meanwhile, the Eleventh Circuit has held that conspiracy jurisdiction is consistent with the Fourteenth

Amendment's Due Process Clause when applied under Alabama's long-arm statute.  *See J & M Associates, Inc. v. Romero*, 488 Fed. Appx. 373, 376 (11th Cir. 2012) (holding district court had personal jurisdiction over defendant for overt acts taken in Alabama by co-conspirators); *see also Schrier*, 2022 WL 4598630 at *12, 24 (acknowledging that conspiracy jurisdiction is acceptable under Florida's long-arm statute).[23]  And remember that the Eleventh Circuit also held that "courts should analyze personal jurisdiction under the Fifth Amendment using the same basic standards and tests that apply under the Fourteenth Amendment."  *Herederos*, 43 F.4th at 1307.  As a result, I am not convinced that *Walden* precludes application of conspiracy jurisdiction under the Fifth or Fourteenth Amendment.

The *Schrier* court's final reason was a prudential one.  At least at the time, "[n]o federal court in the country . . . [had] *ever* applied a conspiracy-based theory of jurisdiction under Rule 4(k)(2)."  *Schrier*, 2022 WL 4598630 at *24.  That has since changed.  *See Rusesabagina v. Republic of Rwanda*, 2023 WL 2562692, at *7-8 (D.D.C. Mar. 16, 2023) (finding personal jurisdiction over foreign officials, under Rule 4(k)(2), for their co-conspirators' contacts with the United States); *cf. In re Platinum*, 61 F.4th at 272 (exercising conspiracy jurisdiction under federal

---

[23] And while the Eleventh Circuit has not had the opportunity to reach the constitutional question in cases alleging conspiracy jurisdiction under Florida's long-arm statute, it has cited the theory approvingly for at least 25 years.  *Stone v. Wall*, 135 F.3d 1438, 1442 n.4 (11th Cir. 1998) (stating that personal jurisdiction may exist by way of conspiracy); *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1218 (11th Cir. 1999) (same); *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1281–82 (11th Cir. 2009) ("Florida courts have held that the state's long-arm statute can support personal jurisdiction over any alleged conspirator where any other co-conspirator commits an act in Florida in furtherance of the conspiracy, even if the defendant over whom personal jurisdiction is sought individually committed no act in, or had no relevant contact with, Florida."); *RMS Titanic, Inc. v. Kingsmen Creatives, Ltd.*, 579 Fed. Appx. 779, 789-90 (11th Cir. 2014) (citing with approval state and district court opinions finding conspiracy jurisdiction where "the defendant committed a tort in Florida against a Florida resident, and the tort committed in Florida was also the principal object of the conspiracy.").  The Florida Supreme Court has, however, found it to meet the due process test.  *See Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co. Ltd.*, 752 So. 2d 582, 586 (Fla. 2000).

statutes and thus the Fifth Amendment).  And in two cases involving *these same Defendants*, two district court judges in the Eastern District of New York analyzed, but did not find, conspiracy jurisdiction under Rule 4(k)(2).  *See Henkin v. Qatar Charity*, *et al.*, 21-5716-CIV, 2023 WL 2734788, at \*10 (E.D.N.Y. Mar. 31, 2023); *Przewozman v. Qatar Charity*, *et al.*, 20-6088-CIV, 2023 WL 2562537, at \*17 (E.D.N.Y. Mar. 17, 2023).

I understand, and share in, the general hesitation to apply conspiracy jurisdiction in all cases.  If the test were merely the participation in a conspiracy with an overt act in the forum, without consideration of the facts of a particular case, then that would likely broaden the scope of the court's jurisdiction well beyond that allowed by the Constitution.  Recently, the Second Circuit responded to that very concern by drawing a line that I find persuasive:

> [A]lthough . . . our caselaw does not require a relationship of control, direction, or supervision, we should also underscore that *Schwab*'s three-prong test *serves* the purposeful availment requirement, rather than supplants it . . . . To that end, the conspiracy theory could not get off the ground if a defendant were altogether blindsided by its co-conspirator's contacts with the forum; the conspiratorial contacts must be of the sort that a defendant "should reasonably anticipate being haled into court" in the forum as a result of them.

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Group PLC*, 22 F.4th 103, 125 (2d Cir. 2021) ("*Schwab II*"), *cert. denied*, 142 S.Ct. 2852 (June 21, 2022) (citation omitted).

Considering the lack of controlling precedent in this area, I adopt the Second Circuit's test for establishing conspiracy jurisdiction, which states: "[T]he plaintiff must allege that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state."  *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018) ("*Schwab I*") (relying on *Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322 (4th

Cir. 2013)).[24]   In addition, I adopt the following two principles under the purposeful availment analysis to further ensure that its application is consistent with due process:

1. The act or effect in the forum must be a "principal object of the conspiracy." *RMS Titanic, Inc. v. Kingsmen Creatives, Ltd.*, 579 Fed. Appx. 779, 789-90 (11th Cir. 2014); and

2. While "control, direction, or supervision" is not required, "[t]he conspiratorial contacts must be of the sort that a defendant 'should reasonably anticipate being haled into court' in the forum as a result of them." *Schwab II* at 125 (citation omitted).

In summary, I find that conspiracy jurisdiction can be consistent with Rule 4(k)(2) and the Fifth Amendment's Due Process Clause.  Accordingly, I will apply the *Schwab I* test, the above principles, and the aforementioned precedent.

Having outlined the relevant law regarding the Effects Test and conspiracy jurisdiction, I now turn back to the personal jurisdiction analysis in this case.

### a.  QATAR NATIONAL BANK

---

[24]   I adopt this test—based on California's coextensive long-arm statute—rather than the Florida Supreme Court's test because it is more consistent with the text of Rule 4(k)(2) which is not limited to "tortious activity" committed in the forum.  *See Wilcox v. Stout*, 637 So. 2d 335, 337 (Fla. 2d DCA 1994); *Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co. Ltd.*, 752 So. 2d 582, 586 (Fla. 2000) (adopting *Wilcox*).

I find that the exercise of personal jurisdiction over QNB is consistent with due process. As a reminder, courts apply a three-part due process test in evaluating whether there is specific personal jurisdiction over a defendant: "(1) whether the plaintiff's claims 'arise out of or relate to' at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant purposefully availed himself of the privilege of conducting activities with the forum state, thus invoking the benefit of the forum state's law; and (3) whether the exercise of personal jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *Louis Vuitton*, 736 F.3d at 1355.

**Minimum Contacts.**  The first prong does not require direct causation.  *SkyHop Techs., Inc. v. Narra*, 58 F.4th 1211, 1229 (11th Cir. 2023) (relying on *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S.Ct. 1017, 1026 (2021)).  "Rather, it 'contemplates that some relationships will support jurisdiction without a causal showing.'"  *Id.* (citation omitted).  "So we focus on the 'essential foundation' of specific jurisdiction—whether there is 'a strong relationship among the defendant, the forum, and the litigation.'"  *Id.* (citation omitted and cleaned up).  That "essential foundation" is met here.

QNB "touches" the United States in three ways, all of which demonstrate a "strong relationship" among QNB, the forum, and the litigation.  Those contacts are:  (1) its use of a correspondent banking account in New York to complete QC's wire transfer to al Salim; (2) the execution of Sotloff; and (3) the publication of the execution video in the United States.  The second and third contacts are attributed to QNB under a conspiracy theory of personal jurisdiction or the Effects Test.  I will take each in turn.

The correspondent bank account transaction through New York is a direct contact.  True, Plaintiffs allege only that "virtually all" foreign transactions in USD pass through New York, not

that this specific transaction did.  (¶ 122).  However, *QNB*—likely the only party to this litigation with access to that information—*has not rebutted Plaintiffs' allegation with any evidence.  See Internet Sols. Corp. v. Marshall*, 557 F.3d 1293, 1295 (11th Cir. 2009) (citation omitted and cleaned up) ("The plaintiff bears the burden of making out a *prima facie* case for personal jurisdiction by presenting sufficient evidence to withstand a directed verdict motion. 'The defendant then must raise, through *affidavits, documents or testimony*, a meritorious challenge to personal jurisdiction.'").  And it is not as if QNB needed more information to track down the wire transfer.  Plaintiffs allege the wire transfer's amount ($800,000), date (October 16, 2013), time (11:25 AM), sender (Jassem Abdullah of Qatar Charity), recipient (al Salim), last three digits of the recipient's account number (XXXX013), and the recipient's bank (Ziraat Bank). (¶¶ 106, 109). QNB's decision to remain silent in the face of these specific allegations speaks volumes.

While not evidence, QNB's attorneys did not even deny the allegation in the briefing. Instead, QNB relies on the *ipse dixit* response that the allegation is speculative. (*See* DE 58 at 8). I disagree.  As I must on a motion to dismiss, I construe the Complaint in the light most favorable to Plaintiffs and assume the truth of their allegations.  *See Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007).  Moreover, given that QNB publicly discloses that it holds several U.S.-based correspondent bank accounts to execute transactions in USD, Plaintiffs' allegation is not an "unwarranted deduction of fact."  (¶ 125); *see Einhorn v. Axogen, Inc.*, 42 F.4th 1218, 1222 (11th Cir. 2022).[25]

---

[25] Plaintiffs provide the following cite to this allegation: *Nostro Account*, QNB Finansbank, https://www.qnbfinansbank.com/en/popup-en/nostro-account.  (¶ 125 n.26).  As of May 25, 2023, the website lists 36 correspondent bank accounts that QNB holds.  The *only* correspondent bank accounts that transact in USD (totaling nine) are based in New York or Philadelphia.  Obviously, this may have been different in 2013, but the point is that QNB has not even attempted to rebut Plaintiffs' plausible allegation with competent (or any) evidence.

Remember I noted that *Schrier v. Qatar Islamic Bank*, a case relied on heavily by Defendants, cuts markedly in favor of Plaintiffs due to its factual distinctions. *Supra*, note 20. In *Schrier*, Plaintiff Schrier relied on six transactions that passed through the Defendant Qatari bank's US correspondent accounts to Qatar Charity (which in turn allegedly funded the terrorists holding Schrier) or the Nusra Front.[26] *Schrier*, 2022 WL 4598630 at *19. The court held that the six transactions did not satisfy this prong of the due process analysis for two reasons. First, because three of the transactions were made *after* Plaintiff Schrier's escape, so there was no way his claims could arise from those transactions.[27] *Id*. Second, as to the other three transactions, Defendant Qatar Islamic Bank provided affidavits and exhibits demonstrating that the transactions actually went to "legitimate organizations," not Qatar Charity or a terrorist organization. *Id*. at *20. Plaintiff Schrier did not provide evidence in rebuttal. As the court put it, it was left with little choice but to accept the Qatari bank's version of events. *Id*. Here, in stark contrast, QNB *does not rebut* Plaintiffs' allegations that the transaction (1) passed through New York, (2) the recipient was the actual terrorist (al Salim) that signed Sotloff's "death warrant" just 10 months later, and

---

[26] It is not clear from the *Schrier* Order who initiated these wire transfers. That is perhaps because the briefing containing that information is redacted. (Case No. 20-60075, DE 156-1 at 15).

[27] *Przewozman v. Qatar Charity* demonstrates a similar point. *See* 20-6088-CIV, 2023 WL 2562537, at *17 (E.D.N.Y. Mar. 17, 2023). In *Przewozman*, QNB was not the bank using New York correspondent banking, Masraf al Rayan (another Qatari bank) was. *Przewozman*, 2023 WL 2562537, at *3. Much like *Schrier*, the court explained that "it is fatal to jurisdiction over Masraf al Rayan and Qatar Charity that Plaintiffs have failed to allege a causal link between the use of the correspondent account, which ended in 2015, and the rocket attacks that caused their injury in 2019." *Id*. at *15. There is no such attenuation here.

(3) the money served as al Salim's seed money to raise an ISIS brigade and conduct acts of terror like Sotloff's execution.[28]

The second and third contacts—Sotloff's execution and video of the same directed to and published in the United States—arise from QNB's participation in a conspiracy aimed at the United States or under the Effects Test.  As to conspiracy jurisdiction, the analysis goes something like this:  QNB conspired with, *inter alia*, al Salim and thus ISIS to commit acts of terror in Syria. ISIS (through al Salim), in turn, executed Sotloff and published a video of the same, both expressly aimed at the United States.  Because QNB's co-conspirators, ISIS, took a substantial step in furtherance of the conspiracy in the United States—causing terror through the execution of an American and publication of the video (directed to the U.S. President and citizenry)—their contacts can be attributed to QNB.

Again, to establish conspiracy jurisdiction, "the plaintiff must allege that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." *Schwab I* at 87.  As to the first prong, I note that this analysis is the same as in the merits analysis on conspiracy, which I also get into later.  *See Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983) ("[T]he separate elements of civil conspiracy [are]: (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common

---

[28] Contrary to QNB's assertion (DE 58 at 8), Plaintiffs do not have to allege exactly *how* al Salim used the money in furtherance of the execution because they do not have to show *direct causation*, only a "strong relationship."  *SkyHop Techs.*, at 1229.  Based on the allegations, the money served as the basis for al Salim to be in Syria as an ISIS judge and thus put him in the position of ordering Sotloff's execution.

scheme.").[29]   In addition, I will apply the two principles adopted in Part III.A.2 under the purposeful availment analysis.

Plaintiffs successfully allege that QNB was controlled by the Qatar government and its Royal Family, who (as alleged) clearly conspired with, *inter alia*, terrorists like al Salim to destabilize Syria by funding ISIS and ISIS precursors.  (*See* DE 56 at 18 n.11) (listing relevant allegations).  Perhaps the most outstanding allegation in support of a conspiracy is that Hammad bin Jassim funded several terrorist organizations at a September 2011 meeting attended by the apparent "who's who" of terrorism financing.  Simultaneously, Hammad bin Jassim was a member of the Royal Family who served as prime minister, foreign minister, and head of the Qatar Investment Authority, which held a *50% stake in QNB*.  Also at the same time, other members of the Royal Family sat on QNB's board and senior government positions with regulatory authority over QNB.

Plaintiffs further allege that the September 2011 model turned into a well-run terrorist financing operation whereby (1) the Muslim Brotherhood, to which the Royal Family has close ties, would "vet" the terrorists; (2) Qatar would fund them by providing the relevant account details to QC, whose chairman is also a member of the Royal Family; (3) QC would use its accounts at QNB to wire the funds in USD to a fraudulent charity at Ziraat Bank in Turkey set up by Turkish intelligence; and (4) the Turkish charity would give the money to the vetted terrorists organizations.  Given all that, it strains credulity to believe that QNB was not actively involved in the conspiracy when QC wired al Salim $800,000 in virtually the same exact manner.  The only variation being that al Salim *himself* withdrew the money, not the Turkish charity.  Accordingly, I

---

[29] Congress expressly adopted *Halberstam*'s aiding and abetting and conspiracy liability analysis as the "proper legal framework for how such liability should function" under ATA/JASTA.  JASTA, Pub. L. No. 114-222, § 2(b), 130 Stat. 852, 853 (2016).

find that Plaintiffs plausibly allege an agreement between QNB and al Salim and thus ISIS.[30]  To the extent that Plaintiffs' Complaint must plead conspiracy allegations with "specificity," I find that it does.  *See Condor, S.A. v. Plurinational State of Bolivia*, 352 So. 3d 921, 927 (Fla. 3d Dist. App. 2022) (citation omitted) (explaining conspiracy jurisdiction requires "specific" allegations that "give rise to a reasonable inference" that defendant joined a conspiracy).

The rest of the *Halberstam*-conspiracy prongs are readily met.  Regarding the second prong, the agreement was illegal because it was an agreement to form an ISIS brigade in Syria to destabilize the Asaad government through, in part, acts of terror against the United States.  On the third prong, al Salim caused the injury by ordering Sotloff's execution.  Finally, the fourth prong is satisfied, in that Sotloff's execution (and its filming) was in furtherance of the conspiracy (destabilizing Syria) because it was aimed at stopping U.S. involvement in Syria, further strengthening ISIS.

Having found that QNB participated in an existing conspiracy, the last prong under *Schwab I* is to determine whether the co-conspirators' overt acts in furtherance of the conspiracy had sufficient contacts with the United States to subject that co-conspirator to jurisdiction in the United States.  There is no real question that al Salim and ISIS's execution of Sotloff, an act in furtherance of the conspiracy, subjects them to the jurisdiction of U.S. courts.  Nobody should be surprised that when you abduct, torture, and execute an American citizen to change U.S. foreign policy that will subject you to, among many other things, suit in the United States.[31]

---

[30] Given that al Salim was going to use the money to form an ISIS brigade—a fact all members of the conspiracy were allegedly aware of—and indeed crossed over to Syria the very next day to do just that, I do not see how he could reasonably be distinguished from ISIS.  In fact, Plaintiffs allege that by April 2013 ISI merged with the Nusra Front and adopted the name ISIS. (¶ 66).

[31] I find *Henkin v. Qatar Charity*, *et al.*, 2023 WL 2734788, at *10 (E.D.N.Y. Mar. 31, 2023) and *Przewozman v. Qatar Charity*, *et al.*, 2023 WL 2562537, at *17 (E.D.N.Y. Mar. 17,

In the words of *Mwani*, al Salim and ISIS "engaged in unabashedly malignant actions direct[ed] at and felt in this forum" and intended to "cause pain and sow terror" in the United States. *See Mwani v. bin Laden*, 417 F.3d 1, 13 (D.C. Cir. 2005). In case that were not already clear, ISIS told us in the videos that its execution of Sotloff was aimed at the United States. *See, e.g.,* (¶ 234) ("I'm back, Obama, and I'm back because of your arrogant foreign policy towards the Islamic State, because of your insistence on continuing your bombings and [unclear] on Mosul Dam, despite our serious warnings."). The execution of Foley, another American journalist, also establishes the sort of ongoing conspiracy aimed at the United States that was present in *Mwani*. *See Lewis v. Mutond*, 62 F.4th 587, 593 (D.C. Cir. 2023). Lastly, ISIS's publication of the video, accessed by countless people in the United States, tangibly reached into the forum. Indeed, both the Foley (which also included Sotloff) and Sotloff videos were akin to ISIS sending a letter to the U.S. President and every single American. Thus, under the Effects Test, both the execution and publication of the video were (1) intentional torts, (2) aimed at the United States, that (3) ISIS and al Salim not only anticipated, but intended, to cause harm in the United States. *See Del Valle v. Trivago GMBH*, 56 F.4th 1265, 1276 (11th Cir. 2022).

The second and third contacts are also attributable to QNB under the Effects Test because its funding of al Salim constitutes engagement in unabashedly malignant actions directed at and felt in the United States. The brunt of this analysis is under the purposeful availment prong, which I turn to now.

---

2023) factually distinguishable on this point. There, both sets of plaintiffs alleged that QNB conspired with *another* bank that, in turn, used correspondent banking accounts in New York to generally fund Hamas's terrorist activities. Here, QNB is the bank with the correspondent bank transaction, and it directly facilitated the payment to al Salim.

***Purposeful Availment.***  QNB purposefully availed itself of the United States through the contacts described above because (as alleged) it knew that it was facilitating a payment to a terrorist who would perpetrate acts of terrorism against the United States.   In the context of a bank facilitating payments to terrorists, one district court put it well:

> "In the absence of any allegations that a bank has ties to a terrorist organization, or that it knew or had reason to believe that the monies it was processing through the bank would be used to carry out terrorist attacks on civilian targets," the mere provision of routine banking services that benefitted a terrorist organization "in some general, nondescript manner" will not support a finding of specific personal jurisdiction based on the contacts created by such provision.

*Wultz v. Islamic Republic of Iran*, 755 F.Supp. 2d 1, 34 (D.D.C. 2010) (citation omitted).

QNB is right that a foreign bank with no other relevant contacts with the United States that provides routine banking services, especially just once, to a terrorist organization does not purposefully avail itself of the United States.   The cases that have dealt with correspondent banking have sought to identify multiple transactions to establish purposeful availment.  *See, e.g.*, *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 171 (2d Cir. 2013) (citation omitted) ("[P]laintiffs allege wire transfers through AmEx that numbered in the dozens and totaled several million dollars, so it cannot be said that [the bank's] contacts with New York were 'random, isolated, or fortuitous.'").[32]   In an analogous context, the Eleventh Circuit held that a defendant's (1) maintenance of U.S. bank accounts that received *multiple* payments from fraudulent sales of securities *plus* (2) advertisements and articles published in and aimed at the United States of the

---

[32] The New York cases are anchored in the state's more limiting long-arm statute, which requires that the defendant "transact any business" in New York.  *See Licci v. Lebanese Canadian Bank*, 984 N.E.2d 893, 895 (N.Y. 2012).   As applied to correspondent banking, New York's highest court held that multiple correspondent transactions could give rise to a "course of dealing" that would satisfy the long-arm statute's "transact any business" language.  *Id*. at 900.   However, Rule 4(k)(2) is not so limited.

same, satisfied the purposeful availment requirement. *S.E.C. v. Carrillo*, 115 F.3d 1540, 1545-46 (11th Cir. 1997).

However, QNB attempts to divorce the conspiracy allegations from the correspondent bank transaction, completely disregarding Plaintiffs' allegations that QNB *knew* exactly what it was doing. (*See* DE 53 at 12).  As alleged, this is not a case of a hapless or negligent bank.  Plaintiffs plausibly allege that QNB knowingly facilitated the $800,000 payment to a terrorist, al Salim.  In addition, Plaintiffs allege that QNB used correspondent banking to access USD because that was "the currency of choice and lifeblood of terrorist organizations. . . . "  (¶ 82).  And in any event, the question is not whether a single correspondent bank transaction establishes purposeful availment.  The question is whether QNB's decision to use a correspondent bank *and* participate in a conspiracy that was aimed at and touched the United States, is enough to establish purposeful availment.  I find that it is.

Returning to the two contacts (the execution and video) attributable to QNB under conspiracy jurisdiction, I now apply the two principles adopted in Part III.A.2 to determine purposeful availment.  The first was that the act or effect in the forum must be a "principal object of the conspiracy."  *RMS Titanic, Inc. v. Kingsmen Creatives, Ltd.*, 579 Fed. Appx. 779, 789-90 (11th Cir. 2014).  Here, the act (the execution and publication of the video) *and* effect (cause pain and sow fear) in the forum were without a doubt *a* "principal object of the conspiracy."  Again, the conspiracy was to destabilize Syria.  The execution and publication of the video and the fear caused by both furthered the conspiracy by attempting to push the United States out of Syria, strengthening ISIS's hold and weakening the Syrian government.  The second principle was that while "control, direction, or supervision" is not required, "[t]he conspiratorial contacts must be of the sort that a defendant 'should reasonably anticipate being haled into court' in the forum as a

result of them." *Schwab II* at 125 (citation omitted).  To believe that QNB did not reasonably anticipate being haled into a U.S. court as a result of its participation in a conspiracy to fund terrorists in Syria, especially *these* terrorists after they had already kidnapped two American journalists, *see supra*, note 6, is just not sensible.  Moreover, QNB is a sophisticated international bank that surely understood the potential for civil liability under the ATA.  *See Wultz*, 755 F. Supp. 2d at 34 (finding same of Bank of China).

Finally, under the Effects Test, I believe it is evident from QNB's participation in the conspiracy that it intended to—and indeed, did—cause harm in the United States when it facilitated the wire transfer that led to Sotloff's execution and the publication of the video.  I nonetheless turn to the five factors distilled from the relevant caselaw aimed at addressing a lack of direct evidence. *See* Part III.A.2.   First, was the terrorist attack intended to "cause pain and sow terror" in the United States?   Again, the answer to that is an easy yes.  Unlike in *Lewis* where the purpose of the torture was to tar a political rival, ISIS executed Sotloff to influence U.S. foreign policy.  *See Lewis*, 62 F.4th at 590.[33]   Second, did the terrorist organization perform similar attacks before the defendant paid them?   Yes.   Plaintiffs allege that the Zarqawi organization, an ISIS precursor,

---

[33] There is a colorable argument that *Lewis v. Mutond* forecloses this theory of personal jurisdiction because the ultimate goal of the conspiracy was related to regional politics, not necessarily terrorism aimed at the United States.  *See* 62 F.4th 587, 594 (D.C. Cir. 2023).  Putting aside that *Lewis* is persuasive authority, there is no question that al Salim's execution of Sotloff was aimed at and touched the United States.  The reason the foreign officials in *Lewis* tortured Lewis was to extract a false confession that he was an American mercenary working for their political rival—a fact, that if true, would have been politically damaging.  None of that can reasonably be said to be aimed at the United States.  Here, on the other hand, while the conspiracy's goal was to destabilize Syria, a primary mechanism for doing so was funding terrorist organizations (like ISIS) that were taking over territory in the face of U.S. airstrikes.  ISIS had already taken Foley and Sotloff hostage as a way of influencing the United States.  It was in that moment that QNB facilitated the wire transfer.  These facts sufficiently distinguish this case from *Lewis*.  In this case, the United States is the focal point of the harm.  The execution videos make that unmistakably clear.

released a series of propaganda videos in the early 2000s beheading American hostages in the same manner.  (¶¶ 6-7); *see also supra*, note 6 ("[T]he Zarqawi organization routinely kidnapped, tortured, and beheaded Americans and journalists in strikingly similar fashion [to ISIS's execution of Sotloff].").  Foley and Sotloff were also taken hostage *before* the transaction, raising the level of certainty that QNB was intentionally aiming its actions at the United States.

Third, did the defendant directly give the money to the terrorist organization?  Technically no because QNB did not itself initiate the transaction, but on the other hand it did facilitate the payment directly to al Salim.  This case is a lot like the foreign bank official in *In re Terrorist II* because QNB's participation in the conspiracy "raise[s] a plausible inference that [it] may have *intended*" for its "indirect support . . . to cause injury in the United States."  *In re Terrorist II* at 669.  However, unlike the court in *In re Terrorist II*, I find the allegations surrounding QNB's central role in the terrorist funding scheme to raise a strong enough inference that jurisdictional discovery should be bypassed.  Thus, this factor slightly favors Plaintiffs.

Fourth, how much time passed between the defendant's payment and the terrorist attack?  Here, a little over 10 months passed between the wire transfer and Sotloff's execution.  In addition, the day after the payment, al Salim crossed over into Syria with the known purpose of starting an ISIS brigade.  This short lapse of time raises another strong inference that QNB intended to fund terrorist attacks aimed at the United States.  Were the lapse of time, for instance, several years, then it would be less likely that QNB "expressly aimed" its actions at the forum.  And fifth, was defendant's payment "earmarked" for terrorism aimed at the United States?  The allegation is that the money was for al Salim to raise an ISIS brigade and commit acts of terror against the United States.  Unlike in *Schrier*, Defendants did not contradict that allegation with competent evidence.

In sum, I find that all the factors weigh in favor of finding that QNB intended for its support to cause harm in the United States. The context here is important. QNB played a central role in facilitating payments from QC to Ziraat Bank for terrorist activities in Syria. Qatar is a constitutional monarchy run by the Al Thani family who had control over QNB (by various levers within and outside of QNB) and was allegedly behind the initiation of the funding scheme. At the time of the wire transfer, Foley and Sotloff were already being held hostage by ISIS. ISIS is an outgrowth of the Zarqawi organization, which executed American hostages in a strikingly similar fashion. The man that received the transaction, al Salim, said he wanted to raise an ISIS brigade in Syria. The next day he crossed into Syria to do just that, and 10 months later ordered Sotloff's (and Foley's) execution. The execution was videotaped, and the ISIS terrorist warned President Obama directly that further airstrikes would result in more executions of Americans. ISIS then disseminated the video online to terrorize the American public and influence U.S. foreign policy. Given all that, and for the reasons stated above, I find that QNB satisfies the Effects Test.

Considering these contacts, I find that Plaintiffs have met their burden of showing that QNB has sufficient minimum contacts with the United States. Once a plaintiff establishes the first two elements of the due process test, as is the case here, then the defendant is required to make a "compelling case" regarding the third element. *Louis Vuitton*, 736 F.3d at 1355.

***Fair Play and Substantial Justice.*** The third prong of the due process test is whether the exercise of personal jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *Id*. A primary concern of this "fairness test is the burden placed on the defendant" to defend a claim in a given forum. *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1221 (11th Cir. 2009). Other factors include the forum's interest in adjudicating the dispute, the

plaintiff's interest in obtaining convenient and effective relief, and the judicial system's interest in resolving the dispute.  *Licciardello v. Lovelady*, 544 F.3d 1280, 1288 (11th Cir. 2008).

QNB fails to make a "compelling case" on the third element, limiting its argument to a footnote in its reply brief.  (*See* DE 58 at 9 n.4).  QNB argues that the burden of litigating this case in the United States would be "immense" because it "does not have an office" here, it "is not otherwise physically present here[,] [and] none of QNB's books, records, files, or potential witnesses are located in Florida."  *Id*.  Given that QNB is an *international* bank and the heavy weight of the other factors, I do not view these inconveniences as warranting dismissal for lack of personal jurisdiction.  *See Securities and Exch. Commn. v. Marin*, 982 F.3d 1341, 1351 (11th Cir. 2020) (citation omitted) ("Even in 1988, we observed that '[m]odern means of communication and transportation have lessened the burden of defending a lawsuit in a distant forum.'").  Indeed, QNB already manages to transact business with several banks located in the United States.

It almost goes without saying that the other factors weigh overwhelmingly in favor of adjudicating this dispute in the United States.  The United States has a strong interest in adjudicating disputes arising from international acts of terrorism expressly aimed at it.  A unique aspect of this terrorist act—the video direct at and published in the United States—makes the United States' interest even more compelling.  For similar reasons, Plaintiffs, all of whom reside in Florida, share a very strong interest in having this dispute adjudicated here.  It is also not clear that they could bring this action elsewhere other than perhaps Qatar, which would be unduly burdensome.  The last factor—the judicial system's interest—is not relevant because if the case cannot be brought here, it likely cannot be brought anywhere else in the United States.

Accordingly, QNB's motion to dismiss for lack of personal jurisdiction is denied.

**b.  QATAR CHARITY**

For very similar reasons, I find that the exercise of personal jurisdiction over QC is consistent with due process.  In some ways, Plaintiffs' case for personal jurisdiction over QC is stronger, and in other ways it is weaker.  It is stronger insofar as the QC's contact is even closer to Sotloff's execution because it sent the wire transfer.[34]  And it is weaker because the correspondent banking contact is QNB's, not QC's.  These distinctions essentially cancel each other out and thus lead to the same conclusion as for QNB.

As an initial matter, I will briefly address the exhibits QC filed alongside its Motion to Dismiss and Reply Brief.  (DE 54-1-18; DE 59-1-8).  As mentioned, defendants must rebut a *prima facie* case for personal jurisdiction with "affidavits, documents, or testimony."  *Internet Sols. Corp. v. Marshall*, 557 F.3d 1293, 1295 (11th Cir. 2009).  QC filed seventeen exhibits with its Motion to Dismiss and seven with its Reply Brief.  The vast majority of the exhibits highlight QC and/or Qatar's recent goodwill around the world.[35]  In particular, President Biden designated Qatar a "Major Non-NATO ally" for its support "this past year . . . [in] relocating . . . Afghans; maintaining stability in Gaza . . . keeping pressure on ISIS and deterring threats across the Middle East; and a lot more."  (DE 54-8 at 3, 11).  A few exhibits relate to QC's humanitarian aid in Gaza, Malaysia, and Pakistan around 2014.  (DE 54-2-3, 18).  Only one exhibit—a 2009 letter from QC to the Union of Good cancelling its membership—is even remotely relevant to Plaintiffs' *prima facie* case.  (*See* DE 59-7).

---

[34] About halfway into its Motion to Dismiss, QC seems to argue that when Plaintiffs alleged that "QNB wired USD $800,00" to al Salim, they literally meant QNB initiated the transaction from its own account.  (DE 54 at 25-26) (citing ¶¶ 106-109).  That makes no sense considering that ¶ 109 alleges that the money originated from a QC representative, Jassem Abdullah.  Moreover, the terrorism funding scheme alleged earlier in the complaint places QNB as the conduit for QC's transactions.

[35] Some of the exhibits are to links cited in Plaintiffs' complaint or filed in support of an unrelated point.

There are three problems with these exhibits.  First, QC never actually cites to or mentions them in its personal jurisdiction challenge.  The only places they are cited is in the factual background and merits challenge sections.  Thus, it is not even clear that QC is using these exhibits to rebut Plaintiffs' *prima facie* case for personal jurisdiction.  The only exhibit that rebuts an allegation in the complaint is the 2009 letter. (DE 59-7).  All that possibly proves is that QC withdrew from the Union of Good in 2009, a notorious terrorist funding organization.

Second, even assuming QC is using the exhibits to overcome Plaintiffs' *prima facie* case, I do not find them convincing.  For one, the exhibits are mainly about recent diplomatic relations with Qatar.  That says little, if anything, about Qatar or QC in 2013/2014.  Moreover, there are many complex reasons why the United States may maintain a certain level of diplomacy with another country.  To the extent QC is attempting to dispute the plausibility of the conspiracy allegations as it relates to personal jurisdiction, I do not find these exhibits at all persuasive.[36]

Third, the exhibits are entirely silent on the sort of personal jurisdiction disputes that matter.  For instance, QC denies that it ever made the transfer to al Salim.  What evidence does it put forth?  Its lawyers' argument in a brief.  (*See, e.g.,* DE 59 at 9) ("Even assuming *arguendo* that Qatar Charity made the transfer at issue to al Salim—which it did not . . . . ").  A lawyer's argument is, of course, not evidence.  Similarly, buried in a footnote towards the end of its brief, QC's lawyers represent that "as a matter of fact[,] management of Qatar Charity has no idea who that is," referring to Mr. Jassem Abdulla, the alleged representative of Qatar Charity that wired al Salim the money.  (DE 54 at 26 n.10; ¶ 109).  Neither of these representations are evidence that a court

---

[36] In addition, to the extent QC is relying on the exhibits in its Rule 12(b)(6) challenge, I disregard them altogether.

can rely on in resolving a personal jurisdiction challenge.  Given the lack of rebuttal, I accept Plaintiffs' allegations as true.

Turning now more directly to the due process analysis, QC's contacts are, much like QNB, the causing of pain and sowing of terror aimed at the United States by first, Sotloff's execution and second, publication of the video.[37]  *Both* contacts are equally attributable to QC under conspiracy jurisdiction or the Effects Test.  As to the conspiracy, the analysis is nearly the same. Plaintiffs plausibly allege that QC conspired with al Salim given its central role in the funding scheme initiated by the Qatar Royal Family and government.  QC's chairman was a member of the Royal Family and senior government official.  (¶ 61).  Several other members of QC's board were also senior government officials with obvious close ties to the al Thanis.  Plaintiffs cite to compelling allegations by U.S. government officials in the early-to-mid 2000's that QC was a funding source for Osama bin Laden's 1998 East Africa bombing and that it was a "terrorism support entity . . . because of its intent and willingness to support terrorist organizations that attack the U.S. and its interests."  (¶¶ 42, 45) (cleaned up).  In the face of these allegations, QC sticks its head in the sand.  Much like QNB, QC attempts to completely divorce these connections with any inference that it conspired with al Salim and ISIS.  I refuse to do the same.  The rest of the conspiracy jurisdiction analysis breaks down in the same way as for QNB.

As for the Effects Test, Plaintiffs' case is even stronger for QC.  Again, that is because Plaintiffs allege, and QC does not rebut, that QC paid al Salim the $800,000.  Thus, factor four

---

[37] While the correspondent banking transaction is QNB's contact, Plaintiffs do allege that QC could not have obtained U.S. dollars without QNB's access to the U.S. financial market. (¶ 50).

(whether the defendant directly gave the money to the terrorist), is fully met here.  The rest of the analysis is also the same.

The remaining due process analysis is the same too.  QC purposefully availed itself of the United States for the same reasons.  QC fails to put forth any meaningful argument on the third element, relying on two sentences in its Reply Brief.  (DE 59 at 10-11)  For similar reasons, I find that any inconvenience in litigating this case here does not run afoul of traditional notions of fair play and substantial justice.

Accordingly, QC's motion to dismiss for lack of personal jurisdiction is denied.

### B. THE MERITS

Defendants also bring a Rule 12(b)(6) challenge as to all claims.  Rule 12(b)(6) allows for dismissal for failure to state a claim.  *See* Fed. R. Civ. P. 12(b)(6).  A complaint "must . . . contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Dismissal is therefore permitted when on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action."  *Glover v. Liggett Grp., Inc.*, 459 F.3d 1304, 1308 (11th Cir. 2006) (citation omitted). Moreover, I must construe the complaint in the light most favorable to the plaintiff and assume the truth of the plaintiff's factual allegations.  *See Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002); *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).  However, pleadings that "are no more than conclusions, are not entitled to the assumption of truth."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Einhorn v. Axogen, Inc.*, 42 F.4th 1218, 1222 (11th Cir. 2022) (stating that an unwarranted deduction of fact is not considered true for purposes of determining whether a claim is legally sufficient).  "Factual allegations must be enough to raise [the plaintiff's] right to relief above the speculative level."  *Bell* Atlantic, 550 U.S. at 555.

Given the demanding standard under the due process clause in this case, it is no surprise that all of Defendants' Rule 12(b)(6) challenges fail.  I will address each in turn.

### 1. COUNTS III AND IV – PRIMARY LIABILITY

Plaintiffs allege that Defendants may be held directly liable for the execution of Sotloff because their financial support amounts to committing the act itself.  Section 2333(a) of the ATA provides a cause of action for the estate or survivor of "[a]ny national of the United States injured

. . . by reason of an act of international terrorism . . . . "  18 U.S.C. § 2333(a).  There is no dispute that Sotloff is a U.S. national.  Defendants instead argue that they did not commit an "act of international terrorism" by funding al Salim.  In addition, Defendants argue that their actions did not proximately cause Sotloff's death.

As is relevant here, the ATA defines "international terrorism" as activities that (1) involve "**acts dangerous to human life**" that are a violation of the criminal laws of the United States" (2) "appear to be intended . . . to influence the policy of a government by intimidation or coercion" or "affect the conduct of a government by . . . kidnapping" and (3) "occur primarily outside" the United States.  18 U.S.C. § 2331(1)(A)-(C) (emphasis added).  Defendants' focus in on whether their support amounts to an "act dangerous to human life."  For purposes of primary liability, Defendants do not rebut that Defendants' alleged support of al Salim violated the criminal material supports statutes, 18 U.S.C. §§ 2339A, 2339B(a)(1).  It appears to be an open question in the Eleventh Circuit whether financial support of a terrorist organization can constitute an act of "international terrorism" within the meaning of § 2331.  However, at least one circuit has taken the view, which I adopt here, that financially supporting a known terrorist organization is an "act dangerous to human life" because it is "like giving a loaded gun to a child."  *Boim v. Holy Land Found. for Relief and Dev.*, 549 F.3d 685, 690 (7th Cir. 2008) (Posner, J.) (en banc); *see also In re Chiquita Brands Intl., Inc.*, 284 F. Supp. 3d 1284, 1308 (S.D. Fla. 2018) (relying on same). *But see Linde v. Arab Bank, PLC*, 882 F.3d 314, 327 (2d Cir. 2018) (concluding that "providing routine financial services to members and associates of terrorist organizations is not so akin to providing a loaded gun to a child" but remanding for jury to decide what constitutes routine).

QNB frames the allegations against it as "passively facilitating transfers on behalf of its customers," or, even if actively doing so, as providing nothing more than "routine financial

services." (DE 53 at 27) (citing *Linde*, 882 F.3d at 327).  According to QNB, none of that amounts to an "act dangerous to human life."  I do not view QNB's actions as passive given the conspiracy allegations.  And even on *Linde*'s own terms, whether QNB's actions constitute "routine financial services" is a question of fact better left to be assessed at later stages of this case.  *See, e.g.*, *Schansman v. Sberbank of Russia PJSC*, 565 F. Supp. 3d 405, 416 (S.D.N.Y. 2021) (relying on *Linde* to deny motion to dismiss on primary liability where financial institutions "provided financial services to fundraisers and individuals who supported [a terrorist organization] . . . . ").  QC is on even weaker footing on this front since its support—directly sending money to al Salim, rather than providing financial services—falls squarely within *Boim*.  *See* 549 F.3d at 690.

QC argues that al Salim is essentially a nobody, so a transfer to him could not constitute support to a known terrorist organization.[38]  (DE 59 at 13).  This argument reflects a recurring strategy in Defendants' motions to dismiss:  ignore the conspiracy allegations.  Plaintiffs plausibly allege that QNB and QC were central players in a terrorism funding scheme.  Viewed under that lens, it does not really matter that al Salim may not have been generally known to another financial institution or charity because QNB and QC were actively involved in a terrorism funding conspiracy, so he was plausibly known to *them*.  To hold otherwise would mean that defendants could escape liability simply by choosing to finance terrorists who are skilled at concealing their terrorist connections.  That cannot be right.  A plaintiff should be able to defeat a motion to dismiss by raising a plausible inference that the defendant knew it was funding a terrorist, regardless of whether *other* institutions would have.  Plaintiffs have accomplished that here.

---

[38] While sparse, al Salim did identify himself as affiliated with the Nusra Front, an FTO, in a March 19, 2013, article published in the Daily Star Lebanon.  (¶¶ 103-04).

Defendants then argue that their support did not proximately cause the attack.  The Parties agree that Section § 2333(a) imposes a proximate cause standard by limiting liability to injuries arising "*by reason of* an act of international terrorism."  (*See, e.g.,* DE 53 at 28) (citing *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013)); 18 U.S.C. § 2333(a).  Specifically, Plaintiffs must allege that Defendants' actions were "a substantial factor in the sequence of responsible causation and whose injury was reasonably foreseeable or anticipated as a natural consequence."  *Rothstein*, 708 F.3d at 91.  In terms of what constitutes a "substantial factor" in the context of terrorism financing, I find *In re Chiquita*'s standard persuasive.  *In re Chiquita Brands Intl., Inc.*, 284 F. Supp. 3d at 1313 (Marra, J.) ("Hence, the greater the time between the payments and the attack, the more attenuated the foreseeability of the attack, and the weaker the likelihood that the support played a significant role in facilitating the attacks. Similarly, the smaller the amount of payments, the less foreseeable that the payments would contribute to an imminent attack, and the weaker the likelihood [that] the funding played [a] substantial or significant role in facilitating the attacks.").

Plaintiffs plausibly allege that QC's wire transfer, and QNB's facilitation of the same, proximately caused Sotloff's execution.  In terms of timing, al Salim ordered Sotloff's execution just a little over 10 months after the wire transfer.  And the payment amount was large enough to function as al Salim's seed money, propelling him into leadership positions within ISIS.  Thus, the $800,000 was a substantial factor.  Furthermore, it was, of course, reasonably foreseeable that by giving a terrorist $800,000 to raise an ISIS brigade, it would result in him committing acts of terror, like Sotloff's execution.  *See Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 227 (D.C. Cir. 2022) (finding attacks reasonably foreseeable, *inter alia*, because "providing fungible resources to a terrorist organization allows it to grow, recruit, and pay members, and obtain weapons and other equipment.").

### 2.   COUNT II – CONSPIRACY LIABILITY

Plaintiffs further allege that Defendants are liable under 18 U.S.C. § 2333(d) for conspiring with ISIS to bring about Sotloff's execution.  In 2016, Congress amended the ATA in the Justice Against Sponsors of Terrorism Act to expressly include a cause of action for secondary liability (aiding/abetting and conspiracy).  The stated Congressional purpose for doing so was to:

> [P]rovide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, **directly or indirectly**, to foreign organizations or persons that engage in terrorist activities against the United States.

JASTA § 2333(b) (emphasis added).   Under § 2333(d)(2), a defendant can be liable for "conspir[ing] with the person who committed such an act of international terrorism."  18 U.S.C. § 2333(d)(2).  Moreover, the "injury [must] arise[] from an act of international terrorism committed, planned, or authorized" by a U.S.-designated Foreign Terrorist Organization ("FTO") on the date of the act.  *Id*.  The Parties do not dispute that ISIS was an FTO on the date of Sotloff's execution.

Defendants seem to argue that Plaintiffs' conspiracy claims fail because al Salim was not the "triggerman," so he was not the "person" that committed the terrorist act.   (*See, e.g.,* DE 54 at 28).  I find that to be a nonsensical distinction given that al Salim *ordered* Sotloff's execution— that, in my view, is like being the triggerman.  Similarly, Defendants argue that al Salim was, at the time of the transaction, a member of another terrorist organization, the Nusra Front (designated an FTO before the transaction) so they did not conspire with ISIS directly.  (DE 58 at 11).  It appears that the U.S. Supreme Court has recently kept this an open question.  *See Twitter, Inc. v. Taamneh*, 598 U.S. ___, ___ (2023) (slip op., at 21 n.12) ("we need not resolve whether defendants must have aided and abetted ISIS, [the individual terrorist], or some subgroup of ISIS operatives in committing the [terrorist] attack. In other words, we need not resolve whether 'the person'

referred to in § 2333(d)(2) encompasses international terrorist syndicates or is somehow otherwise limited . . . . ").

Notwithstanding, the Second and D.C. Circuits have expressly rejected such a narrow reading of JASTA, and I agree.  *See Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 79 (2d Cir. 2023) ("We therefore see no reason to conclude that a JASTA conspiracy claim requires a direct connection between the defendant and the person who commits an act of international terrorism. To hold otherwise would require us to read 'directly' into the plain text of the statute, defy well-established principles of conspiracy law, and risk shielding avowed terrorists and terrorist facilitators from liability simply because they did not have direct dealings with those who detonated explosive devices – something that is clearly inconsistent with JASTA's stated purpose."); *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 225 (D.C. Cir. 2022) ("The statute imposes no directness requirement.  In defining secondary liability in § 2333(d)(2), Congress purposefully omitted any requirement of 'direct' assistance.").

"[T]he separate elements of civil conspiracy [are]: (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme."  *See Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983).  For the same reasons stated in the personal jurisdiction analysis, Part III.A.2.a-b, I find that Plaintiffs plausibly allege that QNB and QC conspired with al Salim and ISIS.

### 3. COUNT I – AIDING AND ABETTING

Lastly, Plaintiffs allege that Defendants are liable under 18 U.S.C. § 2333(d) for aiding and abetting ISIS in Sotloff's execution. *Halberstam* sets out three elements of an aiding and abetting claim: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation." *Halberstam*, 705 F.2d at 477. The first element is undisputedly met. On the third element, *Halberstam* identifies six factors to consider:

> (i) the nature of the act assisted, (ii) the amount and kind of assistance, (iii) the defendants' presence at the time of the tort, (iv) the defendants' relationship to the tortious actor, (v) the defendants' state of mind, and (vi) the duration of assistance.

*Atchley*, 22 F.4th at 221.

The U.S. Supreme Court very recently clarified a few matters as it relates to aiding and abetting liability under JASTA. *See Twitter, Inc. v. Taamneh*, 598 U.S. ___ (2023). In the Court's own framing, there are two questions raised when one reads 18 U.S.C § 2333(d). First, "what exactly does it mean to 'aid and abet'"? *Id*. at 8. Aid and abet "refers to a conscious, voluntary, and culpable participation in another's wrongdoing." *Id*. at 17. In answering that question, the Court emphasized that *Halbertstam*'s "elements and factors should not be taken as inflexible codes; rather, they should be understood in light of the common law and applied as a framework designed to hold defendants liable when they consciously and culpably 'participate[d] in' a tortious act in such a way as to help 'make it succeed.'" *Id*. at 20-21 (citation omitted). Similarly, the six substantiality factors should not be regarded as a "sequence of disparate, unrelated considerations without a common conceptual core." *Id*. at 28. Instead, the "point of those factors is to help courts capture the essence of aiding and abetting: participation in another's wrongdoing that is both

significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor." *Id*.  For instance, under the common law, "less substantial assistance required more scienter before a court could infer conscious and culpable assistance . . . . And, vice versa, if the assistance were direct and extraordinary, then a court might more readily infer conscious participation in the underlying tort." *Id*. at 15 (citation omitted).

Second, "what precisely must the defendant have 'aided and abetted'"? *Id*. at 8.  As an initial matter, the Court found that question to be a largely "syntactic dispute [making] little difference . . . because aiding and abetting is inherently a rule of secondary liability for specific wrongful acts." *Id*. at 18.  Notwithstanding, the Court explained that defendants must have "aided and abetted the act of international terrorism that injured the plaintiffs—though that requirement does not always demand a strict nexus between the alleged assistance and the terrorist act." *Id*. at 21.  Defendants need not "have known 'all the particulars of the primary actor's plan.'" *Id*. at 19.  Instead, a defendant "can be held liable for other torts that were a 'foreseeable risk' of the intended tort." *Id*. at 20.

Applying that framing to the facts of *Twitter* crystalizes the point:  Twitter did not aid and abet ISIS in the commission of a terrorist attack by (1) passively allowing ISIS to access Twitter, (2) indiscriminately employing an algorithm that matched ISIS-related content to users most likely to be interested, and (3) taking insufficient steps to ensure that ISIS content was removed from the platform.  *Id*. at 22.  The Court found the lack of Twitter's *affirmative* actions and global scale of its platform made its actions (or inaction) far too attenuated from the terrorist attack at issue, without a "strong showing of assistance and scienter." *Id*. at 24.  The Court described Twitter's relationship with ISIS as "arm's length, passive, and largely indifferent." *Id*.

Keeping *Twitter*'s guidance in mind, I now apply the *Halberstam* framework to this case. The first *Halberstam* element is easily met because ISIS, through al Salim, executed Sotloff. Here too, Defendants take issue with al Salim being an "intermediary." Again, I find no merit to this argument both as a matter of fact and law. (*See* Part III.B.1). Second, Defendants were generally aware of their role as participants in the overall tortious activity at the time of the wire transfer. Defendants pound the table on the fact that there was only a single public article of al Salim's terrorist affiliations, so how could they have known what he was up to? For the same reasons stated in my discussion of direct liability, I do not find this argument persuasive. (*See id*.). As alleged, Defendants are not some hapless or even negligent actors that were blindly roped into a terrorism funding scheme—they were active participants. If Defendants have evidence to the contrary, they can raise it in later stages of this case. *Twitter*'s guidance to avoid a wooden application of *Halberstam* further bolsters that conclusion. *See Twitter*, 598 U.S. at ___ (2023) (slip op., at 20-21).

Third, Defendants knowingly and substantially assisted Sotloff's execution. The connection between Defendants' transfer of $800,000 to al Salim and his execution of Sotloff 10 months later is extraordinarily direct, such that I easily infer conscious participation in the underlying tort. *See id*. at 15. While it is not clear *exactly how* the money was used to aid in the execution, a "strict nexus" is not required. *Id*. at 21. What we do know from the allegations is that the money was intended to serve, and indeed did serve, as al Salim's seed money to raise an ISIS brigade and commit acts of terror in, not surprisingly, the same manner that ISIS and its precursor did in the past. Moreover, the first, second, and fifth substantiality factors weigh heavily here. The nature of the alleged act assisted, providing the seed money to raise an ISIS brigade to commit acts of terror, like Sotloff's execution, is on its face substantial. *See Atchley v. AstraZeneca UK*

*Ltd.*, 22 F.4th 204, 222 (D.C. Cir. 2022) ("In relation to such vicious acts, even 'relatively trivial' aid could count as substantial."). The amount of assistance—$800,000—was substantial as evidenced by al Salim's ability to cross over into Syria the very next day to begin raising his ISIS brigade. The allegations plausibly show that Defendants, in participating in a terrorism financing conspiracy, held a culpable state of mind in relation to the transaction and the foreseeable acts of terror to follow. Accordingly, considering the six substantiality factors as a whole, and for the reasons previously stated, I find Defendants' assistance to be "substantial and culpable enough to justify attributing the principal wrongdoing" to them. *See Twitter*, 598 U.S. at ___ (2023) (slip op., at 28).

The thrust of *Halberstam*'s aiding and abetting framework is meant to avoid holding innocent facilitators liable. *Id.* at 13 ("[I]f aiding-and-abetting liability were taken too far, then ordinary merchants could become liable for any misuse of their goods and services, no matter how attenuated their relationship with the wrongdoer."). On these facts, as alleged, I do not have that concern. Plaintiffs plausibly allege that QNB and QC acted consciously, voluntarily, and culpably in relation to al Salim and ISIS's execution of Sotloff.

## IV.    CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendants' Motions to Dismiss (DE 53; DE 54) are **DENIED.**

**SIGNED**, in Chambers, at West Palm Beach, Florida, this 30th day of May, 2023.

Donald M. Middlebrooks
United States District Judge

CC:    Counsel of Record