**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

| | |
|---|---|
| ARTHUR BARRY SOTLOFF Individually and as the Administrator of the Estate of STEVEN JOEL SOTLOFF; SHIRLEY GOLDIE PULWER, and LAUREN SOTLOFF, <br><br> *Plaintiffs*, <br><br> v. <br><br> QATAR CHARITY and QATAR NATIONAL BANK (Q.P.S.C.), <br><br> *Defendants*. | Case No. 9:22-cv-80726 (DMM) (WDM) |

**DEFENDANT QATAR NATIONAL BANK'S
ANSWER TO PLAINTIFFS' COMPLAINT**

Defendant Qatar National Bank (Q.P.S.C.) ("QNB" or "Defendant") respectfully submits the following answers, defenses, and affirmative defenses (collectively, the "Answer") to the Complaint (the "Complaint"), filed by Plaintiffs Arthur Barry Sotloff, Individually and as the Administrator of the Estate of Steven Joel Sotloff; Shirley Goldie Pulwer, and Lauren Sotloff (collectively, the "Plaintiffs") on May 13, 2022.

Unless expressly and specifically admitted below, QNB denies each and every allegation contained in the Complaint. The headings and subheadings contained in the Complaint do not constitute well-pleaded allegations of fact and therefore require no response. To the extent a response is required, any allegations contained in the headings and subheadings in the Complaint are denied. QNB expressly reserves the right to amend and/or supplement this Answer, including without limitation the defenses and affirmative defenses set forth herein.

1

## INTRODUCTION

**1.      Plaintiffs assert claims for wrongful death, personal injury, and related torts pursuant to the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 *et seq.*, against the members of a terrorism-financing conspiracy directed by the government and Royal Family of the State of Qatar ("Qatar"), whose objectives were the creation of an Islamic state in Syrian territory to sow chaos and weaken the Syrian Arab Republic ("Syria"), Qatar's regional rival, and whose methods were the financial support of radical Islamist terrorist groups operating in Syria.**

1.      QNB admits that Plaintiffs purport to bring an action under the ATA, 18 U.S.C. § 2331, *et seq*. The remaining allegations of Paragraph 1 consist of Plaintiffs' characterizations of their purported claims and legal conclusions that require no response. To the extent a response is required, QNB denies the allegations.

**2.      The members of that conspiracy financed the notorious terrorist organization the Islamic State of Iraq and Syria ("ISIS") at the same time that ISIS was holding Steven Sotloff hostage and torturing him.  Steven Sotloff, a journalist documenting the Arab Spring in Syria, was taken hostage by ISIS on August 4, 2013 as he travelled to Aleppo, Syria from the border between the Republic of Turkey ("Turkey") and Syria.**

2.      QNB denies any allegation, express or implied, of having knowledge of, providing support to, or participating in the purported conspiracy alleged in Paragraph 2.  QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 2, and therefore denies those allegations on that basis.

**3.      ISIS would eventually behead Steven Sotloff on August 31, 2014, at the written direction of ISIS judge Fadhel al Salim ("al Salim"), a man to whom the members of this conspiracy paid $800,000 ten months earlier.  At the time of this payment, al Salim had already publicly announced his affiliation with the Al Nusra Front ("Al Nusra"), a U.S.-designated Foreign Terrorist Organization ("FTO") seeking to establish an Islamic caliphate in Syria.  The members of the conspiracy paid this sum to al Salim so that he could found a militant brigade, join ISIS, and destabilize Syria by committing acts of terror, such as the murder of American hostages like Steven. Predecessor terrorist groups in Iraq and Syria which later morphed into ISIS had been practicing this tactic for many years, dating at least to the U.S. invasion of Iraq in 2003.**

2

3. QNB denies any allegation, express or implied, of having knowledge of, providing support to, or participating in the purported conspiracy alleged in Paragraph 3.  QNB further denies the allegations of Paragraph 3 to the extent that Plaintiffs purport that the $800,000 described in this paragraph was sent through QNB.  QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 3, and therefore denies those allegations on that basis.

**4. Qatar has made little effort to conceal its support for ISIS and its predecessor organizations such as the Islamic State in Iraq ("ISI"), the al Nusra Front, and Al Qaeda in Iraq ("AQI").  At all times relevant to this Complaint, the Qatari government, to bolster its Islamist credentials domestically and internationally, encouraged private fundraising for ISIS and its predecessor organizations and allowed their financiers to operate in Qatar.**

4. QNB denies that it has any reason to believe, based on information available to it, that Qatar supported "ISIS and its predecessor organizations such as the Islamic State in Iraq ('ISI'), the al Nusra Front, and Al Qaeda in Iraq ('AQI')," and that Qatar "encouraged private fundraising for ISIS and its predecessor organizations and allowed their financiers to operate in Qatar," and on that basis denies the allegations. QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 4, and therefore denies those allegations on that basis.  By way of further response, QNB respectfully refers the Court to the source cited in the footnote by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**5. As early as 2003, Abdul Karim al-Thani, a member of the Qatari Royal Family, operated a safe house in Qatar for Abu Mussab al-Zarqawi, leader of the eponymous terror network that would eventually become ISIS.**

5. QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 5, and therefore denies those allegations on that basis.  By way of further response, QNB respectfully refers the Court to the source cited in the footnote by

Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

> **6.     Zarqawi famously organized the murder of USAID worker Lawrence Foley, Jr. in Amman, the Hashemite Kingdom of Jordan ("Jordan") in 2002.   The international press widely reported the assassination and following developments.   The Jordanian government quickly traced the plot to Zarqawi and publicly sentenced him to death.   The United States offered $10 million reward for Zarqawi's capture.**

6.     QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 6, and therefore denies those allegations on that basis.

> **7.     In 2004, Zarqawi would appear in a series of propaganda videos in which he personally beheaded Americans that his group had kidnaped and held hostage, including a businessman from Pennsylvania, Nicholas Berg, as well as American contractors Eugene Armstrong and Jack Hensley.**

7.     QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 7, and therefore denies those allegations on that basis. By way of further response, QNB respectfully refers the Court to the source cited in the footnote by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

> **8.     Abdul Karim al Thani also provided Qatari passports and more than one million dollars to finance Zarqawi's network.**

8.     QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 8, and therefore denies those allegations on that basis.

> **9.     Qatar took advantage of Syria's Arab Spring in order to destabilize its regional rival, the Assad Regime, and "elbow its way to the forefront of Middle Eastern statecraft." Qatar made itself "indispensable" to the rebel forces battling the government of Syrian President Bashar al Assad. In 2013, the Obama administration issued a warning to the Gulf states to avoid arming Syrian rebel groups, lest they be used by terrorist groups.   Qatar continued shipping arms into Syria.**

9.      QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 9, and therefore denies those allegations on that basis.  By way of further response, QNB respectfully refers the Court to the source cited in the footnote by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**10.      The United States has limited direct leverage over Qatar as it hosts a U.S. Central Command forward base used to protect U.S. interests throughout the region.**

10.      QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 10, and therefore denies those allegations on that basis.

**11.      On December 18, 2013, the United States Treasury imposed sanctions on Abd al-Rahman bin 'Umayr al-Nu'aymi ("Sheik Nu'aymi"), a "Qatar-based terrorist financier and facilitator who has provided money and material support and conveyed communications to al-Qa'ida and its affiliates in Syria . . . for more than a decade.  Sheik Nu'aymi was considered among the most prominent Qatar-based supporters of Iraqi Sunni extremists."**

11.      QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 11, and therefore denies those allegations on that basis.  By way of further response, QNB respectfully refers the Court to the source cited in the footnote by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

12.      **According to the Treasury:**

**Nu'aymi has facilitated significant financial support to al-Qa'ida in Iraq, and served as an interlocutor between al-Qa'ida in Iraq leaders and Qatar-based donors.  Nu'aymi reportedly oversaw the transfer of over $2 million per month to al-Qa'ida in Iraq for a period of time.  He also served as an interlocutor between these Qatari nationals and al-Qa'ida in Iraq leaders.**

12.      QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 12, and therefore denies those allegations on that basis.  By

way of further response, QNB respectfully refers the Court to the source cited in the footnote by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**13.    The U.S. State Department's 2013 Country Reports on Terrorism finds that "Qatari-based terrorist fundraisers, whether acting as individuals or as representatives of other groups, were a significant terrorist financing risk and may have supported terrorist groups in countries such as Syria," further noting that "Qatar does require financial institutions to file suspicious transactions reports."**

13.    QNB admits that Qatar requires financial institutions to file suspicious transaction reports.  QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 13, and therefore denies those allegations on that basis.  By way of further response, QNB respectfully refers the Court to the U.S. State Department's 2013 Country Reports on Terrorism referenced by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**14.    In March 2014, then Treasury Under Secretary for Terrorism and Financial Intelligence David Cohen referred to reports indicating that "the Qatari government is also supporting extremist groups operating in Syria. To say the least, this threatens to aggravate an already volatile situation in a particularly dangerous and unwelcome manner."**

14.    QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 14, and therefore denies those allegations on that basis.  By way of further response, QNB respectfully refers the Court to the statements of then Treasury Under Secretary for Terrorism and Financial Intelligence David Cohen referenced by Plaintiffs for their full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**15.    More specifically, Under Secretary Cohen noted that "a number of fundraisers operating in more permissive jurisdictions – particularly in Kuwait and Qatar – are soliciting donations to fund extremist insurgents, not to meet legitimate humanitarian needs.  The recipients of these funds are often**

**terrorist groups, including al-Qa'ida's Syrian affiliate, al-Nusrah Front, and the Islamic State of Iraq and the Levant (ISIL), the group formerly known as al-Qa'ida in Iraq (AQI)," and that these "[p]rivate fundraising networks in Qatar, for instance, increasingly rely upon social media to solicit donations for terrorists and to communicate with both donors and recipient radicals on the battlefield.  This method has become so lucrative, and Qatar has become such a permissive terrorist financing environment, that several major Qatar-based fundraisers act as local representatives for larger terrorist fundraising networks . . . ."**

15.    QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 15, and therefore denies those allegations on that basis.  By way of further response, QNB respectfully refers the Court to the source cited in the footnote by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

16.    **As former U.S. Navy Admiral and NATO Supreme Commander James Stavridis noted in 2014, the largest share of private donations to ISIS originated in Qatar, and the Qatari government had done less to stem the flow of cash than its Gulf neighbors, who were "more in line with U.S. foreign policy." Stavridis further noted that early cash infusions to ISIS predecessors allowed it to become a self-sustaining terrorist organization:**

> **These rich Arabs are like what 'angel investors' are to tech start-ups, except they are interested in starting up groups who want to stir up hatred . . . . Groups like al-Nusrah and ISIS are better investments for them. The individuals act as high rollers early, providing seed money.  Once the groups are on their feet, they are perfectly capable of raising funds through other means, like kidnapping, oil smuggling, selling women into slavery, etc.**

16.    QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 16, and therefore denies those allegations on that basis.  By way of further response, QNB respectfully refers the Court to the source cited in the footnote by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

17.    **During a July 26, 2017 hearing before the Subcommittee on the Middle East and North Africa of the House Committee on Foreign Affairs**

entitled "Assessing the U.S.-Qatar Relationship," then subcommittee chair **Rep. Ileana Ros-Lehtinen** stated in her opening remarks that "Qatar has been known to be a permissive environment for terror financing, reportedly funding U.S. designated foreign terrorist organizations, such as Hamas, as well as several extremist groups operating in Syria." Ros-Lehtinen went on to note that:

> Many individuals and charities in Qatar have been known to raise large sums of money for al-Qaeda, the Nusra front, Hamas, and even ISIS.  In Qatar, there are three buckets: Terror financing by the government; terror financing done in Qatar through their own citizens that their government may not know about; and terror financing in Qatar that the government knows about but does nothing to stop.

17.       QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 17, and therefore denies those allegations on that basis.  By way of further response, QNB respectfully refers the Court to the source cited in the footnote by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**18.       Since 2011, Defendant Qatar Charity paid millions of U.S. Dollars ("USD") to ISIS, its operatives, its predecessor organizations, and front organizations while knowing and intending that these terrorists would put spend these funds in furtherance of the brutal violence for which they were already notorious.  Defendant Qatar National Bank carried out these payments on behalf of Qatar Charity with the same knowledge and intention.**

18.       QNB denies it had any knowledge or intent alleged in Paragraph 18.  QNB denies that it has any reason to believe, based on information available to it, that "Qatar Charity paid millions of U.S. Dollars . . . to ISIS, its operatives, its predecessor organizations, and front organizations while knowing and intending that these terrorists would put spend [sic!] these funds in furtherance of the brutal violence for which they were already notorious," and on that basis denies the allegation.

**19.       As members of a criminal conspiracy to destabilize Syria through acts of terrorism, and as witnesses to the havoc wrought by Zarqawi and his successors, Defendants and their co-conspirators could certainly have**

**foreseen, and intended, that Americans would be taken hostage and killed. Steven Sotloff's televised beheading by ISIS, ordered by a direct recipient of Defendants' material support, furthered the objectives of the conspiracy in that it strengthened ISIS, helped ISIS gather recruits, terrorized the population of Syria and the United States, and offered ISIS the opportunity to spread extremist Sunni propaganda favored by Defendants and their co-conspirators.**

19.     Upon information and belief, QNB admits that ISIS televised the beheading of Steven Sotloff.  QNB denies any allegation, express or implied, of having knowledge of, providing support to, or participating in the purported conspiracy alleged in Paragraph 19.  The remaining allegations of Paragraph 19 consist of Plaintiffs' characterizations of their purported claims and legal conclusions that require no response.  To the extent a response is required, QNB denies the allegations.

**20.     Indeed, as the objective of the conspiracy was to destabilize Qatar's regional rival, Syria, through the creation of an Islamic state in Syrian territory, the co-conspirators benefitted from the hostage taking of foreigners, which could only strengthen ISIS and its precursor organizations.**

20.     QNB denies any allegation, express or implied, of having knowledge of, providing support to, or participating in the purported conspiracy alleged in Paragraph 20.  QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 20, and therefore denies those allegations on that basis.

**21.     For example, if the United States had capitulated to ISIS's televised demands that it cease interfering in the Syrian civil war, lest ISIS behead Steven Sotloff, ISIS would face one less threat to its operations in Syria. If, as turned out to be the case, ISIS chose to execute Steven Sotloff, it would demoralize the Syrian and American people, put pressure on the United States government, raise ISIS' profile among potential terrorist recruits, and attract funding from other terror funding networks besides Defendants'.  In either eventuality, ISIS hostage taking of Americans strengthened ISIS and furthered the objectives of the conspiracy, to destabilize Syria.**

21.     QNB denies any allegation, express or implied, of having knowledge of, providing support to, or participating in the purported terror funding network and/or conspiracy alleged in

9

Paragraph 21.  QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 21, and therefore denies those allegations on that basis.

**22.     For this reason, Defendants and their co-conspirators targeted the United States by supporting terrorist organizations in Syria, such as ISIS and its predecessor organizations, that had the will and capacity to take, torture, and kill Americans, that had successfully taken Americans hostage in the past, tortured, and executed them, and that already had American hostages in custody at the time of Defendants' support.**

22.     QNB denies any allegation, express or implied, of having knowledge of, providing support to, or participating in the purported conspiracy alleged in Paragraph 22.  QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 22, and therefore denies those allegations on that basis.

**23.     Because Defendants' support made it possible for ISIS to kidnap, torture, and execute Steven Sotloff, they are liable to Plaintiffs for, inter alia, the indescribable trauma of watching a son and brother be slowly beheaded on live television.**

23.     The allegations of Paragraph 23 consist of Plaintiffs' characterizations of their purported claims and legal conclusions that require no response.  To the extent a response is required, QNB denies the allegations.

## JURISDICTION AND VENUE

**24.     Plaintiffs, all citizens of the United States, were injured by acts of international terrorism that arose from the Defendants' conspiracy to support ISIS and the efforts Defendants undertook to aid and abet that violence.**

24.     QNB lacks knowledge or information sufficient to form a belief as to the citizenship status of Plaintiffs.  QNB denies any allegation, express or implied, of having knowledge of, providing support to, or participating in the purported conspiracy alleged in Paragraph 24.  The

remaining allegations of Paragraph 24 consist of legal conclusions that require no response.  To

the extent a response is required, QNB denies the remaining allegations of Paragraph 24.

      **25.     As a result, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 18 U.S.C. §§ 2333(a), and 2338.**

      25.     The allegations of Paragraph 25 consist of legal conclusions that require no

response.  To the extent a response is required, QNB denies the allegations of Paragraph 25.

      **26.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (d), as well as under 18 U.S.C. § 2334(a).**

      26.     The allegations of Paragraph 26 consist of legal conclusions that require no

response.  To the extent a response is required, QNB denies the allegations of Paragraph 26.

      **27.     Defendants are subject to personal jurisdiction in the United States pursuant to 18 U.S.C. § 2334(a), and Fed. R. Civ. P. 4(k)(1)-(2) because, pursuant to a conspiracy, they:**

            **(a) Directed tortious conduct towards the United States in that they materially supported ISIS while that organization targeted and held American hostages, after ISIS threatened to kill those hostages, and did eventually kill those hostages, in order to extract concessions from the United States government, to terrorize the American people generally, and to terrorize the Sotloff family specifically.**

            **(b) transacted business and committed tortious acts within the United States by transferring funds through the United States for the benefit of ISIS; and purposefully availed themselves of the benefits and protections offered by the United States banking system and United States law in the course of committing the wrongful acts Plaintiffs allege.**

      27.     QNB denies it is subject to personal jurisdiction in the United States.  QNB denies

any allegation, express or implied, of having knowledge of, providing support to, or participating

in the purported conspiracy or any specific acts alleged in Paragraph 27.  The remaining allegations

of Paragraph 27 (including subparagraphs (a) – (b)) consist of Plaintiffs' characterizations of their

purported claims and legal conclusions that require no response. To the extent a response is required, QNB denies the allegations.

> **28.     Throughout the course of the conspiracy, all Defendants recognized that ISIS had taken American hostages, knew or should have known that ISIS was the most recent iteration of the Zarqawi terrorist network, which at the time U.S. federal courts had already found responsible for the gruesome executions of American hostages, and knew or should have known that this organization had a long history of using the funding it had obtained to carry out terrorist attacks, including beheadings. Based upon the infamous and widely-publicized activities of Zarqawi and his successors which began in 2002, Defendants knew or recklessly ignored the fact that ISIS would target Westerners and Americans for spectacular acts of terrorism and murder.**

28.     QNB denies any allegation, express or implied, of having knowledge of, providing support to, or participating in the purported conspiracy or any specific acts alleged in Paragraph 28. The remaining allegations of Paragraph 28 consist of Plaintiffs' characterizations of their purported claims and legal conclusions that require no response. To the extent a response is required, QNB denies the allegations.

## THE PARTIES

### A. Plaintiffs

> **29.     Plaintiff Arthur Barry Sotloff is the father of Steven Joel Sotloff. Arthur Barry Sotloff is a citizen of the United States of America who resides in the state of Florida. Arthur Barry Sotloff brings this suit in his own capacity and in his capacity as Personal Representative of the Estate of Steven Joel Sotloff.**

29.     QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 29, and therefore denies those allegations on that basis.

> **30.     Plaintiff Shirley Goldie Pulwer is the mother of Steven Joel Sotloff. Plaintiff Shirley Goldie Pulwer is a citizen of the United States of America who resides in the state of Florida.**

30.     QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 30, and therefore denies those allegations on that basis.

**31.     Plaintiff Lauren Sotloff is the sister of Steven Joel Sotloff. Plaintiff Lauren Sotloff is a citizen of the United States of America who resides in the state of Florida.**

31.     QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 31, and therefore denies those allegations on that basis.

## B. Defendants

## Qatar National Bank ("QNB")

**32.     QNB, founded in 1964, was Qatar's first domestically owned commercial bank.  As per QNB's website, QNB is a multinational banking organization.**

32.     QNB admits the allegations of Paragraph 32.

**33.     The Qatar Investment Authority, Qatar's state-owned sovereign wealth fund, owned a 50% interest in QNB at all times relevant to this Complaint.**

33.     QNB admits that, pursuant to QNB's Articles of Association, the Qatar Investment Authority (QIA) is owner of 50% of QNB's capital, which QIA has done since 2010. The remaining allegations in Paragraph 33 are either ambiguous—using undefined terms, such as "state-owned sovereign wealth fund"—constitute legal conclusions, or make allegations about third parties as to which QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegation, and on those bases QNB denies the remaining allegations of Paragraph 33.

**34.     The Qatar Investment Authority was founded in 2005 by Qatar's then-Emir, Hamad bin Khalifa Al Thani.  Hamad bin Jassim bin Jaber bin Mohammed Al Thani, the former Prime Minister and Foreign Minister of Qatar, ran the Qatar Investment Authority until 2013.  From 2015 to 2018, Sheikh Abdullah bin Mohammed bin Saud Al Thani, another member of the Qatari Royal Family, served as the Qatar Investment Authority's CEO.**

34.     QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 34, and therefore denies those allegations on that basis.

13

**35.     QNB has received substantial funding from the Qatari state at all times relevant to this Complaint.**

35.     The allegations of Paragraph 35 are so vague and ambiguous that QNB cannot reasonably prepare a response, and therefore denies those allegations on that basis.

**36.     At all times relevant to this Complaint, QNB was controlled by the Qatari government and members of the Qatari Royal Family through their substantial stock ownership in the bank and membership on the bank's board of directors.  Several members of the Qatari Royal Family are or have been members QNB's board, including the bank's current vice-chair, Sheikh Fahad Bin Faisal Al-Thani (also the vice Governor of Qatar Central Bank), chairman Ali Ahmed Al Kuwari, Qatar's Minister of Finance, Sheikh Abdulrahman Bin Saud Bin Fahad Al-Thani, and Sheikh Hamad Bin Jaber Bin Jassim Al-Thani.**

36.     QNB admits that the following individuals are or have been members of QNB's board of directors: Sheikh Fahad Bin Faisal Al-Thani, Ali Ahmed Al Kuwari, Sheikh Abdulrahman Bin Saud Bin Fahad Al-Thani, and Sheikh Hamad Bin Jaber Bin Jassim Al-Thani. QNB admits that Sheikh Fahad Bin Faisal Al-Thani is or has been Deputy Governor of the Qatar Central Bank.  The remaining allegations in Paragraph 36 amount to legal conclusions that require no response or are so vague and ambiguous that QNB cannot reasonably prepare a response, and therefore denies those allegations on that basis.

**37.     QNB's regulator in Qatar, Qatar Central Bank, was at the time of the misconduct described in this Complaint, governed by senior members of the Qatari ruling family: Sheikh Abdullah Bin Saoud Al-Thani as Governor; and Sheikh Fahad Faisal Al-Thani as Deputy Governor.**

37.     QNB admits that QNB's regulator in Qatar is Qatar Central Bank. QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 37, and therefore denies those allegations on that basis.

**38.     QNB markets its ability to provide "Sharia compliant current accounts in numerous currencies" and associated services throughout the Middle East and in the U.K.  According to QNB, its "Islamic products and offerings are approved by our Sharia Supervisory Board (SSB)."**

38.     QNB admits that the quoted language in Paragraph 38 is excerpted from the webpage cited by Plaintiffs.  By way of further response, QNB respectfully refers the Court to the webpage cited by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**39.     QNB maintained at least six accounts for Qatar Charity, despite that organization's reputation for terror finance.  Qatar Charity specifically instructed donors to send funds to its accounts at QNB.  In addition, QNB gave Qatar Charity access to its correspondent accounts in the United States, allowing Qatar Charity to carry out large dollar-denominated payments to ISIS, its operatives, its predecessor organizations, and front organizations that would otherwise have been impossible.  Indeed, in 2013 QNB processed the $800,000 wire transfer to the individual who ordered Steven Sotloff's execution.**

39.     QNB denies the allegations of Paragraph 39.

### Qatar Charity

**40.     Qatar Charity was founded in 2002 as the Qatar Charitable Society.  According to its website Qatar Charity is a non-profit organization.  In reality Qatar Charity is a key funding source for international terrorists.**

40.     QNB admits, based on information and belief, that Qatar Charity is a non-profit organization.  QNB denies that it has any reason to believe, based on information available to it, that "Qatar Charity is a key funding source for international terrorists," and on that basis denies the allegation.  QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 40, and therefore denies those allegations on that basis.

**41.     The Qatar Charitable Society renamed itself Qatar Charity after it became notorious under its prior name for financing international terrorism.**

41.     QNB denies that it has any reason to believe, based on information available to it, that Qatar Charity "became notorious under its prior name for financing international terrorism," and on that basis denies the allegation.  QNB lacks knowledge or information sufficient to form a

belief as to the truth or falsity of the remaining allegations of Paragraph 41, and therefore denies those allegations on that basis.

> **42.    In March 2008, the U.S. Interagency Intelligence Committee on Terrorism (IICT) of the U.S. National Counterterrorism Center listed Qatar Charity (then known as Qatar Charitable Society) as a "priority III terrorism support entity (TSE)" because of its "intent and willingness" to support terrorist organizations that attack the U.S. and its interests.  While that information was not published publicly, all of the Defendants were well aware of the reasons for that designation and, thus, Qatar Charity's status as a principal supporter of terrorist organizations.**

42.    QNB denies that it has any reason to believe, based on information available to it, that the U.S. Interagency Intelligence Committee on Terrorism listed Qatar Charity "as a 'priority III terrorism support entity (TSE)' because of its 'intent and willingness' to support terrorist organizations that attack the U.S. and its interests," and on that basis denies the allegation.  QNB denies that it was "well aware of the reasons for that [TSE] designation and, thus, Qatar Charity's status as a principal supporter of terrorist organizations."  QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 42, and therefore denies those allegations on that basis.  By way of further response, QNB respectfully refers the Court to the source cited in the footnote by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

> **43.    Long before 2008, however, Qatar Charity had engaged in a pattern of support and financing of international terrorist organizations.**

43.    QNB denies that it has any reason to believe, based on information available to it, that, "[l]ong before 2008, . . . Qatar Charity had engaged in a pattern of support and financing of international terrorist organizations," and on that basis denies the allegation.

> **44.    In testimony to the 9/11 Commission and Congress, Jamal al-Fadl, a former business aide to Osama bin Laden who defected to the United States in 1996, said that Bin Laden told him in 1993 that the Qatar Charitable Society was one of Bin Laden's major sources of funding.**

16

44.    QNB denies that it has any reason to believe, based on information available to it, that "Qatar Charitable Society was one of Bin Laden's major sources of funding," and on that basis denies the allegation. QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 44, and therefore denies those allegations on that basis. By way of further response, QNB respectfully refers the Court to the testimony referenced by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**45.    In 2002, in a terrorism-related criminal case in the United States District Court for the Northern District of Illinois, the U.S. government confirmed that the Qatar Charitable Society financed Osama Bin Laden, who used the funds to carry out the 1998 East Africa embassy bombings.**

45.    QNB denies that it has any reason to believe, based on information available to it, that "Qatar Charitable Society financed Osama Bin Laden, who used the funds to carry out the 1998 East Africa embassy bombings," and on that basis denies the allegation. QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 45, and therefore denies those allegations on that basis. By way of further response, QNB respectfully refers the Court to the source cited in the footnote by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**46.    The 2003 testimony provided by Matthew Epstein and Evan Kohlmann to the U.S. House Committee on Financial Services Subcommittee on Oversight and Investigations (the "Epstein/Kohlmann Testimony") provides additional evidence of the Qatar Charitable Society's support for terrorism.**

46.    QNB denies that it has any reason to believe, based on information available to it, that Qatar Charity supported terrorism, and on that basis denies the allegation. QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining

allegations of Paragraph 46, and therefore denies those allegations on that basis.  By way of further response, QNB respectfully refers the Court to the Epstein/Kohlmann Testimony referenced by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**47.     The Epstein/Kohlmann Testimony noted that the Qatar Charitable Society engaged in the "active financing of Al-Qaida and other designated international terror groups" and "served a critical role in the Arab-Afghan terrorist infrastructure by laundering money originating from bank accounts belonging to Bin Laden and his sympathetic patrons in the Arabian Gulf, providing employment and travel documents to Al-Qaida personnel worldwide, and helping 'to move funds to areas where Al-Qaida was carrying out operations.'"**

47.     QNB denies that it has any reason to believe, based on information available to it, that Qatar Charity "engaged in the active financing of Al-Qaida and other designated international terror groups and served a critical role in the Arab-Afghan terrorist infrastructure by laundering money originating from bank accounts belonging to Bin Laden and his sympathetic patrons in the Arabian Gulf, providing employment and travel documents to Al-Qaida personnel worldwide, and helping to move funds to areas where Al-Qaida was carrying out operations" (internal quotations omitted), and on that basis denies the allegation. QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 47, and therefore denies those allegations on that basis.  By way of further response, QNB respectfully refers the Court to the source cited in the footnote by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**48.     The Epstein/Kohlmann Testimony also emphasized that, while Qatar Charitable Society touted its humanitarian work, its "charitable mission represented little more than an excuse to provide material support to terrorists."**

48.     QNB denies that it has any reason to believe, based on information available to it, that Qatar Charity's "charitable mission represented little more than an excuse to provide material

support to terrorists," and on that basis denies the allegation. QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 48, and therefore denies those allegations on that basis.  By way of further response, QNB respectfully refers the Court to the Epstein/Kohlmann Testimony referenced by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

> **49.     In addition to serving as a major financial conduit for Al-Qaida, Qatar Charity has financed and supported other terrorist organizations throughout the Middle East, Africa and elsewhere.**

49.     QNB denies that it has any reason to believe, based on information available to it, the allegations in Paragraph 49, and on that basis denies the allegation.

> **50.     For example, Qatar Charity actively aided radical quasi-official terrorist militias associated with the National Islamic Front ("NIF") in Sudan.**

50.     QNB denies that it has any reason to believe, based on information available to it, the allegations in Paragraph 50, and on that basis denies the allegation.

> **51.     In the 1990s, Qatar Charity supported the Eritrean Islamic Jihad Movement, another terrorist organization in Africa.**

51.     QNB denies that it has any reason to believe, based on information available to it, the allegations in Paragraph 51, and on that basis denies the allegation.

> **52.     Outside of Africa, Qatar Charity was extremely active in terrorist activities in the Balkans and the turbulent republics of the Caucasus.**

52.     QNB denies that it has any reason to believe, based on information available to it, the allegations in Paragraph 52, and on that basis denies the allegation.

> **53.     Qatar Charity has also acted as a financier and agency for terrorist organizations in Chechnya and Mali and funded Syria's Ahfad al-Rasul Brigade.**

53.     QNB denies that it has any reason to believe, based on information available to it, the allegations in Paragraph 53, and on that basis denies the allegation.

**54.     In addition, Qatar Charity provided funding to, and partnered with, Islamic Relief Worldwide, which Israel banned in 2014 for funding Hamas.**

54.     QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 54, and therefore denies those allegations on that basis.

**55.     In July 2008, Israel's Defense Minister signed an order banning Qatar Charity (then known as the Qatar Charitable Society) and all of its branches operating in the territories administered by the Palestinian Authority.  The same Israeli government order designated Qatar Charity as a member of the Union of Good, a notorious funder of Hamas terrorism.**

55.     QNB admits that Israel made an order and designation related to Qatar Charity. By way of further response, QNB respectfully refers the Court to the Israeli order referenced by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto. QNB further denies that it has any reason to believe, based on information available to it, that Qatar Charity funds Hamas terrorism, and on that basis denies the allegations. QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 55, and therefore denies those allegations on that basis.

**56.     At the time of that designation, Israel also expressly warned all world banking and financial institutions to "prepare accordingly and act with caution in order to avoid criminal actions and civil lawsuits by victims of terrorism," including those brought in the United States.**

56.     QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 56, and therefore denies those allegations on that basis.  By way of further response, QNB respectfully refers the Court to the statement quoted by Plaintiffs

for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**57.    In 2017, to avoid suspicion from international banks after a damning report by the UK Charity Commission noting its questionable "independence," and its connections to the Muslim Brotherhood, the UK branch of Qatar Charity renamed itself Nectar Trust.**

57.    QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 57, and therefore denies those allegations on that basis.  By way of further response, QNB respectfully refers the Court to the report by the UK Charity Commission referenced by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**58.    Saudi Arabia, Bahrain, Egypt, and the United Arab Emirates ("UAE") cut ties with Qatar on June 5, 2017, due to Qatar's connections with, and support of, terrorist organizations.**

58.    QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 58, and therefore denies those allegations on that basis.

**59.    On June 9, 2017, Saudi Arabia, Bahrain, Egypt, and the UAE designated Qatar Charity as a financial supporter of terrorism.**

59.    QNB admits that the referenced designations were made in 2017 but denies that such designations have any relevance to this case, which relates to events in and before 2014.   By way of further response, QNB respectfully refers the Court to the source cited in the footnote by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**60.    According to the International Centre for the Study of Radicalisation [sic] at King's College London, Qatar Charity has spent tens of millions of Euros on Muslim Brotherhood-associated projects throughout Europe, noting that "A classified cable from the American embassy in Doha from 2009, later published by Wikileaks, described QC as 'an entity of concern to the USG [US government] due to some of its suspect activities abroad and reported links with extremists,' additionally noting that '[t]he cable referred**

to the charity's listing, in March 2008, as a 'priority III terrorism support entity (TSE) by the Interagency Intelligence Committee on Terrorism (IICT).'"

60.     QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 60, and therefore denies those allegations on that basis.  By way of further response, QNB respectfully refers the Court to the source cited in the footnote by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**61.     At all times relevant to this Complaint, the chairman of the Qatar Charity board has been Hamad bin Nasser al-Thani, a member of the Qatari Royal Family, former Minister of State, Minister of Interior Affairs, and General Secretary of the Ruling Family Affairs Council.  The vice chairman is Ahmad Abdulla S G Al-Marri, former Minister of Endowments and Islamic Affairs, Adviser to the Emir of Qatar.  Other board members include Mohamed Abdelwahed Al Hammadi, Minister of Education and Higher Education and Secretary-General of the Supreme Education Council, Yousef bin Ahmed Al Kuwari, member of the Shura Council (one of two main branches of Qatar's legislative body), and Mohamed Nasser M A. Al Hajri, Director of Economic and Political Affairs for the Emir of Qatar's Diwan (administrative office of the Emir).**

61.     QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 61, and therefore denies those allegations on that basis.

## THE FACTUAL BASES FOR PLAINTIFFS' CLAIMS

I.     **THE CONSPIRACY AMONG QATAR, DEFENDANTS, AND THE MUSLIN BROTHERHOOD TO FUND ISIS AND ITS PREDECESSOR ORGANIZATIONS IN CIRCUMVENTION OF U.S. AND INTERNATIONAL SANCTIONS**

A.     **ISIS**

**62.     ISIS is a U.S.-designated FTO whose predecessor organization was designated in 2004 under the name al Qaeda in Iraq (AQI).**

62.     QNB admits that ISIS is a US-designated FTO but lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 62, and therefore denies those allegations on that basis.  By way of further response, QNB respectfully

refers the Court to the source cited in the footnote by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**63.     In 2004, following the U.S.-led invasion of Iraq, AQI, led by Zarqawi, became a leading force in the anti-American insurgency and sectarian war.   AQI distinguished itself through its military effectiveness, brutality against rival Sunni factions, gruesome murders of Shiite civilians, and its communications wing which televised many of its most notorious and spectacular acts of terrorism against Westerners and U.S. citizens.**

63.     QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 63, and therefore denies those allegations on that basis.

**64.     AQI's methods caused a backlash within Sunni enclaves, which formed militia groups that often cooperated with U.S. forces against AQI.   AQI eventually lost the support of al-Qaeda "central" and became stigmatized within the Iraqi insurgency and the Sunni community.**

64.     QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 64, and therefore denies those allegations on that basis.

**65.     Following its loss of influence in Iraq, in January 2006, AQI merged with several terrorist groups to create the Mujahadeen Shura Council. In June 2006, Zarqawi was killed by U.S. forces in Hibhib, Iraq.**

65.     QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 65, and therefore denies those allegations on that basis.

**66.     In October 2006, the Mujahadeen Shura Council proclaimed the formation of the Islamic State of Iraq ("ISI"), under the leadership of Abu Ayyub al-Masri and Abu Adullah al-Rashid al-Baghdadi.   In April 2010, Abu Ayyub al-Masri and Abu Adullah al-Rashid al-Baghdadi were killed in a joint U.S.-Iraqi operation, and Abu Bakr al-Baghdadi ("al-Baghdadi") took over leadership of ISI.   In April 2013, having merged with the Al Nusra Front and expanded into Syria, ISI adopted the name Islamic State of Iraq and the Levant ("ISIL"), also widely known as "ISIS" and "Daesh."**

66.     QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 66, and therefore denies those allegations on that basis.

**B.     The Muslim Brotherhood**

**67.    The Muslim Brotherhood is a transnational Sunni Islamist organization founded in Egypt in 1928.  The group rose to new heights of influence during the Arab Spring, starting in 2011, when it coopted various anti-government movements within the Arab world in support of its goal of creating a global Islamic state under its own control.**

67.    QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 67, and therefore denies those allegations on that basis.

**68.    The Muslim Brotherhood participated in the conspiracy described in this Complaint in furtherance of this goal, specifically, in the hopes of destabilizing Syria enough that an Islamic state might arise, subject to its own influence.**

68.    QNB denies any allegation, express or implied, of having knowledge of, providing support to, or participating in the purported conspiracy alleged in Paragraph 68. The remaining allegations of Paragraph 68 consist of generalized characterizations in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**69.    The Muslim Brotherhood maintains close ties with Qatar and its Royal Family including all times relevant to this Complaint.**

69.    QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 69, and therefore denies those allegations on that basis.

**70.    Though he has eschewed formal titles, Yusuf al Qaradawi is the undisputed spiritual leader of the Muslim Brotherhood.  According to Matthew Levitt, a former counterterrorism official at the FBI, Qaradawi is "one of the most popular figures in the extremist wing of the Muslim Brotherhood."**

70.    QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 70, and therefore denies those allegations on that basis.  By way of further response, QNB respectfully refers the Court to the source cited in the footnote by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

71.     The Qatari Royal Family, the al Thanis, have allowed Qaradawi to live in Qatar since 1961, and even granted him a diplomatic passport. According to then-U.S. Ambassador to Qatar, Chase Untermeyer:

> [Qaradawi] developed strong ties with Qatari leadership that continue to today.  He was granted Qatari citizenship in 1968 by Sheikh Khalifa bin Hamad Al Thani who was then Heir Apparent.  Qaradawi has been granted other favors by the Qatari government; in particular, he was given substantial properties including villas, which he rents, and the building which houses the Ruling Family Council, an organization of the Al Thani family.  We have no figures on Qaradawi's income, but it is substantial.

71.     QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 71, and therefore denies those allegations on that basis.  By way of further response, QNB respectfully refers the Court to the sources cited in the footnotes by Plaintiffs for their full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

72.     Al-Qaradawi's influence as a leader in Qatar's religious, media, education, financial and charitable sectors is enhanced by his position as a close friend and confidante of the Qatari Royal Family.

72.     QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 72, and therefore denies those allegations on that basis.

73.     Indeed, Ambassador Untermeyer wrote in a 2005 State Department cable that Al-Qaradawi is "the one Islamic thinker in Qatar who matters.  The others are distant also-rans."

73.     QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 73, and therefore denies those allegations on that basis.  By way of further response, QNB respectfully refers the Court to the source cited in the footnote by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

74.      **Al-Qaradawi's status in Qatar is demonstrated by the fact that, at both the 2017 and 2018 Ramadan banquets hosted by Qatar's Emir, Sheikh Tamim bin Hamad Al-Thani, Qaradawi was seated next to the Emir. At those public holiday celebrations, Al-Qaradawi was seen chatting cordially with the Emir, who embraced Qaradawi and kissed him on his forehead.**

74.      QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 74, and therefore denies those allegations on that basis.

75.      **QNB has endeavored to capitalize upon its relationship with Al-Qaradawi by placing him on the bank's Sharia Advisory Board. QNB maintains such close ties to Al-Qaradawi that he performed the ribbon-cutting at the opening of QNB's Islamic banking division.**

75.      QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 75, and therefore denies those allegations on that basis.

76.      **QNB has endeavored to capitalize upon its relationship with Al-Qaradawi by placing him on the bank's Sharia Advisory Board. QNB maintains such close ties to Al-Qaradawi that he performed the ribbon-cutting at the opening of QNB's Islamic banking division.**

76.      QNB admits that Yousef Al Qaradawi served on its Sharia Advisory Board but notes further that he resigned from that board in 2010. QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegation that Yousef Al Qaradawi performed the ribbon-cutting at the opening of QNB's Islamic banking division. QNB denies remaining allegations in Paragraph 76.

C.      **The Conspiracy to Provide Funding to ISIS by Creating a Money Laundering Nexus in Turkey for the Purpose of Destabilizing Syria**

77.      **Beginning in 2011, the Qatari Government and Royal Family conspired with Defendants, Turkish intelligence services, and the Muslim Brotherhood to move money from Qatar in the form of U.S. dollars to ISIS' predecessor organizations, then later to ISIS, ISIS' operatives, and ISIS front organizations.**

77.      QNB denies any allegation, express or implied, of having knowledge of, providing support to, or participating in the purported conspiracy alleged in Paragraph 77. QNB further

26

denies that it has any reason to believe, based on information available to it, that the "Qatari Government and Royal Family conspired with Defendants, Turkish intelligence services, and the Muslim Brotherhood to move money from Qatar in the form of U.S. dollars to ISIS' predecessor organizations, then later to ISIS, ISIS' operatives, and ISIS front organizations," and on that basis denies the allegations.

**78.      The purpose of this conspiracy was to establish an Islamic state in Syria and to destabilize Syria's Assad Regime.  Specifically, Qatar and Turkey wished to undermine their regional rival, the Assad Regime. Defendants, whose boards and management are controlled by Qatari Royal Family members and government officials, and who are regulated by the Qatari government, shared Qatar's objectives.  The Muslim Brotherhood wished to sow chaos in Syria such that it could create an Islamic state in Syria under its own control.  Members of the conspiracy agreed to cooperatively pursue their shared and individual objectives through financial support of terrorist groups operating in Syria.**

78.      QNB denies any allegation, express or implied, that QNB had knowledge of, provided support to, or participated in the purported conspiracy alleged in Paragraph 78. QNB further responds that the allegations in Paragraph 78 that it is controlled by members of the Qatari Royal Family and Qatari government officials amount to legal conclusions that require no response or are so vague and ambiguous that QNB cannot reasonably prepare a response, and therefore denies those allegations on that basis.  To the extent a response is required, QNB denies those allegations.  QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 78, and therefore denies those allegations on that basis.

**79.      The co-conspirators, at all times relevant to this Complaint, knew that the taking of Western, particularly American, hostages increased the notoriety, power, wealth, and recruiting power of ISIS and its predecessor organizations, and therefore furthered the goals of the conspiracy described in this Complaint.**

79.     QNB denies any allegation, express or implied, that QNB had knowledge of, provided support to, or participated in the purported conspiracy alleged in Paragraph 79.  QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 79, and therefore denies those allegations on that basis.

**80.     As the U.S. District Court for the District of Columbia found, material support for ISIS and its predecessor organizations as early as 2011 foreseeably increased the likelihood that Americans would be tortured and beheaded in the exact manner ISIS killed Steven Sotloff:**

> **the Zarqawi organization routinely kidnapped, tortured, and beheaded Americans and journalists in strikingly similar fashion.  ISIS in Iraq had even "captured Americans; put them in orange jumpsuits of a kind that Mr. Sotloff and Mr. Foley were forced to wear; [ ] tortured them; and then [ ] beheaded them on camera." Thus, 'it was very foreseeable that it might happen again.'"**

80.     QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 80, and therefore denies those allegations on that basis.  By way of further response, QNB respectfully refers the Court to the source cited in the footnote by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**81.     The co-conspirators, prior to the acts of terror finance complained of herein, knew or should have known that ISIS had at the time taken a number of American hostages, including Steven Sotloff, and that ISIS was threatening to kill Mr. Sotloff in order to extract political concessions from Syria and the United States that would strengthen ISIS and would further destabilize Syria.**

81.     QNB denies any allegation, express or implied, of having knowledge of, providing support to, or participating in the purported conspiracy alleged in Paragraph 81.  QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 81, and therefore denies those allegations on that basis.

**82.     All co-conspirators knew or should have known that U.S. dollars are the currency of choice and lifeblood of terrorist organizations as they are necessary to purchase material and illicit services upon which terrorist organizations such as ISIS rely.**

82.     QNB denies any allegation, express or implied, that QNB had knowledge of, provided support to, or participated in the purported conspiracy alleged in Paragraph 82.  QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 82, and therefore denies those allegations on that basis.

**83.     Accordingly, Defendants knew or should have known that their financial support of ISIS its operatives, its predecessor organizations, and front organizations, in particular their provision of U.S. dollars, would strengthen that organization's ability to capture, torture, and kill Western hostages such as Steven Sotloff, and that this result would further the objectives of their co-conspirators, chaos in Syria.**

83.     QNB denies any allegation, express or implied, that QNB had knowledge of, provided support to, or participated in the purported conspiracy alleged in Paragraph 83. QNB further denies providing any financial support to ISIS or its operatives, predecessor organizations, or front organizations.  QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 83, and therefore denies those allegations on that basis.

**84.     Defendants also knew or should have known that their conduct would expose them to massive civil liability in the United States.**

84.     The allegations of Paragraph 84 consist of legal conclusions that require no response.  To the extent a response is required, QNB denies the allegations of Paragraph 84.

**85.     At the time of their conspiracy, all co-conspirators knew of high-profile U.S. litigation against the Arab Bank, one of the largest financial institutions in the Middle East and a major economic engine in Jordan. Hundreds of American victims of acts of Hamas terrorism during the Second Intifada sued the Arab Bank in 2003 based upon the use of its correspondent account in New York to transform various currencies into U.S. dollars for transmission back to the Middle East.**

29

85.     QNB denies any allegation, express or implied, that QNB had knowledge of, provided support to, or participated in the purported conspiracy alleged in Paragraph 85.  QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 85, and therefore denies those allegations on that basis.  By way of further response, QNB respectfully refers the Court to the pleadings filed in the U.S. litigation referenced by Plaintiffs for their full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**86.     As a direct result of that filing, the Federal Office of the Comptroller of the Currency ("OCC") and Financial Crimes Enforcement Network ("FinCEN") investigated the Bank's then-operating New York branch for failing to monitor and report suspected terror financing and in February 2005, the regulators fined the Bank $24 million and forced it to convert its New York branch into an agency that could no longer clear U.S. dollars.**

86.     QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 86, and therefore denies those allegations on that basis.

**87.     In July 2008, Israel's Defense Minister signed an order banning Qatar Charity (then known as the Qatar Charitable Society) and certain other organizations, from operating in the territories administered by the Palestinian Authority because Qatar Charity was a front for terror finance.**

87.     QNB admits that Israel made an order and designation related to Qatar Charity. By way of further response, QNB respectfully refers the Court to the Israeli order referenced by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto. QNB further denies that it has any reason to believe, based on information available to it, that Qatar Charity was a "front for terror finance," and therefore denies those allegations on that basis. QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 87, and therefore denies those allegations on that basis.

**88.      Israel also expressly warned all world banking and financial institutions to "prepare accordingly and act with caution [i.e. to stop banking for Qatar Charity] in order to avoid criminal actions and civil lawsuits by victims of terrorism, such as that against the Arab Bank, in the U.S.".**

88.      QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 88, and therefore denies those allegations on that basis.  By way of further response, QNB respectfully refers the Court to the Israeli order referenced by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**89.      ISIS took American hostages to strengthen itself through several mechanisms:**

> **a. Tightening ISIS' control over prisoners and populations under its rule through fear;**
>
> **b. Increasing the pressure on the United States to negotiate, in particular to cease military operations in the region;**
>
> **c. Demoralizing the United States population; and**
>
> **d. Increasing ISIS' profile among potential recruits and financial supporters through the online publication of the executions as gruesome propaganda videos.**
>
> **e. The capacity of ISIS to take American hostages and use them effectively for propaganda purposes, as well demonstrated by the brutal track records of its predecessor organizations, made them an attractive target for Defendant's terror finance conspiracy.**

89.      Upon information and belief, QNB admits that ISIS took American hostages, but denies knowing for what purpose.  QNB denies any allegation, express or implied, of having knowledge of, providing support to, or participating in the purported conspiracy alleged in Paragraph 89. QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 89 (including subparagraphs (a) – (e)), and therefore denies those allegations on that basis.

**90.     From 2011-2013 a number of high-ranking Qatari politicians and members of the Royal Family visited Turkey to meet with groups that opposed the Assad regime in Syria.**

90.     QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 90, and therefore denies those allegations on that basis.

**91.     During one or more of these visits, then Prime Minister and Foreign Minister Hamad bin Jassim al Thani declared his intention to finance the Muslim Brotherhood's strategy of destabilizing Syria through the funding of radical militant groups such as ISIS and its predecessors.**

91.     QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 91, and therefore denies those allegations on that basis.

**92.     Between 2011 and 2013, U.S. dollar-denominated funds were withdrawn from QNB accounts and/or wired from QNB accounts to accounts at Ziraat Bank, a state-owned Turkish bank, then withdrawn to fund numerous conferences held in Turkey at which funds were distributed to ISIS predecessor organizations and then later to ISIS itself, its operatives, and front organizations.**

92.     QNB denies that it has any reason to believe, based on information available to it, that "[b]etween 2011 and 2013, U.S. dollar-denominated funds were withdrawn from QNB accounts and/or wired from QNB accounts to accounts at Ziraat Bank, a state-owned Turkish bank, then withdrawn to fund numerous conferences held in Turkey at which funds were distributed to ISIS predecessor organizations and then later to ISIS itself, its operatives, and front organizations," and on that basis denies the allegations of Paragraph 92.

**93.     For example, in 2011 and 2012, Hamad bin Jassim al Thani, Sheikh Tamim bin Hamad Al Thani (the brother-in-law of the Emir of Qatar), and Abdul Hadi Manna al Hajri ("al Hajri") (a leading Qatari businessman), made multiple visits to Turkey to conduct meeting at which they discussed military plans with, and provided cash payments to, Islamic brigades that swore allegiance to the Islamic State or the Al-Nusra Front.**

93.     QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 93, and therefore denies those allegations on that basis.

**94.     They were accompanied by officers in the Qatari and Turkish intelligence services, including Abd al-Salam al-Mashiri ("Abu Abdullah"), who was a senior member of the external Qatari intelligence service and a security advisor to the Emir of Qatar.**

94.     QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 94, and therefore denies those allegations on that basis.

**95.     Abu Abdullah supervised Qatar's interests in the formation and funding of Syrian jihadist brigades.**

95.     QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 95, and therefore denies those allegations on that basis.

**96.     In September 2011, a meeting was held at a hotel in Ankara Turkey that was attended by, *inter alia*:**

**a. Qatari Prime Minister and Foreign Minister Hamad bin Jassim;**

**b. Former Lebanese Prime Minister Saad Hariri;**

**c. Lebanese politician Oqab Saqer;**

**d. Several military leaders of the Muslim Brotherhood who swore allegiance to the Islamic State and to Al Qaeda;**

**e. Mamoun Kanaan, an al-Qaeda leader from Iraq operating under the nom de guerre "Abu al-Hamam al-Dulaimi";**

**f. Hassan Abboud, one of the founders of Ahrar al-Sham, who worked with the Islamic State;**

**g. Qatari terror financier Abd al-Rahman bin 'Umayr al-Nu'aymi ("Sheik Nu'aymi"), who was designated as a terrorist by the U.S. Treasury in 2013 for his support of ISIS precursor AQI; and**

**h. Maher al-Nu'aymi, a relative of Sheik Nu'aymi and terrorist brigade commander in Homs.**

96.     QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 96 (including subparagraphs (a) – (h)), and therefore denies those allegations on that basis.

33

**97.    At the meeting, Hamad bin Jassim shook hands with all the attendees, and met with Sheik Nu'aymi privately.  The leader of each terror group submitted to Saqer a CV and funding request.  The following day, Hammad bin Jassim returned and told the representatives of the terrorist organizations that all funding requests had been approved.  Hammad bin Jassim then left and suitcases of cash were distributed to the terror group leaders.**

97.    QNB lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations of Paragraph 97, and therefore denies those allegations on that basis.

**98.    Another such conference was held in July 2012 at a hotel in Istanbul and at a large villa on the Bosphorus purchased by Abdul Hadi Manna al Hajri, brother-in-law of the Emir of Qatar, Sheikh Tamim bin Hamad Al Thani.  Al Hajri attended the meeting along with, inter alia, 11 leaders of Syrian terrorist groups swearing allegiance to ISIS and/or its precursor groups.  Al Hajri had reported a purchase price on the villa of €100 million, but the actual price was €75 million.  The difference was distributed to the 11 leaders, who each received between $2 million and $3 million in cash.**

98.    QNB lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations of Paragraph 98, and therefore denies those allegations on that basis.

**99.    Over time, Qatari funding for terrorist groups in Syria became regularized, like a venture capital business.  Terrorists would approach the Muslim Brotherhood with proposals to carry out various acts of violence or destabilization in Syria.  The Muslim Brotherhood would vet the terrorists, and Qatar would fund any approved groups or "projects."**

99.    QNB lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations of Paragraph 99, and therefore denies those allegations on that basis.

**100.    While initially there was no reliable means of laundering millions of U.S. dollars in cash, Qatar, Turkish intelligence officers, the Muslim Brotherhood, and Defendants conspired to set up a reliable money-laundering organization.  Turkish intelligence set up a fraudulent charity at the Turkish state-owned bank, Ziraat Bank, and provided all account details to the Qatari government.  The Qatari government, in turn, provided the account details to Qatar Charity, which initially wired 2 million USD into the account.  Turkish intelligence required that a certain amount of the funds be used to purchase actual medical supplies as a cover, but the remainder was used to purchase weapons in Libya that the Muslim Brotherhood transferred to warehouses in Syria and distributed to ISIS precursor groups.**

100.     QNB denies any allegation, express or implied, that QNB had knowledge of, provided support to, or participated in the purported conspiracy alleged in Paragraph 100.  QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 100, and therefore denies those allegations on that basis.

**101.     Most, if not all, of the dollars that ISIS, its operatives, its predecessor organizations, and front organizations received pursuant to the Defendants' conspiracy were transferred from Qatar National Bank to Ziraat Bank in Turkey.  In 2011 and 2012, operatives of ISIS predecessor organizations and affiliates would be accompanied to Ziraat Bank branches by Muslim Brotherhood members multiple times per week to withdraw USD in cash, which they would transport by the kilogram in cardboard boxes across the border into Syria.  These funds were used for the purpose of funding ISIS activities such as the abduction, torture, and beheading of Steven Sotloff.**

101.     QNB denies any allegation, express or implied, that QNB had knowledge of, provided support to, or participated in the purported conspiracy alleged in Paragraph 101.  QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 101, and therefore denies those allegations on that basis.

**102.     In carrying out these dollar-denominated wires from Qatar to Turkey for the benefit of ISIS predecessor organizations (which ultimately benefited ISIS itself) and later ISIS, the funds necessarily passed through QNB's correspondent accounts at banks in New York.**

102.     QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 102, and therefore denies those allegations on that basis.

**D.     Qatar Charity and QNB Made a USD 800,000 Wire Payment to the ISIS Judge that Would Order the Executions of James Foley and Steven Sotloff Less Than a Year Later**

**103.     On March 19, 2013, the Daily Star Lebanon published the following quote by "Fadel al-Salim, a lawyer who is close to the Nusra Front":**

**We are working to re-establish the Islamic caliphate in Syria, and we have informed [Syrian National Council head] Moaz al-Khatib that we**

**will not accept the building of a civil state in Syria.  We control the ground and will rule by Islamic law.**

103.     QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 103, and therefore denies those allegations on that basis.  By way of further response, QNB respectfully refers the Court to the source cited in the footnote by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**104.     The article goes on to note that both Turkey and Qatar "share[] an ideological grounding with the Muslim Brotherhood's militias [such as the Nusra Front] . . . and its vision of a future Syria."**

104.     QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 104, and therefore denies those allegations on that basis.  By way of further response, QNB respectfully refers the Court to the source cited in the footnote by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**105.     As of December 11, 2012, the United States Department of State had already designated Al Nusra as an FTO in recognition of the fact that it was an "alias" of AQI, led by the same terrorists, that had claimed nearly 600 attacks, seeking to "hijack the struggles of the Syrian people for its own malign purposes."**

105.     Upon information and belief, QNB admits that Al Nusra is a U.S.-designated FTO. QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 105, and therefore denies those allegations on that basis.  By way of further response, QNB respectfully refers the Court to the source cited in the footnote by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**106.     On October 16, 2013, at 11:25 AM, QNB wired USD 800,000 to Fadhel al Salim ("al Salim") at his account at Ziraat Bank (account no. ending in XXXX013) via its correspondent account in the U.S.**

106.     QNB denies the allegations of Paragraph 106.

**107.     Less than a year later, al Salim would, in his capacity as an ISIS judge, order the execution of ISIS captive Steven Sotloff.**

107.     QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 107, and therefore denies those allegations on that basis.

**108.     Fadhel al Salim waited at a Muslim Brotherhood office for the arrival of a wire confirmation.  Upon arrival of the confirmation, he was escorted to the Fatih Branch of Ziraat Bank in Istanbul by Muslim Brotherhood members and Turkish intelligence officers, whereupon he withdrew the USD 800,000 in cash.**

108.     QNB denies the allegations of Paragraph 108 to the extent that Plaintiffs purport that Fadhel al Salim withdrew from Ziraat Bank $800,000 that was wired from QNB.  QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 108, and therefore denies those allegations on that basis.

**109.     Al Salim signed (and marked with his thumbprint) a copy of the wire confirmation printout with a handwritten statement acknowledging receipt of USD 800,000 from "Mr. Jassem Abdullah, representative of Qatar Charity."**

109.     QNB denies the allegations of Paragraph 109 to the extent that Plaintiffs purport that Fadhel al Salim withdrew from Ziraat Bank $800,000 that was wired from QNB. QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 109, and therefore denies those allegations on that basis.

**110.     The dollars were then taken to al Salim's apartment, where $50,000 was given to the Muslim Brotherhood, and the remaining $750,000 was packed into cardboard boxes and duffel bags.**

110.     QNB denies the allegations of Paragraph 110 to the extent that Plaintiffs purport that money described in this paragraph was wired from QNB. QNB lacks knowledge or

information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 110, and therefore denies those allegations on that basis.

**111.    Members    of    the    Muslim    Brotherhood    stated contemporaneously that all parties to the conspiracy were aware that the money was originally and ultimately intended for ISIS.**

111.    QNB denies any allegation, express or implied, that QNB had knowledge of, provided support to, or participated in the purported conspiracy alleged in Paragraph 111. QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 111, and therefore denies those allegations on that basis.

**112.    Within 24 hours, Al Salim crossed the Turkish-Syrian border and arrived in al Hasakah with the dollars, where he proceeded to found and organize a brigade of Islamic State fighters under the nom de guerre Abu al Mughira al-Hashemi, and to become a Sharia Judge under the Islamic State in at the Islamic Court in Ash Shaddadi, a town in southern al Hasakah.**

112.    QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 112, and therefore denies those allegations on that basis.

**E.    QNB Provided Qatar Charity and the Other Co-Conspirators with Access to the U.S. Financial System**

**113.    In furtherance of Defendants' conspiracy to provide the USD that ISIS, its operatives, its predecessor organizations, and front organizations needed to conduct their terrorist operations, QNB utilized the U.S. financial system to move Qatar Charity funds into the hands of terrorists in Turkey who would carry it across the border into Syria.**

113.    QNB denies any allegation, express or implied, that QNB had knowledge of, provided support to, or participated in the purported conspiracy alleged in Paragraph 113. The remaining allegations of Paragraph 113 consist of legal conclusions that require no response. To the extent a response is required, QNB denies the allegations of Paragraph 113.

**114.    QNB had no U.S. branch or office.  As a result, it arranged with banking institutions that maintained offices located in the United States to conduct "correspondent banking" transactions that allowed QNB to move USD through the international banking system.**

114.    QNB denies the allegations of Paragraph 114 as pleaded, but admits that QNB has no U.S. branch or office, and maintains correspondent banking relationships with institutions in the U.S.

**115.    A correspondent bank is a financial institution that creates and maintains accounts for other financial institutions.  The account holder uses the account with the correspondent bank to make deposits and payments and to engage in other financial transactions, particularly those requiring currency translation.**

115.    The allegations in this Paragraph consist of generalized characterizations about correspondent banks in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**116.    Correspondent banks can act as intermediaries between banks in different countries or as an agent to process local transactions for clients of the account holder when they are traveling abroad.  At the local level, correspondent banks can accept deposits, process documentation, and serve as transfer agents for funds.**

116.    The allegations in this Paragraph consist of generalized characterizations about correspondent banks in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**117.    The ability of correspondent banks to provide these services relieves foreign banks of the need to establish a physical presence in other jurisdictions, such as the U.S.**

117.    The allegations in this Paragraph consist of generalized characterizations about correspondent banks in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**118.    Foreign banks often use correspondent banks in the U.S. to access the U.S. financial system and to conduct USD transactions.  Frequently, those transactions involve the exchange of currencies or transfers made in currencies other than the account holder's home currency.**

118.    The allegations in this Paragraph consist of generalized characterizations about correspondent banks in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**119.    QNB used its correspondent banking relationships in the United States to process USD transactions for Qatar Charity. As a result, those relationships allowed Qatar Charity to access USD and to distribute those dollars to ISIS, its operatives, its predecessor organizations, and front organizations.**

119.    QNB admits that it has occasionally used its correspondent banking relationship in the United States to process USD transactions for Qatar Charity. QNB denies that it has any reason to believe, based on information available to it, that QNB's correspondent "relationships allowed Qatar Charity . . . to distribute those dollars to ISIS, its operatives, its predecessor organizations, and front organizations," and on that basis denies the allegation. QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 119, and therefore denies those allegations on that basis.

**120.    USD were a coveted currency in the world of terror finance during the time period relevant to this action.**

120.    QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 120, and therefore denies those allegations on that basis.

**121.    Qatar Charity and ISIS, its operatives, its predecessor organizations, and front organizations could not have obtained those USD without QNB's participation in Defendants' terrorist funding scheme. Reputable international banking institutions would not have passed USD through the American banking system on behalf of an entity such as Qatar Charity, which was a known supporter of terrorism.**

121.    QNB denies any allegation, express or implied, that QNB had knowledge of, provided support to, or participated in any terrorist funding scheme alleged in Paragraph 121. QNB also denies that it has any reason to believe, based on information available to it, that Qatar Charity was a known supporter of terrorism, and on that basis denies the allegation.  QNB lacks knowledge

or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 121, and therefore denies those allegations on that basis.

**122.    Payments denominated in USD using electronic funds transfer, regardless of origin and ultimate destination, are virtually all processed through a U.S. bank in New York.**

122.    QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 122, and therefore denies those allegations on that basis.

**123.    CHIPS, a private payment clearing system located in the New York, is the predominant wire payment system utilized to this day for international wires/payments in USD.  CHIPS settlements are ultimately resolved between U.S. banks using the Fedwire, a real-time gross payment settlement system administered by the U.S. Federal Reserve.**

123.    QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 123, and therefore denies those allegations on that basis.

**124.    Foreign Banks with no physical U.S. presence, like QNB, cannot directly participate in either CHIPS or Fedwire.  Accordingly, non-U.S. banks access CHIPS or Fedwire through correspondent bank accounts, which are accounts in U.S. banks held in the name of foreign financial institutions.**

124.    QNB admits it does not participate directly in CHIPS or Fedwire. The remaining allegations in this Paragraph consist of generalized characterizations about correspondent banks in support of Plaintiffs' legal theories which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**125.    A multinational commercial bank like QNB certainly understood that in transferring dollar-denominated funds from the account of Qatar Charity in Doha to the account of Fadel al Salim at Ziraat Bank in Turkey (among other dollar-denominated transactions described herein), those USD would necessarily clear and settle through a U.S.-based correspondent financial institution.  Indeed, QNB advertises on its website that it holds U.S. correspondent bank accounts at the Bank of New York Mellon, JP Morgan Chase Bank NA, Wells Fargo Bank NA, Standard Charted Bank (New York), and Citibank NA.  The purpose of these accounts is to allow QNB customers such as Qatar Charity to access the U.S. financial markets for dollar clearing.**

125.     QNB admits that, on July 14, 2023, the web page referenced in Paragraph 125 lists correspondent bank accounts at Bank of New York Mellon, JP Morgan Chase Bank NA, Wells Fargo Bank NA, Standard Charted Bank (New York), and Citibank NA, but notes that QNB FinansBank is a separate subsidiary of QNB that was acquired by QNB in 2016, after the events of 2013 and 2014 alleged in the Complaint.   QNB further admits that a transfer of dollar-denominated funds from an account in Qatar to a bank account in another country would often clear through a U.S.-based correspondent financial institution.   QNB denies it made any transfers to the account of Fadel al Salim at Ziraat Bank in Turkey.   QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 125, and therefore denies those allegations on that basis.

**126.     At the time Defendants participated in their conspiracy to pass USD to ISIS, its operatives, its predecessor organizations, and front organizations, Defendants knew or should have known that ISIS and its predecessors regularly targeted U.S. nationals for abductions, executions and other forms of terrorist attacks.   Indeed, during the conspiracy, Steven Sotloff was already a hostage of ISIS, which was threatening to kill him in order to affect U.S. and Syrian public policy.**

126.     QNB denies any allegation, express or implied, that QNB had knowledge of, provided support to, or participated in the purported conspiracy alleged in Paragraph 126. QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 126, and therefore denies those allegations on that basis.

**127.     Without the support that QNB provided through the conspiracy, ISIS would not have been able to abduct, torture, and kill Steven Sotloff.**

127.     QNB denies any allegation, express or implied, that QNB had knowledge of, provided support to, or participated in the purported conspiracy alleged in Paragraph 127. QNB denies the remaining allegations of Paragraph 127.

**F.     The Anti-Terrorism Protections QNB Employed Bolstered Its Knowledge of Qatar Charity's Funding of Terrorism**

**128.   Like other international banks, QNB had to implement and employ anti-money laundering ("AML"), counter-terrorism financing ("CTF"), know-your-customer ("KYC"), and other due diligence requirements designed to prevent precisely the type of illicit activity that caused the abduction, torture, and death of Steven Sotloff.**

128.   QNB admits that it implements and employs AML, CTF, KYC, and other due diligence requirement to prevent illicit activities. QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 128, and therefore denies those allegations on that basis.

**129.   Among other sources, those rules were provided by the banking law of Qatar and the U.S., as well as the CTF, AML, KYC, and customer due diligence procedures that QNB purportedly maintained and that international banking standards imposed at all relevant times.**

129.   The allegations in this Paragraph consist of generalized characterizations about CTF, AML and KYC diligence requirements in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**130.   Qatari AML and CTF laws, like U.S., European Union, and international law, prohibit collecting funds to support terrorism and require banks to implement procedures to combat the financing of terrorism.**

130.   The allegations in this Paragraph consist of generalized characterizations about AML and CTF laws in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**131.   In addition, multiple internationally recognized banking organizations have published guidelines designed to guide best practices by financial institutions and to prevent them from becoming entangled with terrorist organizations or facilitating the flow of money to those illicit entities.**

131.   The allegations in this Paragraph consist of generalized characterizations in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**132.    Those international standards provided QNB with well-accepted guidance regarding the AML, CTF, KYC & due diligence procedures the banks should employ to prevent the illicit use of their services by terrorist groups, individual terrorists, and their sympathizers.**

132.    The allegations in this Paragraph consist of generalized characterizations about AML, CTF, KYC, and diligence procedures in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**133.    International AML and CTF standards are published by three broad categories of organizations: (a) those concerned primarily with financial/supervisory matters, including the Basel Committee of Banking Supervision (the "Basel Committee"); (b) those concerned with financial/supervisory and legal/criminal enforcement matters, including the Financial Action Task Force ("FATF"), the United Nations, the Council of Europe, and the European Union; and (c) those primarily concerned with legal/criminal enforcement matters, including the Egmont Group of Financial Intelligence Units.**

133.    The allegations in this Paragraph consist of generalized characterizations about international CTF and AML standards in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**134.    In addition, the Wolfsberg Group is an association of global banks that has published guidelines based on its understanding of international standards, as well as the member banks' own policies and procedures for KYC, AML and CTF functions.**

134.    The allegations in this Paragraph consist of generalized characterizations about KYC, AML and CTF functions in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**135.    The leading authorities that international banks follow to strengthen their AML and CTF policies include: FATF's International Standards on Combating Money Laundering and the Financing of Terrorism & Proliferation; the Wolfsberg Anti-Money Laundering Principles for Private Banking; and the Basel Committee's Anti-Money Laundering principles.**

44

135.    The allegations in this Paragraph consist of generalized characterizations about AML and CTF policies in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**136.    Those internationally recognized standards obligate banks to adopt a risk-based approach to evaluate prospective customers, to monitor those customers on an ongoing basis, and to systematically monitor funds flowing into and out of their institutions.**

136.    The allegations in this Paragraph consist of generalized characterizations about AML and CTF standards in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**137.    The risk-based approach that banks employ involves both customer-specific due diligence and systems-wide transaction monitoring. The level of due diligence applied to a customer is based on the customer's risk profile.**

137.    The allegations in this Paragraph consist of generalized characterizations about due diligence standards in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**138.    In evaluating the level of risk presented by a customer, banks do not look to any single indicator.**

138.    The allegations in this Paragraph consist of generalized characterizations about due diligence standards in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**139.    Rather, risk assessment evaluates customers, accounts, and transactions against established criteria. Because banks are unable to check every transaction offline, they develop risk-profiles, applying relatively greater scrutiny to those customers and transactions that pose the greatest risk of unlawful activity.**

139.    The allegations in this Paragraph consist of generalized characterizations about due diligence standards in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**140.    The most commonly-used risk criteria are country risk, customer risk, and service risk.**

140.    The allegations in this Paragraph consist of generalized characterizations about due diligence standards in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**141.    Country risk is measured by the connection a customer or transaction may have to high-risk jurisdictions.  Relevant connections include any nexus between a high-risk jurisdiction and the funds involved in a transaction; the customer or its officers and directors; or the counterparties or financial institutions involved in a transaction.**

141.    The allegations in this Paragraph consist of generalized characterizations about due diligence standards in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**142.    High-risk jurisdictions include countries: (a) subject to sanctions, embargoes, or similar measures; (b) identified by the FATF as non-cooperative; (c) identified by credible sources as providing funding or support for terrorist activities; (d) where terrorism or other violent conflict is prevalent; and (e) identified by credible sources as having significant levels of corruption, drug trafficking or other criminal activity.**

142.    The allegations in this Paragraph consist of generalized characterizations about due diligence standards in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**143.    In addition, country risk includes the existence of unregulated charities and other unregulated not-for-profit organizations that do business with a bank's customers or are parties to transactions involving the bank.**

143.     The allegations in this Paragraph consist of generalized characterizations about due diligence standards in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**144.     Customer risk involves an assessment of, among other things, the nature of the customer and the business in which it engages.  Well-established corporations, for example present lower risks than unknown sole proprietorships, particularly where the latter are largely cash businesses.**

144.     The allegations in this Paragraph consist of generalized characterizations about due diligence standards in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**145.     Charities warrant additional scrutiny because criminal enterprises, including terrorist organizations, frequently exploit purported charitable organizations to gather and move funds.**

145.     The allegations in this Paragraph consist of generalized characterizations about due diligence standards in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**146.     Services risk relates to the kinds of banking services the customer anticipates or actually uses.  For example, wire transfers are considered a higher-risk service because they are a principal means used by criminal enterprises to move funds between and among persons, institutions, and countries.**

146.     The allegations in this Paragraph consist of generalized characterizations about due diligence standards in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**147.     While the occasional use of wire transfers alone may not give rise to suspicion, the number, frequency, origin, and destination of wire transfers are risk factors that banks must consider as part of their ongoing evaluation of persons and entities with whom they conduct business. Transactions involving the transfer of funds internationally or that involve some effort to render a participant anonymous to a bank present higher levels of service risk.**

47

147.    The allegations in this Paragraph consist of generalized characterizations about due diligence standards in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**148.    KYC standards are well-established risk-management rules that obligate banks to develop a clear and concise understanding of their customers and their businesses.**

148.    The allegations in this Paragraph consist of generalized characterizations about KYC standards in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**149.    Those standards constitute an integral element of both opening and maintaining bank accounts and customer relationships.**

149.    The allegations in this Paragraph consist of generalized characterizations about KYC standards in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**150.    Thus, KYC procedures are an ongoing process.  By gaining familiarity with their customers, and the kinds of services and account activity each customer might reasonably undertake, banks can uncover and prevent potential, actual or suspected unlawful activity.**

150.    The allegations in this Paragraph consist of generalized characterizations about KYC standards in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**151.    Standard banking industry practice calls for banks to begin applying KYC measures when they first establish a new customer relationship, typically when that new customer seeks to open an account.**

151.    The allegations in this Paragraph consist of generalized characterizations about KYC standards in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**152.    Standard KYC account opening procedures include: obtaining proper documentation of the customer's legal status (e.g., sole proprietorship, corporation, or charitable association); verifying the customer's name, address and other identifier information; obtaining identification documentation for the customer's officers and directors, at least with respect to those authorized to engage in banking transactions; gathering information on the customer's business, including its sources of funds, the kinds of services the customer will be using the bank for, and where the customer's funds will be going; and other information necessary to formulate a risk profile for that customer.**

152.    The allegations in this Paragraph consist of generalized characterizations about KYC standards in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**153.    In formulating a customer's risk profile, a bank must pay particular attention to the country risk posed by the customer or its officers and directors, i.e., the connections they may have with high-risk jurisdictions. Contacts with high-risk jurisdictions mandate closer scrutiny of the customer during the entire course of the business relationship.**

153.    The allegations in this Paragraph consist of generalized characterizations about KYC standards in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**154.    A bank's risk-management function includes the adoption of sound policies and procedures for determining expected or normal activity at account opening, as well as during the course of the relationship. Evaluating reasonably expected account activity against actual transactional activity is a critical aspect of customer due diligence. Account and transaction monitoring is the backbone of any AML or CTF compliance program.**

154.    The allegations in this Paragraph consist of generalized characterizations about risk management standards in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**155.    Banks constantly monitor their customers' accounts and transactions. The monitoring of transactions encompasses the entire spectrum of the money flow of wire transactions, particularly those involving the international transmission of funds. That monitoring includes gathering information concerning the originators and recipients of transactions because**

**a bank cannot effectively evaluate a transaction or transactional pattern by looking only at one side of the money flow.**

155.    The allegations in this Paragraph consist of generalized characterizations about risk management standards in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**156.    The purpose of this monitoring activity is to identify: (a) transactions that by their very nature are inherently suspect; (b) unusual transactions, i.e., transactions that do not have an obvious financial or legitimate purpose; and (c) suspicious transactions, i.e., transactions that may be considered inconsistent with the known and legitimate business of the customer or with the usual activity in the account in question.**

156.    The allegations in this Paragraph consist of generalized characterizations about risk management standards in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**157.    Transaction monitoring compares transactional information against identified risks.   Among other things, transaction monitoring compares account/transaction activity against the customer's profile, compares that activity to peer group data, measures the activity against established typologies, and highlights and investigates anomalous, unusual, or suspicious transactions.**

157.    The allegations in this Paragraph consist of generalized characterizations about risk management standards in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**158.    Customer due diligence also utilizes and references third-party information such as newspapers, internet data, and the information available in banks' internal databases to maintain an adequate understanding of banks' clients and the environment in which each client does business, including unusual political or terrorism-related factors operative in the countries connected to the client's transactions.**

158.    The allegations in this Paragraph consist of generalized characterizations about risk management standards in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

159.   **The need for this ongoing analysis is particularly acute when customers are connected with global hot spots or conflict zones, or otherwise have high risk profiles.**

159.   The allegations in this Paragraph consist of generalized characterizations about risk management standards in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

160.   **Like other international banks, the QNB maintain compliance departments, ostensibly to ensure that the bank complies with its AML, CTF, KYC, and other due diligence obligations.**

160.   QNB admits that it maintains a compliance department and that such department ensures QNB complies with its AML, CTF, KYC, and other due diligence obligations.  QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 160, and therefore denies those allegations on that basis.

161.   **To fulfill those obligations, banks—including the QNB—now use sophisticated software to monitor accounts and transactions, including products marketed by third parties expressly to fulfill banks' AML and CTF obligations.**

161.   QNB admits that it uses third-party AML and CTF software. QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 161, and therefore denies those allegations on that basis.

162.   **The vendors of those products constantly enhance them in response to changes in the legal environment, revisions to sanctions and embargo lists, and other relevant factors, such as increased terrorist activity in particular regions or among particular groups.**

162.   The allegations in this Paragraph consist of generalized characterizations about risk management standards in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

163.   **Banks employ two primary types of software in connection with AML and CTF compliance: (a) programs that monitor transaction trends and patterns and thus highlight potentially anomalous or suspicious activity; and**

**(b) filtering software that identifies potential matches to embargo and sanction lists by scanning fields such as the names of originators and beneficiaries.  The latter type of software is used to identify potentially suspicious parties and counterparties to transactions (i.e., those that match to lists).**

163.    The allegations in this Paragraph consist of generalized characterizations about AML and CTF compliance in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**164.    Banks, particularly those that operate in terrorism hot spots such as QNB, recognize that there have been numerous lists of terrorists and terrorist organizations in force since 1990, including those promulgated by Treasury's Office of Financial Assets Control ("OFAC"), the EU, the UN, and other states.**

164.    QNB admits that there are lists of terrorists and terrorist organizations, including lists promulgated by OFAC, the EU, and UN, and other states.  The remaining allegations of Paragraph 164 are so vague and ambiguous that QNB cannot reasonably prepare a response, and therefore denies those allegations on that basis.

**165.    International banks input these lists to their filtering software to maintain a consolidated filtering system for monitoring accounts and transactions.  As these lists are updated, the new information is loaded into the software as well.**

165.    The allegations in this Paragraph consist of generalized characterizations about risk management standards in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**166.    Bank compliance groups are responsible for researching and evaluating the transactions identified as suspicious by these systems.  The compliance groups' role is critical because software systems simply scan data that, due to transactional volumes, the complexity of account activity, and the increasingly extensive nature of embargo lists, cannot be analyzed manually.**

166.    The allegations in this Paragraph consist of generalized characterizations about bank compliance groups' roles and responsibilities in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**167.   The AML compliance function thus includes reviewing and researching the "hits" generated by compliance software, whether for anomalous activity or for identification of a name that matches one found on an embargo list (or both) and evaluating that information in light of the ongoing customer due diligence associated with the account in question.**

167.   The allegations in this Paragraph consist of generalized characterizations about AML compliance in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**168.   The steps that banks' compliance departments take in response to the hits generated by compliance software are therefore integral to banks' ability to avoid providing material assistance to terrorists and other money launderers.**

168.   The allegations in this Paragraph consist of generalized characterizations about bank compliance groups' roles and responsibilities in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**169.   The compliance personnel must determine which hits are "false positives" that should not prevent the consummation of transactions and which involve a material risk of facilitating illicit behavior, including terrorist attacks.  Regulations applicable in most countries, including the U.S., require banks to report the transactions they have identified as suspicious to government officials.**

169.   The allegations in this Paragraph consist of generalized characterizations about bank compliance groups' roles and responsibilities in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**170.   When bank policy or government regulations appear to prohibit the consummation of particular transactions, the involved funds are typically "blocked" in a segregated account, and the involved parties must usually receive government approval to release the funds after establishing the legitimacy of the blocked transaction.**

170.   The allegations in this Paragraph consist of generalized characterizations about bank policies and government regulations in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**171.   FATF is an intergovernmental body created in 1989 by the G-7 countries (Canada, France, Germany, Italy, Japan, the United Kingdom, and the United States).  Currently, its membership consists of 31 countries and territories.**

171.   QNB admits the allegations of Paragraph 171.

**172.   FATF has published authoritative guidance designed to strengthen banks' AML and CTF policies, particularly the influential Forty Recommendations on Money Laundering (along with interpretive notes) that FATF issued in 1990.  The Forty Recommendations have been updated and revised since their initial publication.**

172.   QNB admits the allegations of Paragraph 172.

**173.   In response to the September 11, 2001 attacks, FATF issued eight additional Special Recommendations specifically related to Terrorist Financing.  A ninth recommendation was added in October 2004.**

173.   QNB admits the allegations of Paragraph 173.

**174.   The FATF Forty Recommendations include a recommendation that banking authorities implement customer due diligence procedures (including identify verification) and record keeping and suspicious transactions reporting requirements for financial institutions and designated non-financial businesses and professions.**

174.   The allegations in this Paragraph consist of generalized characterizations about FATF Forty Recommendations in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**175.   Expanding on that recommendation, FATF Recommendation Number Five states that banks should undertake customer due diligence measures designed to identify and verify the identity of their customers, when: (a) establishing business relations; (b) carrying out occasional transactions; (c) there is a suspicion of money laundering or terrorist financing; or (d) the bank has doubts about the veracity or adequacy of previously obtained customer identification data.**

175.   The allegations in this Paragraph consist of generalized characterizations about FATF Recommendations in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis. By way of further response, QNB respectfully refers

the Court to the FATF Recommendation Number Five referenced by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**176. FATF's Nine Special Recommendations include recommendations that banks: (a) freeze and confiscate terrorist assets; and (b) report suspicious transactions related to terrorism and money laundering to government authorities.**

176.   The allegations in this Paragraph consist of generalized characterizations about FATF Recommendations in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis. By way of further response, QNB respectfully refers the Court to the FATF's Nine Special Recommendations referenced by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**177.   The Nine Special Recommendations also recognize the critical role that purported charities play in terrorist financing.**

177.   The allegations in this Paragraph consist of generalized characterizations about FATF Recommendations in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis. By way of further response, QNB respectfully refers the Court to the FATF Nine Special Recommendations referenced by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**178.   FATF recommended that countries should review the adequacy of laws and regulations governing non-profit organizations because those entities are particularly vulnerable to abuse in connection with the financing of terrorism, either intentionally or through terrorist organizations' exploitation of unwitting participants.**

178.   The allegations in this Paragraph consist of generalized characterizations about FATF Recommendations in support of Plaintiffs' legal theories, which QNB denies. QNB denies

the allegations in this Paragraph on that basis.  By way of further response, QNB respectfully refers the Court to the FATF Recommendations referenced by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

     **179.   The Basel Committee was formed in 1974 by the central bank governors of the G-10 countries.**

179.   QNB admits the allegations of Paragraph 179.

     **180.   The Basel Committee works by consensus to formulate broad supervisory standards and guidelines and to publish statements on a wide range of banking issues.**

180.   QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 180, and therefore denies those allegations on that basis.

     **181.   Three of the most important Basel Committee statements of banking standards concern AML issues.  Basel Committee statements are directed to national ban supervisory authorities beyond the organization's core membership.  By issuing those statements, the Basel Committee hopes to persuade banking supervisors to protect the integrity of the global banking system by implementing the Basel Committee standards and guidelines.**

181.   The allegations in this Paragraph consist of generalized characterizations about Basel Committee statements in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.  By way of further response, QNB respectfully refers the Court to the Basel Committee statements referenced by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

     **182.   Because the Basel Committee guidelines are formulated as the result of a consensus building exercise by the G-10's national bank regulators, they carry substantial weight within the banking industry.  Therefore, Basel Committee guidelines are generally regarded as reflecting the minimum standards for individual banks with regard to AML and CTF policies.**

182.     The allegations in this Paragraph consist of generalized characterizations about Basel Committee guidelines in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.

**183.     In 1988, the Basel Committee issued its Statement on Prevention of Criminal Use of the Banking System for the Purpose of Money Laundering (the "Basel Statement on Prevention").**

183.     QNB admits the allegations of Paragraph 183.

**184.     The Basel Statement on Prevention outlines basic policies and procedures that bank management should ensure are in place within their institutions both domestically and internationally.**

184.     The allegations in this Paragraph consist of generalized characterizations about Basel Statement on Prevention in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.  By way of further response, QNB respectfully refers the Court to the Basel Statement of Prevention referenced by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**185.     The Basel Statement on Prevention further recognizes that the most important safeguard against the use of financial institutions for purposes of money laundering is the integrity of banks' management and their vigilant determination to prevent their institutions from becoming associated with criminals or being used as channels for money laundering.**

185.     The allegations in this Paragraph consist of generalized characterizations about Basel Statement on Prevention in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.  By way of further response, QNB respectfully refers the Court to the Basel Statement on Prevention referenced by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**186.    The Basel Statement on Prevention sets forth four key principles: (a) banks should make reasonable efforts to determine the true identity of all customers requesting the institution's services; (b) banks should ensure that business is conducted in conformity with high ethical standards and adheres to laws and regulations pertaining to financial transactions; (c) banks should cooperate fully with national law enforcement authorities to the extent permitted by local regulations relating to customer confidentiality and, where a bank has reason to suspect that funds on deposit are from criminal activity or that transactions entered into are for a criminal purpose, the bank should take appropriate measures, including denial of assistance, severing of the customer relationship, and closing or freezing the account; and (d) banks should adopt formal policies consistent with the Basel Statement on Prevention.**

186.    The allegations in this Paragraph consist of generalized characterizations about Basel Statement on Prevention in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.  By way of further response, QNB respectfully refers the Court to the Basel Statement on Prevention referenced by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**187.    In 1997, the Basel Committee issued its Core Principles for Effective Banking Supervision (the "Core Principles").  Those principles were intended to provide a comprehensive blueprint for a safe and sound banking system.**

187.    QNB admits Basel Committee issued the Core Principles in 1997.  QNB without knowledge or information sufficient to form a belief as to the intent of Basel Committee, and therefore denies remaining allegations on that basis.

**188.    The Basel Committee emphasized that the Core Principles are "minimum requirements" and are "intended to serve as a basic reference" in formulating an effective bank compliance environment.**

188.    The allegations in this Paragraph consist of generalized characterizations about Basel Committee statements in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.  By way of further response, QNB respectfully refers the Court to the Basel Committee's purported statements about the Core

Principles referenced by Plaintiffs for their full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**189.    Core Principle 15 deals with money laundering and reinforces the importance of KYC policies and procedures.  It provides that banks must have adequate policies, practices and procedures in place, including strict KYC rules that promote high ethical and professional standards in the financial sector and that prevent banks from being used, intentionally or unintentionally, by criminal elements.**

189.    The allegations in this Paragraph consist of generalized characterizations about the Core Principles in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.  By way of further response, QNB respectfully refers the Court to the Core Principles referenced by Plaintiffs for their full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**190.    The Basel Committee also issued a further "Core Principles Methodology" in 1999 that set forth widely accepted benchmarks for bank supervision.**

190.    QNB admits that the Basel Committee issued a "Core Principles Methodology" in 1999.  The remaining allegations of Paragraph 190 are so vague and ambiguous that QNB cannot reasonably prepare a response, and therefore denies those allegations on that basis.

**191.    The Core Principles Methodology was drafted to assist bank supervisors worldwide in self-assessments of the degree to which their banking systems, and the banks operating within the Core Principles Methodology contains a Principle-by-Principle discussion of "essential" and "additional" criteria.  The section on Core Principle Methodology 15 contains eleven essential criteria and five additional criteria to help assess the adequacy of KYC policies and procedures.**

191.    The allegations in this Paragraph consist of generalized characterizations about the Core Principles Methodology in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.  By way of further response, QNB respectfully refers the Court to the Core Principles Methodology referenced by Plaintiffs for its

full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

> **192.   The first additional criterion specifically references the FATF Forty Recommendations as reflecting "international sound practices."**

192.   The allegations in this Paragraph consist of generalized characterizations about the Core Principles Methodology in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.   By way of further response, QNB respectfully refers the Court to the Core Principles Methodology referenced by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

> **193.   Among the essential criteria are: (a) banks must have in place policies and procedures to prevent them from being used, intentionally or unintentionally, by criminal elements; (b) banks must have clear and effective KYC policies and procedures, including effective recordkeeping and records retention for both customer identification and individual transactions; (c) banks must have formal procedures to recognize potentially suspicious transactions; (d) banks must have clear lines of authority and communication for implementation of their AML programs; and (e) banks must report suspicious activities to their regulators where they potentially may be material to the safety, soundness or reputation of the bank.**

193.   The allegations in this Paragraph consist of generalized characterizations about Core Principles Methodology in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis. By way of further response, QNB respectfully refers the Court to the Core Principles Methodology referenced by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

> **194.   In 2001, the Basel Committee also issued standards governing minimum customer due diligence for banks (the "Customer Due Diligence Statement").  The Customer Due Diligence Statement notes that customer due diligence involves developing customer risk-profiles, including consideration of factors such as a customer's background, country of origin, public or high-**

60

**profile position, linked accounts, business activities, use of wire transfers (particularly for international remittance of funds) and other risk indicators.**

194.    QNB admits that the Basel Committee issued the Customer Due Diligence Statement in 2001. The remaining allegations in this Paragraph consist of generalized characterizations about the Customer Due Diligence Statement in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.  By way of further response, QNB respectfully refers the Court to the Customer Due Diligence Statement referenced by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**195.    The Due Diligence Statement also clarifies that even basic KYC is not simply a function of account opening procedures.  Rather, it remains an ongoing process.**

195.    The allegations in this Paragraph consist of generalized characterizations about the Customer Due Diligence Statement in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis. By way of further response, QNB respectfully refers the Court to the Customer Due Diligence Statement referenced by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**196.    The Due Diligence Statement also highlights the importance of ongoing monitoring of accounts and transactions as part of an effective AML program.**

196.    The allegations in this Paragraph consist of generalized characterizations about the Customer Due Diligence Statement in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.  By way of further response, QNB respectfully refers the Court to the Customer Due Diligence Statement referenced by Plaintiffs for

its full and complete content, and denies any allegations or characterizations implied by Plaintiffs'

citation thereto.

**197.    Specifically, the Due Diligence Statement provides, "Ongoing monitoring is an essential aspect of effective KYC procedures.  There should be intensified monitoring for higher risk accounts."**

197.    The allegations in this Paragraph consist of generalized characterizations about the

Customer Due Diligence Statement in support of Plaintiffs' legal theories, which QNB denies.

QNB denies the allegations in this Paragraph on that basis.  By way of further response, QNB

respectfully refers the Court to the Customer Due Diligence Statement referenced by Plaintiffs for

its full and complete content, and denies any allegations or characterizations implied by Plaintiffs'

citation thereto.

**198.    The Basel Committee's 2012 Core Principles for Effective Banking Supervision (the "2012 Core Principles") stressed the need for banks to "have adequate policies and processes that promote high ethical and professional standards and prevent the bank from being used, intentionally or unintentionally, for criminal activities."**

198.    The allegations in this Paragraph consist of generalized characterizations about the

2012 Core Principles in support of Plaintiffs' legal theories, which QNB denies. QNB denies the

allegations in this Paragraph on that basis. By way of further response, QNB respectfully refers

the Court to the 2012 Core Principles referenced by Plaintiffs for its full and complete content, and

denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**199.    The 2012 Core Principles explained that the essential elements of "customer due diligence" standards include a policy identifying "business relationships that the bank will not accept based on identified risks," an ongoing "customer identification, verification and due diligence" program, and policies and processes that require the bank to monitor "unusual or potentially suspicious transactions" and to apply enhanced scrutiny to high-risk accounts.**

199.    The allegations in this Paragraph consist of generalized characterizations about the

2012 Core Principles in support of Plaintiffs' legal theories, which QNB denies. QNB denies the

allegations in this Paragraph on that basis.  By way of further response, QNB respectfully refers

the Court to the 2012 Core Principles referenced by Plaintiffs for its full and complete content, and

denies any allegations or characterizations implied by Plaintiffs' citation thereto.

> **200.    The Wolfsberg Group is an association of 13 global banks.  In addition to its formal members, other significant global banks are recognized as being affiliated with Wolfsberg.**

200.    QNB lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations of Paragraph 200, and therefore denies those allegations on that basis.

> **201.    The Wolfsberg Group has published its own sets of methodologies in an effort to assist banks worldwide in complying with international AML standards.    The banking community considers the guidance published by the Wolfsberg Group as representative of the views of the global banking community.  On October 30, 2000, the Wolfsberg Group published the Wolfsberg AML Principles.**

201.    QNB admits that the Wolfsberg Group has published its own set of methodologies,

and that on October 30, 2000, the Wolfsberg Group published the Wolfsberg AML Principles.

QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the

remaining allegations of Paragraph 201, and therefore denies those allegations on that basis.

> **202.    The Wolfsberg AML Principles set forth guidelines regarding client acceptance, including the client identification and due diligence procedures banks should undertake when accepting a new client.  The due diligence procedures require banks to ascertain the client's reasons for opening the account, the source of its funds, and the client's anticipated activity Those procedures also specify steps that banks should employ to undertake risk-based customer due diligence.**

202.    The allegations in this Paragraph consist of generalized characterizations about the

Wolfsberg AML Principles in support of Plaintiffs' legal theories, which QNB denies. QNB denies

the allegations in this Paragraph on that basis. By way of further response, QNB respectfully refers

the Court to the Wolfsberg AML Principles referenced by Plaintiffs for its full and complete

content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**203.    The Wolfsberg AML Principles also set out practices for identifying unusual or suspicious transactions and for the on-going monitoring of account activity.  In addition, the principles stress the need for a reporting and control system within the bank, staff education and training, and setting record retention requirements.**

203.    The allegations in this Paragraph consist of generalized characterizations about the Wolfsberg AML Principles in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis. By way of further response, QNB respectfully refers the Court to the Wolfsberg AML Principles referenced by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**204.    The Wolfsberg Group also designed a questionnaire intended to help banks develop internal policies and practices for KYC, AML and CTF policies.**

204.    QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 204, and therefore denies those allegations on that basis.

**205.    This questionnaire provides an overview of a financial institution's AML policies and practices and can help determine whether a financial institution is complying with industry best practices.**

205.    The allegations in this Paragraph consist of generalized characterizations about Wolfsberg Group publications in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.  By way of further response, QNB respectfully refers the Court to the questionnaire referenced by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**206.    The questions relate to the following areas: (a) general AML policies, practices, and procedures; (b) risk assessment; (c) KYC, due diligence and enhanced due diligence; (d) reportable transactions and prevention and detection of transactions with illegally obtained funds; (e) transaction monitoring; and (f) AML training.**

206.    The allegations in this Paragraph consist of generalized characterizations about Wolfsberg Group publications in support of Plaintiffs' legal theories, which QNB denies. QNB

denies the allegations in this Paragraph on that basis.  By way of further response, QNB respectfully refers the Court to the questionnaire referenced by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**207.   The questions the Wolfsberg Group questionnaire sets forth include:**

**a. Does the Bank have record retention procedures that comply with applicable law?**

**b. Are the Bank's AML policies and practices being applied to all branches and subsidiaries of the Bank, both in the home country and in locations outside of that jurisdiction?**

**c. Does the Bank have a risk-based assessment of its customer base and their transactions?**

**d. Does the Bank determine the appropriate level of enhanced due diligence necessary for those categories of customers and transactions that the Bank has reason to believe pose a heightened risk of illicit activities at or through the Bank?**

**e. Does the Bank require the collection of information regarding its customers' business activities?**

**f. Does the Bank have policies or practices for the identification and reporting of suspicious transactions?**

**g. Does the Bank have a monitoring program for unusual and potentially suspicious activity that covers funds transfers and monetary instruments, such as travelers' checks, money orders, etc.?**

207.   The allegations in this Paragraph (including subparagraphs (a) – (g)) consist of generalized characterizations about Wolfsberg Group publications in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.  By way of further response, QNB respectfully refers the Court to the questionnaire referenced by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**208.    The Wolfsberg Statement on the Suppression of Financing of Terrorism (the "Wolfsberg Terrorism Statement") was published in January 2002.**

208.    QNB admits the allegations of Paragraph 208.

**209.    The Wolfsberg Terrorism Statement reiterated and elaborated upon the existing international standards designed to prevent financial institutions from becoming entangled with terrorism and the financing of terrorist organizations and attacks.**

209.    The allegations in this Paragraph consist of generalized characterizations about the Wolfsberg Terrorism Statement in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis.  By way of further response, QNB respectfully refers the Court to the Wolfsberg Terrorism Statement referenced by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**210.    The most critical components of the Wolfsberg Terrorism Statement include the following: (a) Paragraph four emphasizes the importance of KYC policies and procedures; (b) Paragraph five refers to high-risk sectors and activities and focuses on a financial institution's application of enhanced and appropriate due diligence; and (c) paragraph six addresses monitoring and how financial institutions should apply existing monitoring procedures to identify unusual or suspicious transactions because, although transactions may be unclear, monitoring and then identifying and reporting unusual or suspicious transactions may assist government agencies by linking seemingly unrelated activity to the financing of terrorism.**

210.    The allegations in this Paragraph consist of generalized characterizations about the Wolfsberg Terrorism Statement in support of Plaintiffs' legal theories, which QNB denies. QNB denies the allegations in this Paragraph on that basis. By way of further response, QNB respectfully refers the Court to the Wolfsberg Terrorism Statement referenced by Plaintiffs for its full and complete content, and denies any allegations or characterizations implied by Plaintiffs' citation thereto.

**211.   QNB completely disregarded the international banking standards identified in above in connection with the transactions that they conducted with Qatar Charity, Ziraat Bank, ISIS, its operatives, its predecessor organizations, and front organizations.**

211.    QNB denies the allegations of Paragraph 211.

**212.   The violations of those standards that QNB committed include, but are not limited to the following:**

**a. QNB provided banking services for Qatar Charity despite its knowledge that the charity was a leading contributor to Al Qaeda, Hamas, and numerous other terrorist organizations;**

**b. QNB failed to develop a suitable risk profile for Qatar Charity and to subject its transactions to enhanced due diligence despite the significant money laundering and terrorism-financing risks presented by Qatar Charity's activities as a purported charity affiliated with terrorist organizations and their sponsors, the concentration of Qatar Charity's contributions in terrorism hot spots like Turkey, Syria, the Palestinian Territories and other Middle Eastern areas prone to terrorist conduct, Qatar Charity's history of donations to purported charities affiliated with Al Qaeda, Hamas, and other terrorist organizations, and the unusual and substantial nature of the wire transfers that Qatar Charity made;**

**c. QNB failed to monitor the transactions undertaken by Qatar Charity, and in doing so allowed Qatar Charity to (among other illegitimate transactions) wire a large dollar-denominated sum to an account at Ziraat Bank in Turkey held in the name of a Fadel al Salim, a known terrorist whose declaration of affiliation with the Nusra Front, a U.S.-designated FTO, was published online and in print.**

**d. QNB subordinated its AML and CTF obligations to the desire of their largest shareholders, the members of the Qatari Royal Family and the entities they control, to fund ISIS, its operatives, its predecessor organizations, and front organizations;**

**e. QNB failed to consider the risks associated with providing banking services to Qatar Charity—particularly its supposed status as a charitable entity operating in Middle Eastern locations prone to terrorism—or to design appropriate measures for counteracting those risks and thereby preventing money laundering and terrorism financing;**

**f. QNB ignored its obligation to detect and block transactions with people and organizations included on terrorist and money laundering sanctions and embargo lists propounded by the E.U., the U.N., the U.S., and other nations;**

**g. QNB failed to undertake any research to determine the terrorist affiliations of its account holders and the beneficiaries of transfers made from the account holders' accounts despite the suspicious nature of those transactions and the availability of information corroborating the terrorist ties of the account holders and the transfer beneficiaries on the Internet, databases such as Lexis/Nexis, and specialized software widely used by international banks;**

**h. QNB either ignored the feedback provided by its AML and CTF software regarding transactions involving account holders or transferees tied to terrorism or money laundering or failed to update that software to prevent the bank from participating in those transactions; and**

**i. QNB ignored the well-accepted guidance for international banking provided by, among other standards, FATF's Forty Recommendations on Money Laundering, FATF's Special Recommendations specifically related to terrorist financing, the Basel Statement on Prevention, the Basel Committee's Core Principles for Effective Banking Supervision, the Basel Committee's Core Principles Methodology, the Basel Committee's Customer Due Diligence Statement, the Basel Committee's 2012 Core Principles, the Wolfsberg AML Principles, the Wolfsberg AML questionnaire, and the Wolfsberg Terrorism Statement.**

212. QNB denies the allegations of Paragraph 212 (including subparagraphs (a) – (i)).

**213.    Despite these AML and CTF failings, QNB endeavored to create the appearance that it was complying with Qatari CTF law, the bank's internal policies barring terror financing, and the foregoing international CTF and AML principles.**

213. QNB denies the allegations of Paragraph 213.

**214.    For example, QNB's annual Corporate Governance Reports from 2012 to date stress QNB's compliance with the (a) Anti-Money Laundering and Combat of Terrorism Financing issued by FATF, (b) as domestic regulations issued by the Central Bank of Qatar and Qatar Financial Markets Authority, and (c) its own system implemented in 2013 and said to be**

**"one of the world's best anti-money laundering systems in Qatar and for all of [QNB's] international branches and subsidiaries."**

214.    QNB denies the allegations of Paragraph 214 as pleaded, but admits that its annual Corporate Governance Reports from 2012 through the date of the Complaint truthfully and accurately highlights QNB's compliance with  (a) the Anti-Money Laundering and Combat of Terrorism Financing issued by FATF, (b) the domestic regulations issued by the Central Bank of Qatar and Qatar Financial Markets Authority, and (c) its own system implemented in 2013 and said to be "one of the world's best anti-money laundering systems in Qatar and for all of [QNB's] international branches and subsidiaries."

**215.    Given the notorious nature of Qatar Charity's sponsorship of various terrorist groups in the region, the well-publicized interest of the Muslim Brotherhood, the state of Qatar, the Qatari Royal Family, and Turkey in destabilizing Syria through terrorism, as well as the due diligence steps QNB's policies and procedures required the bank to undertake, QNB could not have remained unaware of the critical role that Qatar Charity and the Muslim Brotherhood played in financing and promoting ISIS and its predecessor organizations.**

215.    QNB admits that it maintains due diligence steps pursuant to the QNB's policies and procedures.  QNB denies that it has any reason to believe, based on information available to it, that Qatar Charity had a "notorious nature" of sponsoring "various terrorist groups in the region" or that Qatar Charity played critical role in "financing and promoting ISIS and its predecessor organizations," and on that basis denies the allegation.  QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 215, and therefore denies those allegations on that basis.

**216.    Thus, QNB could have utilized the AML and CTF policies and procedures that it described to prevent the financing of ISIS terrorism, had the bank actually wanted to eliminate that illicit conduct.**

216.    QNB denies the allegations of Paragraph 216 but admits that it utilizes AML and CTF policies and procedures to prevent the financing of terrorists and terror groups, like ISIS.

217.   Instead, QNB moved millions of USD to a shell charity with no legitimate history created expressly for the purpose financing terrorism in Syria, and to an account held by an individual who had publicly stated (1) his affiliation with terrorist organizations operating in Syria, (2) his intent re-establish the Islamic caliphate in Syria, (3) his unwillingness to accept a civil state in Syria, and who would, within a year of payment by Qatar Charity, order the execution of Steven Sotloff.

217.   QNB denies the allegations of paragraph 217.

## II.   THE ABDUCTION, TORTURE, AND MURDERS OF JAMES WRIGHT FOLEY AND STEVEN JOEL SOTLOFF

218.   On November 22, 2012, James Foley, an American freelance journalist covering the war in Syria, and his British colleague John Cantlie rode back toward the Turkish border in a taxi.  Their car was blocked by a group of militants who handcuffed them and forced them into the back of a van.  Over the next eighteen months that they were held in captivity, Foley and Cantlie were moved three times, ultimately ending up in an ISIS prison beneath the Aleppo Children's Hospital in Syria.

218.   QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 218, and therefore denies those allegations on that basis.

219.   On August 4, 2013, Steven Sotloff, an American journalist covering the civil war in Syria, and his fixer, Yosef Abobaker, were kidnapped by ISIS militants shortly after they crossed the border from Turkey.  Two days after his abduction, Sotloff was placed in a cell at Aleppo Children's Hospital.

219.   QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 219, and therefore denies those allegations on that basis.

220.   Sotloff and Foley shared a cell for months.

220.   QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 220, and therefore denies those allegations on that basis.

221.   During their captivity, Foley, and Sotloff were held in darkness without seeing daylight for months at a time, forced to use bottles and buckets to relieve themselves, starved, chained together for months at a time, and beaten.  The beatings did not occur on a regular schedule, but rather intensified before prisoner releases or proof of life contact so that the hostages would recount their horror and put more pressure on their home countries.

221.    QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 221, and therefore denies those allegations on that basis.

**222.    They were also subjected to psychological torture, which included threats of execution, as well as forcing them to watch execution videos of other hostages.**

222.    QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 222, and therefore denies those allegations on that basis.

**223.    In late 2013/early 2014, Foley and Sotloff were transferred to a prison in Raqqa, Syria.**

223.    QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 223, and therefore denies those allegations on that basis.

**224.    On August 14, 2014, the date that al Salim adjudged James Foley at the Ash Shaddadi Islamic Court, four closed Hyundai military vehicles belonging to the Islamic State travelled from Raqqa to the Ash Shaddaddi "reform prison." Al Salim headed the convoy all the way from Raqqa to Ash Shaddadi.**

224.    QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 224, and therefore denies those allegations on that basis.

**225.    The convoy transported three prisoners of American and Egyptian nationality.  One of the detainees, an American journalist, was executed the evening after arriving in Ash Shadadi.  This American journalist was presumably James Foley, and his American co-captive was presumably Steven Sotloff.**

225.    QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 225, and therefore denies those allegations on that basis.

**226.    Less than a year after receiving a wire from Qatar Charity and QNB for USD $800,000, Al Salim signed the "Legal Retribution Verdict" for James Wright Foley as Sharia Judge "Abu Al-Mughirah Al-Hashemi" for the Islamic Court in Ash Shaddadi, al Barakah District (an Islamic State administrative district), ordering his beheading.**

226.    QNB denies the allegation that "Al Salim" "receiv[ed] a wire from Qatar Charity and QNB for USD $800,000."  QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 226, and therefore denies those allegations on that basis.

**227.    The Foley Legal Retribution Verdict noted the date and place of birth of James Foley, a judgment date of "Shawwal 17, 1435", August 14, 2014 on the Gregorian calendar, and an execution date of "Shawwal 19, 1435", August 16, 2014 on the Gregorian calendar, the place of execution, the place of burial, and listed the executioner as "Abu Abdul Kareem Al Britani" a no de guerre for Jihadi John (AKA Mohammed Emwazi).**

227.    QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 227, and therefore denies those allegations on that basis.

**228.    Al Salim also ordered the beheading of Steven Sotloff when he signed the Legal Retribution Verdict for Steven Joel Sotloff as Sharia Judge "Abu Al-Mughirah Al-Hashemi" for the Islamic Court in Ash Shaddadi, al Barakah District.**

228.    QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 228, and therefore denies those allegations on that basis.

**229.    The Sotloff Legal Retribution Verdict noted the date and place of birth of Steven Sotloff, a judgment date of "Shawwal 27, 1435", August 24, 2014 on the Gregorian calendar, and an execution date of "Dhul Qi'dah 5, 1435", August 31, 2014 on the Gregorian calendar, the place of execution, the place of burial, and listed the executioner as "Abu Abdul Kareem Al Britani" a nom de guerre for Jihadi John (AKA Mohammed Emwazi).**

229.    QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 229, and therefore denies those allegations on that basis.

**230.    Before his execution James Foley was forced to kneel in front of a camera and recite a statement denouncing the United States:**

**I call on my friends, family, and loved to rise up against my real killers, the U.S. government, for what will happen to me is only a result of their complacency and criminality.  My message to my beloved parents: Save me some dignity and don't accept any meager compensation for my death from the same people who**

**effectively hit the last nail in my coffin with the recent aerial campaign in Iraq. I call on my brother John who is a member of the U.S. Air Force: Think about what you are doing. Think about the lives you destroy, including those of your own family. I call on you, John, think about who made the decision to bomb Iraq recently and kill those people, whoever they may have been. Think John, who did they really kill? Did they think about me, your and our family when they made that decision? I died that day, John. When your colleagues dropped that bomb on those people they signed my death certificate.**

230.   QNB lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations of Paragraph 230, and therefore denies those allegations on that basis.

**231.   After finishing his statement, an individual later identified by the U.S. government, counterterrorism experts, and media outlets as ISIS member and "Beatle" Mohammad Emwazi stated the following:**

**This is James Wright Foley, an American citizen of your country. As a government, you have been at the forefront of aggression towards the Islamic State. You have plotted against us and gone far out of your way to find reasons to interfere in our affairs. Today, your military airforce is attacking us daily in Iraq. Your strikes have caused casualties amongst Muslims. You're no longer fighting an insurgency, we are an Islamic army and a State that has been accepted by a large number of Muslims worldwide, so effectively, any aggression towards the Islamic State is an aggression towards Muslims from all walks of life who have accepted the Islamic Caliphate as their leadership. So any attempt by you, Obama, to deny the Muslims their rights of living in safety under the Islamic Caliphate will result in the bloodshed of your people.**

231.   QNB lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations of Paragraph 231, and therefore denies those allegations on that basis.

**232.   After finishing his statement, Emwazi began beheading Foley. The video does not show the full beheading but does show Foley being mortally wounded before concluding with an image of Foley's beheaded corpse. Emwazi reappears holding Sotloff, in the same position and orange jumpsuit as Foley, then states "[t]he life of this American citizen, Obama, depends on your next decision."**

232.    QNB lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations of Paragraph 232, and therefore denies those allegations on that basis.

**233.    Days later, ISIS executed Sotloff in another publicly released video.  Sotloff appears kneeling in an orange jumpsuit, and makes the following statement:**

**I am Steven Joel Sotloff.  I'm sure you know exactly who I am by now and why I am appearing before you.  And now this time for my message: Obama, your foreign policy of intervention in Iraq was supposed to be for the preservation of American lives and interests, so why is it that I am paying the price of your interference with my life? Am I not an American citizen? You've spent billions of U.S. taxpayers' dollars and we've lost thousands of our troops in our previous fighting against the Islamic State, so where is the people's interest in reigniting this war? From what little I know about foreign policy, I remember a time you could not win an election without promising to bring our troops back home from Iraq and Afghanistan and to close down Guantánamo.  Here you are now, Obama, nearing the end of your term, and having achiev[ed] none of the above, and deceivingly marching us the American people in the blazing fire.**

233.    QNB lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations of Paragraph 233, and therefore denies those allegations on that basis.

**234.    As with Foley, Sotloff's executioner, identified by U.S. government sources as Emwazi, directs a threat at President Obama:**

**I'm back, Obama, and I'm back because of your arrogant foreign policy towards the Islamic State, because of your insistence on continuing your bombings and [unclear] on Mosul Dam, despite our serious warnings.  You, Obama, have but to gain from your actions but another American citizen.  So just as your missiles continue to strike our people, our knife will continue to strike the necks of your people... We take this opportunity to warn those governments that enter this evil alliance of America against the Islamic State to back off and leave our people alone.**

234.    QNB lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations of Paragraph 234, and therefore denies those allegations on that basis.

**235.   As in the Foley video, after finishing his statement Emwazi is shown cutting Sotloff's throat and inflicting a mortal wound, but does not show the full beheading.  The video concludes with an image of Sotloff's beheaded corpse before Emwazi appears with British hostage David Cawthorne Haines, who was subsequently executed by ISIS.**

235.   QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 235, and therefore denies those allegations on that basis.

## CAUSES OF ACTION

## COUNT I

## AIDING AND ABETTING FOREIGN TERRORIST ORGANIZATIONS IN VIOLATIONS OF 18 U.S.C. § 2333(d) AGAINST ALL DEFENDANTS

**236.   Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.**

236.   QNB repeats each of its responses to the allegations of Paragraphs 1 – 235 (and 237 – 290) as if set forth fully herein.

**237.   Plaintiffs assert this cause of action against all Defendants under 18 U.S.C. § 2333(d) and the Justice Against Sponsors of Terrorism Act ("JASTA") § 2b.**

237.   QNB denies the allegations of Paragraph 237 as pleaded, but admits that Plaintiffs purport to assert a cause of action against all Defendants under 18 U.S.C. § 2333(d) and the JASTA § 2b.

**238.   Plaintiffs are nationals of the United States or the estates, survivors, or heirs of U.S. nationals.**

238.   QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 238, and therefore denies those allegations on that basis.

**239.   ISIS was an FTO at the time it abducted, tortured, and killed Steven Sotloff and injured Plaintiffs.**

239.     QNB admits that ISIS is a U.S.-designated FTO, but lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 239, and therefore denies those allegations on that basis.

**240.     The abduction, torture, and murder of Steven Sotloff was an act of international terrorism, as defined by 18 U.S.C. § 2331.  The attack: (a) involved violence and endangered human life; (b) would have violated federal and state criminal law, had it been committed in the United States; (c) appeared to be intended to intimidate or coerce the civilian populations of Syria and the United States, to influence the policies of the Syria and American governments, and to affect the policies of those governments through violent action; and (d) occurred primarily outside the United States and transcended national boundaries.**

240.     The allegations of Paragraph 240 consist of Plaintiffs' legal conclusions that require no response. To the extent a response is required, QNB denies the allegations.

**241.     Defendants knowingly provided substantial assistance to those acts of international terrorism.**

241.     QNB denies the allegations of Paragraph 241 to the extent they apply to QNB. QNB denies that it has any reason to believe, based on information available to it, that Qatar Charity "knowingly provided substantial assistance to those acts of international terrorism," and therefore denies those allegations on that basis.

**242.     The substantial assistance that Defendants knowingly provided to ISIS included transferring significant sums of money to ISIS, its operatives, its predecessor organizations, and front organizations; (b) providing ISIS with access to U.S. dollars and the U.S. banking system; (c) enabling the FTOs to convert funds nominally intended to support humanitarian causes into the resources necessary to commit terrorist attacks.**

242.     QNB denies the allegations of Paragraph 242 to the extent they apply to QNB. QNB denies that it has any reason to believe, based on information available to it, that Qatar Charity knowingly provided substantial assistance to ISIS as alleged in Paragraph 242, and therefore denies those allegations on that basis.

**243.   Defendants' services and support provided encouragement to would-be terrorists and incentivized their future attacks.**

243.   QNB denies the allegations of Paragraph 243 to the extent they apply to QNB. QNB denies that it has any reason to believe, based on information available to it, that Qatar Charity's "services and support provided encouragement to would-be terrorists and incentivized their future attacks," and therefore denies those allegations on that basis.

**244.   At the time Defendants provided that substantial assistance to ISIS, its operatives, its predecessor organizations, and front organizations, Defendants knew that: (a) the ISIS was a designated FTO; (b) ISIS and its operatives engaged in terrorism, including the attacks alleged herein; (d) ISIS held Steven Sotloff hostage and was threatening his life; and (e) the financial assistance that Defendants were providing to those FTOs was essential to their ability to carry out terrorist attacks, including the attack that injured Plaintiffs.**

244.   QNB denies the allegations of Paragraph 244 to the extent they apply to QNB. QNB denies that it has any reason to believe, based on information available to it, that Qatar Charity provided substantial assistance to ISIS as alleged in Paragraph 244, and therefore denies those allegations on that basis.

**245.   Defendants also intended that their substantial assistance would facilitate the ability of ISIS to carry out their terrorist attacks against Plaintiffs and other civilians.  As a result, Defendants recognized that they played an integral role in ISIS' terrorist activities.**

245.   QNB denies the allegations of Paragraph 245 to the extent they apply to QNB. QNB denies that it has any reason to believe, based on information available to it, that Qatar Charity "intended that [its] substantial assistance would facilitate the ability of ISIS to carry out . . . terrorist attacks against Plaintiffs and other civilians," and therefore denies those allegations on that basis.  QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 245, and therefore denies those allegations on that basis.

**246.    The assistance that Defendants provided to ISIS was a substantial factor in causing Plaintiffs' injuries.  Moreover, Plaintiffs' injuries were a foreseeable result of that substantial assistance.**

246.    The allegations of Paragraph 246 consist of Plaintiffs' legal conclusions that require no response. To the extent a response is required, QNB denies the allegations.

**247.    As a direct and proximate result of the substantial, knowing assistance that Defendants provided to ISIS, Plaintiffs have suffered significant physical, psychological and emotional injuries.**

247.    The allegations of Paragraph 247 consist of Plaintiffs' legal conclusions that require no response. To the extent a response is required, QNB denies the allegations.

**248.    Defendants knowingly aided and abetted ISIS within the meaning of 18 U.S.C. § 2333(d), which Congress enacted to provide "civil litigants with the broadest possible basis" for relief against those "that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." *See* JASTA, § 2b.**

248.    The allegations of Paragraph 248 consist of Plaintiffs' legal conclusions that require no response. To the extent a response is required, QNB denies the allegations.

**249.    Defendants are therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.**

249.    The allegations of Paragraph 249 consist of Plaintiffs' legal conclusions that require no response. To the extent a response is required, QNB denies the allegations.

<u>COUNT II</u>

**VIOLATION OF THE ANTI- TERRORISM ACT, 18 U.S.C. § 2333(d)
AGAINST ALL DEFENDANTS (CONSPIRACY LIABILITY)**

**250.    Plaintiffs repeat and re-allege allegations 1 through 235 of the foregoing paragraphs as if fully set forth herein.**

250.    QNB repeats each of its responses to the allegations of Paragraphs 1 – 249 (and 251 – 290) as if set forth fully herein.

**251.     Plaintiffs assert this cause of action against all Defendants under 18 U.S.C. § 2333(d) and JASTA, § 2b.**

251.     QNB denies the allegations of Paragraph 251 as pleaded, but admits that Plaintiffs purport to assert a cause of action against all Defendants under 18 U.S.C. § 2333(d) and JASTA § 2b.

**252.     Plaintiffs are nationals of the United States or the estates, survivors or heirs of U.S. nationals.**

252.     QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 252, and therefore denies those allegations on that basis.

**253.     Defendants conspired with each other, the government of Qatar, the Muslim Brotherhood, ISIS, and others to bring about acts of international terrorism.**

253.     QNB denies any allegation, express or implied, of having knowledge of, providing support to, or participating in the purported conspiracy alleged in Paragraph 253. QNB denies the remaining allegations of Paragraph 253 to the extent they apply to QNB.  QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 253, and therefore denies those allegations on that basis.

**254.     Defendant Qatar Charity joined the conspiracy by agreeing, among other things, expressly or tacitly to raise funds for ISIS, its operatives, its predecessor organizations, and front organizations even though it is designated as and FTO by the United States, and other nations.  Qatar Charity further agreed to distribute those funds on behalf of ISIS.  By engaging in that conduct, Qatar Charity furthered the goals of the conspiracy.**

254.     QNB denies any allegation, express or implied, of having knowledge of, providing support to, or participating in the purported conspiracy alleged in Paragraph 254. QNB denies that it has any reason to believe, based on information available to it, that Qatar Charity raised funds for or distributed funds on behalf of ISIS as alleged in Paragraph 254, and on that basis denies the

allegation. QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity

of the remaining allegations in Paragraph 254, and therefore denies those allegations on that basis.

**255.    Defendant Qatar National Bank joined the conspiracy by agreeing, among other things, expressly or tacitly: (a) to allow Qatar Charity to use accounts at QNB to funnel money to ISIS, its operatives, its predecessor organizations, and front organizations; (b) to give Qatar Charity, and ISIS, its operatives, its predecessor organizations, and front organizations access to U.S. dollars through QNB's correspondent banking relationships in the U.S.; and (c) to provide banking services to its co-conspirator, Qatar Charity.  By engaging in that conduct, QNB furthered the goals of Defendants' conspiracy.**

255.    QNB denies the allegations of Paragraph 255.

**256.    The close relationships among Defendants, the Qatari government, including the Qatari Royal Family, and the Muslim Brotherhood, connected QNB and Qatar Charity to the conspiracy.**

256.    QNB denies the allegations of Paragraph 256.

**257.    Defendant QNB knew that it facilitated acts of terrorism and Defendants' conspiracy by allowing a notorious designated financer of terrorism like Qatar Charity to maintain accounts at the bank and by disregarding suspicious transactions involving those accounts.**

257.    QNB denies the allegations of Paragraph 257.

**258.    QNB knew that the government of Qatar and members of the Qatari Royal Family, who had leadership positions at the bank, openly supported ISIS and other terrorist groups operating in Syria by financing their operations.**

258.    QNB denies the allegations of Paragraph 258.

**259.    QNB knew that, by allowing Qatar Charity to use accounts at the banks to funnel money to ISIS, it was joining a conspiracy intended to commit acts of international terrorism, including the hostage taking, torture, and murder of Steven Sotloff, specifically.**

259.    QNB denies any allegation, express or implied, of having knowledge of, providing

support to, or participating in the purported conspiracy alleged in Paragraph 259. QNB denies that

it has any reason to believe, based on information available to it, that Qatar Charity "use[d]

accounts at the banks to funnel money to ISIS," and on that basis denies the allegation. The

remaining allegations of Paragraph 259 consist of Plaintiffs' legal conclusions that require no response. To the extent a response is required, QNB denies the allegations.

**260.    As a direct and proximate result of the Defendants' conspiracy and the steps they knowingly took in furtherance thereof, Plaintiffs have suffered significant physical, psychological and emotional injuries.**

260.    QNB denies any allegation, express or implied, of having knowledge of, providing support to, or participating in the purported conspiracy alleged in Paragraph 260.  The remaining allegations of Paragraph 260 consist of Plaintiffs' legal conclusions that require no response. To the extent a response is required, QNB denies the allegations.

**261.    Defendants are therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.**

261.    The allegations of Paragraph 261 consist of Plaintiffs' legal conclusions that require no response. To the extent a response is required, QNB denies the allegations.

<u>COUNT III</u>
PROVIDING MATERIAL SUPPORT TO TERRORISTS
IN VIOLATION OF 18 U.S.C. §§ 2339A AND 2333(a)
AGAINST ALL DEFENDANTS

**262.    Plaintiffs repeat and re-allege allegations 1 through 235 of the foregoing paragraphs as if fully set forth herein.**

262.    QNB repeats each of its responses to the allegations of Paragraphs 1 – 261 (and 263 – 290) as if set forth fully herein.

**263.    Plaintiffs assert this claim against all Defendants for violations of 18 U.S.C. §§ 2333(a) and 2339A.**

263.    QNB denies the allegations of Paragraph 263 as pleaded, but admits that Plaintiffs purport to assert a cause of action against all Defendants under 18 U.S.C. §§ 2333(a) and 2339A.

**264.    The financial assistance that Defendants provided to ISIS, its operatives, its predecessor organizations, and front organizations constituted material support of ISIS and facilitated the efforts of ISIS in acts of**

**international terrorism, including the abduction, tortured, and execution of Steven Sotloff that injured Plaintiffs.**

264.    QNB denies the allegations of Paragraph 264 to the extent they apply to QNB. QNB denies that it has any reason to believe, based on information available to it, that Qatar Charity provided financial assistances to ISIS and facilitated the efforts of ISIS in acts of international terrorism as alleged in Paragraph 264, and therefore denies those allegations on that basis.

**265.    Defendants provided that material assistance to ISIS, its operatives, its predecessor organizations, and front organizations knowing or intending that their material assistance would be utilized by the terrorist organization to prepare for or carry out terrorist attacks, including the abduction, torture, and execution of Steven Sotloff that injured Plaintiffs.**

265.    QNB denies the allegations of Paragraph 265 to the extent they apply to QNB. QNB denies that it has any reason to believe, based on information available to it, that Qatar Charity provided "material assistance to ISIS, its operatives, its predecessor organizations, and front organizations," and therefore denies those allegations on that basis.  QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 265, and therefore denies those allegations on that basis.

**266.    Defendants provided that material assistance to ISIS, its operatives, its predecessor organizations, and front organizations in furtherance of the conspiracy to facilitate the acts of terrorism that ISIS perpetrated, including the abduction, torture, and execution of Steven Sotloff that injured Plaintiffs.**

266.    QNB denies the allegations of Paragraph 266 to the extent they apply to QNB. QNB denies that it has any reason to believe, based on information available to it, that Qatar Charity provided "material assistance to ISIS, its operatives, its predecessor organizations, and front organizations," and therefore denies those allegations on that basis.  QNB further denies any allegation, express or implied, of having knowledge of, providing support to, or participating in

the purported conspiracy alleged in Paragraph 266. QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 266, and therefore denies those allegations on that basis.

> **267.   The material assistance that Defendants provided to ISIS, its operatives, its predecessor organizations, and front organizations constituted activities dangerous to human life that violated 18 U.S.C. § 2339A and that were either unlawful under state law, including Fla. Stat. § 775.33, or would have been unlawful under that state law if committed in the United States.**

267.   The allegations of Paragraph 267 consist of Plaintiffs' legal conclusions that require no response. To the extent a response is required, QNB denies the allegations.

> **268.   The material assistance that Defendants provided to ISIS, its operatives, its predecessor organizations, and front organizations was dangerous to human life because that assistance enabled the terrorist organizations to finance their violent attacks and recruit individuals to carry out those attacks.**

268.   QNB denies the allegations of Paragraph 268 to the extent they apply to QNB. QNB denies that it has any reason to believe, based on information available to it, that Qatar Charity provided "material assistance" "to ISIS, its operatives, its predecessor organizations, and front organizations," and therefore denies those allegations on that basis.  QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 268, and therefore denies those allegations on that basis.

> **269.   The actual and apparent intention of the material assistance that Defendants provided to ISIS, its operatives, its predecessor organizations, and front organizations was: (a) to intimidate or coerce the civilian populations of Syria and the United States; (ii) to influence the policies of Syria and the United States by means of intimidation and coercion; or (iii) to affect the conduct of the governments of Syria and the United States by mass destruction, assassination, or kidnapping.**

269.   QNB denies the allegations of Paragraph 269 to the extent they apply to QNB. QNB denies that it has any reason to believe, based on information available to it, that Qatar Charity provided "material assistance" "to ISIS, its operatives, its predecessor organizations, and front

organizations," and therefore denies those allegations on that basis QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 269, and therefore denies those allegations on that basis.

> **270.  The substantial financial assistance that Defendants provided to ISIS, its operatives, its predecessor organizations, and front organizations was occurred primarily outside the United States and transcended national boundaries in that Defendants operated internationally in providing that financial assistance.**

270.  QNB denies the allegations of Paragraph 270 to the extent they apply to QNB. QNB denies that it has any reason to believe, based on information available to it, that Qatar Charity provided "substantial financial assistance" "to ISIS, its operatives, its predecessor organizations, and front organizations," and therefore denies those allegations on that basis. QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 270, and therefore denies those allegations on that basis.

> **271.  As a result, Defendants committed acts of international terrorism, as defined by 18 U.S.C. § 2331 and F.S. § 775.30.**

271.  The allegations of Paragraph 271 consist of Plaintiffs' legal conclusions that require no response. To the extent a response is required, QNB denies the allegations.

> **272.  ISIS, its operatives, its predecessor organizations, and front organizations did rely upon the financial assistance and material support provided by Defendants in carrying out the terrorist activities.**

272.  QNB denies it provided "financial assistance and material support" to ISIS, its predecessor organizations, and front organizations.  QNB denies that it has any reason to believe, based on information available to it, that Qatar Charity provided such financial assistance or material support to ISIS as alleged in Paragraph 272, and on that basis denies the allegations. QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations, and therefore denies those allegations on that basis.

84

**273.    ISIS, its operatives, its predecessor organizations, and front organizations engaged in acts of physical violence outside of the United States with the intent to kill or to cause serious bodily injuries to Plaintiffs, nationals of the United States.**

273.    QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 273, and therefore denies those allegations on that basis.

**274.    ISIS, its operatives, its predecessor organizations, and front organizations engaged in that illicit conduct pursuant to a joint plan and conspiracy with Defendants and others.**

274.    QNB denies any allegation, express or implied, of having knowledge of, providing support to, or participating in the purported conspiracy alleged in Paragraph 274. QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 274, and therefore denies those allegations on that basis.

**275.    ISIS, its operatives, its predecessor organizations, and front organizations acts of violence caused the abduction, torture, and death of Steven Sotloff and injured his family members.**

275.    QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 275, and therefore denies those allegations on that basis.

**276.    The material support and substantial assistance that Defendants provided to ISIS, its operatives, its predecessor organizations, and front organizations was a substantial factor in causing Plaintiffs' injuries. Moreover, Plaintiffs' injuries were a foreseeable result of the material support and substantial assistance that Defendants provided to ISIS, its operatives, its predecessor organizations, and front organizations.**

276.    The allegations of Paragraph 276 consist of Plaintiffs' legal conclusions that require no response. To the extent a response is required, QNB denies the allegations.

**277.    As a direct and proximate result of the material support and substantial assistance that Defendants knowingly provided to ISIS, its operatives, its predecessor organizations, and front organizations, Plaintiffs have suffered significant physical, psychological and emotional injuries.**

277.    The allegations of Paragraph 277 consist of Plaintiffs' legal conclusions that require no response. To the extent a response is required, QNB denies the allegations.

**278.    Defendants are therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.**

278.    The allegations of Paragraph 278 consist of Plaintiffs' legal conclusions that require no response. To the extent a response is required, QNB denies the allegations.

## COUNT IV

**PROVIDING MATERIAL SUPPORT TO FOREIGN TERRORIST ORGANIZATIONS IN VIOLATION OF 18 U.S.C. §§ 2339(a)(1) AND 2333(a) AGAINST ALL DEFENDANTS**

**279.    Plaintiffs repeat and re-allege allegations 1 through 235 of the foregoing paragraphs as if fully set forth herein.**

279.    QNB repeats each of its responses to the allegations of Paragraphs 1 – 278 (and 280 – 290) as if set forth fully herein.

**280.    Plaintiffs assert this claim against all Defendants for violation of 18 U.S.C. §§ 2333(a) and 2339B(a)(1).**

280.    QNB denies the allegations of Paragraph 280 as pleaded, but admits that Plaintiffs purport to assert a cause of action against all Defendants under 18 U.S.C. §§ 2333(a) and 2339B(a)(1).

**281.    Plaintiffs are nationals of the United States or the estates, survivors or heirs of U.S. nationals.**

281.    QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 281, and therefore denies those allegations on that basis.

**282.    At the time of the attack that injured ISIS was an FTO.**

282.    The allegations of Paragraph 282 are incomplete and so vague and ambiguous that QNB cannot reasonably prepare a response, and therefore denies those allegations on that basis.

**283.    At that time, Defendants knew that ISIS was an FTO, that ISIS was engaged in terrorist activity (as defined in 8 U.S.C. § 1182(a)(3)(B)), and that it engaged in terrorism (as defined in 22 U.S.C. § 2656f(d)(2)).**

283.    The allegations of Paragraph 283 consist of Plaintiffs' legal conclusions that require no response. To the extent a response is required, QNB denies the allegations.

**284.    As Plaintiffs allege in detail above, Defendants provided material support to ISIS, its operatives, its predecessor organizations, and front organizations.**

284.    QNB denies the allegations of Paragraph 284 to the extent they apply to QNB. QNB denies that it has any reason to believe, based on information available to it, that Qatar Charity provided "material support to ISIS, its operatives, its predecessor organizations, and front organizations," and therefore denies those allegations on that basis.  QNB lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 284, and therefore denies those allegations on that basis.

**285.    That material support was integral to the ability of ISIS to carry out its terrorist attacks, including the attack that injured Plaintiffs.**

285.    The allegations of Paragraph 285 consist of Plaintiffs' legal conclusions that require no response. To the extent a response is required, QNB denies the allegations.

**286.    As Plaintiffs allege in detail above, the material support that Defendants provided to ISIS, its operatives, its predecessor organizations, and front organizations constituted acts of international terrorism, as defined in 18 U.S.C. § 2331(1).**

286.    QNB denies that it provided material support to ISIS, its operatives, its predecessor organizations, and front organizations.  QNB denies that it has any reason to believe, based on information available to it, that Qatar Charity provided "material support" to ISIS, its operatives, its predecessor organizations, and front organizations, and therefore denies those allegations on that basis. The remaining allegations of Paragraph 286 consist of Plaintiffs' legal conclusions that require no response. To the extent a response is required, QNB denies the allegations.

**287.   The material support that Defendants provided to ISIS, its operatives, its predecessor organizations, was a substantial and foreseeable factor in causing Plaintiffs' injuries.**

287.   QNB denies that it provided material support to ISIS, its operatives, and its predecessor organizations. QNB denies that it has any reason to believe, based on information available to it, that Qatar Charity provided material support to ISIS, its operatives, and its predecessor organizations, and therefore denies those allegations on that basis. The remaining allegations of Paragraph 287 consist of Plaintiffs' legal conclusions that require no response. To the extent a response is required, QNB denies the allegations.

**288.   Moreover, Plaintiffs' injuries were a foreseeable result of the material support and substantial assistance that Defendants provided to ISIS, its operatives, its predecessor organizations.**

288.   The allegations of Paragraph 288 consist of Plaintiffs' legal conclusions that require no response. To the extent a response is required, QNB denies the allegations.

**289.   As a direct and proximate result of the material support and substantial assistance that Defendants knowingly provided to ISIS, its operatives, its predecessor organizations, Plaintiffs have suffered significant physical, psychological, and emotional injuries.**

289.   The allegations of Paragraph 289 consist of Plaintiffs' legal conclusions that require no response. To the extent a response is required, QNB denies the allegations.

**290.   Defendants are therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.**

290.   The allegations of Paragraph 290 consist of Plaintiffs' legal conclusions that require no response. To the extent a response is required, QNB denies the allegations.

## PRAYER FOR RELIEF

QNB denies that Plaintiffs are entitled to the relief sought.

## DEMAND FOR JURY TRIAL

Defendant, QNB, demands trial by jury of all issues so triable as a matter of right.

## DEFENSES AND AFFIRMATIVE DEFENSES

### FIRST DEFENSE AND AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred for failure to state a claim upon which relief can be granted.

### SECOND DEFENSE AND AFFIRMATIVE DEFENSE

The Complaint must be dismissed because the Court lacks personal jurisdiction over QNB.

### THIRD DEFENSE AND AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, by Plaintiffs' lack of standing.

### FOURTH DEFENSE AND AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the intervening acts, wrongs, omissions and/or negligence of other individuals and entities.

### FIFTH DEFENSE AND AFFIRMATIVE DEFENSE

To the extent that Plaintiffs or the decedents have suffered injuries and/or damages, any such damages were not caused by the conduct of QNB, nor were Plaintiffs' and the decedents' alleged injuries a foreseeable consequence of the QNB's conduct.

### SIXTH DEFENSE AND AFFIRMATIVE DEFENSE

QNB had no prior awareness of the acts of the assailants that are alleged to have caused Plaintiffs' and the decedents' injuries, nor was the commission of any such act the intent of QNB.

### SEVENTH DEFENSE AND AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, because no act or omission or any agent, servant, or employee of QNB proximately caused any harm or damages to Plaintiffs and the decedents.

## EIGHTH DEFENSE AND AFFIRMATIVE DEFENSE

To the extent Plaintiffs and the decedents have suffered harm or damages by individuals alleged to be QNB's agents or employees, such persons were acting outside the scope of their supposed employment or agency.

## NINTH DEFENSE AND AFFIRMATIVE DEFENSE

QNB owed no legal duty to Plaintiffs. Even if QNB owed any such duty to Plaintiffs, no such duty was breached or violated by QNB.

## TENTH DEFENSE AND AFFIRMATIVE DEFENSE

To the extent Plaintiffs have already recovered or will recover from other persons for the injuries alleged in the Complaint, they are barred from seeking duplicative recovery from QNB.

## ELEVENTH DEFENSE AND AFFIRMATIVE DEFENSE

Plaintiffs' claims are time-barred.

## TWELFTH DEFENSE AND AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred by principles of international comity because QNB complied with applicable foreign laws during the relevant time.

## ADDITIONAL DEFENSES AND AFFIRMATIVE DEFENSES

Because the Complaint is pleaded in vague and conclusory terms and fails to conform to the pleading requirements of Federal Civil Procedure Rule 8, QNB cannot presently evaluate all of the defenses and affirmative defenses that may otherwise be applicable to one or more of the claims alleged therein. QNB expressly reserves the right to amend this Answer and raise additional Defenses and Affirmative Defenses on this basis, and on such basis as may otherwise be

established during discovery and by the evidence to be adduced.  QNB also adopts all defenses

and affirmative defenses of Qatar Charity to the extent applicable.


Dated: July 14, 2023                              Respectfully submitted,

                                                  */s/Daniel Alvarez Sox*
                                                  Edward M. Mullins
                                                  Daniel Alvarez Sox
                                                  **REED SMITH LLP**
                                                  200 South Biscayne Boulevard, 26th Floor
                                                  Miami, Florida 33131
                                                  Telephone: (786) 747-0200
                                                  Facsimile: (786) 747-0299
                                                  emullins@reedsmith.com
                                                  dsox@reedsmith.com

                                                  Michael G. McGovern (*pro hac vice*)
                                                  **ROPES & GRAY LLP**
                                                  1211 Avenue of the Americas
                                                  New York, New York 10036-8704
                                                  Telephone: (212) 596-9000
                                                  Facsimile: (212) 596-9090
                                                  michael.mcgovern@ropesgray.com

                                                  Douglas Hallward-Driemeier (*pro hac vice*)
                                                  **ROPES & GRAY LLP**
                                                  2099 Pennsylvania Avenue, NW
                                                  Washington, DC 20006-6807
                                                  Telephone: (202) 508-4600
                                                  Facsimile: (202) 508-4650
                                                  douglas.hallward-driemeier@ropesgray.com

                                                  *Counsel for Defendant Qatar National Bank*
                                                  *(Q.P.S.C.)*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on July 14, 2023, the foregoing document was served on all

parties via CM/ECF.

By: *<u>/s/Daniel Alvarez Sox</u>*
Daniel Alvarez Sox