**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

ARTHUR BARRY SOTLOFF Individually and
as the Administrator of the Estate of STEVEN
JOEL SOTLOFF; SHIRLEY GOLDIE
PULWER, and LAUREN SOTLOFF,

    *Plaintiffs*,

        v.

QATAR CHARITY and QATAR NATIONAL
BANK (Q.P.S.C.),

    *Defendants*.

Case No. 9:22-cv-80726 (DMM)

**PLAINTIFFS AND DEFENDANTS' JOINT MOTION TO VACATE THE COURT'S**
**MAY 30, 2023 OPINION AND ORDER [D.E. 70] AND TO DISMISS PLAINTIFFS'**
**COMPLAINT *WITH PREJUDICE* AND INCORPORATED MEMORANDUM OF LAW**

Pursuant to Fed. R. Civ. P. 60(b), the Parties jointly and respectfully move this Court to

vacate its May 30, 2023 Opinion and Order [D.E. 70] denying Defendants' motions to dismiss for

lack of personal jurisdiction and failure to state a claim.  The Parties also jointly and respectfully

move this Court, pursuant to Fed. R. Civ. P. 41(a)(2), to dismiss Plaintiffs' Complaint ***with***

***prejudice***.

As the Court will recall, its decision to deny Defendants' previously filed motions to

dismiss was premised in substantial part on Plaintiffs' allegation that they possessed a "wire

confirmation printout" showing that, on October 16, 2013, Defendant Qatar National Bank,

(Q.P.S.C) ("QNB") facilitated, on behalf of a representative of Defendant Qatar Charity ("QC"),

an $800,000 wire transfer to an individual named Fadhel al Salim, who allegedly ordered the

execution of Steven Sotloff less than a year later.  Following entry of the Court's order denying

Defendants' motions to dismiss, Defendants asked the Court to order production of the alleged "wire confirmation printout," which to date had not been produced.  Defendants explained that, despite diligent and comprehensive searches of their own databases, Defendants had been unable to find any record of the alleged wire transfer.

On June 8, 2023, Magistrate Judge Matthewman ordered Plaintiffs to produce the alleged "wire confirmation printout" (hereafter, the "Purported Transfer Record" or "PTR") to Defendants within three days of entry of a confidentiality order, and Plaintiffs ultimately did so on June 26, 2023.[1]  Immediately following receipt of the document, Defendants and their Counsel identified what they consider to be several indicia of forgery on the face of the document, including numerous misspellings of key banking terms, blanks where required information should have been included, and reference to a SWIFT Business Identifier Code ("BIC")[2] for QNB that did not exist in 2013 when the alleged transfer occurred and that SWIFT did not assign to QNB until October 25, 2017—more than four years after the alleged wire transfer by QNB to al Salim.  On August 17, 2023, Defense Counsel promptly brought these and other indicia of forgery to the attention of Counsel for Plaintiffs, who undertook their own investigation.

Counsel for the Parties have since met and conferred over these issues several times, both

---

[1] Plaintiffs initially designated the entirety of the Purported Transfer Record "Attorneys' Eyes Only," thereby preventing Defense Counsel from sharing the document with their clients.  After Defense Counsel demanded that they be able to provide at least portions of the Purported Transfer Record to their clients to allow for verification of some of the information contained in the PTR, Plaintiffs' Counsel produced the attached redacted version (Exhibit A), which they designated "Confidential."  For purposes of this Joint Motion, Plaintiffs have removed all confidentiality designations on the unredacted portions of the Purported Transfer Record.

[2] SWIFT, which is the acronym for the Society for Worldwide Interbank Financial Telecommunication, is a network that banks use for execution of financial transactions and transfer of funds between accounts worldwide.  To avoid confusion in the sending and receipt of interbank wire transfers worldwide, SWIFT assigns unique BICs to each bank that participates in its network.

in writing and in person.  The Parties now agree that, following Plaintiffs' investigation of the information brought to their attention by Defendants, they are unable to authenticate the document and that, because the document is central to Plaintiffs' Complaint, the Complaint should be dismissed with prejudice.  As another essential term of the Parties' resolution of this case—pursuant to which no payment or other consideration is being provided by either Defendant to the Plaintiffs in settlement or otherwise—the Parties have agreed that *vacatur* of the Court's May 30, 2023 Opinion and Order pursuant to Fed. R. Civ. P. 60(b) is both equitable and in the public interest.

## **BACKGROUND**

As Plaintiffs previously argued and this Court found in its May 30 Opinion and Order, Plaintiffs' claims and their invocation of the Court's personal jurisdiction depend centrally on an alleged $800,000 wire transfer on October 16, 2013, by an individual named "Jassem Abdullah" (allegedly acting for QC) from an account at QNB to an account at Ziraat Bank in Turkey in the name of Fadhel al Salim.  Plaintiffs alleged that, as shown on the "wire confirmation printout," al Salim picked up the $800,000 from a branch of Ziraat Bank in Istanbul, Turkey, signing his name and writing other information on the "wire confirmation printout" as proof of his receipt of the funds.  Plaintiffs further alleged that al Salim proceeded to use the funds to raise a brigade of terrorist fighters in Syria and that, less than a year after the alleged wire transfer, al Salim ordered the execution of Steven Sotloff.  In sum, the alleged wire transfer, as purportedly documented in the "wire confirmation printout," was the critical alleged link between Defendants and the murder of Steven Sotloff, as confirmed by Plaintiffs' Complaint, their opposition to Defendants' motions to dismiss, and the Court's rulings denying Defendants' motions to dismiss.  *See, e.g.,* Compl. [D.E. 1] ¶¶ 3, 39, 106-109, 226 (alleging QNB processed $800,000 wire transfer from QC

representative to al Salim—the man who allegedly ordered the murder of Steven Sotloff—and claiming that there is a signed "*wire confirmation printout with a handwritten statement*" documenting the transaction) (emphasis added); Dec. 23, 2022 Plaintiffs' Opposition to Defendants' Motions to Dismiss [D.E. 56] at 1, 4-5, 7, 9, 11, 13, 18-22, 24-25, 27-32 (citing the alleged $800,00 transfer and the "*signed . . . handwritten note on the wire confirmation printout*" in arguing that the Court has personal jurisdiction and that Plaintiffs had stated valid claims for relief) (emphasis added); *see also* May 30, 2023 Order Denying Defendants' Motions to Dismiss [D.E. 70] at 37-53 (finding Court's exercise of personal jurisdiction over QNB and QC appropriate because "Plaintiffs plausibly allege that QNB knowingly facilitated the $800,000 payment to a terrorist, al Salim" and that "QC paid al Salim the $800,000"); *see also* June 23, 2023 Order Regarding Motions for Confidentiality [D.E. 87] at 3 (noting that "the wire transfer allegation is at the heart of this case").

The "wire confirmation printout" that Plaintiffs' Counsel cited in support of Plaintiffs' Complaint is a single, one-page document allegedly created by Ziraat Bank and written in Turkish, a document that, as noted above, Plaintiffs' Counsel produced to Defendants pursuant to an order of the Court.  *See* Exhibit A, Sotloff 00007–Sotloff 00009 (redacted version of Purported Transfer Record, dated Oct. 16, 2013); *see also* June 8, 2023 Paperless Order [D.E. 80] (giving Plaintiffs' Counsel three days from entry of the confidentiality order to produce the Purported Transfer Record to Defense Counsel).

Upon receipt of the Purported Transfer Record, Defendants and their Counsel immediately identified what they consider several indicia of forgery.  For example, the Purported Transfer Record contains numerous misspellings of basic banking terms, including multiple misspellings of the Turkish word for "bank branch."  Further, it identifies the "Transaction Place" as the

"DOHA BRANCH" of QNB, when in fact QNB had dozens of branches and offices in and around Doha at the time of the alleged transfer and none of them was named the "DOHA BRANCH." The Purported Transfer Record also leaves blank the space calling for entry of an International Bank Account Number ("IBAN") [3] for al Salim's supposed account at Ziraat Bank, despite the fact that use of IBANs for wire transfers to customer accounts in Turkey became mandatory in January 2010. The Purported Transfer Record also contains a SWIFT BIC for QNB that did not exist in 2013 when the alleged transfer occurred; rather, SWIFT—the registration authority for issuing BICs—did not assign that particular BIC to QNB until October 25, 2017—more than four years after the supposed date of the alleged wire transfer.

Immediately after this lawsuit was filed, and long before Plaintiffs were ordered to produce the Purported Transfer Record to Defendants in discovery, Defendants began searching diligently for any evidence of the wire transfer alleged in the Complaint. They found none. Defense Counsel also contacted Ziraat Bank, which likewise confirmed that it had no record of any such wire transfer. Defendants maintain that neither they nor Ziraat Bank could find any such record of the alleged wire transfer for the simple reason that no such wire ever happened and the alleged "wire confirmation printout" of that transfer is a forgery. *See* Part C, *infra*.

For their part, Plaintiffs maintain that there is insufficient basis to conclude that the Purported Transfer Record is forged. However, in light of the information provided by Defendants, and despite a wide-ranging investigation in response, Plaintiffs have been unable to

---

[3] An IBAN is a standard international numbering system that identifies individual bank accounts worldwide and is commonly used in cross-border transfers. While some countries, such as the United States, use but do not require IBANs for wire transfers, they are mandatory in other countries, including Turkey, which made the use of IBAN numbers mandatory for all wire transfers as of January 1, 2010. *See* IBAN, *IBAN Mandatory for International and Domestic Payments*, https://www.iban.com/iban-mandatory.

authenticate the document.  *See* Part C, *infra*.

Because Plaintiffs' claims and their invocation of this Court's personal jurisdiction depend on Plaintiffs' ability to authenticate the PTR as proof that such a wire transfer occurred, the Parties have agreed that Plaintiffs' Complaint against QNB and QC should be dismissed with prejudice. Moreover, as an essential element of their agreed resolution of this case, the Parties also have agreed that it is both equitable and in the public interest that the Court vacate its May 30, 2023 Opinion and Order pursuant to Fed. R. Civ. P. 60(b).

## ARGUMENT

### A.    Legal Standard for *Vacatur* Under Fed. R. Civ. P. 60(b)

Pursuant to Fed. Rule Civ. P. 60(b), "the court may relieve a party or its legal representative from a final judgment, order, or proceeding" for a number of reasons, including where "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5).  The Court also may vacate an order under Fed. R. Civ. P 60(b)(6) for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6).[4]  Courts determine the propriety of granting *vacatur* by weighing the benefits to the parties and the public in receiving such relief against the harm to the public by way of losing a judicial decision.  *See Hartford Cas. Ins. Co. v Crum & Forster Specialty Ins. Co.*, 828 F.3d 1331,

---

[4] Another subsection of Rule 60(b) provides for *vacatur* in the case of "misrepresentation, or misconduct by an opposing party." Fed. R. Civ. P. 60(b)(3). Defendants accept for purposes of this Motion the assurances of Plaintiffs' Counsel that, if the Purported Transfer Record is forged, they and the Sotloffs are victims, as opposed to perpetrators, of that forgery. In any event, "Rule 60(b)(3) applies to *unintentional* misconduct or misrepresentations as well as intentional ones." *Scott v. United States*, 81 F. Supp. 3d 1326, 1339 (M.D. Fla. 2015), *aff'd*, 890 F.3d 1239 (11th Cir. 2018) (emphasis added) (collecting cases); *see also United States v. Lee*, No. 4:97-cr-00243-02 KGB, 2020 U.S. Dist. LEXIS 116167, at \*24 (E.D. Ark. July 2, 2020) (citing *United States v. One Douglas A-26B Aircraft*, 662 F.2d 1372, 1374 n.6 (11th Cir. 1981)) (noting that the Eleventh Circuit does not require misrepresentation to be intentional under Rule 60(b)(3)).  Again, Defendants are not alleging any intentional misrepresentation or misconduct by Plaintiffs or their Counsel, nor is that required under Rule 60(b)(3) in this Circuit. Plaintiffs dispute that any misconduct or misrepresentations within the meaning of Rule 60(b)(3), unintentional or otherwise, occurred, but agree that *vacatur* is merited under Rule 60(b)(5) or (b)(6).

1336 (11th Cir. 2016); *see Core Bus. Fin., Inc. v. K.E. Martin Dev. of Pasco, Inc.,* No. 8:19-cv-279, 2021 WL 1516192, at *1 (M.D. Fla. Apr. 16, 2021) (same).  This is an equitable inquiry determined on a case-by-case basis.  *Hartford Cas. Ins.*, 828 F.3d at 1336.  "When proper consideration is given to the interests of the parties, the judicial system, and the public taken together, vacatur may still prove an appropriate remedy even if the public's interest in the preservation of precedent is not affirmatively advanced when considered in isolation." *Id.* at 1337.

**B.    The Alleged $800,000 Wire Transfer—and Thus the Authenticity of the Purported Transfer Record—Is Central to Plaintiffs' Claims and Their Invocation of This Court's Personal Jurisdiction**

The Parties and the Court have acknowledged that the Purported Transfer Record is essential to Plaintiffs' claims against QNB and QC, as well as to Plaintiffs' invocation of the Court's personal jurisdiction over the Defendants.  Indeed, the Purported Transfer Record is the only alleged documentary "evidence" that Defendants were allegedly responsible for providing the funding that allowed al Salim to raise his brigade and, ultimately, to order the gruesome murder of Steven Sotloff.  Plaintiffs' fundamental dependence on the alleged $800,000 wire transfer is apparent from the Complaint and from their oppositions to Defendants' motions to dismiss.[5]  The Court similarly relied on the alleged wire transfer in denying Defendants' motions to dismiss[6] and,

---

[5] *See, e.g.*, Compl. [D.E. 1] ¶ 3 ("ISIS would eventually behead Steven Sotloff on August 31, 2014, at the written direction of ISIS judge Fadhel al Salim . . . a man to whom the members of this conspiracy paid $800,000 ten months earlier."); *id.* ¶ 39 ("[I]n 2013 QNB processed the $800,000 wire transfer to the individual who ordered Steven Sotloff's execution."); *id.* ¶ 109 ("Al Salim signed (and marked with his thumbprint) a copy of the wire confirmation printout with a handwritten statement acknowledging receipt of USD 800,000 from 'Mr. Jassem Abdullah, representative of Qatar Charity.'"); Dec. 23, 2022 Plaintiffs' Opposition to Defendants' Motions to Dismiss [D.E. 56] at 1, 4-5, 7, 9, 11, 13, 18-22, 24-25, 27-32 (citing the alleged $800,000 transfer and the "***signed . . . handwritten note on the wire confirmation printout***" in arguing that the Court has personal jurisdiction and that Plaintiffs had stated valid claims for relief) (emphasis added).

[6] *See, e.g.*, May 30, 2023 Order Denying Defendants' Motions to Dismiss [D.E. 70] at 37-53 (finding Court's exercise of personal jurisdiction over QNB and QC appropriate because

even more recently, the Court pointedly observed that "***the wire transfer allegation is at the heart***

***of this case***."   June 23, 2023 Order Regarding Motions for Confidentiality Order [D.E. 87] at 3

(emphasis added).

### C.   Defendants Maintain that the Purported Transfer Record Is a Forgery, and Plaintiffs Have Been Unable to Authenticate It, Despite Their Best Efforts

In Defendants' view, several anomalies apparent on the face of the Purported Transfer

Record make obvious that the document is forged.  *First*, the Turkish word for "bank branch"—

"şubesi"—is misspelled ***three out of four times*** as "şubasi," which is not even a word in Turkish.

In yet another location on the document, the Turkish word for "branch" is similarly misspelled as

"şuba," which likewise is not a word in Turkish.  Also, the Turkish word for "only"—"yalnız"—

is misspelled as "yalniz" (putting a "dot" over the fifth letter, which converts it to a different letter

in the Turkish alphabet and a non-existent word in Turkish).  And al Salim's supposed address in

Istanbul is misspelled as "TURCÜMAN SITISI," whereas the correct name of the apartment

complex is "T<u>E</u>RCÜMAN S<u>İ</u>T<u>E</u>S<u>İ</u>."  Defendants contend that such anomalies indicate that the

document is forged; it is not reasonable to expect that a Turkish bank of Ziraat Bank's international

stature did not know how to spell "bank branch" in Turkish (its native language) and would

generate a bank template replete with Turkish misspellings.

*Second*, the Purported Transfer Record identifies the "Transaction Place," *i.e.,* the location

---

"Plaintiffs plausibly allege that QNB knowingly facilitated the $800,000 payment to a terrorist, al Salim" and that "QC paid al Salim the $800,000"); *id.* at 57, 62 (finding Plaintiffs' allegations adequate under Rule 12(b)(6) because (i) "it was . . . reasonably foreseeable that by giving a terrorist $800,000 to raise an ISIS brigade, it would result in him committing acts of terror, like Sotloff's execution," and (ii) the "connection between Defendants' transfer of $800,000 to al Salim and his execution of Sotloff 10 months later is extraordinarily direct"); *see also* June 13, 2023 Order Denying Defendants' Motion for Certification for Interlocutory Appeal and Stay [D.E. 83], at 3-4 (finding Court has personal jurisdiction over QNB and QC because the alleged $800,000 wire satisfies both conspiracy jurisdiction and the Effects Test).

from which the supposed wire transfer originated, as the "DOHA BRANCH" of QNB.  In 2013, however, QNB had dozens of branches and offices in and around the capital city of Doha, none of which was named the "DOHA BRANCH."  In Defendants' view, the Purported Transfer Record is equivalent to a purported record of a wire transfer from the "NEW YORK CITY BRANCH" of Citibank.

*Third*, the space on the PTR calling for entry of the customer's IBAN, a key identifier in international wire transfers *required for wire transfers to and from Turkey*, likewise is blank.  Thus, if QNB had facilitated the alleged wire transfer (which it did not), it would have been required to include al Salim's IBAN at Ziraat Bank in the wire instructions, or else the wire would have been rejected.  In Defendants' view, this means the only explanation for the blank IBAN in the PTR is the extremely unlikely scenario that the putative Ziraat Bank employee who completed the Purported Transfer Record template possessed, but chose not to include, al Salim's IBAN at Ziraat Bank, despite the Ziraat Bank template expressly calling for entry of the customer's IBAN and specifically providing a space for that information.  Also notably absent from the PTR is any mention of a U.S. correspondent bank, the supposed "nexus" between the alleged wire transfer and the Court's assertion of personal jurisdiction over the Defendants in this case.

*Fourth*, the Purported Transfer Record lists a BIC for QNB that *did not exist in 2013* when the alleged transfer occurred.  In fact, the registration authority for issuing BICs—SWIFT—did not assign that particular BIC to QNB until October 25, 2017—*more than four years after* the supposed date of the alleged wire transfer.  *See* Exhibit A, Sotloff 00007 – Sotloff 00009 ("Confidential" version of Purported Transfer Record, dated Oct. 16, 2013 and identifying QNB's BIC as "QNBAQAQAFTD"); Exhibit B, QNB00000001 (Oct. 25, 2017 email from SWIFT to QNB, authorizing use of BIC QNBAQAQAFTD with an activation date of Nov. 4, 2017); Exhibit

C, QNB00000002 - QNB00000003 (Aug. 16, 2023 email from SWIFT to QNB, confirming BIC QNBAQAQAFTD was first authorized by SWIFT on Oct. 25, 2017, and made active on Nov. 4, 2017).  In Defendants' view, a careless forger would have simply "Googled" the current BICs for QNB and acted on the mistaken assumption that the same BICs existed back in October 2013.  As the attached correspondence from SWIFT conclusively demonstrates, however, the BIC reflected in the Purported Transfer Record did not exist in 2013, establishing to Defendants that the document is a forgery.  *See, e.g.*, Katherine Koppenhaver, *Attorney's Guide to Document Examination, Part IV—Detecting Fraud* (2001) (proof of forgery exists where document includes information not available at the time document is alleged to have been created).  Moreover, SWIFT has further confirmed that, had a wire transfer instruction included the "QNBAQAQAFTD" BIC back in October 2013, SWIFT would have refused to validate the transfer.  *See* Exhibit D (QNB00000004 - QNB00000006) (August 31, 2023 email from SWIFT to QNB, confirming again that BIC QNBAQAQAFTD was first activated on Nov. 4, 2017, and that a wire transfer using that BIC before Nov. 4, 2017 "would not have been successfully validated").

In addition, Ziraat Bank, which supposedly received the wire reflected in the Purported Transfer Record, has confirmed that it likewise is unable to identify any record of the alleged transfer.

In sum, neither bank allegedly involved in sending or receiving the alleged wire transfer has been able to locate any record of this transaction; the Purported Transfer Record on its face contains several indicia that it is forged; an independent third party—SWIFT—has confirmed that the BIC listed on the document did not exist until more than four years after the wire transfer supposedly occurred and that any wire transfer instruction bearing that as-yet-unauthorized BIC in 2013 would not have been validated; and Plaintiffs' efforts to authenticate the PTR have been

unsuccessful.

For their part, Plaintiffs conducted an investigation of the Purported Transfer Record prior to filing their Complaint, which included interviewing numerous witnesses. Plaintiffs' certified translations of the PTR corrected the misspellings later identified by Defendants without identifying them.  Additionally, the SWIFT records provided by Defendants' Counsel in August 2023 were not public at the time of filing.  And immediately after Defendants raised their concerns regarding the Purported Transfer Record in August, Plaintiffs' Counsel undertook a further investigation to verify and respond to Defendants' various points.  Plaintiffs' Counsel consulted with multiple witnesses and experts.  Despite extensive investigation, Counsel for Plaintiffs have been unable to authenticate the Purported Transfer Record.  Because of the expected difficulty in authenticating this document at trial, Plaintiffs now seek the relief requested in this motion. Plaintiffs will pursue other avenues of justice available to them, including, *inter alia*, enforcement of their judgment against the Syrian Arab Republic.  *See Sotloff v. Syrian Arab Republic*, No. 16-cv-725 (TJK), 2023 WL 2727599, at *1 (D.D.C. Mar. 31, 2023).

### D.     The Parties Agree that the Court Should Vacate Its May 30, 2023 Opinion and Order and Dismiss Plaintiffs' Complaint with Prejudice

The Parties agree that the equities heavily favor *vacatur* of the Court's May 30 Opinion and Order, as the benefits to all Parties and the Court in vacating the decision far outweigh the harm to the public by way of losing an opinion of limited general applicability.  *See Hartford Cas. Ins.*, 828 F.3d at 1336.

*First*, the Parties are best served in vacating the May 30 Opinion and Order.  They are in mutual agreement that the Purported Transfer Record, upon which the Plaintiffs' claims depend and upon which the Court relied to exercise personal jurisdiction over the Defendants, is unreliable and potentially forged.  Plaintiffs, in light of the information provided by Defendants, have been

unable to authenticate the document and, thus, have determined that it is not in their interest to continue prosecuting this action. Accordingly, the Parties jointly move this Court to dismiss Plaintiffs' Complaint with prejudice and to vacate the May 30 Opinion and Order. *See Johnson v. Specialized Loan Servicing, LLC*, No. 3:16-cv-178, 2019 WL 8437149, at *2 (M.D. Fla. Sept. 25, 2019) (finding *vacatur* appropriate because, among other reasons, both parties jointly seek the relief).

*Second*, *vacatur* advances the public's interest and will not otherwise cause harm to the public by loss of the Court's May 30 Opinion and Order. In *Hartford*, the Eleventh Circuit gave particular weight to the fact that, as here, an essential term of the parties' resolution of the case was *vacatur* of certain court orders. *See Hartford Cas. Ins.*, 828 F.3d at 1337. In particular, the court was persuaded by the reasoning of its sister circuits that "the equities plainly favor vacatur" when weighing the "concrete and individualized harm" to the parties in not having their dispute resolved in the way that they jointly seek against the "diffuse and slight harm to the public interest in preserving precedent." *Id*. at 1335 (citing *Motta v. Dist. Dir. of INS*, 61 F.3d 117, 118 (1st Cir. 1995) (per curiam); *Major League Baseball Props., Inc. v. Pac. Trading Cards, Inc.*, 150 F.3d 149, 150-52 (2d Cir. 1998)). Here, the Parties agree that *vacatur* is a critical component of their resolution of this litigation and, thus, there is "concrete and individualized harm" to the Parties by having the Court preserve an order that undermines the relief that both Parties find jointly appropriate. In contrast, there is only "diffuse and slight harm" to the public by vacating the May 30 Opinion and Order. That Order relates to a specific set of factual allegations concerning a unique set of jurisdictional questions tied to two particular foreign entities, meaning vacating the Court's decision will have only a limited, if any, impact on the public. *See Heartland Catfish Co., Inc. v. Navigators Specialty Ins.*, No. 15-cv-368, 2018 WL 1913549, at *2 (S.D. Ala. Mar. 6, 2018)

(finding the "slight value" in preserving the court's decision on questions of state contract law related to a dispute between foreign companies "strongly outweighed by the benefits to the parties in settling the litigation and to the public in preserving judicial resources"); *see also River House Partners, LLC v. Grandbridge Real Est. Cap. LLC,* 2018 WL 813903, at *1 (M.D. La. Feb. 9, 2018) (balancing the equities and granting motion to vacate because, among other reasons, "no third parties will be impacted by the vacatur").

*Third*, to not vacate the decision would result in the Court having issued an improper advisory opinion premised upon hypothetical facts. *See Flast v. Cohen*, 392 U.S. 83, 95 (1968) (explaining that "no justiciable controversy is presented . . . when the parties are asking for an advisory opinion, [or] when the question sought to be adjudicated has been mooted by subsequent developments"); *Roventini v. Pasadena Indep. Sch. Dist.*, 183 F.R.D. 500, 502 (S.D. Tex. 1998) (citing *Flast*, 392 U.S. at 95) (noting that because "[t]here is no true case or controversy regarding the false material factual allegations upon which the ruling was based," *vacatur* is appropriate because "the Court was asked to render an advisory opinion in violation of Article III"); *cf. United States v. Cook*, 795 F.2d 987, 994 (Fed. Cir. 1986) (vacating an order tolling the statute of limitations in an FLSA action because potential opt-in plaintiffs were not yet before the court, and thus the order was an impermissible advisory opinion that "must be vacated . . . as prematurely issued"). Here, the Court credited the allegations of the Complaint and accordingly issued the May 30 Opinion and Order, which was premised on a material (in fact, central) allegation that the Parties now are in mutual agreement cannot be relied upon; thus, the earlier order should be vacated, especially in light of the Parties' agreement on *vacatur*.

Finally, Defendants assert an additional ground for *vacatur*. Where, as here, courts have premised their decisions upon factual allegations that later proved to be false, they have granted

*vacatur*. For example, in *Roventini*, a federal district court granted the parties' Rule 60(b) joint motion to vacate the court's prior memorandum opinion and order that denied in part defendants' motion to dismiss because the court had "relied on various material allegations in the Second Amended Complaint that were false," and those "false allegations, coupled with the publication of the Court's Memorandum Opinion and Order ha[d] caused [defendants] to suffer significant injury to their reputations." 183 F.R.D. at 502. Given the memorandum opinion and order "was, in material part, premised on a version of events that was without basis in fact," the court found *vacatur* to be appropriate relief. *Id.* Here, like in *Roventini*, the Court and the public are not— and cannot be—well served by the Court's maintaining the May 30 Opinion and Order. That order substantially relies on factual allegations premised on a potentially forged document that Plaintiffs are unable to authenticate in a litigation that Defendants allege has caused significant reputational damage to Defendants and that will never be fully adjudicated. Plaintiffs dispute that any misconduct or misrepresentations within the meaning of Rule 60(b)(3), unintentional or otherwise, occurred, and therefore do not join Defendants in arguing that *Roventini* is applicable. However, Plaintiffs agree that *vacatur* is merited under Rule 60(b)(5) or (b)(6).

In sum, giving proper consideration to the interests of the Parties, the integrity of the judicial system, and the public taken together, *vacatur* is the appropriate remedy here. *See Hartford Cas. Ins.*, 828 F.3d at 1337.

## CONCLUSION

For the reasons set forth herein, the Parties jointly and respectfully request that the Court vacate its May 30, 2023 Opinion and Order [D.E. 70] and dismiss Plaintiffs' Complaint with prejudice.

Dated: September 22, 2023                    Respectfully submitted,


By: /s/ *George A. Minski*                    /s/ *Edward M. Mullins*
George A. Minski, Esq.                        Edward M. Mullins
FBN. 724726                                   Daniel Alvarez Sox
**LAW OFFICES OF GEORGE A.**                  **REED SMITH LLP**
**MINSKI, P.A**.                              200 South Biscayne Boulevard, 26th Floor
*Co-Counsel for Plaintiffs*                   Miami, Florida 33131
2500 Hollywood Boulevard                      Telephone: (786) 747-0200
Hollywood, FL 33020                           Facsimile: (786) 747-0299
Dade: 305-792-2200                            emullins@reedsmith.com
Broward: 954-362-4214                         dsox@reedsmith.com
Email: gminski@minskilaw.com
Primary email:                                Michael G. McGovern (*pro hac vice*)
dgomez@minskilaw.com                          **ROPES & GRAY LLP**
                                              1211 Avenue of the Americas
                                              New York, New York 10036-8704
**PERLES LAW FIRM PC**                        Telephone: (212) 596-9000
Steven R. Perles*                             Facsimile: (212) 596-9090
Joshua K. Perles*                             michael.mcgovern@ropesgray.com
Edward Macallister*
Emily Amick*                                  Douglas Hallward-Driemeier (*pro hac vice*)
816 Connecticut Ave. NW,                      **ROPES & GRAY LLP**
12th Floor                                    2099 Pennsylvania Avenue, NW
Washington D.C. 20006                         Washington, DC 20006-6807
Telephone: 202-955-9055                       Telephone: (202) 508-4600
                                              Facsimile: (202) 508-4650
*Motions for admission *pro hac               douglas.hallward-driemeier@ropesgray.com
vice* filed or to be filed
                                              *Counsel for Defendant Qatar National Bank*
                                              *(Q.P.S.C.)*

                                              Harout J. Samra
                                              **DLA Piper LLP (US)**
                                              200 South Biscayne Boulevard, Suite 2500
                                              Miami, FL 33131
                                              Tel: 305.423.8534
                                              Email: harout.samra@dlapiper.com

                                              John M. Hillebrecht*
                                              Kevin Walsh*
                                              Jessica A. Masella*
                                              Michael G. Lewis*
                                              *Pro Hac Vice
                                              **DLA Piper LLP (US)**

1251 Avenue of the Americas, 27th Floor
New York, NY 10020
Tel: 212.335.4500
Email:john.hillebrecht@us.dlapiper.com
kevin.walsh@us.dlapiper.com
jessica.masella@us.dlapiper.com
michael.lewis@us.dlapiper.com

*Counsel for Qatar Charity*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on September 22, 2023, a true and correct copy of the foregoing was served via transmission of Notices of Electronic Filing generated by CM/ECF on all counsel or parties of record.

*/s/ Edward M. Mullins*
Edward M. Mullins
